**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HUMANA INC.<br><br>Plaintiff,<br><br>v.<br><br>ACTAVIS ELIZABETH, LLC, ACTAVIS HOLDCO US, INC., ACTAVIS PHARMA, INC., AKORN, INC., AMNEAL PHARMACEUTICALS, INC., APOTEX CORP., BRECKENRIDGE PHARMACEUTICAL, INC., DR. REDDY'S LABORATORIES INC., ENDO INTERNATIONAL PLC, EPIC PHARMA, LLC, FOUGERA PHARMACEUTICALS INC., GLENMARK PHARMACEUTICALS INC., USA, HERITAGE PHARMACEUTICALS INC., HI-TECH PHARMACAL CO., INC., LANNETT COMPANY, INC., LUPIN PHARMACEUTICALS, INC., MAYNE PHARMA (USA) INC., MORTON GROVE PHARMACEUTICALS, INC., MYLAN PHARMACEUTICALS, INC., MYLAN INC., MYLAN, N.V., NOVARTIS AG, PAR PHARMACEUTICAL, INC., PAR PHARMACEUTICAL COMPANIES, INC., PERRIGO COMPANY PLC, PERRIGO PHARMACEUTICALS COMPANY, PERRIGO NEW YORK, INC., SANDOZ, INC., SUN PHARMACEUTICAL INDUSTRIES, INC., TARO PHARMACEUTICAL INDUSTRIES LTD., TARO PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICALS USA, INC., UDL LABORATORIES INC., UPSHER-SMITH LABORATORIES, LLC, WEST-WARD PHARMACEUTICALS CORP., WOCKHARDT USA LLC, and ZYDUS PHARMACEUTICALS (USA) INC.<br><br>Defendants. | Case No. ________________<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>**Redacted Version** |

## Table of Contents:

**I. NATURE OF THE CASE ... 3**

II. **THE DRUGS SUBJECT TO THE CONSPIRACY ... 7**

**III. JURISDICTION AND VENUE ... 9**

**IV. PARTIES ... 10**

A. PLAINTIFF ... 10
B. DEFENDANTS ... 12
C. CO-CONSPIRATORS ... 26

**V. REGULATORY AND ECONOMIC BACKGROUND ... 27**

A. GENERIC DRUGS SHOULD PROVIDE LOWER-PRICED OPTIONS FOR PURCHASERS ... 27
B. THE PRESCRIPTION DRUG MARKET ... 29
C. THE MARKET FOR GENERIC DRUGS IS HIGHLY SUSCEPTIBLE TO COLLUSION ... 29

**VI. THE FEDERAL AND STATE INVESTIGATIONS OF THE PRICE-FIXING CONSPIRACY ... 32**

A. CONGRESS LAUNCHED AN INVESTIGATION INTO GENERIC PRICE HIKES ... 32
B. THE DOJ INVESTIGATES CRIMINAL GENERIC DRUG COLLUSION ... 34
C. STATE ATTORNEYS GENERAL LAUNCHED THEIR OWN INVESTIGATION INTO GENERIC DRUG PRICE HIKES 38

**VII. DEFENDANTS' EXTENSIVE INTER-FIRM COMMUNICATIONS ... 41**

**VIII. DEFENDANTS SIGNAL TO COMPETITORS THEIR INTENT TO SET AND MAINTAIN SUPRACOMPETITIVE PRICES ... 55**

**IX. INDUSTRY ANALYSTS SUSPECT COLLUSION ... 63**

**X. THERE IS NO JUSTIFICATION FOR THE EXTRAORDINARY PRICE INCREASES OF THE SUBJECT DRUGS ... 64**

**XI. THE OVERARCHING GENERIC DRUG CONSPIRACY ... 64**

**XII. ALLEGATIONS SPECIFIC TO EACH OF THE SUBJECT DRUGS ... 66**

A. AMITRIPTYLINE ... 66
B. BACLOFEN ... 68
C. BENAZEPRIL ... 71
D. CLOBETASOL ... 71
E. CLOMIPRAMINE ... 76
F. DIGOXIN ... 77
G. DIVALPROEX ... 79
H. DOXYCYCLINE ... 79
I. LEFLUNOMIDE ... 81
J. LEVOTHYROXINE ... 84
K. LIDOCAINE ... 87
L. NYSTATIN ... 88
M. PRAVASTATIN ... 90
N. PROPRANOLOL ... 90
O. URSODIOL ... 97
P. VERAPAMIL ... 98

**XIII. HUMANA'S PURCHASES AND ANTITRUST INJURY ..... 99**

A. AMITRIPTYLINE ..... 99
B. BACLOFEN ..... 100
C. BENAZEPRIL ..... 100
D. CLOBETASOL ..... 100
E. CLOMIPRAMINE ..... 101
F. DIGOXIN ..... 101
G. DIVALPROEX ..... 101
H. DOXYCYCLINE ..... 101
I. LEFLUNOMIDE ..... 102
J. LEVOTHYROXINE ..... 102
K. LIDOCAINE ..... 103
L. NYSTATIN ..... 104
M. PRAVASTATIN ..... 104
N. PROPRANOLOL ..... 104
O. URSODIOL ..... 104
P. VERAPAMIL ..... 105

**XIV. INTERSTATE TRADE AND COMMERCE ..... 106**

**XV. TOLLING AND FRAUDULENT CONCEALMENT ..... 107**

**XVI. CLAIMS FOR RELIEF ..... 108**

**XVII. JURY TRIAL DEMANDED ..... 261**

Plaintiff Humana Inc. ("Humana") files this Complaint against Defendants Actavis Elizabeth, LLC, Actavis Holdco US, Inc., Actavis Pharma, Inc., Akorn, Inc., Amneal Pharmaceuticals, Inc., Apotex Corp., Breckenridge Pharmaceutical, Inc., Dr. Reddy's Laboratories Inc., Endo International plc, Epic Pharma, LLC, Fougera Pharmaceuticals Inc., Glenmark Pharmaceuticals Inc., USA, Heritage Pharmaceuticals Inc., Hi-Tech Pharmacal Co., Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma (USA) Inc., Morton Grove Pharmaceuticals, Inc., Mylan Pharmaceuticals, Inc., Mylan Inc., Mylan, N.V., Novartis AG, Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Perrigo Company plc, Perrigo Pharmaceuticals Company, Perrigo New York, Inc., Sandoz, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceutical Industries Ltd., Taro Pharmaceuticals USA, Inc., Teva Pharmaceuticals USA, Inc., UDL Laboratories Inc., Upsher-Smith Laboratories, LLC, West-Ward Pharmaceuticals Corp., Wockhardt USA LLC, and Zydus Pharmaceuticals (USA) Inc. (collectively "Defendants") and alleges as follows based on personal knowledge as to the facts pertaining to it, and upon information and belief as to all other matters:

## I. NATURE OF THE CASE

1. Humana brings this action to recover damages it incurred from egregious overcharges it paid for certain widely-used generic drugs, arising from a far-reaching conspiracy among Defendants and others to blatantly fix the price of such drugs. This conspiracy increased the profits of Defendants and others working with them at the expense of consumers, the government, and private payors such as Humana.

2. In the pharmaceutical industry, generic drug entry predictably and typically results in increased price competition, which reduces the price of drugs for wholesalers, retailers, consumers and third-party payers such as Humana. Defendants here, however, along with other generic drug manufacturers, conspired to manipulate the relevant markets, allocate these markets among

themselves, and obstruct generic competition. They also agreed to fix, increase, stabilize, and/or maintain the price of the drugs specified below, along with other drugs.

3. Defendants orchestrated their conspiracy through secret communications and meetings, both in private and at public events, like trade association meetings held by the Generic Pharmaceutical Association (GPhA) (n/k/a Association for Accessible Medicines), the Healthcare Distribution Management Association ("HDMA") (n/k/a Healthcare Distribution Alliance), Efficient Collaborative Retail Marketing ("ECRM"), and the National Pharmacy Forum ("NPF"), among others.

4. The conduct alleged in this Complaint is the subject of numerous federal and state investigations.

5. Two executives of Defendant Heritage Pharmaceuticals, Inc. have pleaded guilty to participating in a conspiracy to fix prices of Doxycycline—one of the drugs that is the subject of this Complaint—as well as Glyburide, between at least 2013 and 2015.

6. The Attorneys General of 47 states, Washington, D.C., and Puerto Rico have filed a civil enforcement action against most of the Defendants here, alleging agreements to fix prices of 15 drugs, including 4 that are the subject of this Complaint: Doxycycline, Leflunomide, Nystatin, and Verapamil. Plaintiff States' Consolidated Amended Complaint, Case No. 2:17-cv-03768-CMR, ECF No. 14 (E.D. Pa.) ("AG Complaint"). The AG Complaint is the result of, among other things, information gathered in response to Civil Investigative Demands that would otherwise remain private. The specific allegations in the AG Complaint do not exhaust the generic drugs and manufacturers of such drugs involved in the price-fixing conspiracy. Rather, the AG Complaint

alleges an "overarching conspiracy … to minimize if not thwart competition across the generic drug industry."[1] It also alleges that the investigation is continuing as to other drugs and manufacturers.[2]

7. The federal investigation is likewise ongoing. In a filing in *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF 561-1 (E.D. Pa. Oct. 27, 2017), the United States Department of Justice ("DOJ") stated that its investigation has revealed evidence that a large number of generic drugs, and manufacturers of such drugs that have not yet been the subject of federal enforcement actions, are implicated in price-fixing agreements.

8. The DOJ has convened a grand jury to investigate a number of Defendants here. In connection with its investigation, the DOJ has subpoenaed most or all of Defendants and has executed search warrants at the corporate offices of two Defendants, as alleged in more detail below.

9. Predictably, the results of the conspiracy alleged in this Complaint were severe and resulted in unprecedented increases in the price of the drugs subject to this Complaint (collectively the "Subject Drugs"), such as: (1) 2,400% for Amitriptyline; (2) 600% for Baclofen; (3) 400% for Benazepril; (4) 1,800% for Clobetasol; (5) 2,600% for Clomipramine; (6) 630% for Digoxin; (7) 700% for Divalproex; (8) 8,000% for some forms of Doxycycline; (9) 1,300% for Leflunomide; (10) 230% for Levothyroxine; (11) 300% for some forms of Lidocaine; (12) 100% for Nystatin; (13) 500% for Pravastatin; (14) 1,000% for Propranolol; (15) 1,000% for Ursodiol; and (16) 100% for Verapamil.

10. These price increases are consistent with Medicare Part D price increases found by the Government Accountability Office ("GAO") for many of the Subject Drugs.[3] Among the drugs for which GAO identified "extraordinary price increases" (defined as a price increase of 100% or

---

[1] AG Compl. ¶ 2.
[2] *Id.* at ¶ 3.
[3] Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases, GAO-16-706 (August 2016) ("the GAO Report").

more between the first quarter of one year and the first quarter of the subsequent year) between the first quarter of 2011 and the first quarter of 2015 were Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Digoxin, Divalproex, Doxycycline (in Hyclate form), Lidocaine, Nystatin, Pravastatin, and Ursodiol.[4]

11. Defendants engaged in a broad, overarching conspiracy to inflate the prices of their generic drug portfolios *en masse*. They implemented this conspiracy by fixing prices of individual drugs among the co-conspirators that manufactured competing generic versions.

12. The market for each of the Subject Drugs was small enough to foster collusion, but still large enough that prices should have remained at their historical, near marginal cost levels. Defendants overcame this obstacle and produced the extraordinary price increases reflected in industry-wide data by engaging in a concerted effort to grow their conspiracy and dominate the market for the Subject Drugs.

13. This industry-wide data is consistent with the extraordinary price increases suffered by Humana for the Subject Drugs.

14. Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as the state antitrust and unfair competition laws alleged in this Complaint.

15. Humana seeks treble damages and injunctive relief on account of Defendants' unlawful scheme to fix, maintain, and stabilize prices for the Subject Drugs.

16. Humana's allegations are based on personal knowledge of these matters relating to it and upon information and belief as to all other matters. Some of Humana's allegations are based on information made public during ongoing government investigations of Defendants and other generic drug companies.

[4] *Id.* at Appx. III.

## II. THE DRUGS SUBJECT TO THE CONSPIRACY

17. Humana purchased substantial quantities of the Subject Drugs described below during the relevant time period for each drug. Humana paid grossly inflated prices for these Subject Drugs due to the price-fixing conspiracy alleged in this Complaint, both directly from certain Defendants and from other sources.

18. **Amitriptyline.** Amitriptyline is a tricyclic antidepressant. Recognized as an "Essential Medicine" by the World Health Organization ("WHO"),[5] it is used to treat symptoms of depression.

19. **Baclofen**. Baclofen is a muscle relaxant and an anti-spastic agent. It is typically used to treat muscle symptoms caused by multiple sclerosis, including spasms, pain, and stiffness. It is also sometimes used to treat muscle spasms and other symptoms in people with spinal injury or disease.

20. **Benazepril**. Benazepril Hydrochlorothiazide ("Benazepril") is an angiotensin converting enzyme ("ACE") inhibitor. It is used to treat hypertension (high blood pressure).

21. **Clobetasol**. Clobetasol Propionate ("Clobetasol") is a steroid and anti-inflammatory agent. It is used to treat inflammation and itching caused by several skin conditions, such as allergic reactions, eczema, and psoriasis. Clobetasol is one of the most prescribed dermatological drugs in the United States. It comes in a variety of forms: as a cream, foam, gel, lotion, ointment, shampoo, solution, and spray.

---

[5] According to the WHO, "Essential medicines are those that satisfy the priority health care needs of the population. They are selected with due regard to public health relevance, evidence on efficacy and safety, and comparative cost-effectiveness. Essential medicines are intended to be available within the context of functioning health systems at all times in adequate amounts, in the appropriate dosage forms, with assured quality and adequate information, and at a price the individual and the community can afford." World Health Organization, Essential medicines, *available at* http://www.who.int/medicines/publications/essentialmedicines/en/.

22. **Clomipramine.** Clomipramine is a tricyclic antidepressant. It is used to treat symptoms of obsessive-compulsive disorder. It is included on the WHO's list of Essential Medicines.

23. **Digoxin.** Digoxin is a cardiotonic glycoside. It is used to treat heart failure and atrial fibrillation (irregular and/or rapid heart rate). It is included on the WHO's list of Essential Medicines.

24. **Divalproex.** Divalproex Sodium ("Divalproex") extended release affects chemicals in the body involved in causing seizures. It is used to treat various types of seizure disorders, to treat manic episodes related to bipolar disorder, and to prevent migraine headaches.

25. **Doxycycline.** Doxycycline is a tetracycline antibiotic. It is used to treat many bacterial infections, such as acne, urinary tract infections, intestinal infections, eye infections, gonorrhea, chlamydia, and periodontitis. It is also used to treat symptoms of rosacea. It is included on the WHO's list of Essential Medicines.

26. **Leflunomide**. Leflunomide is an immunosuppressive and anti-inflammatory agent. It is used to treat the symptoms of rheumatoid arthritis.

27. **Levothyroxine.** Levothyroxine is a manufactured, synthetic form of the thyroid hormone, thyroxine. It is used to treat hypothyroidism, a condition in which the thyroid gland fails to produce enough hormone. It is also used to treat goiter (enlarged thyroid gland), thyroid cancer, and cretinism (congenital hypothyroidism). First manufactured in 1927, Levothyroxine is included on the WHO's list of Essential Medicines. Levothyroxine was, by number of prescriptions, the second most popular prescription drug in the United States in the first quarter of 2016.

28. **Lidocaine**. Lidocaine is a local anesthetic agent. It is used to numb an area of the body to reduce pain or discomfort caused by invasive medical procedures. It is sold in several formulations and combinations, including Lidocaine-Prilocaine.

29. **Nystatin**. Nystatin is an antifungal medication. It is used to treat skin infections caused by yeast. It is included on the WHO's list of Essential Medicines.

30. **Pravastatin.** Pravastatin is an HMG CoA reductase inhibitor (known as a statin). It is used to lower cholesterol and triglycerides in the blood. Pravastatin was, by number of prescriptions, the twenty-third most popular prescription drug in the United States in the first quarter of 2016.

31. **Propranolol.** Propranolol Hydrochloride ("Propranolol") is a beta-blocker used to treat hypertension, heart rhythm disorders, tremors, and other heart and circulatory conditions, and to prevent heart attacks, migraine headaches, and angina (chest pain caused by reduced blood flow to the heart). Propranolol is on the WHO's list of Essential Medicines. Propranolol is available as a capsule, a tablet, an oral liquid solution, and an injection.

32. **Ursodiol.** Ursodiol is a bile acid that decreases the amount of cholesterol produced by the liver. It is used to treat primary biliary cirrhosis (an autoimmune disease in which the bile ducts in the liver are destroyed).

33. **Verapamil.** Verapamil is a calcium channel blocker. It is used to treat hypertension, angina, and certain heart rhythm disorders. It is included on the WHO's list of Essential Medicines.

## III. JURISDICTION AND VENUE

34. This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. Humana asserts claims for relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

35. This Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States (including in this District), sold and distributed one

or more of the Subject Drugs throughout the United States (including in this District), has registered agents in the United States (including in this District), may be found in the United States (including in this District), engaged in an unlawful conspiracy to artificially increase prices for one or more of the Subject Drugs that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States (including in this District), and is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

36. Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1391(b)-(d). Defendants transact business within this District, have agents and can be found in this District, and the relevant interstate trade and commerce is carried out, in substantial part, in this District.

37. Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of the Subject Drugs in the United States (including in this District). Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States (including in this District).

## IV. PARTIES

### a. Plaintiff

38. Humana Inc. is incorporated in Delaware and headquartered at 500 West Main Street, Louisville, Kentucky. Humana is publicly traded under the NYSE symbol "HUM."

39. Humana is the parent company, and assignee of the claims, of subsidiaries and affiliates that provide, *inter alia:* (1) Medicare benefits, through contracts with the Centers for Medicare and Medicaid Services ("CMS"), for Medicare beneficiaries through a variety of Medicare Advantage plans offered under Part C of Medicare, or prescription drug benefits under Part D of Medicare; and (2) private commercial health insurance plan benefits that cover the medical expenses incurred by plan beneficiaries on an individual or group basis. Humana's subsidiaries provide these

benefits to beneficiaries in all 50 states, the District of Columbia, and Puerto Rico. Humana is the second largest Medicare Advantage Organization in the United States. These assignor subsidiaries and/or affiliates include: Arcadian Health Plan, Inc., CarePlus Health Plans, Inc., Cariten Health Plan Inc., Cariten Insurance Company, CHA HMO, Inc., CompBenefits Insurance Company, Emphesys Insurance Company, Health Value Management, Inc., dba ChoiceCare Network, Humana AdvantageCare Plan, Inc., Humana Behavioral Health, Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc., Humana Health Benefit Plan of Louisiana, Inc., Humana Health Company of New York, Inc., Humana Health Insurance Company of Florida, Inc., Humana Health Plan of California, Inc., Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plans of Puerto Rico, Inc., Humana Health Plan, Inc., Humana Insurance Company, Humana Insurance Company of Kentucky, Humana Insurance Company of New York, Humana Insurance of Puerto Rico, Inc., Humana Medical Plan of Pennsylvania, Inc., Humana Medical Plan of Utah, Inc., Humana Medical Plan, Inc., Humana Regional Health Plan, Inc., Humana Wisconsin Health Organization Insurance Corporation and M.D. Care, Inc. Humana's subsidiaries and affiliates expressly have assigned the claims pleaded herein to Humana.

40. Humana is also the parent and assignee of claims of its subsidiary Humana Pharmacy, Inc. f/k/a Rightsource ("HPI"). HPI buys prescription drugs directly from manufacturers and wholesalers and dispenses them to Humana's benefits plan members on a mail-order and retail pharmacy basis, pursuant to members' doctors' prescriptions. HPI has purchased Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Digoxin, Divalproex, Doxycycline, Leflunomide, Levothyroxine, Lidocaine, Nystatin, Pravastatin, Propranolol, Ursodiol, and Verapamil from Defendants Actavis, Akorn, Apotex, Breckenridge, Dr. Reddy's, Endo, Glenmark, Hi Tech,

Impax, Lannett, Mylan, Par, Sandoz, Sun, Taro, Teva, Upsher-Smith, and Zydus (defined below), among others, pursuant to various agreements.

41. In addition, Humana is the parent and assignee of claims of its subsidiary Humana Pharmacy Solutions, Inc. ("HPS"). HPS is a pharmacy benefit manager ("PBM") that provides Humana's benefits plan members with benefits and services including processing and pricing prescription drug claims.

42. Humana, either directly or through its health plan subsidiaries, insures and administers health plan benefits for its members and group customers, including self-funded group customers that contract with Humana to administer claims on their behalf and pursue recoveries related to those claims. Many of these health plan benefits provide members with prescription drug coverage under which claims for drugs manufactured by Defendants were submitted and paid. Humana is pursuing recovery related to those claims.

**b. Defendants**

43. Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis plc. During the relevant time period, Actavis Elizabeth participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and the state antitrust and consumer protection laws.

44. Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In March 2015, Actavis plc, the parent company of all Actavis Defendants, merged with Allergan plc ("Allergan") and adopted Allergan's name. In August 2016, Teva Pharmaceutical Industries Ltd., the Israeli parent company of Defendant Teva, purchased Actavis' generics business, which included Defendant Actavis Pharma,

Inc., from Allergan plc. All of the entities' assets were then transferred to the newly formed Actavis Holdco. During the relevant time period, Actavis Holdco participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws.

45. Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is now a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. During the relevant time period, Actavis Pharma, Inc. participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws.

46. Actavis Holdco (and its predecessors), Actavis Pharma, and Actavis Elizabeth are collectively defined as "Actavis." During the relevant time period, Actavis was a leading manufacturer of the following Subject Drugs: Clobetasol, Doxycycline, Pravastatin, Propranolol, Ursodiol, and Verapamil. Actavis sold Clobetasol, Propranolol, and Ursodiol directly to Humana.

47. Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. Akorn is the parent company of Defendant Hi-Tech Pharmacal Co., Inc. During the relevant time period, Akorn participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Akorn was a leading manufacturer of, and sold directly to Humana, the following Subject Drugs: Clobetasol and Lidocaine.

48. Defendant Amneal Pharmaceuticals, Inc. ("Impax") has its principal place of business in Bridgewater, New Jersey and was created through a merger of Amneal Pharmaceuticals LLC and Impax Laboratories, Inc., completed on May 7, 2018. Most of the conduct relevant to this Complaint was conducted by Impax Laboratories, Inc. prior to this merger. During the relevant time period, Impax participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Impax was a leading manufacturer of the following Subject Drugs: Digoxin and Lidocaine. Impax sold Digoxin and Ursodiol directly to Humana. Amneal Pharmaceuticals, LLC sold Benazepril and Lidocaine directly to Humana.

49. Defendant Apotex Corp. ("Apotex") is a Florida corporation with its principal place of business in Weston, Florida. During the relevant time period, Apotex participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Apotex was a leading manufacturer of the following Subject Drugs: Leflunomide and Pravastatin. Apotex sold Leflunomide, Pravastatin, and Verapamil directly to Humana.

50. Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business in Fairfield, New Jersey. During the relevant time period, Breckenridge participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and

consumer protection laws. During the relevant time period, Breckenridge was a leading manufacturer of, and sold directly to Humana, the following Subject Drug: Propranolol.

51. Defendant Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey. Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India. During the relevant time period, Dr. Reddy's participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Dr. Reddy's was a leading manufacturer of the following Subject Drugs: Divalproex and Pravastatin. Dr. Reddy sold Divalproex directly to Humana.

52. Defendant Endo International plc ("Endo") is an Irish company with its principal place of business in Dublin, Ireland. Endo is the parent company of Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. Par Pharmaceutical, Inc. is also the successor to Qualitest Pharmaceuticals, Inc. and DAVA Pharmaceuticals, Inc. During the relevant time period, Endo participated in the conspiracy alleged in this Complaint and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. Endo purposefully directed these activities at the United States and this District and derived benefits from these activities. During the relevant time period, Endo acted to reduce the supply and/or fix the price of the following Subject Drugs: Doxycycline, and Propranolol. During the relevant time period, Endo, through its subsidiary Qualitest, which later became Par, was a leading manufacturer of, and sold directly to Humana, the following Subject Drugs: Amitriptyline, Baclofen, and Divalproex.

53. Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. During the relevant time period, Epic participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Epic was a leading manufacturer of the following Subject Drug: Ursodiol.

54. Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. It is under common ownership with Defendant Sandoz, Inc., as both are wholly-owned subsidiaries of Novartis AG ("Novartis"). During the relevant time period, Fougera participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Fougera was a leading manufacturer of the following Subject Drugs: Clobetasol and Lidocaine.

55. Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark"), known between 2008 and 2015 as "Glenmark Generics Inc., USA," is a Delaware corporation with its principal place of business in Mahwah, New Jersey. During the relevant time period, Glenmark participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Glenmark was a leading manufacturer of the following Subject Drug: Pravastatin. Glenmark sold Clobetasol, Nystatin, and Verapamil directly to Humana.

56. Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business in Edison, New Jersey. Heritage is a wholly-owned subsidiary of Emcure Pharmaceuticals Limited, an Indian company with its principal place of business in Pune, India. During the relevant time period, Heritage participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Heritage was a leading manufacturer of the following Subject Drugs: Doxycycline, Leflunomide, Nystatin, Propranolol, and Verapamil.

57. Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. Hi-Tech is a wholly-owned subsidiary of Defendant Akorn. Upon information and belief, in or around 2009, Defendant Hi-Tech obtained 5 generic ANDA applications from DFB Pharmaceuticals, Inc. During the relevant time period, Hi-Tech participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Hi-Tech was a leading manufacturer of the following Subject Drugs: Clobetasol and Lidocaine. Hi-Tech sold Clobetasol directly to Humana.

58. Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. During the relevant time period, Lannett participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Lannett was a leading manufacturer of the following Subject

Drugs: Baclofen, Digoxin, Doxycycline, Levothyroxine, and Ursodiol. Lannett sold Ursodiol directly to Humana.

59. Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. During the relevant time period, Lupin participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Lupin was a leading manufacturer of the following Subject Drug: Pravastatin.

60. Defendant Mayne Pharma (USA), Inc. ("Mayne") is a Delaware corporation with its principal place of business in Paramus, New Jersey. Mayne is a wholly-owned subsidiary of Mayne Pharma Group Limited, an Australian company with its principal place of business in Salisbury, Australia. During the relevant time period, Mayne participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Mayne was a leading manufacturer of the following Subject Drug: Doxycycline.

61. Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. Morton Grove is a wholly-owned subsidiary of Wockhardt, Ltd., an Indian company with its principal place of business in Mumbai, India. During the relevant time period, Morton Grove participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section

1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Morton Grove was a leading manufacturer of the following Subject Drug: Clobetasol.

62. Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. It is the parent company of Defendant Mylan Pharmaceuticals, Inc. and Defendant UDL Laboratories Inc. During the relevant time period, Mylan Inc. participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws.

63. Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. During the relevant time period, Mylan Pharmaceuticals Inc., participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws.

64. Mylan N.V. is a Dutch company with its principal place of business and global headquarters in Canonsburg, Pennsylvania. Mylan N.V. is the direct parent of Mylan Inc. and the ultimate parent of Mylan Pharmaceuticals, Inc. and UDL Laboratories Inc. During the relevant time period, Mylan N.V. participated in the conspiracy alleged in this Complaint and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws.

65. Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively defined as "Mylan." During the relevant time period, Mylan Pharmaceuticals, Inc. was a leading manufacturer of the following Subject Drugs: Amitriptyline, Benazepril, Clomipramine, Digoxin, Divalproex,

Doxycycline, Levothyroxine, Pravastatin, Propranolol, and Verapamil. Mylan sold Clomipramine, Levothyroxine, and Verapamil directly to Humana.

66. Defendant Novartis AG ("Novartis") is a Swiss multinational pharmaceutical company with its principal place of business in Basel, Switzerland. Novartis' U.S. headquarters is located in East Hanover, New Jersey. Novartis is the parent company of wholly-owned subsidiaries Fougera and Sandoz (defined below). During the relevant time period, Novartis, sometimes through subsidiaries Fougera and Sandoz, participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Novartis was a leading manufacturer of the following Subject Drugs: Amitriptyline, Benazepril, Clobetasol, Clomipramine, Lidocaine, and Levothyroxine.

67. Defendant Par Pharmaceutical, Inc. ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York. Defendant Par Pharmaceutical Companies, Inc. is the immediate parent of Defendant Par Pharmaceutical, Inc. Throughout this Complaint, these two Defendants are collectively referred to as "Par." Both Par Defendants are wholly-owned subsidiaries of Defendant Endo. During the relevant time period, Par participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Par was a leading manufacturer of the following Subject Drugs: Amitriptyline, Baclofen, Digoxin, Divalproex, Doxycycline, and Propranolol. Par sold Amitriptyline, Baclofen, and Divalproex directly to Humana.

68. Defendant Perrigo Company plc is an Irish company with its principal place of business in Dublin, Ireland. Its subsidiaries include Defendant Perrigo New York, Inc., a Delaware corporation with its principal place of business in Bronx, New York, and Defendant Perrigo Pharmaceuticals Company, a Michigan corporation with its principal place of business in Allegan, Michigan. Throughout this Complaint, these Defendants will be collectively referred to as "Perrigo." During the relevant time period, Perrigo participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Perrigo was a leading manufacturer of the following Subject Drug: Clobetasol.

69. Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a wholly-owned subsidiary of Defendant Novartis. During the relevant time period, Sandoz participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Sandoz was a leading manufacturer of the following Subject Drugs: Amitriptyline, Benazepril, Clobetasol, Clomipramine, Lidocaine, and Levothyroxine. Sandoz sold Clobetasol directly to Humana.

70. Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd. Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendant Taro Pharmaceutical Industries Ltd. During the relevant time period, Sun participated

in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Sun was a leading manufacturer of the following Subject Drugs: Digoxin, Doxycycline, and Nystatin. Sun sold Divalproex and Doxycycline directly to Humana.

71. Defendant Taro Pharmaceuticals USA, Inc. ("Taro USA") is a New York corporation with its principal place of business in Hawthorne, New York. Its immediate parent is Defendant Taro Pharmaceutical Industries Ltd., ("Taro Israel") an Israeli company with its principal place of business in Haifa Bay, Israel. Throughout the relevant time period, the Indian parent company of Defendant Sun has owned a large majority stake of Taro Israel. Throughout this Complaint, the Taro Defendants will be collectively referred to as "Taro." During the relevant time period, Taro participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Taro was a leading manufacturer of the following Subject Drugs: Clobetasol and Clomipramine. Taro sold Clobetasol and Nystatin directly to Humana.

72. Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business in Petah Tikva, Israel. During the relevant time period, Teva participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period,

Teva was a leading manufacturer of the following Subject Drugs: Baclofen, Leflunomide, Nystatin, Pravastatin, and Propranolol. Teva sold Baclofen, Benazepril, Nystatin, Pravastatin, and Verapamil directly to Humana.

73. Defendant UDL Laboratories Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois. UDL is a subsidiary of Defendant Mylan Inc. During the relevant time period, UDL participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, UDL was a leading manufacturer of the following Subject Drug: Propranolol.

74. Defendant Upsher-Smith Laboratories, LLC (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota. During the relevant time period, Upsher-Smith participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Upsher-Smith was a leading manufacturer of the following Subject Drugs: Baclofen and Propranolol. Upsher-Smith sold Baclofen directly to Humana.

75. Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. During the relevant time period, West-Ward participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and

consumer protection laws. During the relevant time period, West-Ward was a leading manufacturer of the following Subject Drugs: Digoxin and Doxycycline.

76. Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Wockhardt is a wholly owned subsidiary of Defendant Morton Grove. During the relevant time period, Wockhardt participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Wockhardt was a leading manufacturer of the following Subject Drug: Clobetasol.

77. Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. Zydus is owned by Cadila Healthcare, an Indian company with its principal place of business in Ahmedabad, India. During the relevant time period, Zydus participated in the conspiracy alleged in this Complaint, produced and sold one or more of the Subject Drugs throughout the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. During the relevant time period, Zydus was a leading manufacturer of the following Subject Drugs: Divalproex and Pravastatin. Zydus sold Divalproex directly to Humana.

78. All references to Defendants or any of them individually also includes their officers, managers, agents, employees, and representatives.

79. Defendants Mylan, Novartis, Par and Sandoz shall collectively be referred to as the "Amitriptyline Defendants."

80. Defendants Lannett, Par, Teva, and Upsher-Smith shall collectively be referred to as the "Baclofen Defendants."

81. Defendants Mylan, Novartis, and Sandoz shall collectively be referred to as the "Benazepril Defendants."

82. Defendants Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Novartis, Perrigo, Sandoz, Taro, and Wockhardt shall collectively be referred to as the "Clobetasol Defendants."

83. Defendants Mylan, Novartis, Sandoz, and Taro shall collectively be referred to as the "Clomipramine Defendants."

84. Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward shall collectively be referred to as the "Digoxin Defendants."

85. Defendants Dr. Reddy's, Mylan, Par, and Zydus shall collectively be referred to as the "Divalproex Defendants."

86. Defendants Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, and West-Ward shall collectively be referred to as the "Doxycycline Defendants."

87. Defendants Apotex, Heritage, and Teva shall collectively be referred to as the "Leflunomide Defendants."

88. Defendants Lannett, Mylan, Novartis, and Sandoz shall collectively be referred to as the "Levothyroxine Defendants."

89. Defendant Akorn, Fougera, Hi-Tech, Impax, Novartis, and Sandoz shall collectively be referred to as the "Lidocaine Defendants."

90. Defendants Heritage, Sun, and Teva shall collectively be referred to as the "Nystatin Defendants."

91. Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus shall collectively be referred to as the "Pravastatin Defendants."

92. Defendants Actavis, Breckenridge, and Upsher-Smith shall collectively be referred to as the "Propranolol Capsule Defendants." Defendants Actavis, Endo (as Par's parent), Heritage,

Mylan (on its own and as UDL's parent), Par, Teva, and UDL shall collectively be referred to as the "Propranolol Tablet Defendants." Throughout this Complaint, Humana will occasionally refer to both groups as the "Propranolol Defendants."

93. Defendants Actavis, Epic, and Lannett shall collectively be referred to as the "Ursodiol Defendants."

94. Defendants Actavis, Heritage, and Mylan shall collectively be referred to as the "Verapamil Defendants."

**c. Co-Conspirators**

95. Various other persons, firms, entities, and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

96. The true names of additional co-conspirators are presently unknown to Humana. Humana may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

97. At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

98. The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

99. The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees,

or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V. REGULATORY AND ECONOMIC BACKGROUND

### a. Generic Drugs Should Provide Lower-Priced Options for Purchasers

100. Generic drugs provide a lower-cost but therapeutically equivalent substitute for brand-name drugs. Congress enacted the Hatch-Waxman Act ("Hatch-Waxman") in 1984 to encourage the production and sale of cheaper generic drugs by simplifying the regulatory hurdles that generic pharmaceutical manufacturers must clear to market and sell their drug products.[6]

101. To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the Food and Drug Administration's ("FDA") Center for Drug Evaluation and Research, Office of Generic Drugs.

102. When the FDA approves an ANDA, that generic drug receives an "AB" rating from the FDA. This signifies the drug is therapeutically equivalent to a referenced brand-name drug. Therapeutic equivalence indicates the generic is both pharmaceutically equivalent (having the same active ingredient(s), same dosage form and route of administration, and identical strength or concentration) and bioequivalent (no significant difference in the rate and extent of absorption of the active pharmaceutical ingredient) to the brand-name drug.

103. Typically, AB-rated generic versions of brand-name drugs are priced significantly below their brand-name counterparts. When multiple generic manufacturers enter the market, prices for generic versions of the same branded drug should predictably decrease, sometimes by as much as 90%, as price competition increases. Because of this, AB-rated generic drugs typically gain market share rapidly. As more generic drugs enter the market, the price of those drugs should progressively

---

[6] Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

decrease, resulting in lower costs for purchasers, like Humana. These cost reductions were the purpose behind the Hatch-Waxman's expedited generic approval pathway.

104. Because AB-rated generic drugs are therapeutically equivalent to both a referenced brand-name drug and each other, price is the only material difference between different AB-rated generic drugs that reference the same brand-name drug. Because each generic of the same referenced drug is readily substitutable for another generic, the products behave like commodities; price is the only differentiating feature, and the basis for competition.[7]

105. Generic competition, therefore, when functioning in a market undisturbed by anticompetitive forces, reduces drug costs by driving down prices for AB-rated generic versions of brand-name drugs. Predictably, the longer generic drugs remain on the market, the lower their prices will become.

106. In the United States, a prescription drug may be dispensed to a patient only by a licensed pharmacist pursuant to a doctor's prescription that identifies the drug, and the prescription may only be filled with either the brand-name drug identified or an AB-rated generic version. Pharmacists may (and, in most states, must) substitute an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the prescribing doctor.

107. Generic competition enables purchasers like Humana to purchase a generic version of a brand-name drug at substantially lower prices. In fact, studies have shown that use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[8]

---

[7] *See, e.g.,* Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact,* at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

[8] GPhA, *Generic Drug Savings in the U.S.* (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

**b. The Prescription Drug Market**

108. The United States is a venue ripe for illegal anticompetitive exploitation of prescription drug prices due to laws that regulate how prescription drugs are prescribed and how the prescriptions can be filled.

109. For most consumer products, the person responsible for paying for them is also the person selecting them. The pharmaceutical marketplace departs from this norm.

110. Prescription drugs may be dispensed only pursuant to a doctor's prescription, and a pharmacist may dispense only the brand-name drug named in the prescription or its AB-rated, FDA-approved generic equivalent, as set forth above.

111. In most instances, the patient and his health insurer pay for the prescription drug that a doctor prescribes. Like the pharmacist, their "choice" is limited to the brand drug named in the prescription or its AB-rated generic equivalent.

112. Therefore, the doctor's prescription defines the relevant product market, because it limits the consumer's (and the pharmacist's) choice to the drug named therein.

**c. The Market for Generic Drugs is Highly Susceptible to Collusion**

113. Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix prices and allocate markets and customers. As such, Humana is not required to define relevant markets. However, there are certain features characteristic of the market for generic drugs which indicate that it is susceptible to collusion and that the price increases were in fact the result of collusion and not parallelism.

114. Factors showing that a market is susceptible to collusion include:

a. **High level of industry concentration:** A small number of competitors control roughly 100% of the market for each of the Subject Drugs.

b. **Sufficient numbers to drive competition:** While the market for each of the Subject Drugs had a small enough number of competitors to foster collusion, the number of sellers was large enough that prices should have remained at their historical, near marginal cost levels.

c. **High barriers to entry:** The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market. The Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2012. Any potential new entrant would have to go through the lengthy ANDA approval process before commercially marketing its product. This type of barrier to entry increases a market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

d. **High inelasticity of demand and lack of substitutes:** For most patients prescribed one of the Subject Drugs, the drug is a necessity that must be purchased regardless of price. Substituting non-AB rated drugs presents challenges, and both patients and physicians are unwilling to sacrifice patient wellbeing for cost savings. For many patients, one of the Subject Drugs is the only effective treatment.

e. **Commoditized market:** Defendants' products are fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one for another.

f. **Absence of departures from the market:** There were no departures from the market during the relevant period that could explain the drastic price increases.

g. **Absence of non-conspiring competitors:** Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2013 and the present. Thus, Defendants have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

h. **Opportunities for contact and communication among competitors:** Defendants participate in the committees and events of the GPhA, HDMA, ECRM, NPF, and other industry groups, which provide and promote opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to, among other things, generic pricing.

i. **Size of Price Increases:** The magnitude of the price increases involved in this case further differentiates it from examples of parallelism. Oligopolists seeking to test price boundaries need to take a measured approach. But here the increases are not 5% or even 10% jumps; they are of far greater magnitude. A rational company would not implement such large increases unless it was certain that its ostensible competitors would follow.

j. **Reimbursement of Generic Drugs:** The generic market has institutional features that would inhibit non-collusive, parallel price increases. As a result,

the usual hesitance of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

## VI. THE FEDERAL AND STATE INVESTIGATIONS OF THE PRICE-FIXING CONSPIRACY

115. Defendants and other generic drug makers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the DOJ Antitrust Division, the United States Senate, the United States House of Representatives, and Attorneys General of 47 states, the District of Columbia, and Puerto Rico (the "State AGs").

116. The DOJ's and State AGs' investigations followed a congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor and Pensions ("HELP") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

### a. Congress launched an investigation into generic price hikes

117. In January 2014, the NCPA urged the United States Senate HELP Committee and the United States House Energy and Commerce Committee to hold hearings on significant spikes in generic pharmaceutical pricing, citing surveys and data from community pharmacists. The NCPA surveyed over one thousand pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

118. On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of HELP and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug

manufacturers, including Defendants Actavis, Endo, Heritage, Lannett, Mylan, Par, Sun, and Teva, requesting information about the escalating prices of generic drugs.[9]

119. Senator Sanders and Representative Cummings issued a joint press release, advising that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" and having a "'very significant'" impact, threatening pharmacists' ability to remain in business.[10]

120. On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[11] The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [Average Manufacturer Pricing] exceeded the specified inflation factor."[12]

121. In August 2016, the GAO issued GAO-16-706 (the "GAO Report"), a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015. The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more. Among the drugs with extraordinary price increases were 12 of the Subject Drugs: Amitriptyline,

---

[9] Press Release, U.S. Senator Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[10] *Id.*

[11] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[12] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), *available at* https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

Baclofen, Benazepril, Clobetasol, Clomipramine, Digoxin, Divalproex, Doxycycline, Lidocaine, Nystatin, Pravastatin, and Ursodiol.[13]

**b. The DOJ Investigates Criminal Generic Drug Collusion**

122. The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry and empaneled a grand jury on or around November 3, 2014.

123. The DOJ initially focused on only two of the Subject Drugs: Glyburide and Doxycycline. However, news reports, court filings, and other public statements corroborate the sweeping nature of the DOJ's investigation. Reportedly, the DOJ believes price-fixing between makers of generic pharmaceuticals is widespread and its investigation already spans "more than a dozen companies and about two dozen drugs."[14]

124. Most of the Defendants here have come under the DOJ's scrutiny.

125. The DOJ first charged two Heritage executives, Jeffrey Glazer and Jason Malek, with criminal counts related to price collusion for generic Doxycycline hyclate and Glyburide. *See United States of America v. Jeffrey A. Glazer,* No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T Malek,* No. 2:16-cr- 00508-RBS (E.D. Pa.).

126. On January 9, 2017, both defendants pled guilty to the charges of violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix prices, rig bids, and engage in market and customer allocation concerning Doxycycline Hyclate and Glyburide.

---

[13] GAO Report at Appx. III.

[14] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread-source*, POLICY AND REGULATORY REPORT (June 26, 2015), available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf; David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG MARKETS (Nov. 3, 2016), available at https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

127. Defendants Actavis, Dr. Reddy's, Endo, Fougera (through Sandoz), Impax, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Taro, and Teva have admitted to receiving grand jury subpoenas from the DOJ. The DOJ executed a search warrant on Defendant Perrigo.

128. Information disclosed by some Defendants evidence the broad scope of the conspiracy being investigated by the DOJ.

129. For example, in a quarterly report filed with the Securities and Exchange Commission ("SEC"), Lannett disclosed that on November 3, 2014, its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." [15] Lannett added that "[t]he subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period." [16]

130. In February 2016, Mylan disclosed in an annual report filed with the SEC that it received a DOJ subpoena relating to Doxycycline,[17] and disclosed in a quarterly report in November 2016 that it had received subpoenas relating to Propranolol and Verapamil.[18] In the same report, Mylan also disclosed that the DOJ executed search warrants in connection with the investigation.[19]

131. Novartis, the parent company of Sandoz and Fougera disclosed that "[i]n March 2016, Sandoz Inc. received a subpoena from the Antitrust Division of the DOJ requesting

[15] Lannett Company, Inc., Quarterly Report (Form 10-Q) at 16 (Nov. 6, 2014).
[16] *Id.*
[17] Mylan Inc., Annual Report (Form 10-K) at 160 (Feb. 16, 2016).
[18] Mylan Inc., Quarterly Report (Form 10-Q) at 58 (Nov. 9, 2016).
[19] *Id.*

documents related to the marketing and pricing of generic pharmaceutical products sold by Sandoz Inc. and its subsidiaries, including Fougera Pharmaceuticals, Inc. (Fougera) and related communications with competitors. Sandoz Inc. is cooperating with this investigation which it believes to be part of a broader inquiry into industry practice."[20]

132. On December 5, 2014, Defendant Par received a subpoena from the DOJ Antitrust Division regarding its communications with competitors concerning Digoxin and Doxycycline.[21]

133. Defendant Endo, Par's parent, also received a subpoena duces tecum from the Connecticut AG relating to the pricing of its generic products.[22]

134. On May 2, 2017, Perrigo announced that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the DOJ Antitrust Division related to drug pricing in the pharmaceutical industry. As has been previously disclosed by a number of companies, the Antitrust Division has been looking at industry-wide pricing practices."[23]

135. According to a Form 6-K filed with the SEC by Taro Israel in September 2016, on September 8, 2016 Defendant Taro USA "as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[24]

---

[20] Novartis, 2016 ANNUAL REPORT at 217, available at https://www.novartis.com/sites/www.novartis.com/files/novartis-20-f-2016.pdf.
[21] Par Pharmaceutical Companies, Inc., Annual Report (Form 10-K) at 37 (Mar. 12, 2015).
[22] Endo International PLC, Quarterly Report (Form 10-Q) at 29 (May 9, 2017).
[23] *Perrigo Discloses Investigation*, PERRIGO (May 2, 2017), http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.
[24] Taro Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) (Sept. 9, 2016).

136. On June 21, 2016, Defendant Teva received a subpoena from the DOJ Antitrust Division "seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products. [Defendant] Actavis [at that point a subsidiary of Teva's Israeli parent] received a similar subpoena in June 2015."[25]

137. A DOJ grand jury subpoena is significant. Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, Section F.1, notes that when deciding whether to request the initiation of a grand jury investigation, "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[26] Recommendations are made to the Assistant Attorney General by the Deputy Assistant Attorney General ("DAAG") for Operations, the Criminal DAAG, and the Director of Criminal Enforcement. The request must be approved by the field chief and the Assistant Attorney General.[27]

138. The DOJ has intervened in numerous civil antitrust actions alleging price-fixing, bid-rigging, and market and customer allocation of generic pharmaceuticals, stating that these cases overlap with the DOJ's ongoing criminal investigation. In a civil antitrust action related to Propranolol, for example, the DOJ intervened and requested a stay of discovery, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Heritage executives'] informations that were unsealed."[28]

---

[25] Teva Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) at 33 (Nov. 15, 2016).
[26] DOJ, ANTITRUST DIV. MANUAL (5th ed. 2015) at III-82.
[27] *Id.*
[28] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC,* No. 16-cv- 9901, ECF 112 (S.D.N.Y. Feb. 21, 2017).

139. In another civil action alleging price-fixing of Clobetasol and two other dermatological drugs, the DOJ filed a letter requesting a stay of discovery, saying "there are significant overlaps between the companies and drugs that are being investigated criminally and the defendants and drugs identified in plaintiffs' amended complaints." The lawsuit targeted manufacturers Akorn, Perrigo, Taro, Teva, Sandoz, and Wockhardt.[29]

140. The DOJ also filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that, "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug – overlap significantly with aspects of the ongoing criminal investigation."[30]

141. The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines. The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[31]

**c. State Attorneys General launched their own investigation into generic drug price hikes**

142. Immediately after the DOJ filed the first criminal charges against two Heritage executives, the State AGs filed a civil action. Although the state AGs' first complaint focused on Doxycycline Hyclate and Glyburide, it also alleged that the State AGs uncovered a wide-ranging series of conspiracies implicating numerous different generic drugs and manufacturers. *The*

---

[29] *Perrigo Joins Generic-Drugs Firms Under U.S. Probe*, FIRSTWORD PHARMA (Mar. 3, 2017), https://www.firstwordpharma.com/node/1454159.

[30] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re: Generic Digoxin and Doxycycline Antitrust Litig.,* MDL No. 2724, ECF 284 (J.P.M.L. Mar. 10, 2017).

[31] DOJ, Division Update Spring 2017 (Mar. 28, 2017), available at https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

*Connecticut Mirror* reported at the time that the State AGs "suspected fraud on a broader, nearly unimaginable scale," that "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[32] Connecticut Attorney General George Jepsen called the evidence obtained in that investigation "mind-boggling."[33]

143. Mr. Jepsen confirmed the scope of the State AGs' action in a press release in December 2016:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers - and, indeed, our healthcare system as a whole - who paid for these actions through artificially high prices for generic drugs.[34]

144. In filings with the United States Judicial Panel on Multidistrict Litigation on May 16, 2017, and June 13, 2017, the State AGs reiterated that their ongoing investigation is broad in scope and goes beyond Doxycycline Hyclate and Glyburide.[35]

145. Then New York Attorney General Eric T. Schneiderman reported that the State AGs "uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States."[36]

---

32 Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/. *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the Connecticut Attorney General issued its first subpoena. Id.

33 *Id.*

34 Press Release, Attorney General George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), available at https://portal.ct.gov/AG/Press-Releases/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

35 *See* Brief and Reply in Support of Plaintiff States' Motion to Vacate Conditional Transfer Order (CT0-3*), In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF Nos. 321 & 334 (J.P.M.L. May 16, 2017 & June 13, 2017).

36 Press Release, New York State Office of the Attorney General, A.G. Schneiderman Files Federal Antitrust Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug Companies (Dec. 15, 2016), available at https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage.

146. The State AGs revealed that their Doxycycline Hyclate and Glyburide action "encompass[es] illegal agreements – including with regard to Doxy DR – where prices remained constant (or remained higher than they would have been in a competitive market) as a result of customer or market allocation agreements designed specifically to avoid price erosion[.]" The State AGs also disclosed that they entered into settlements with the Heritage executives which require cooperation with the State AGs.

147. In the most recent version of their Complaint, filed on June 18, 2018, the State AGs broadened the case to include fifteen drugs, including four of the Subject Drugs: Doxycycline, Leflunomide, Nystatin, and Verapamil. At the time, Connecticut Attorney General Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies. Way beyond…We're learning new things every day."[37] As of June 2018, the action includes the attorneys general of 47 states, the District of Columbia, and Puerto Rico, asserting claims against eighteen companies, including Defendants Heritage, Teva, Mylan, Actavis, Lannett, Par, and Sandoz; Rajiv Malik, the President of Defendant Mylan; and Satish Mehta, the CEO of Defendant Heritage's parent company Emcure Pharmaceuticals Ltd.[38]

148. Evidence reportedly uncovered in the State AGs' action shows that Malek compiled a large list of generic drugs Heritage targeted for price increases and instructed employees to reach agreements with competitors to increase prices and engage in market and customer allocation, and that some competitors were willing to reach such agreements. The State AG Complaint identifies at least Mayne, Mylan, and Teva (along with others) as co-conspirators with Heritage.

---

[37] Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices?source=twitter&via=desktop.
[38] Dani Kass, *State AGs Triple Size of Generic Price-Fixing Litigation*, LAW360, Oct. 31, 2017, available at https://www.law360.com/articles/980102/state-ags-triple-size-of-generic-price-fixing-litigation.

149. The DOJ's and the State AGs' investigations of alleged price-fixing and other unlawful collusive conduct in the generic drug industry are ongoing.

## VII. DEFENDANTS' EXTENSIVE INTER-FIRM COMMUNICATIONS

150. At all relevant times, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, along with other drugs, which had the intended and actual effect of causing Humana to pay artificially inflated prices at supracompetitive rates.

151. In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

i. Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;

ii. Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs sold in the United States;

iii. Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States;

iv. Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers with respect to the Subject Drugs sold in the United States;

v. Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

vi. Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

vii. Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

152. The Defendants ensured that all conspirators were adhering to the collective scheme by communicating at (1) trade association meetings and conferences; (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) individual, private communications between and among Defendants' employees through use of the telephone, electronic messaging, and similar means.

153. The Policy and Regulatory Report, an intelligence-gathering and data analytics firm, reported that the DOJ's investigation into generic drug manufacturers includes trade associations and industry conferences as "one potential avenue for facilitating the collusion between salespeople at different generic producers."[39]

154. The State AGs have similarly noted the key role of trade associations and industry conferences in their investigation, including evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[40]

---

[39] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain,* FIERCEPHARMA, Aug. 7, 2015, https://www.fiercepharma.com/regulatory/actavis-gets-subpoena-as-doj-probe-of-generic-pricing-moves-up-food-chain.

[40] Press Release, Attorney General George Jepsen, 40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit (Mar. 1, 2017), *available at* http://members.naag.org/assets/files/Antitrust/files/03-01-17%20CT%20Announces%2040%20AGs%20in%20Generic%20Drug%20case.pdf.

155. Defendants used their memberships in numerous trade organizations to facilitate conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, including, but not limited to, ECRM, GPhA and HDMA.

156. GPhA is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs…"[41] GPhA was created in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. Regular members are "corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[42]

157. GPhA's website offers members the opportunity to "participate in shaping the policies that govern the generic industry." GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." It boasts of networking opportunities as one of the cornerstone benefits of membership: "GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[43]

158. Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Heritage, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus are regular members

---

[41] GPhA, Membership, available at http://web.archive.org/web/2015041303008/http://www.gphaonline.org:80/about/membership.
[42] *Id.*
[43] *Id.*

of GPhA, and have been since 2013. Furthermore, executives of these companies frequently attend GPhA meetings and events.

159. Executives from Defendants Actavis, Apotex, Fougera, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, and Zydus served on GPhA's Board of Directors during overlapping times at various points both prior to and after 2013, including:

a. 2013 Board of Directors:[44] Tony Mauro, President, Mylan North America as Chair; Don DeGolyer, President and CEO, Sandoz as Vice Chair; Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Pharmaceuticals; Carole Ben-Maimon,, President, Global Pharmaceuticals (div.) of Impax; Doug Boothe, Executive Vice President & General Manager, Perrigo Pharmaceuticals; Jeffrey Glazer, President and CEO, Heritage; Charlie Mayr, Chief Communications Officer - Global, Actavis Inc.; Joseph Renner, President & CEO, Zydus; and Jeff Watson, President, Apotex Corp.

b. 2014 Board of Directors:[45] Carole Ben-Maimon, President, Global Pharmaceuticals (div.) of Impax; Doug Boothe, Executive Vice President & General Manager, Perrigo Pharmaceuticals; Jeffrey Glazer, President and CEO, Heritage; Peter Goldschmidt, President, Sandoz US; Tony Mauro, President, Mylan Inc.; Allan Oberman, CEO and President, Teva Americas Generics; Joseph Renner, President & CEO, Zydus; Jeff Watson, President, Apotex; and Paul McGarty, President, Lupin as at-large director.

[44] GPhA Announces 2013 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2013-board-of-directors.
[45] GPhA Announces 2014 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2014-board-of-directors.

c. 2015 Board of Directors:[46] Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Doug Boothe, Executive Vice President & General Manager, Perrigo Pharmaceuticals; Jeffrey Glazer, President and CEO, Heritage; Peter Goldschmidt, President, Sandoz US; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Marcie McClintic Coates, Head of Global Regulatory Affairs, Mylan Inc.; Paul McGarty, President, Lupin; Tony Pera, President, Par Pharmaceuticals; Joseph Renner, President & CEO, Zydus; and Jeff Watson, President, Apotex Corp.

d. 2016 Board of Directors:[47] Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Heather Bresch, CEO, Mylan N.V. as Chair; Peter Goldschmidt, President, Sandoz US; Jim Kedrowski, Executive Vice President, Sun; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Paul McGarty, President, Lupin; Tony Pera, President, Par Pharmaceuticals as Secretary-Treasurer; Joseph Renner, President & CEO, Zydus; Richard Stec, Vice President, Perrigo Company; and Jeff Watson, President, Apotex as Vice Chair.

160. The Healthcare Distribution Management Association ("HDMA") (now called the Healthcare Distribution Alliance or "HDA") is a national trade association that represents "primary pharmaceutical distributors," connecting the nation's drug manufacturers to over 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[48] HDMA holds regular conferences at which its members, including generic drug manufacturers, meet to discuss various

---

[46] GPhA Announces 2015 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2015-board-of-directors/.

[47] GPhA Announces 2016 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2016-board-of-directors/.

[48] *About*, HAD, https://healthcaredistribution.org/about.

issues affecting the pharmaceutical industry. Several Defendants were members of HDMA at overlapping times between 2013 and the present. For instance, as of July 2015, HDMA's manufacturer membership list included Defendants Breckenridge, Par, Heritage, Lannett, Mylan, Sandoz, Teva, Upsher-Smith, and Wockhardt.[49] As of March 2016, these Defendants remained members and were joined by Defendants Akorn and Perrigo.[50]

161. Efficient Collaborative Retail Marketing ("ECRM") hosts strategic events and offers innovative technology solutions to help buyers and manufacturers improve sales, reduce expenses, and enter the market faster and more efficiently.[51] It conducts "Efficient Program Planning Sessions" ("EPPS"), in which generic drug manufacturers, purchasers, and other industry professionals meet "to discuss new business opportunities, review contracting strategies, and future business planning activities."[52] Sessions include one-on-one strategic meetings meant to maximize time, grow sales, and uncover trends.

162. At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independent pharmacies.

163. GPhA, HDMA, and ECRM frequently held meetings and events between 2013 and the present, and high-level representatives and corporate officers from Defendants Actavis,

---

[49] *Manufacturer Members*, HDMA, https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org:80/about/membership/manufacturer/manufacturer-members#.Wrj50y7wZpg.

[50] *Manufacturer Members,* HDMA, https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org:80/about/membership/manufacturer/manufacturer-members#.Wrj50y7wZpg.

[51] *See* Company Overview of Efficient Collaborative Retail Marketing Company, LLC, Bloomberg , https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=106996762; *See also Alkaline Water Co. Enjoys Valued Participation at National Retail Marketing Trade Show*, The Alkaline Water Co., http://thealkalinewaterco.com/2013/08/06/alkaline-water-co-enjoys-valued-participation-national-retail-marketing-trade-show/.

[52] ECRM, Health System/Institutional Pharmacy EPPS, https://ecrm.marketgate.com/Sessions/2019/06/HospitalAlternateSitePharmacyPharmaceuticals.

Akorn, Breckenridge, Dr. Reddy's, Endo, Fougera, Heritage, Lannett, Morton Grove, Mylan, Par, Perrigo, Sandoz, Taro, Teva, Upsher-Smith, UDL, and Wockhardt, including employees with price-setting authority, attended these meetings.

164. For example, on February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida. Representatives from Defendants Actavis, Akorn, Apotex, Dr. Reddy's, Glenmark, Heritage, Lupin, Impax, Mylan, Par, Perrigo, Sandoz, Taro, Teva, Wockhardt, and Zydus attended this meeting, including:[53]

a. Actavis: Sigurdur Olafsson;

b. Mylan: Tony Mauro, President;

c. Sandoz: Don DeGolyer, President; and

d. Teva: Allan Oberman, President & CEO.

165. On June 2-5, 2013, HDMA held its 2013 Business Leadership Conference in Orlando, Florida. Upon information and belief, key executives for generic sales and pricing from at least Defendants Dr. Reddy's, Lannett, Mylan, and Upsher-Smith attended, including:

a. Dr. Reddy's: Mike Burton;

b. Lannett: Kevin Smith, Lauren Carotenuto, and Justin McManus;

c. Mylan: Richard Isaac, Rob O'Neil, Edgar Escoto, Kevin McElfresh, Jim Nestsa, and Gary Tighe;

d. Upsher-Smith: JoAnn Gaio, Brad Leonard, Mike Muzetras, David Zitnak, and Doug Sitnak.

---

[53] GPhA Meeting Agenda, February 20-22, 2013, available at http://www.gphaonline.org/media/cms/AM13_-_Agenda_1.pdf.

166. GPhA held a Chemistry, Manufacturing, and Controls ("CMC") workshop in North Bethesda, Maryland on June 4-5, 2013.[54] Representatives from Levothyroxine Defendants Lannett, Mylan, and Sandoz attended, as well as Defendants Actavis, Apotex, Breckenridge, Dr. Reddy's, Endo (through subsidiary Qualitest), Fougera, Glenmark, Heritage, Hi-Tech, Impax, Morton Grove, Par, Perrigo, Sun, Taro, Teva, Upsher-Smith, and Zydus. The conference included a networking reception sponsored by Teva.

167. On October 28-30, 2013, GPhA held a Technical Conference in North Bethesda, Maryland.[55] Representatives from all the Propranolol Defendants (Actavis, Breckenridge, Endo, Heritage, Mylan (UDL's parent), Par, Teva, and Upsher-Smith) attended, along with Defendants Akorn, Apotex, Dr. Reddy's, Fougera, Glenmark, Hi-Tech, Impax, Lannett, Lupin, Perrigo, Sandoz, Sun, Taro, Wockhardt, and Zydus. The conference included a networking breakfast sponsored by Endo subsidiary Qualitest, a key participant the conspiracy to raise Baclofen prices.

168. Shortly after the October 2013 meeting, the average prices for Levothyroxine experienced a rapid surge. According to Humana's data, prices rose by approximately 225% between May and October of 2013, with an overall price hike of approximately 400% by May 2014.

169. Also shortly after the October 2013 meeting, the average prices for Propranolol capsules increased dramatically, as set forth below.

---

[54] 2013 CMC Workshop Past Attendees, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.gphaonline.org/events/2013-cmc-workshop-past-attendees.

[55] 2013 GPhA Fall Technical Conference Past Attendees, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.gphaonline.org/index.php/events/2013-gpha-fall-technical-conference-past-attendees.

170. On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida.[56] Representatives from Baclofen Defendants Par, Teva, and Upsher-Smith attended, along with Defendants Actavis, Apotex, Dr. Reddy's, Heritage, Hi-Tech, Impax, Lupin, Mylan, Perrigo, Sandoz, Taro, Wockhardt, and Zydus. Teva and Par, along with a number of other companies, co-sponsored the event. Upon information and belief, Defendants' representatives at the event included:

a. Apotex: Jeff Watson, President;

b. Mylan: Tony Mauro, President.

171. Shortly thereafter, the average prices for generic Baclofen increased dramatically, as set forth below.

172. On February 23-26, 2014, ECRM held its annual Retail Pharmacy EPPS at Omni Amelia Island Plantation Resort in Amelia Island, Florida.[57] This meeting was attended by key generic sales and pricing executives from at least Defendants Actavis, Akorn, Breckenridge, Dr. Reddy's, Epic, Heritage, Hi-Tech, Lannett, Lupin, Par, Perrigo, Sandoz, Sun, Taro, Teva, Upsher-Smith, West-Ward, Wockhardt, and Zydus.

173. On March 9-12, 2014, HDMA held its Distribution Management Conference and Technology Expo in Palm Desert, California. Representatives from at least Defendants Actavis, Mylan, Par, Taro, Teva, and Upsher-Smith attended.[58]

---

[56] 2014 Annual Meeting Past Meeting Attendees, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.gphaonline.org/index.php/events/2014-annual-meeting-past-meeting-attendees.
[57] EPPS Attendees, ECRM, https://ecrm.marketgate.com/Events/Attendees.aspx?s=3250.
[58] 2015 Distribution Management Conference, Previous Attendees, HDMA, Google Cache, https://webcache.googleusercontent.com/search?q=cache:tavttopjP9kJ:https://www.healthcaredistribution.org/events/2015-distribution-management-conference/previous-attendees+&cd=1&hl=en&ct=clnk&gl=us.

174. On April 1, 2014, HDMA held its sixth annual CEO Roundtable Fundraiser in New York. Certain Defendants' key generic sales and pricing executives attended, including executives from Lannett, Mylan, and Sandoz.

175. On June 1-4, 2014, HDMA held a Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona.[59] Representatives from Defendants Actavis, Apotex, Dr. Reddy's, Mylan, Par, Qualitest, Sun, Taro, Teva, and Upsher-Smith all attended, including:

a. Actavis: Anthony Giannone, Executive Director, Sales;

b. Mylan: Lance Wyatt, Director, National Accounts; Richard Isaac, Senior Manager, Strategic Accounts;

c. Upsher-Smith: JoAnn Gaio, Senior National Account Manager, Trade; Scott Hussey, Senior Vice President, Global Sales.

176. On June 3-4, 2014, GPhA held its annual CMC Workshop in North Bethesda, Maryland.[60] Clobetasol Defendants Actavis, Fougera, Hi-Tech (subsidiary of Akorn), Morton Grove (subsidiary of Wockhardt), Perrigo, Sandoz (subsidiary of Novartis), and Taro all attended. along with Defendants Apotex, Dr. Reddy's, Glenmark, Heritage, Impax, Lannett, Lupin, Mylan, Par, Teva, Upsher-Smith, and Zydus.

177. Shortly after the June 2014 GPhA CMC Workshop, the average price for generic Clobetasol increased dramatically, as set forth in more detail below. According to NADAC data,[61] Clobetasol saw some of the following price increases from July 2014 to September 2014:

a. Clobetasol 0.05% Gel (30g): 1,319%;

---

[59] DMC and Expo, HDA, Previous Attendees, https://webcache.googleusercontent.com/search?q=cache:tavttopjP9kJ:https://www.healthcaredistribution.org/events/2015-distribution-management-conference/previous-attendees+&cd=1&hl=en&ct=clnk&gl=us.

[60] 2014 CMC Workshop Past Attendees, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.gphaonline.org/events/2014-cmc-workshop-past-attendees.

[61] "NADAC" refers to the National Average Drug Acquisition Cost. The NADAC for certain drugs is compiled and published by the Center for Medicare and Medicaid Services based on a survey of pharmacies' invoice prices.

b. Clobetasol 0.05% Ointment (15g): 1,852%;

c. Clobetasol 0.05% Solution (50ml): 1,176%;

d. Clobetasol 0.05% Cream (30g): 1,596%;

e. Clobetasol 0.05% Emollient Cream (60g): 929%.

178. On February 9-11, 2015, GPhA held its Annual Meeting in Miami Beach, Florida. Representatives from Propranolol Tablet Defendants Actavis, Endo, Heritage, Mylan, Par, and Teva all attended, along with Defendants Akorn, Apotex, Breckenridge, Dr. Reddy's, Epic, Glenmark, Impax, Lupin, Perrigo, Sandoz, Taro, Upsher-Smith, West-Ward, Wockhardt, and Zydus.[62]

179. On February 22-25, 2015, ECRM held an EPPS meeting at the Hilton Sandestin Beach Golf Resort & Spa in Destin, Florida. Representatives from Propranolol Tablet Defendants Actavis, Heritage, Par, and Teva all attended, along with Defendants Akorn, Apotex, Dr. Reddy's, Epic, Impax, Lannett, Lupin, Mayne, Par, Perrigo, Sandoz, Taro, Teva, Upsher-Smith, West-Ward, Wockhardt, and Zydus.[63]

180. Shortly after the February 2015 meetings, prices for Propranolol tablets surged, separate and apart from the previous price increase in Propranolol capsules. According to NADAC data, over the course of the next year, various dosage levels of Propranolol tablets saw the following price increases:

a. Propranolol 10mg tablets: Between February 18, 2015 and September 23, 2015, the average price increased by 819%;

b. Propranolol 20mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 892%;

---

[62] 2015 Annual Meeting Past Meeting Attendees, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.gphaonline.org/index.php/events/2015-annual-meeting-past-meeting-attendees.
[63] EPPS Attendees: Retail Pharmacy Generic Pharmaceuticals, ECRM, https://ecrm.marketgate.com/Events/Attendees.aspx?s=3610&rt=S

c. Propranolol 40mg tablets: Between February 18, 2015 and February 17, 2016, the average price increased by 1008%;

d. Propranolol 80mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 958%.

181. On June 9-10, 2015, GPhA held a meeting in North Bethesda, Maryland that was attended by representatives from Leflunomide Defendants Apotex, Heritage, and Teva, along with Actavis, Dr. Reddy's, Fougera, Glenmark's parent company Glenmark Pharmaceuticals Limited, Impax, Lannett, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Upsher-Smith, West-Ward, Wockhardt, and Zydus.[64]

182. Shortly after the June 2015 GPhA CMC Workshop, Leflunomide prices increased dramatically and suddenly, despite their previous relative stability. According to NADAC data, between June 2015 and December 2015, Leflunomide saw the following price increases:

a. Leflunomide (10mg): the average price increased by 730%, from $0.60 per unit to $4.98 per unit;

b. Leflunomide (20mg): the average price increased by 617%, from $0.70 per unit to $5.02 per unit.

183. Throughout the relevant time period, certain Defendants continued to regularly attend trade association meetings, conferences, and events, including:

a. The October 1-3, 2012 GPhA Annual Fall Technical Conference in North Bethesda, Maryland;

[64] 2015 CMC Workshop Past Attendees, ASSOCIATION FOR ACCESSIBLE MEDICINES, https://www.gphaonline.org/index.php/events/2015-gpha-cmc-workshop-past-attendees.

b. The February 24-27, 2013 ECRM annual Retail Pharmacy-Generic Pharmaceuticals EPPS event;

c. The October 27-29, 2014 GPhA meeting in North Bethesda, Maryland;

d. The February 9-11, 2015 GPhA Annual Meeting in Miami Beach, Florida;

e. The March 8-11, 2015 HDMA annual Distribution Management Conference and Expo in Orlando, Florida;

f. The June 7-10, 2015 HDMA Business and Leadership Conference in San Antonio, Texas;

g. The November 2-4, 2015 GPhA meeting in North Bethesda, Maryland; and

h.

i. The March 6-9, 2016 HDMA Distribution Management Conference and Expo in San Antonio, Texas.

184. At these various conferences and trade shows, Defendants' employees and representatives, as well as representatives of other generic drug manufacturers, discussed their respective businesses and customers. Their discussions also occurred at lunches, cocktail parties, dinners, and golf outings that would typically accompany these events. Defendants' representatives used these opportunities to discuss and share upcoming bids, generic drug markets, pricing strategies, and contractual pricing terms specific to certain customers. [65]

185. Additionally, representatives of generic drug manufacturers congregated in smaller, more limited groups. For example, high-level executives of many generic drug manufacturers periodically met for "industry dinners."[66]

---

[65] *See, e.g.,* AG Compl. at ¶ 79.

[66] *Id.* at ¶¶ 81-84

186. Generic drug manufacturer employees also regularly convened for "Girls' Night Out" or "Women in the Industry" meetings and dinners. At these events, generic drug companies' employees met with their competitors and discussed proprietary and competitive information. Upon information and belief, several of these events occurred in May 2015 in Baltimore, Maryland and in August 2015 in Denver, Colorado.[67]

187. Many Defendants are headquartered in close proximity to each other, providing them with easy and frequent access to one another. For example, Defendants Actavis, Breckenridge, Fougera, Heritage, Hi-Tech, Lannett, Mylan, Novartis, Par, Perrigo, Sandoz, Taro, and Teva are all located in the New York/New Jersey/Pennsylvania area. Similarly, Clobetasol Defendants Akorn, Morton Grove, and Perrigo are located close to one another in Michigan and Illinois.

188. In January 2014, as many generic prices were increasing, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey to discuss their ongoing conspiracy.[68]

189. Additionally, as the AGs' investigation uncovered, Defendants routinely conferred with one another on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.[69]

190. Defendants also shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate potentially better prices or terms with their customers, which could ultimately harm consumers like Humana.[70]

[67] *Id.* at ¶¶ 85-88.
[68] *Id.* at ¶ 83.
[69] *Id.* at ¶¶ 89-109.
[70] *Id.*

191. As set forth in the AGs Complaint, based on telephone records obtained during their investigation, representatives of several of the Defendants with pricing responsibility had frequent telephone calls with representatives of their competitors, including Defendants. Executives at Heritage, for example, had at least 513 contacts with executives from Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus. Executives at Teva had at least 1,501 contacts with executives from Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Par, Sandoz, Sun, and Zydus.[71]

192. In short, Defendants' employees, knowledgeable about their competitors' current and future business plans, colluded together to fix prices and allocate specific markets in order to avoid competing on price.

## VIII. DEFENDANTS SIGNAL TO COMPETITORS THEIR INTENT TO SET AND MAINTAIN SUPRACOMPETITIVE PRICES

193. Defendants' public statements and admissions contained in their investor communications indicate they realized record revenues between 2013 and the present, and signaled to competitors a commitment to increasing generic drug prices to supracompetitive levels.

194. In Fiscal Year 2014 (ending Dec. 31, 2014), Defendant Akorn reported a revenue increase of 75% or $237.3 million (from $317.7 million in 2013 to $555 million in 2014) and gross profits increased by 52% or $89.5 million (from $171.9 million in 2013 to $261.4 million in 2014).

195. Akorn's 2015 Annual Report stated "Our gross profit increased by $334.7 million, an increase of 128.0% over gross profit of $261.4 million in 2014. Our overall gross profit margin was 60.5% in 2015 compared to 47.1% in 2014…primarily due to the effect of price changes…"[72]

---

[71] *Id.* at ¶ 94.

[72] Akorn, 2015 ANNUAL REPORT at 41, available at http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NjM0MjM3fENoaWxkSUQ9MzM5MzY5fFR5cGU9MQ==&t=1.

196. Upon information and belief, in or about May 2016, Akorn told industry analysts that "63% of [its] growth in 1Q16 versus 1Q15 was driven by price."

197. In August 2016, Akorn's CFO, Duane Portwood stated on a Q2 earnings call that "net revenue for the quarter ended June 30, 2016, was $281 million, an increase of $60 million or 27% over the prior-year quarter. The increase in revenue was driven by organic growth, with approximately two-thirds attributable to price."

198. In Endo's Q4 2014 earnings call on March 2, 2015, CEO Rajiv De Silva stated, "In 2015, we expect strong double-digit revenue growth for U.S. generics, as a result of consistent volume growth supplemented by recent pricing opportunities."

199. On February 7, 2013, Lannett's CEO Arthur Bedrosian stated in an earnings call:

> I could just say that we're very capable of raising prices and we tend to sometimes lead the market. We see opportunities to raise a price, we take it. We don't sit back and wait for someone else to do it. So you might say we're a little more aggressive in the pricing arena. I'd just rather not focus on which products they were, which could negatively impact us and send the wrong message to my competitors who might think they can get my customers away by lowering the price.

200. On a September 10, 2013 earnings call, Bedrosian stated:

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process. I can reduce costs and manufacturing efficiencies, but it has to be combined with sales increase, a profit increase, as I should say, by the salespeople. And he's done a good job there. With 1 or 2 exceptions, we've tended to lead in the way of price increases. We believe that these prices are important. We need to try raising them. Sometimes, it doesn't stick and we have to go back and reduce our price, and other times it does. I am finding a climate out there has changed dramatically and I see more price increases coming from our competing - competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors will follow suit. If they don't, that's their issue. But our

> plan is to raise prices on any product that we think we can or we haven't raised a price.

201. On that same call, Bedrosian was asked for a reaction to a competitor's recent and significant price increase on Levothyroxine. Bedrosian joked "[y]ou mean after I sent them the thank you note," repeatedly adding that he was "grateful" for the price hike:

> I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well…So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful.…[t]his particular one that was done by a competitor was – isn't price [indiscernible] by any – just like they do any of the price increases, we don't necessarily see the benefits right away because most of the contracts that are in place usually give the customer a buy-in period. So, if you're going to raise a price on them, which is generally not the case, they have an opportunity to place an extra order. So we don't really see the benefit for usually, at least one full quarter, let's say, because there's a 60-day buy in. So I would probably be better able to answer this when we do our guidance for our first quarter sometime in November.

202. On that same call, another investor asked Bedrosian whether he has any "expectations for any new [Levothyroxine] competitors?" Bedrosian noted that two possible competitors "were in the wings…[b]ut hopefully, both companies turn out to be responsible companies and don't go into the marketplace." Bedrosian continued, "We're seeing more responsibility on the part of all of our competitors," adding that because of costs in the industry he "suspect[s] you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace."

203. At the time of this call, and for several months before and after, the price of Levothyroxine saw an approximately 100% price increase. Bedrosian commented on the durability of the price increases on a November 7, 2013 earnings call:

> I don't really see anything significant on the horizon that could cause us any pain, quite frankly. We're still conservatively run. We're still careful how we spend money. We still realize we're in a commodity

> business. While we're enjoying the success of the company, it's not getting to our heads in anyway.

204. On the same call, Lannett's CFO Martin P. Galvan signaled that these were just the "earlier days of the increase," which Bedrosian explained meant that the "price increases that are going on in the industry [are] going to stick for all the companies."

205. On February 6, 2014, both Bedrosian and Galvan confirmed that the price increases were driving growth at Lannett. Galvan reported that "[w]e do believe strongly that there's sustainability in some of the price increases[.]" On May 7, 2014, Bedrosian discussed the 50% price increase of Levothyroxine as part of Lannett's "selective price increases."

206. On November 3, 2014, Bedrosian described one of Lannett's "rational" competitors as one that would not do "anything crazy" such as "just going out and trying to grab market share." He continued:

> So, from my perspective, what we're seeing here is an opportunity to raise prices because everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell.
> So it's really a combination to those things. So I don't think Levo and Digoxin are the only products that would sit here and tell you I could raise prices on, because I believe any of the products in our product line, including products that we may have just gotten approved have those same opportunities underlying them. We look at the market and sometimes we're the first ones to raise a price, sometimes we're not. But we look at everything in line as a potential product to have a price increased on.

207. On the same call, Bedrosian replied to a question about Lannett's continued price increases on Levothyroxine. He remarked that "[i]n the case of Levo, we're already at 75% of the innovative brand," and noted that Lannett could stay at the price for the foreseeable future.

208. On a February 4, 2015 earnings call, Bedrosian explained:

> If you're saying that the price increases that we've had in place, are they sustainable, and are they maintaining? My answer would be yes, they continue to hold up.
> As far as whether we talked about any increases for this year, we don't usually give a guidance for that. We predict what our revenues will be for the year. We're not seeing any declines, generally speaking, on the price increase products. So, they continue to, let's say, level off at their new pricing.

209. Later, on the same call, Bedrosian stated:

> So, I'm expecting these pricings to really sustain themselves to continue. I see people raising prices further, because the generic prices were so low, when you're 10% of the brand, that's not because the brand overpriced the product by 90%. It's because the generic marketplace has so much competition sometimes, people get desperate just to unload their inventory that they cut the prices.
> We don't see that kind of behavior sustainable, and we don't see it going further into the future. I think you're going to find more capital pricing, more - I'll say less competition, in a sense. You won't have price wars. You are still going to have competition, because there's a lot of generic companies in the market. I just don't see the prices eroding like they did in the past.

210. On August 25, 2015, Bedrosian again signaled continuing price increases, because they have been "sustainable" and because "it's a more rational market we're in."

211. Drug price increases contributed to $157.3 million of revenue in 2015 for Lannett. Its sales volume only changed by 5%, but its sales price changed by 54%. Deutsche Bank estimates that price increases for Levothyroxine and Ursodiol accounted for half of Lannett's revenue in fiscal 2015.[73]

212. On August 23, 2016, Bedrosian summarized that price competition "usually doesn't get you to results you want. So, I think a lot of people have learned that lesson by now." He described a problem that "some of the dumber newer companies [that] continue to go down that

---

[73] Lannett Company, Inc., Annual Report (Form 10-K) at 31 (Aug. 27, 2015); Nathan Vardi, *Another Drug Company That Raises Prices Like Crazy*, FORBES, Oct. 6, 2016, available at https://www.forbes.com/sites/nathanvardi/2016/10/06/another-drug-company-that-raises-prices-like-crazy/2/#20ad900d6245.

path" of competing on price. Bedrosian equated experience and expertise with price gouging. Bedrosian also claimed that "occasional" competitors who attempted to compete on price were fortunately "maturing in the market and realizing they need to make a profit as well."

213. On an October 25, 2012 earnings call, Mylan's CEO Heather Bresch stated that "[y]ou've heard me quarter after quarter coming and saying we weren't going to chase the bottom, that there's been irrational behavior and that we would continue to hold steady and control what we can control."

214. On a February 27, 2013 earnings call, Mylan's CFO John Sheehan stated:

> 2013 will yet be another strong year for Mylan. In the U.S., we are anticipating a high volume of new product launches, and we expect to once again be agile enough to quickly seize new supply opportunities when they become available. In addition, favorable changes to the regulatory environment, including increased resources to expedite product reviews and greater oversight with respect to manufacturing, as well as an anticipated more stable pricing environment resulting in part from continued consolidation within the industry, are just two of the favorable macroeconomic factors that we see in 2013.

215. On a May 1, 2014 earnings call, Bresch stated "[w]e continue to see stability really across our entire generic line on pricing."

216. On an August 7, 2014 earnings call, Bresch stated:

> As far as pricing, look, I think that, that stability in our North American -that core business is certainly why we're able to deliver the results we have today, which, like I said, despite those product delays, we see growth year-over-year. We've seen North America continue to maximize opportunities.

217. On an October 30, 2015 earnings call, Bresch stated:

> With respect to gross margin, I guess I would start by pointing out that, since 2010, our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year–of 55%. So the gross margins have been sustained. They have steadily increased over the last five, six years. . .. It also has been driven

> by the positive pricing environment that we've seen, especially over the last couple of years in North America.

218. On that same call, Bresch stated "[l]ook, I would say as far as price increases, we've had a very consistent approach. We have absolutely had opportunities around generic pricing."

219. On February 10, 2016, Bresch stated in an earnings call that she believed Mylan had been a "very responsible generic player with hundreds of products into the market and have shown very responsibly price erosion."

220. On February 7, 2015, Perrigo Company plc's Chairman and CEO Joseph C. Papa stated during an earnings call that, "On the question of pricing…I will say the Rx side does have, as I sit here today, the greatest upside." Papa also noted that Perrigo "achieved record results, growing sales 12% with an adjusted operating margin of 46%." On the same call, industry analyst Gregg Gilbert from Deutsche Bank commented, "Obviously, the generic side of your business and many other companies has benefited from an enhanced pricing environment, if we could call it that, in the last several years." In response, Papa affirmed the continued enhanced pricing trend: "The next year we're going to look at Rx and raise those prices."

221. In its annual 10-K filing with the SEC, Perrigo Company plc reported a 36%% increase in gross profits in its prescription pharmaceuticals business from June 2014 to June 2015 ($361.5 million in fiscal year 2013 to $489.9 million in 2014), as well as an increase of $74 million in net sales, naming the launch of Clobetasol Propionate 0.05% Spray as one of the primary causes.[74]

222. Sandoz and Novartis similarly boasted of increased profits since 2013 and emphasized the importance of the U.S. market in their bottom line. On April 23, 2015, Novartis CEO Joseph Jimenez stated that Sandoz had "strong financial results" and the "U.S. was up 13%."

---

[74] Perrigo Company plc, Annual Report (Form 10-K) at 56 (Aug. 13, 2015).

223. On July 21, 2015, Jimenez stated that, "Sandoz delivered very strong financial results with sales and profit up double-digit; as you can see this is driven by the division's increased focus on core markets, particularly the U.S., which is up 23%."

224. In November 2014, Taro Israel's CEO, Kal Sundaram, said on a Q2 2014 earnings call, "Net sales for Q2 were $251 million, up 22% over Q2 last year. As we anticipated in last quarter's earnings release, we are realizing the benefits of the previous quarter's price adjustments in the current quarter. Gross profit increased 24% to $198 million year-on-year resulting in a 130-basis-points expansion in our gross margins to 79%."

225. In September 2016, a Sun Pharmaceutical Industries (parent of Defendants Sun and Taro) analyst report credited Clobetasol price increases for the Company's success. Harith Ahamed and Krishna Kiran Konduri of Spark Capital Advisors noted:

> **Significant price increases across Taro's portfolio:** Price increases across its derma portfolio has been a key driver for Taro's strong performance in recent years. For instance, Clobetasol propionate, Taro's top product, accounting for [approximately] 11% of sales in FY16, has witnessed price increases of >12x between 2013 and 2015. Sustainability of Taro's price increase-driven performance has been a key concern for investors of [Sun Pharmaceutical Industries Ltd.].

226. In September 2016, *The Economic Times* reported that "While Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases"[75]

227. On February 6, 2014, Teva Pharmaceutical Industries Ltd.'s President and CEO Eyal Desheh stated in an earnings call that "our U.S. generic business [Defendant Teva] is definitely the most profitable part with gross margin of about 50%. Desheh went on to comment that the "U.S. generic business is highly profitable."

[75] Divya Rajagopal, *Taro Pharmaceutical Industries under anti-trust scanner for price hike*, THE ECON. TIMES, Sept. 13, 2016, available at https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/taro-pharmaceutical-industries-under-anti-trust-scanner-for-price-hike/articleshow/54302910.cms.

228. On October 29, 2015, Teva Pharmaceutical Industries Ltd.'s President and CEO of the Global Generic Medicines Group Sigurdur Olafsson stated during an earnings call that the "pricing environment has been quite favorable for generics versus six years ago."

## IX. INDUSTRY ANALYSTS SUSPECT COLLUSION

229. Industry analysts agree that generic price increases are consistent with a price-fixing conspiracy. For example, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics - low sales due to either very low prices or very low volumes - accommodate price inflation.[76]

230. According to one study, since 2013, approximately 1in 19 generic drugs sold in the United States have undergone major price increases that may be consistent with collusion:

> Fideres Partners LLP, a London-based consultancy that works with law firms to bring litigation against companies, reported "anomalous pricing patterns" in scores of generic drugs sold in the U.S. from 2013 to 2016. It identified 90 medicines whose prices rose at least 250 percent over the three-year period and were increased by at least two drug companies around the same time, even though there was no obvious market reason for the increases. The average price jump among the 90 drugs was 1,350 percent, Fideres found. "I don't think the public or even the politicians in the U.S. have any idea just how widespread and extreme the phenomenon is," said Alberto Thomas, one of Fideres's founders.[77]

231. Another study found that, in 2014, "292 generic medication listings went up 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[78]

---

[76] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?,* WALL ST. J., Apr. 22, 2015, *available at* https://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[77] Liam Vaughan and Jered S. Hopkins, *Mylan, Teva Led Peers in "Anomalous" Price Moves, Study Says,* BLOOMBERG (Dec. 22, 2016) *available at* https://www.bloomberg.com/news/articles/2016-12-22/widespread-drug-price-increases-point-to-collusion-study-finds.

[78] David Belk, *Generic Medication Prices,* TRUE COST OF HEALTHCARE, *available at* http://truecostofhealthcare.net/generic_medication_prices/.

232. Pennsylvania physicians, acting through the Pennsylvania Medical Society, called on state and federal governments to investigate surging generic prices, believing anticompetitive conduct was to blame:

> According to Robert Campbell MD, chair of Physicians Against Drug Shortages and immediate past president of the Pennsylvania Society of Anesthesiologists, surging prices have hit hundreds of mainstay generics, including anesthetics, chemotherapeutic agents, antibiotics, and nutritional intravenous solutions. He believes the surging prices are a result of anti-competitive behavior.[79]

## X. THERE IS NO JUSTIFICATION FOR THE EXTRAORDINARY PRICE INCREASES OF THE SUBJECT DRUGS

233. At all relevant times, there were no significant increases in the costs of making any of the Subject Drugs, no significant decrease in supply, and no significant increase in demand.[80] Despite this, Defendants implemented extraordinary price increases on each of the Subject Drugs. Such increases would not have been possible absent the existence of a price-fixing agreement.

234. The FDA Safety and Innovation Act of 2012 requires that drug manufacturers report drug shortages.[81] Any drug shortages or supply disruptions reported to the FDA by any of the Defendants with respect to any of the Subject Drugs were temporary (unless that Defendant discontinued manufacturing the drug in furtherance of the conspiracy as set forth below), and, at all times, alternative suppliers with respect to that drug were available, as recorded in the American Society of Health-System Pharmacists' archives of its Current Drug Shortage Bulletins.

## XI. THE OVERARCHING GENERIC DRUG CONSPIRACY

[79] Press Release, Pennsylvania Medical Society, Rising Generic Drug Costs Have Physicians Raising Red Flags (Feb. 5, 2016), *available at* http://www.prnewswire.com/news-releases/rising-generic-drug-costs-have-physicians-raising-red-flags-300216006.html.

[80] In a case alleging similar facts regarding the conspiracy to fix prices of generic Propranolol against the same Propranolol Defendants here, Judge Jed S. Rakoff held that Defendants failed to show any drug shortage sufficient to render allegations of price-fixing implausible. *In re Propranolol Antitrust Litig.*, 249 F.Supp.3d 712, 722 (S.D.N.Y. 2017) (Rakoff, J.).

[81] Pub. L. No. 112-144, §§ 1001-1008, 126 Stat. 995, 1099-1108.

235. As alleged in the AG Complaint, the generic pharmaceutical industry as a whole operated under a system of understandings described as "playing nice in the sandbox," whereby participating companies were guaranteed a "fair share" of the market for certain generic drugs based on the number of participants in the market and the order of entry. Although some specific details of this understanding, including some of the industry terminology used, have been redacted, it remains clear that the State AGs have compiled substantial evidence of such an industry-wide conspiracy.[82]

236. This overarching conspiracy has several aspects, in addition to the price-fixing agreements for certain drugs set forth below.

237. For example, in order for each putative competitor to maintain its "fair share," putative competitors frequently traded off large customers among each other by trading information about bids and requests for proposals and agreeing that a particular incumbent supplier would "walk away" from a large customer by knowingly submitting a higher bid than a competing supplier.

238. This overarching conspiracy necessarily involved more than one drug. Putative competitors declined to compete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined winning bid for a different drug.[83]

239. Similarly, an agreement by a putative competitor to join in the price increase for one drug was traded off by that same competitor leading a price increase for another drug.

240. The fact that an overarching conspiracy existed alongside drug-specific conspiracies is most clearly illustrated by the allegations in the AG Complaint regarding Heritage's attempt to impose industry-wide price increases simultaneously on eighteen drugs, including four of the Subject

[82] *See* AG Compl. ¶¶ 89-109.
[83] *Id.* at ¶ 103.

Drugs: Doxycycline, Leflunomide, Nystatin, and Verapamil.[84] This involved reaching out to competitors as to each of the drugs in an attempt to agree on price increases.[85]

## XII. ALLEGATIONS SPECIFIC TO EACH OF THE SUBJECT DRUGS

### a. Amitriptyline

241. The Amitriptyline market is mature, as the drug has been available in the United States since 1961.

242. At all relevant times, there have been more than one manufacturer of Amitriptyline in the marketplace.

243. At all relevant times, Amitriptyline Defendants Mylan, Novartis, Par, and Sandoz have dominated, and continue to dominate, the market for Amitriptyline.

244. Prior to 2014, the effective prices for Amitriptyline were stable.

245. However, beginning in May 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Amitriptyline Period"), the average NADAC price for Amitriptyline rose dramatically.

246. For example, the average prices for Amitriptyline increased 300% to 2,000% across dosage strengths.

247. The *Financial Times* reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[86]

[84] *Id.* at ¶ 269.
[85] *Id.* at ¶¶ 268-93.
[86] David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, FIN. TIMES, May 12, 2015, available at https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de.

248. The *Boston Globe* similarly reported, in November of the same year, "The cost of the antidepressant drug amitriptyline jumped 2,475 percent, from 4 cents for a 100-milligram pill in 2013 to $1.03 in 2015."[87]

249. The GAO identified Amitriptyline as having experienced an "extraordinary price increase."[88]

250. These price increases impacted multiple dosages of Amitriptyline. The charts below show average price increases for 75mg, 100mg, and 150mg tablets, based on NADAC data:




[87] Priyanka Dayal McCluskey, *As competition wanes, prices for generics skyrocket*, BOS. GLOBE, Nov. 6, 2015, available at https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.
[88] GAO Report at Appx. III.







**b. Baclofen**

251. The Baclofen market is mature, as the drug has been available in the United States since 1977.

252. Baclofen is available in 10mg and 20mg tablets.

253. At all relevant times, there have been at least three manufacturers of generic Baclofen in the market.

254. At all relevant times, Baclofen Defendants Lannett, Par, Teva, and Upsher-Smith have dominated, and continue to dominate, the market for Baclofen.

255. For many years, competition among the small group of manufacturers of generic Baclofen kept prices low and stable.

256. However, beginning in February 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Baclofen Period"), prices for generic Baclofen increased significantly and abruptly. Baclofen Defendants increased their Baclofen prices largely in unison.

257. As set forth above, this price increase followed the February 2014 GPHA Annual Meeting, at which the Baclofen Defendants were present.

258. According to NADAC data, the average market price for Baclofen increased by the following percentages:

a. Baclofen 10mg tablet: Between March 2014 and April 2014, prices increased 636%; and

b. Baclofen 20mg tablet: Between March 2014 and January 2015, prices increased 437%.

259. Further corroborating the data of this sudden and dramatic price hike, the GAO Report identified Baclofen as having "experienced an extraordinary price increase" in 2014-15.[89]

260. According to NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014. From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for 20mg tablets. Then, beginning around February 2014, the overall average market price rose by

[89] GAO Report at 35.

more than 550%. These price increases affected both dosages of Baclofen, *i.e.* 10mg and 20mg tablets, as depicted below:






**c. Benazepril**

261. The Benazepril market is mature, as the drug has been available in the United States since 1991.

262. At all relevant times, there have been more than one manufacturer of Benazepril in the market.

263. Benazepril Defendants Mylan, Novartis, and Sandoz dominate the market for Benazepril.

264. Prior to August 2013, the effective prices for Benazepril were stable.

265. Beginning in August 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Benazepril Period"), Benazepril Defendants increased their prices dramatically and in unison.

266. As a result, prices across the market rose more than 400% for Benazepril, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings. The GAO Report also noted an "extraordinary price increase" for Benazepril in 2013-2014.[90]

**d. Clobetasol**

267. The Clobetasol market is mature, as the drug has been available in the United States since 1985. Generic Clobetasol has been available since 1994.

268. At all relevant times, there have been more than one manufacturer of Clobetasol in the market.

269. In 2009, there were approximately ten Clobetasol manufacturers. In 2012, Novartis acquired Fougera and in 2013, Akorn acquired Hi-Tech, further consolidating the market. By 2014, about half as many Clobetasol manufacturers exited the market, including Teva and Glenmark.

[90] *Id.*

270. Since June 2014, Clobetasol Defendants Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Novartis, Perrigo, Sandoz, Taro, and Wockhardt have dominated the market for generic Clobetasol.

271. Prior to 2014, the effective prices for Clobetasol were stable.

272. Upon information and belief, beginning in June 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Clobetasol Period"), Clobetasol Defendants all increased their prices abruptly and in unison. Collectively, the Clobetasol Defendants raised prices for generic Clobetasol by approximately 1,300% between July 2014 and September 2014.

273. A set forth above, this price increase followed the June 2014 GPhA annual CMC Workshop at which the Clobetasol Defendants were present.

274. According to NADAC data, the average market price for generic Clobetasol saw the following price increases from July 2014 to September 2014:

a. Clobetasol .05% Ointment (15g): increased by 1,852%;

b. Clobetasol 0.05% Solution (50mL): increased by 1,176%; and

c. Clobetasol 0.05% Cream (30g): increased by 1,596%.

275. NADAC data shows that average market prices of Clobetasol remained stable prior to June 2014, but rose dramatically and remained artificially high after June 2014, as depicted in certain forms and dosages below.


Clobetasol 0.05% Solution - 25mL
NADAC price per unit (dollars)
$2.50
$2.00
$1.50
$1.00
$0.50
$-
Date
Avg. Market Price


Clobetasol 0.05% Cream - 15g
NADAC Price per unit (dollars)
$5.00
$4.50
$4.00
$3.50
$3.00
$2.50
$2.00
$1.50
$1.00
$0.50
$-
Date
Avg. Market Price

276. Upon information and belief, WAC data depicted below confirms that Defendants Actavis, Hi-Tech, Sandoz, and Taro all increased prices in their Clobetasol cream by the following amounts:

| Clobetasol cream .05%: | Defendant: | Old WAC: | New WAC: | Date of Increase: | Percentage Increase: |
|---|---|---|---|---|---|
| 15gm | Taro | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | * | $6.12 | 10-Mar-15 | * |

277. News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.

278. For example, by October 2014, pharmacists expressed outrage at the dramatic price increases. Kushal Patel, a pharmacy manager at Well Future Pharmacy said "Clobetasol, which used to cost $10 for the entire tube, now costs $300. The same exact medication we got one day. Next day, it's an increase of three thousand percent."[91]

[91] Dorothy Tucker, *Prices Soar For Some Generic Drugs – Why?*, CBS CHICAGO, Oct. 31, 2014, http://chicago.cbslocal.com/2014/10/31/prices-soar-for-some-generic-drugs-why/.

279. Ascension Health, a hospital system based in Missouri with facilities in 23 states, reported a price increase from $2.89 in 2013 to $198.64 (or 6,773%) in 2014 for a 45-gram tube of generic Clobetasol propionate cream.[92]

280. A dermatologist, likewise, reported the experience of his patient in Tucson, Arizona in 2015. He expressed shock and dismay when his patient informed him that a 60-gram tube of Clobetasol cream would now cost him $220. The dermatologist was so surprised that he called around to other local pharmacies, all of whom were pricing the product above $200.[93]

281. Patient reports also corroborate the skyrocketing prices for Clobetasol. In 2014, Millicent Graves of Williamsburg, Virginia paid $35 for her prescription of Clobetasol solution, but in 2015, it cost $475.88. And just five weeks later, it rose to $627, overall a 1,691% increase over the course of a few months.[94]

282. Express Scripts, a PBM company that compiles its own price index for generic drugs, included Clobetasol in the top four most significant price increases for 2014[95] and in the top ten for 2015.[96]

283. An article in the *Boston Globe* described price changes from 2013 to 2015, when one form of Clobetasol's price spiked 1,496% from $0.23 per gram to $4.15 per gram. In response, Akorn representative Dewey Steadman said that the company simply reacted to price increases by its competitors, Novartis and Taro. In doing so, he invoked the influence of their market dominance

---

[92] Samantha Liss, *Hospitals and Pharmacies Grapple With Rising Drug Prices*, St. Louis Post-Dispatch, Nov. 16, 2014, http://www.stltoday.com/business/local/hospitals-and-pharmacies-grapple-with-rising-drug-prices/article_c6616678-bf8f-5b0e-8df1-9238df0f6919.html.

[93] Norman Levine, *The Tale of the $200 Tube of Clobetasol Cream*, DERMATOLOGY TIMES, Aug. 5, 2015, http://dermatologytimes.modernmedicine.com/dermatology-times/news/tale-220-tube-Clobetasol-cream-2

[94] *Unprecedented Generic Drug Price Spikes Wreaking Havoc*, THE SENIOR CITIZENS LEAGUE, Jul. 6, 2015, http://seniorsleague.org/unprecedented-generic-drug-price-spikes-wreaking-havoc/.

[95] *The Reality Behind Generic Drug Inflation,* EXPRESS SCRIPTS, Dec. 30, 2014, http://lab.express-scripts.com/lab/insights/drug-options/the-reality-behind-generic-drug-inflation.

[96] 2015 Drug Trend Report, EXPRESS SCRIPTS, March 2016, *available at* http://lab.express-scripts.com/lab/drug-trend-report/previous-reports.

and rejected the possibility of outside price factors: "Following price increases by others in this highly competitive market, Akorn brought Clobetasol's price in line with other generic versions of the product."[97]

**e. Clomipramine**

284. The market for generic Clomipramine is mature, as the drug has been available in the United States since 1990, and generic versions have been on the market since 1996. Hundreds of thousands of Clomipramine prescriptions are filled each year.

285. At all relevant times, there have been more than one manufacturer of Clomipramine in the market.

286. Clomipramine Defendants Mylan, Novartis, Sandoz, and Taro dominate the market for Clomipramine. Their sales represent approximately 98% of total generic Clomipramine sales.

287. Prior to 2013, the effective prices for Clomipramine were stable.

288. Upon information and belief, around May 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Clomipramine Period"), Clomipramine Defendants suddenly and dramatically raised the price of Clomipramine largely in unison. According to Red Book data,[98] the Average Wholesale Price ("AWP") for Clomipramine 50 mg increased by the following amounts:

| Defendant: | Old AWP price: | New AWP price: | Post-increase date: | Percentage Increase: |
|---|---|---|---|---|
| **Mylan** | $1.172 | $11.242 | May 2013 | 859% |
| **Sandoz** | $1.065 | $11.242 | July 2013 | 956% |
| **Taro** | $1.103 | $11.242 | May 2013 | 919% |

[97] Priyanka Dayal McCluskey, *As Competition Wanes, Prices for Generics Skyrocket,* THE BOSTON GLOBE, Nov. 6, 2015, https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

[98] "RED BOOK™ Drug References provide electronic access to current pricing and product information on prescription and over-the-counter drugs, nutraceuticals, bulk chemicals, and non-drug items. It is updated continuously." Press Release, Thomson Reuters, RED BOOK from Thomson Reuters Continues Providing Average Wholesale Prices for Drugs as Others Stop Supplying This Important Data (Apr. 8, 2010), available at https://www.fiercehealthcare.com/healthcare/red-book-from-thomson-reuters-continues-providing-average-wholesale-prices-for-drugs-as.

289. Upon information and belief, NADAC price data demonstrates that the average market price per unit for generic Clomipramine (50mg) increased from $0.31 in April 2013 to $9.03 in July 2013, representing a more than 2,800% increase.

290. Prices for various dosages of Clomipramine increased by as much as 2,000% in one year, according to the 2016 GAO Report.[99] In 2015 alone, total sales revenue for Clomipramine spiked to $519 million, which is more than half the total sales revenue for the same products from 2011-2014 combined. This type of revenue growth in a mature market is evidence of Defendants' collusion.

**f. Digoxin**

291. The Digoxin market is mature, as the drug was first approved by the FDA in 1975, and forms of it have been on the market in the United States since prior to the passage of the Federal Food, Drug, and Cosmetic Act in 1938. Variants of the drug, which is derived from the Digitalis lanata plant, have been used since the 18th century.

292. At all relevant times, there have been more than one manufacturer of Digoxin in the market.

293. As of the end of 2012, Impax and Lannett were the only active domestic manufacturers of Digoxin. Par and West-Ward entered the market in 2014 and Mylan entered in 2015.

294. Prior to October 2013, effective prices for Digoxin were stable.

[99] GAO Report at 14.

295. Beginning in October 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Digoxin Period"), Impax and Lannett increased their prices abruptly and in unison.

296. During this period, prices for generic Digoxin rose more than 630%.

297. The following chart, based on NADAC data, depicts Digoxin's average price per unit in various exemplary tablet dosage levels from 2013-2016. As illustrated, Digoxin Defendants dramatically inflated the market rate for Digoxin tablets:



298. These price increases were maintained even after Mylan, Par, and West-Ward entered the market. This is especially telling evidence of collusion, as entry of three additional competitors would typically lead to substantial price prices.

**g. Divalproex**

299. The Divalproex market is mature, as variants of it have been in use for more than a century, and generic versions have been available in the United States since 2008.

300. At all relevant times, there have been more than one manufacturer of Divalproex in the market.

301. Divalproex Defendants Dr. Reddy's, Mylan, Par, and Zydus dominate the market for Divalproex.

302. Prior to June 2013, effective prices for Divalproex were stable.

303. In June 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Divalproex Period"), Mylan and Par increased their prices for Divalproex dramatically and in unison. Dr. Reddy's and Zydus matched those prices two months after the initial price increase.

304. As a result, prices across the market rose more than 700% for Divalproex, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings. The GAO Report also noted an "extraordinary price increase" for Divalproex in 2013-2014.[100]

**h. Doxycycline**

305. The Doxycycline market is mature, as the drug has been available in the United States in various forms since 1967, and generic versions have been available since at least 2005.

[100] GAO Report at 38.

306. Doxycycline is sold primarily in two forms: Doxycycline Hyclate and Doxycycline Monohydrate ("Doxycycline Mono"). The former is more commonly used because it is generally cheaper. These drugs are not bioequivalents but are often considered interchangeable, and many physicians prescribe Doxycycline without specifying the form.

307. At all relevant times, there have been more than one manufacturer of Doxycycline.

308. Defendants Actavis, Par, Sun, and West-Ward dominate the market for Doxycycline Hyclate and Defendants Heritage, Lannett, Mayne, and Par dominate the market for Doxycycline Mono. Defendant Teva also manufactured Doxycycline Hyclate until May 2013. These companies are collectively referred to as the "Doxycycline Defendants."

309. Prior to November 2012, effective prices for Doxycycline Hyclate were stable.

310. Beginning in November 2012 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Doxycycline Period"), Defendants Actavis, Par, Sun, and West-Ward increased their prices abruptly and largely in unison. Despite this large price increase, Teva exited the market as set forth above.

311. In April 2014, DAVA Pharmaceuticals, Inc. ("DAVA"), a company that later became a subsidiary of Defendant Endo, launched a version of Doxycycline Hyclate. This launch led to litigation between DAVA and Chartwell Therapeutics Licensing, LLC ("Chartwell"). In that litigation, Chartwell alleged that DAVA and Endo refused to take delivery of Doxycycline Hyclate from Chartwell despite demand in the market and conspired with competitors to set Doxycycline Hyclate at the same price.[101]

312. As a result of Doxycycline Defendants' collusion, prices across the market rose more than 8,000% for Doxycycline Hyclate, according to data compiled by the Healthcare Supply

---

[101] *See Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC,* Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

Chain Association and released by Senator Sanders and Representative Cummings. The GAO Report also noted two "extraordinary price increase[s]" for Doxycycline Hyclate capsules between 2012 and 2014 and an "extraordinary price increase" for Doxycycline Hyclate tablets in 2013-2014.[102]

313. In early 2013, because of the Doxycycline Hyclate price increases, large purchasers of Doxycycline increased their purchases of Doxycycline Mono.

314. Defendants Heritage and Lannett therefore agreed to maintain the effect of their collusion by implementing substantial price increases on Doxycycline Mono through communications on March 7, 2013 and March 13, 2013. Heritage and Lannett ultimately agreed to increase their Doxycycline Mono prices by about 400%.

315. Mylan and Par were brought into this agreement in May and June of 2013. Executives from the four companies met at industry events in April and May of 2013 to discuss the price increase, then continued those discussions through telephone calls and text messages.

316. Pursuant to this agreement, Mylan and Par announced price increases in the summer of 2013. Heritage announced its price increase in October 2013.

317. The misconduct of the Doxycycline Defendants is further detailed in paragraphs 180-267 of the AG Complaint, which are incorporated herein by reference.

**i. Leflunomide**

318. The market for generic Leflunomide is mature, as the drug has been available in the United States since 1998. Generic versions have been available since 2005.

319. At all relevant times, the generic market has consisted of at least three manufacturers.

[102] GAO Report at 38.

320. At all relevant times, Leflunomide Defendants Apotex, Heritage, and Teva have and continue to dominate the market.

321. With ample competition among generic manufacturers, Leflunomide prices remained steady until June 2015.

322. During an April 15, 2014 phone call, Heritage President Jason Malek and a Teva executive discussed Leflunomide and agreed to artificially increase the price of generic Leflunomide.

323. In May 2014, executives from Defendants Apotex, Heritage, and Teva spoke several times by telephone and agreed to increase prices on Leflunomide and to refrain from submitting competitive bids to each other's customers.

324. Upon information and belief, beginning in the summer of 2015 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Leflunomide Period"), Leflunomide Defendants increased their prices dramatically and uniformly.

325. NADAC data shows the following average market price increases for Leflunomide between June 2015 and December 2015:

a. Leflunomide (10mg): increased by 730%; and

b. Leflunomide (20mg): increased by 617%.

326. After these announced price increases, Teva exited the market. This decision countered Teva's self-interest, as it could have benefitted by undercutting the higher prices charged by Apotex and Heritage and thereby gaining market share.

327. As set forth above, these price increases occurred following the June 2015 GPhA meeting, which the Leflunomide Defendants attended.

328. Based on NADAC data, portrayed in the following charts, the average market price for Leflunomide rose dramatically and remained artificially high after June 2015.







329. Following the dramatic price spikes in June 2015, Leflunomide prices continued to increase to approximately 675% higher than their pre-conspiracy levels and to remain at artificially high levels.

330. The misconduct of the Leflunomide Defendants is further detailed in paragraphs 380-390 of the AG Complaint, which are incorporated herein by reference.

**j. Levothyroxine**

331. The Levothyroxine market is mature, as the drug has been available in the United States since 1955. Generic versions have been available since 2004.

332. At all relevant times, there have been at least three manufacturers of Levothyroxine in the market.

333. Since approximately December 2010, Levothyroxine Defendants Lannett, Mylan, Novartis, and Sandoz have dominated the market with a nearly 100% share.

334. Prior to 2013, the effective prices of Levothyroxine were stable, as is typical in a mature market.

335. [redacted]. Upon information and belief, Defendants Lannett, Novartis, and Sandoz also raised their prices for generic Levothyroxine by similar amounts between May 2013 and October 2013.

336. Beginning in May 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases, Levothyroxine Defendants increased their prices dramatically and uniformly (the "Levothyroxine Period").

337. NADAC data is publicly available only for the time period between November 2013 and the present (after the initial price hike), but even this limited data shows that average market price for various dosages of Levothyroxine nearly doubled in price:

a. Levothyroxine 100 mcg Tablets: increased by 70% between November 2013 and September 2014; and

b. Levothyroxine 175 mcg Tablets: increased by 78% between November 2013 and August 2014.

338. These price increases followed the June 2013 GPhA CMC Workshop, which the Levothyroxine Defendants all attended, as set forth in greater detail above.

339. Extreme increases in Levothyroxine prices are suggestive of Defendants' collective market dominance. Had Defendants not already dominated the market, their price inflation would have caused them to lose sales volume to non-colluding competitors. Since the market included at least three generic manufacturers, a price increase by one manufacturer should have led to a rapid loss of market share unless all competitors increased their prices in kind. Levothyroxine Defendants did not lose sales volume following their price increases.

340. In a November 2014 hearing in the United States Senate HELP Subcommittee, pharmacist Stephen W. Schondelmeyer testified that in the last year, Levothyroxine had experienced a 35-50% price hike. Mr. Schondelmeyer added that Mylan increased its prices for 9 different strengths of Levothyroxine by between 44-63%. Pharmacist Robert Frankil also testified that in 2013, Levothyroxine experienced a dramatic price increase.[103] By 2015, patients were complaining that they experienced a 283% increase for the cost of Levothyroxine, with some patients seeing a spike as high as 300%.[104]

---

[103] *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the Subcomm. On Primary Health and Aging of the S. Comm. on Health, Educ., Labor, and Pensions*, 113th Cong. 10 (2014) (statement of Stephen W. Schondelmeyer, Director, Prime Institute and statement of Robert Frankil, President, Sellersville Pharmacy, Inc.), available at https://www.gpo.gov/fdsys/pkg/CHRG-113shrg24459/pdf/CHRG-113shrg24459.pdf.

[104] Keith Roach, *Hike in prescription cost can be a hardship*, DETROIT NEWS, Mar. 29, 2015, available at https://www.detroitnews.com/story/life/advice/2015/03/29/keith-roach-health-high-prescription-cost-hardship/70639116/; Michelle Andrews, *Insurers May Share Blame for Increased Price of Some Generic Drugs*, NPR, July 26, 2016, available at https://www.npr.org/sections/health-shots/2016/07/26/487367877/insurers-may-share-blame-for-increased-price-of-some-generic-drugs.

341. The Wisconsin Center for Investigative Journalism found that between 2011 and 2016, the price per pill for generic Levothyroxine increased from 14 cents to 46 cents.[105]

342. Generic Levothyroxine saw the following price increases post-November 2013, according to NADAC's average market price data:




[105] Sean Kirby, Dee J. Hall & Bridgit Bowden, WIS. CTR. FOR INVESTIGATIVE JOURNALISM, Nov. 28, 2016, available at https://urbanmilwaukee.com/2016/11/28/prices-of-lifesaving-drugs-skyrocketing/.




**k. Lidocaine**

343. The Lidocaine market is mature, as the drug has been available in the United States since 1948.

344. At all relevant times, there have been more than one manufacturer of Lidocaine in the market.

345. Lidocaine Defendants Akorn, Fougera, Hi-Tech, Impax, Novartis, and Sandoz dominate the market for one popular formulation of Lidocaine, Lidocaine-Prilocaine.

346. Prior to 2014, the effective prices for Lidocaine-Prilocaine were stable.

347. Beginning in April 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Lidocaine Period"), Lidocaine Defendants increased their prices abruptly and largely in unison for Lidocaine-Prilocaine.

348. Prices for other forms of Lidocaine also experienced price increases. The GAO Report noted an "extraordinary price increase" for Lidocaine 5% ointment between in 2012-2013 and another "extraordinary price increase" for Lidocaine-Hydrochloride 3% cream in 2011-2012.[106]

349. Average prices for Lidocaine-Prilocaine increased by close to 300%, according to NADAC data, as set forth below:




### l. Nystatin

350. The Nystatin market is mature, as the drug has been available in the United States since 1954.

351. At all relevant times, there have been more than one manufacturer of Nystatin in the market.

352. Nystatin Defendants Heritage, Sun, and Teva dominate the market for Nystatin.

[106] GAO Report at 41.

353. A senior executive of Sun discussed the price of Nystatin with Jason Malek, former President of Heritage, on April 16, 2013 over the telephone.

354. Malek engaged in several telephone conversations with a Teva executive concerning Nystatin pricing in July 2013.

355. Malek and the Teva executive agreed on a Nystatin price increase during a February 4, 2014 phone conversation.

356. On April 4, 2014, Teva announced an increase of nearly 100% on Nystatin.

357. In June 2014, Heritage announced a price increase of nearly 100% on Nystatin.

358. Sun announced a similar price increase in August 2014.

359. Beginning in April 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Nystatin Period"), the Nystatin Defendants increased their prices abruptly and largely in unison for.

360. NADAC data shows the average price increase for Nystatin 500,000 Unit Oral tablets during this period:



361. The misconduct of the Nystatin Defendants is further detailed in paragraphs 391-414 of the AG Complaint, which are incorporated herein by reference.

**m. Pravastatin**

362. The Pravastatin market is mature, as the drug has been available in the United States since 1991. Generic versions have been available since 1996.

363. At all relevant times, there have been more than one manufacturer of Pravastatin in the market.

364. Pravastatin Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus dominate the market for Pravastatin.

365. Prior to 2013, effective prices for Pravastatin were stable.

366. Beginning in May 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Pravastatin Period"), Pravastatin Defendants increased their prices abruptly and largely in unison.

367. As a result, prices across the market rose more than 500% for Pravastatin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings. The GAO Report also noted an "extraordinary price increase" for Pravastatin between in 2013-2014.[107]

**n. Propranolol**

368. The Propranolol market is mature, as the drug has been available in the United States since at least 1968. Generic propranolol has been available since 2007.

369. The Propranolol price-fixing conspiracy was executed by two overlapping groups of Defendants in two phases. First, on or around December 2013, Propranolol Capsule Defendants colluded to increase the prices of multiple dosage levels of Propranolol capsules. Next, on or around

[107] GAO Report at 43.

February 2015, Propranolol Tablet Defendants colluded to increase the prices of multiple dosage levels of Propranolol tablets.

370. Beginning in December 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Propranolol Period"), the Propranolol Defendants increased their prices abruptly and largely in unison.

371. At all relevant times, there have been at least three manufacturers of Propranolol in both forms in the market.

372. Propranolol Capsule Defendants Actavis, Breckenridge, and Upsher-Smith dominate the market for Propranolol capsules and Propranolol Tablet Defendants Actavis, Endo, Heritage, Mylan, Par, Teva, and UDL dominate the market for Propranolol tablets. This dominance was achieved by consolidation among the manufacturers: Teva Pharmaceutical Industries, Ltd., the parent of Teva, acquired Actavis in March 2015. Endo acquired Par in September 2015.

373. Propranolol Capsule Defendants increased prices on Propranolol capsules between December 2013 and October 2014.

374. According to NADAC data, various dosage levels of Propranolol capsules saw the following average price increases:

a. Propranolol ER 120mg capsules: increased by 181% between December 2013 and July 2014; and

b. Propranolol ER 180mg capsules: increased by 174% between December 2013 and October 2014.

375. As set forth above, these price increases followed the October 2013 GPhA Technical Conference, which Propranolol Capsule Defendants attended.

376. Propranolol Tablet Defendants all increased prices on Propranolol tablets between February 2015 and February 2016.

377. According to NADAC data, various dosage levels of Propranolol tablets saw the following price increases:

a. Propranolol 40mg tablets: Between February 18, 2015 and February 17, 2016, the average price increased by 1008%; and

b. Propranolol 80mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 958%.

378. As set forth above, these price increases followed the February 2015 GPhA Annual Meeting, which Propranolol Tablet Defendants attended.

379. Where a group of manufacturers dominate the market, as they do here, and contemporaneously, or in quick succession, increase prices, the new higher price influences the rest of the market.

380. Using NADAC data, the following charts indicate the average price per unit of Propranolol capsules in the 120mg and 160mg dosage levels:






381. Using NADAC data, the following charts depict the average price per unit of Propranolol tablets at the 40mg and 80mg dosage levels:






382. Medicaid reimbursement data also confirms that Propranolol Defendants increased their prices abruptly and largely in unison. Upon information and belief, the following charts depict Medicaid reimbursement rates for exemplary dosage levels of Defendants' Propranolol capsules.







383. Upon information and belief, the following charts depict Medicaid reimbursement rates for exemplary dosage levels of Defendants' Propranolol tablets.


PROPRANOLOL: Avg. Reimb. per Unit (TAB40MG--100)
Avg. Reimb. per Unit
.5
.4
.3
.2
.1
2011q1
2011q2
2011q3
2011q4
2012q1
2012q2
2012q3
2012q4
2013q1
2013q2
2013q3
2013q4
2014q1
2014q2
2014q3
2014q4
2015q1
2015q2
2015q3
2015q4
2016q1
2016q2
Time
ACTAVIS
HERITAGE
MYLAN
TEVA
PAR


PROPRANOLOL: Avg. Reimb. per Unit (TAB80MG--100)
Avg. Reimb. per Unit
.5
.4
.3
.2
.1
2011q1
2011q2
2011q3
2011q4
2012q1
2012q2
2012q3
2012q4
2013q1
2013q2
2013q3
2013q4
2014q1
2014q2
2014q3
2014q4
2015q1
2015q2
2015q3
2015q4
2016q1
2016q2
Time
ACTAVIS
HERITAGE
MYLAN
TEVA
PAR

384. On April 6, 2017, the United States District Court for the Southern District of New York denied a motion to dismiss an action by direct Propranolol purchasers alleging a similar Propranolol price-fixing conspiracy by the same Propranolol Defendants.[108]

385. Judge Jed S. Rakoff upheld the direct purchaser plaintiffs' federal antitrust claims against Propranolol Defendants, finding that plaintiffs had plausibly alleged "that the defendants illegally conspired to fix the prices of Propranolol capsules and tablets in 2013 and 2015."[109] In support of these allegations, the court credited plaintiffs' four antitrust "plus factors:" (1) "defendants had a motive to increase prices because they operate in an oligopolistic market characterized by falling prices; (2) the price increases were against defendants' self-interest because, in a competitive market, defendants should have tried to undercut each other's prices to increase their market share; (3) defendants frequently communicated at trade association meetings; and (4) there are ongoing state and federal investigations for price manipulation of generic drugs, including Propranolol."[110]

**o. Ursodiol**

386. The Ursodiol market is mature, as the drug has been available in the United States since 1987. Generic versions have been available since at least 2000.

387. At all relevant times, there have been more than one manufacturer of Ursodiol in the market.

388. Ursodiol Defendants Actavis, Epic, and Lannett dominate the market for Ursodiol.

389. Prior to May 2014, prices for Ursodiol were stable.

---

[108] *In re Propranolol Antitrust Litig.*, 249 F.Supp.3d 712 (S.D.N.Y. 2017) (Rakoff, J.).
[109] *Id.* at 724.
[110] *Id.* at 718-19. The court also upheld the direct purchaser plaintiffs' claims brought under the antitrust laws of fifteen states, and dismissed claims brought under the antitrust laws of twelve other states and the District of Columbia for reasons specific to those plaintiffs, e.g. those plaintiffs' injuries and the timing of their discovery of their injuries. *Propranolol*, 249 F.Supp.3d at 724-29.

390. Beginning in May 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Ursodiol Period"), Ursodiol Defendants increased their prices abruptly and largely in unison.

391. Using NADAC data, the following chart indicates the 1000% average price increase of Ursodiol 300mg. The Ursodiol Defendants' Ursodiol prices have continued to stay artificially high since the initial increase:




**p. Verapamil**

392. The Verapamil market is mature, as the drug has been available in the United States since 1981. Generic versions have been available since 1986.

393. At all relevant times, there have been more than one manufacturer of Verapamil in the market.

394. Verapamil Defendants Actavis, Heritage, and Mylan dominate the market for Verapamil.

395. In telephone calls among senior executives of Actavis, Heritage, and Mylan on April 22 and April 23, 2014, Actavis, Heritage, and Mylan agreed to raise prices for Verapamil.

396. Heritage announced its price increase in June 2014, and Actavis and Mylan (along with Epic) soon followed with similar price increases.

397. Beginning in June 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Verapamil Period"), the Verapamil Defendants increased their prices abruptly and largely in unison.

398. Using NADAC data, the following chart depicts the 100% increase in the average price of Verapamil 20mg capsules:




399. The misconduct of the Verapamil Defendants is further detailed in paragraphs 443-453 of the AG Complaint, which are incorporated herein by reference.

## XIII. HUMANA'S PURCHASES AND ANTITRUST INJURY

### a. Amitriptyline

400. During the Amitriptyline Period, HPI purchased over $5.9 million worth of Amitriptyline directly from Qualitest (now Par), Par, and non-party Accord, as well as over $48 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Amitriptyline. Those prices have been substantially higher than the prices Humana would have paid for Amitriptyline but for Defendants' collusion.

**b. Baclofen**

401. During the Baclofen Period, HPI purchased over $3.4 million worth of Baclofen directly from Upsher-Smith, Qualitest (now Par), and Teva, as well as over $68 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Baclofen. Those prices have been substantially higher than the prices Humana would have paid for Baclofen but for Defendants' collusion.

**c. Benazepril**

402. During the Benazepril Period, HPI purchased over $2 million worth of Benazepril directly from Teva, Amneal Pharmaceutical, LLC (sued through its successor, referred to as Impax in this Complaint) and non-party Aurobindo Pharma USA Inc.,[111] as well as over $46 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Benazepril. Those prices have been substantially higher than the prices Humana would have paid for Benazepril but for Defendants' collusion.

**d. Clobetasol**

403. During the Clobetasol Period, HPI purchased over $2.9 million worth of Clobetasol directly from Taro, Akorn, Glenmark, Sandoz, Actavis, and Hi-Tech, as well as over $168 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay

[111] Although Aurobindo Pharma USA Inc. is not a defendant in this Complaint, it is a defendant in other actions alleging price-fixing of certain other drugs, including Fosinopril, Glyburide, and Glyburide-Metformin.

artificially inflated prices for Clobetasol. Those prices have been substantially higher than the prices Humana would have paid for Clobetasol but for Defendants' collusion.

**e. Clomipramine**

404. During the Clomipramine Period, HPI purchased over $200,000 worth of Clomipramine directly from Mylan and over $55 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Clomipramine. Those prices have been substantially higher than the prices Humana would have paid for Clomipramine but for Defendants' collusion.

**f. Digoxin**

405. During the Digoxin Period, HPI purchased over $8.2 million worth of Digoxin directly from Impax and over $122 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Digoxin. Those prices have been substantially higher than the prices Humana would have paid for Digoxin but for Defendants' collusion.

**g. Divalproex**

406. During the Divalproex Period, HPI purchased over $3.7 million worth of all forms of Divalproex directly from Dr. Reddy's, Par, Sun, Zydus, and non-party Unichem Pharmaceuticals (USA), Inc., as well as over $231 million worth indirectly. The bulk of these purchases were for Divalproex ER. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Divalproex. Those prices have been substantially higher than the prices Humana would have paid for Divalproex but for Defendants' collusion.

**h. Doxycycline**

407. During the Doxycycline Period, HPI purchased over $1.1 million worth of Doxycycline directly from Sun and over $142 million worth indirectly. Because of Defendants' illegal

conduct, Humana has been compelled to pay artificially inflated prices for Doxycycline. Those prices have been substantially higher than the prices Humana would have paid for Doxycycline but for Defendants' collusion.

**i. Leflunomide**

408. During the Leflunomide Period, HPI purchased over $860,000 worth of Leflunomide directly from Apotex and non-parties Alembic and Trigen, as well as over $43 million indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Leflunomide. Those prices have been substantially higher than the prices Humana would have paid for Leflunomide but for Defendants' collusion.

**j. Levothyroxine**

409. [redacted].

410. [redacted].

411. [redacted].

[redacted]

**k. Lidocaine**

412. During the Lidocaine Period, HPI purchased over $200,000 worth of Lidocaine directly from Defendant Akorn and Amneal Pharmaceutical, LLC (sued through its successor, referred to as Impax in this Complaint), as well as over $184 million worth indirectly. Because of

Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Lidocaine. Those prices have been substantially higher than the prices Humana would have paid for Lidocaine but for Defendants' collusion.

**l. Nystatin**

413. During the Nystatin Period, HPI purchased over $500,000 worth of Nystatin directly from Glenmark and Taro and over $87 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Nystatin. Those prices have been substantially higher than the prices Humana would have paid for Nystatin but for Defendants' collusion.

**m. Pravastatin**

414. During the Pravastatin Period, HPI purchased over $24 million worth of Pravastatin directly from Apotex and Teva and over $270 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Pravastatin. Those prices have been substantially higher than the prices Humana would have paid for Pravastatin but for Defendants' collusion.

**n. Propranolol**

415. During the Propranolol Period, HPI purchased over $3 million worth of Propranolol directly from Actavis and Breckenridge and over $75 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Propranolol. Those prices have been substantially higher than the prices Humana would have paid for Propranolol but for Defendants' collusion.

**o. Ursodiol**

416. During the Ursodiol Period, HPI purchased over $3.9 million worth of Ursodiol directly from Lannett, Actavis, and Impax, as well as over $49 million worth indirectly. Because of

Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Ursodiol. Those prices have been substantially higher than the prices Humana would have paid for Ursodiol but for Defendants' collusion.

**p. Verapamil**

417. During the Verapamil Period, HPI purchased over $9 million worth of Verapamil directly from Teva, Mylan, Apotex, Glenmark, and Kremers-Urban Pharmaceuticals Inc., a subsidiary of Lannett, as well as over $68 million worth indirectly. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Verapamil. Those prices have been substantially higher than the prices Humana would have paid for Verapamil but for Defendants' collusion.

418. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for the Subject Drugs listed above. Those prices have been substantially higher than the prices that Humana would have paid for the Subject Drugs but for Defendants' collusion.

419. Consequently, Humana has sustained substantial losses and damages to its business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

420. Defendants' unlawful conduct has successfully eliminated competition in the market, and Humana has sustained, and continues to sustain, significant losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

421. Defendants, through their unlawful acts, reduced competition in the United States market for the Subject Drugs, increased prices, and caused antitrust injury to Humana.

422. Prices for the Subject Drugs have been and will continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct. The inflated prices that Humana has paid, and will continue to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct.

## XIV. INTERSTATE TRADE AND COMMERCE

423. Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States. At all material times, the Subject Drugs were manufactured and sold by Defendants, directly or through one of more of their affiliates, throughout the United States in a continuous and uninterrupted flow through interstate commerce, including through and into this District.

424. Between at least 2012 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

425. Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

426. Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

427. The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Humana and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

428. Defendants' agreement to increase, fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of the Subject Drugs, and their actual inflating, fixing,

maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XV. TOLLING AND FRAUDULENT CONCEALMENT

429. The claims asserted in this Complaint have been tolled as a matter of law by: (1) the pendency of various class actions, as to which Humana is a putative class member, alleging price-fixing of various of the Subject Drugs by Defendants, or some subset of them, and (2) the federal criminal antitrust proceedings alleged above, pursuant to 15 U.S.C. § 16(i).

430. In addition, Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

431. Among other things, as alleged in the AG Complaint, Heritage executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012. These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 454-462 of the AG Complaint, which are incorporated by reference. This conduct extended to Heritage's co-conspirators, including Mayne.

432. Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate trade association and industry activities as set forth above, and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recoded in writing. In some cases, as alleged above, price increases were staggered so as to conceal the existence of the price-fixing agreements. Also, as alleged above, Defendants engaged in bid coordination and straw bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

433. Humana acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment. As a result, Humana did not know or reasonably suspect the existence of the claims alleged in this Complaint more than four years before the filing of this Complaint.

## XVI. CLAIMS FOR RELIEF

### COUNT 1

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT (AMITRIPTYLINE)

**(As to Defendants Mylan, Novartis, Par, and Sandoz)**

434. Humana incorporates by reference the preceding allegations.

435. Amitriptyline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Amitriptyline in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

436. Each of the Amitriptyline Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Amitriptyline Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Amitriptyline prices throughout the United States.

437. The conspiracy realized its intended effect; Amitriptyline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Amitriptyline.

438. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Amitriptyline;

b. Humana was deprived of the benefits of free and open competition in the sale of Amitriptyline in the United States market; and

c. Competition in establishing the prices paid for Amitriptyline was unlawfully restrained, suppressed, or eliminated.

439. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Amitriptyline until the market achieves a steady state.

440. As a direct and proximate result of Amitriptyline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Amitriptyline than it would have paid in the absence of Amitriptyline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

441. Amitriptyline Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

442. There is no legitimate, non-pretextual, pro-competitive business justification for Amitriptyline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

443. Amitriptyline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

444. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Amitriptyline, or by assignment from its other subsidiaries that directly purchased generic Amitriptyline during the Amitriptyline Period.

## COUNT II

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (AMITRIPTYLINE)

### (As to Mylan, Novartis, Par, and Sandoz)

445. Humana incorporates by reference the preceding allegations.

446. Amitriptyline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Amitriptyline in the United States. This conspiracy was *per se* unlawful price-fixing.

447. Each of the Amitriptyline Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Amitriptyline Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Amitriptyline prices throughout the United States.

448. The conspiracy realized its intended effect; Amitriptyline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Amitriptyline.

449. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Amitriptyline;

b. Humana was deprived of the benefits of free and open competition in the sale of Amitriptyline in the United States market; and

c. Competition in establishing the prices paid for Amitriptyline was unlawfully restrained, suppressed, or eliminated.

450. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Amitriptyline until the market achieves a steady state.

451. As a direct and proximate result of Amitriptyline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Amitriptyline than it would have paid in the absence of Amitriptyline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

452. There is no legitimate, non-pretextual, pro-competitive business justification for Amitriptyline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

453. Amitriptyline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

454. Amitriptyline Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT III

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (AMITRIPTYLINE)

### (As to Mylan, Novartis, Par, and Sandoz)

455. Humana incorporates by reference the preceding allegations.

456. Amitriptyline Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Amitriptyline Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Amitriptyline at prices restrained by competition and forced to pay artificially inflated prices.

457. There was and is a gross disparity between the price that Humana paid and continues to pay for Amitriptyline, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Amitriptyline should have been available, and would have been available, absent Amitriptyline Defendants' illegal conduct.

458. By engaging in the foregoing conduct, Amitriptyline Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT IV

## UNJUST ENRICHMENT UNDER STATE LAW (AMITRIPTYLINE)

**(As to Mylan, Novartis, Par, and Sandoz)**

459. Humana incorporates by reference the preceding allegations.

460. Amitriptyline Defendants have benefitted from artificial prices in the sale of Amitriptyline resulting from the unlawful and inequitable acts alleged in this Complaint.

461. Amitriptyline Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Amitriptyline by Humana.

462. Humana has conferred upon Amitriptyline Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

463. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Amitriptyline.

464. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Amitriptyline, as it is not liable and would not compensate Humana for the impact of Amitriptyline Defendants' unlawful conduct.

465. The economic benefit of overcharges derived by Amitriptyline Defendants through charging supracompetitive and artificially inflated prices for Amitriptyline is a direct and proximate result of Amitriptyline Defendants' unlawful conduct.

466. The economic benefits derived by Amitriptyline Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Amitriptyline Period, benefiting Amitriptyline Defendants.

467. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Amitriptyline Defendants to be permitted to retain any of the overcharges for

Amitriptyline derived from Amitriptyline Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

468. Amitriptyline Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

469. Amitriptyline Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

470. A constructive trust should be imposed upon all unlawful or inequitable sums received by Amitriptyline Defendants traceable to Humana.

## COUNT V

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (AMITRIPTYLINE)

**(As to Mylan, Novartis, Par, and Sandoz)**

446. Humana incorporates by reference the preceding allegations.

447. Amitriptyline Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Amitriptyline. Amitriptyline Defendants injured Humana through this conduct.

448. But for Amitriptyline Defendants' scheme to inflate the price of Amitriptyline, Humana would have purchased lower-priced generic Amitriptyline.

449. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Amitriptyline than it would have paid absent Amitriptyline Defendants' continuing anticompetitive conduct.

450. Humana has purchased substantial amounts of Amitriptyline during the Amitriptyline Period.

451. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Amitriptyline Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

452. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Amitriptyline Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT VI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (BACLOFEN)**

**(As to Lannett, Par, Teva, and Upsher-Smith)**

453. Humana incorporates by reference the preceding allegations.

454. Baclofen Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Baclofen in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

455. Each of the Baclofen Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Baclofen Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Baclofen prices throughout the United States.

456. The conspiracy realized its intended effect; Baclofen Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Baclofen.

457. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Baclofen;

b. Humana was deprived of the benefits of free and open competition in the sale of Baclofen in the United States market; and

c. Competition in establishing the prices paid for Baclofen was unlawfully restrained, suppressed, or eliminated.

458. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Baclofen until the market achieves a steady state.

459. As a direct and proximate result of Baclofen Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Baclofen than it would have paid in the absence of Baclofen Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

460. Baclofen Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

461. There is no legitimate, non-pretextual, pro-competitive business justification for Baclofen Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

462. Baclofen Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

463. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Baclofen, or by assignment from its other subsidiaries that directly purchased generic Baclofen during the Baclofen Period.

## COUNT VII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (BACLOFEN)

**(As to Lannett, Par, Teva, and Upsher-Smith)**

464. Humana incorporates by reference the preceding allegations.

465. Baclofen Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Baclofen in the United States. This conspiracy was *per se* unlawful price-fixing.

466. Each of the Baclofen Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Baclofen Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Baclofen prices throughout the United States.

467. The conspiracy realized its intended effect; Baclofen Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Baclofen.

468. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Baclofen;

b. Humana was deprived of the benefits of free and open competition in the sale of Baclofen in the United States market; and

c. Competition in establishing the prices paid for Baclofen was unlawfully restrained, suppressed, or eliminated.

469. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Baclofen until the market achieves a steady state.

470. As a direct and proximate result of Baclofen Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Baclofen than it would have paid in the absence of Baclofen Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

471. There is no legitimate, non-pretextual, pro-competitive business justification for Baclofen Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

472. Baclofen Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

473. Baclofen Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT VIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (BACLOFEN)**

**(As to Lannett, Par, Teva, and Upsher-Smith)**

474. Humana incorporates by reference the preceding allegations.

475. Baclofen Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed

below. As a direct and proximate result of Baclofen Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Baclofen at prices restrained by competition and forced to pay artificially inflated prices.

476. There was and is a gross disparity between the price that Humana paid and continues to pay for Baclofen, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Baclofen should have been available, and would have been available, absent Baclofen Defendants' illegal conduct.

477. By engaging in the foregoing conduct, Baclofen Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT IX

## UNJUST ENRICHMENT UNDER STATE LAW (BACLOFEN)

### (As to Lannett, Par, Teva, and Upsher-Smith)

478. Humana incorporates by reference the preceding allegations.

479. Baclofen Defendants have benefitted from artificial prices in the sale of Baclofen resulting from the unlawful and inequitable acts alleged in this Complaint.

480. Baclofen Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Baclofen by Humana.

481. Humana has conferred upon Baclofen Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

482. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Baclofen.

483. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Baclofen, as it is not liable and would not compensate Humana for the impact of Baclofen Defendants' unlawful conduct.

484. The economic benefit of overcharges derived by Baclofen Defendants through charging supracompetitive and artificially inflated prices for Baclofen is a direct and proximate result of Baclofen Defendants' unlawful conduct.

485. The economic benefits derived by Baclofen Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Baclofen Period, benefiting Baclofen Defendants.

486. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Baclofen Defendants to be permitted to retain any of the overcharges for Baclofen derived from Baclofen Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

487. Baclofen Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

488. Baclofen Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

489. A constructive trust should be imposed upon all unlawful or inequitable sums received by Baclofen Defendants traceable to Humana.

## COUNT X

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (BACLOFEN)

**(As to Lannett, Par, Teva, and Upsher-Smith)**

490. Humana incorporates by reference the preceding allegations.

491. Baclofen Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Baclofen. Baclofen Defendants injured Humana through this conduct.

492. But for Baclofen Defendants' scheme to inflate the price of Baclofen, Humana would have purchased lower-priced generic Baclofen.

493. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Baclofen than it would have paid absent Baclofen Defendants' continuing anticompetitive conduct.

494. Humana has purchased substantial amounts of Baclofen during the Baclofen Period.

495. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Baclofen Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

496. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Baclofen Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (BENAZEPRIL)

**(As to Mylan, Novartis, and Sandoz)**

497. Humana incorporates by reference the preceding allegations.

498. Benazepril Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Benazepril in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

499. Each of the Benazepril Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Benazepril Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Benazepril prices throughout the United States.

500. The conspiracy realized its intended effect; Benazepril Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Benazepril.

501. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Benazepril;

b. Humana was deprived of the benefits of free and open competition in the sale of Benazepril in the United States market; and

c. Competition in establishing the prices paid for Benazepril was unlawfully restrained, suppressed, or eliminated.

502. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Benazepril until the market achieves a steady state.

503. As a direct and proximate result of Benazepril Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Benazepril than it would have paid in the absence of Benazepril Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

504. Benazepril Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

505. There is no legitimate, non-pretextual, pro-competitive business justification for Benazepril Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

506. Benazepril Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

507. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Benazepril, or by assignment from its other subsidiaries that directly purchased generic Benazepril during the Benazepril Period.

## COUNT XII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (BENAZEPRIL)

**(As to Mylan, Novartis, and Sandoz)**

508. Humana incorporates by reference the preceding allegations.

509. Benazepril Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Benazepril in the United States. This conspiracy was *per se* unlawful price-fixing.

510. Each of the Benazepril Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Benazepril Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Benazepril prices throughout the United States.

511. The conspiracy realized its intended effect; Benazepril Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Benazepril.

512. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Benazepril;

b. Humana was deprived of the benefits of free and open competition in the sale of Benazepril in the United States market; and

c. Competition in establishing the prices paid for Benazepril was unlawfully restrained, suppressed, or eliminated.

513. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Benazepril until the market achieves a steady state.

514. As a direct and proximate result of Benazepril Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Benazepril than it would have paid in the absence of Benazepril Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

515. There is no legitimate, non-pretextual, pro-competitive business justification for Benazepril Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

516. Benazepril Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

517. Benazepril Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (BENAZEPRIL)

### (As to Mylan, Novartis, and Sandoz)

518. Humana incorporates by reference the preceding allegations.

519. Benazepril Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Benazepril Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Benazepril at prices restrained by competition and forced to pay artificially inflated prices.

520. There was and is a gross disparity between the price that Humana paid and continues to pay for Benazepril, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Benazepril should have been available, and would have been available, absent Benazepril Defendants' illegal conduct.

521. By engaging in the foregoing conduct, Benazepril Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XIV**

**UNJUST ENRICHMENT UNDER STATE LAW (BENAZEPRIL)**

**(As to Mylan, Novartis, and Sandoz)**

522. Humana incorporates by reference the preceding allegations.

523. Benazepril Defendants have benefitted from artificial prices in the sale of Benazepril resulting from the unlawful and inequitable acts alleged in this Complaint.

524. Benazepril Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Benazepril by Humana.

525. Humana has conferred upon Benazepril Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

526. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Benazepril.

527. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Benazepril, as it is not liable and would not compensate Humana for the impact of Benazepril Defendants' unlawful conduct.

528. The economic benefit of overcharges derived by Benazepril Defendants through charging supracompetitive and artificially inflated prices for Benazepril is a direct and proximate result of Benazepril Defendants' unlawful conduct.

529. The economic benefits derived by Benazepril Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Benazepril Period, benefiting Benazepril Defendants.

530. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Benazepril Defendants to be permitted to retain any of the overcharges for Benazepril derived from Benazepril Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

531. Benazepril Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

532. Benazepril Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

533. A constructive trust should be imposed upon all unlawful or inequitable sums received by Benazepril Defendants traceable to Humana.

## COUNT XV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (BENAZEPRIL)

**(As to Mylan, Novartis, and Sandoz)**

534. Humana incorporates by reference the preceding allegations.

535. Benazepril Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Benazepril. Benazepril Defendants injured Humana through this conduct.

536. But for Benazepril Defendants' scheme to inflate the price of Benazepril, Humana would have purchased lower-priced generic Benazepril.

537. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Benazepril than it would have paid absent Benazepril Defendants' continuing anticompetitive conduct.

538. Humana has purchased substantial amounts of Benazepril during the Benazepril Period.

539. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Benazepril Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

540. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Benazepril Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (CLOBETASOL)

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Novartis, Perrigo, Sandoz, Taro, and Wockhardt)**

541. Humana incorporates by reference the preceding allegations.

542. Clobetasol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Clobetasol in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

543. Each of the Clobetasol Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Clobetasol Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Clobetasol prices throughout the United States.

544. The conspiracy realized its intended effect; Clobetasol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Clobetasol.

545. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Clobetasol;

b. Humana was deprived of the benefits of free and open competition in the sale of Clobetasol in the United States market; and

**c.** Competition in establishing the prices paid for Clobetasol was unlawfully restrained, suppressed, or eliminated.

546. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Clobetasol until the market achieves a steady state.

547. As a direct and proximate result of Clobetasol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Clobetasol than it would have paid in the absence of Clobetasol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

548. Clobetasol Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

549. There is no legitimate, non-pretextual, pro-competitive business justification for Clobetasol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

550. Clobetasol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

551. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Clobetasol, or by assignment from its other subsidiaries that directly purchased generic Clobetasol during the Clobetasol Period.

**COUNT XVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (CLOBETASOL)**

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Novartis, Perrigo, Sandoz, Taro, and Wockhardt)**

552. Humana incorporates by reference the preceding allegations.

553. Clobetasol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Clobetasol in the United States. This conspiracy was *per se* unlawful price-fixing.

554. Each of the Clobetasol Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Clobetasol Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Clobetasol prices throughout the United States.

555. The conspiracy realized its intended effect; Clobetasol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Clobetasol.

556. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Clobetasol;

b. Humana was deprived of the benefits of free and open competition in the sale of Clobetasol in the United States market; and

c. Competition in establishing the prices paid for Clobetasol was unlawfully restrained, suppressed, or eliminated.

557. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Clobetasol until the market achieves a steady state.

558. As a direct and proximate result of Clobetasol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Clobetasol than it would have paid in the absence of Clobetasol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

559. There is no legitimate, non-pretextual, pro-competitive business justification for Clobetasol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

560. Clobetasol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

561. Clobetasol Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (CLOBETASOL)

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Novartis, Perrigo, Sandoz, Taro, and Wockhardt)**

562. Humana incorporates by reference the preceding allegations.

563. Clobetasol Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Clobetasol Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Clobetasol at prices restrained by competition and forced to pay artificially inflated prices.

564. There was and is a gross disparity between the price that Humana paid and continues to pay for Clobetasol, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Clobetasol should have been available, and would have been available, absent Clobetasol Defendants' illegal conduct.

565. By engaging in the foregoing conduct, Clobetasol Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XIX**

**UNJUST ENRICHMENT UNDER STATE LAW (CLOBETASOL)**

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Novartis, Perrigo, Sandoz, Taro, and Wockhardt)**

566. Humana incorporates by reference the preceding allegations.

567. Clobetasol Defendants have benefitted from artificial prices in the sale of Clobetasol resulting from the unlawful and inequitable acts alleged in this Complaint.

568. Clobetasol Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Levothyroxine by Humana.

569. Humana has conferred upon Clobetasol Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

570. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Clobetasol.

571. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Clobetasol, as it is not liable and would not compensate Humana for the impact of Clobetasol Defendants' unlawful conduct.

572. The economic benefit of overcharges derived by Clobetasol Defendants through charging supracompetitive and artificially inflated prices for Clobetasol is a direct and proximate result of Clobetasol Defendants' unlawful conduct.

573. The economic benefits derived by Clobetasol Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Clobetasol Period, benefiting Clobetasol Defendants.

574. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Clobetasol Defendants to be permitted to retain any of the overcharges for Clobetasol derived from Clobetasol Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

575. Clobetasol Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

576. Clobetasol Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

577. A constructive trust should be imposed upon all unlawful or inequitable sums received by Clobetasol Defendants traceable to Humana.

**COUNT XX**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (CLOBETASOL)**

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Novartis, Perrigo, Sandoz, Taro, and Wockhardt)**

578. Humana incorporates by reference the preceding allegations.

579. Clobetasol Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Clobetasol. Clobetasol Defendants injured Humana through this conduct.

580. But for Clobetasol Defendants' scheme to inflate the price of Clobetasol, Humana would have purchased lower-priced generic Clobetasol.

581. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Clobetasol than it would have paid absent Clobetasol Defendants' continuing anticompetitive conduct.

582. Humana has purchased substantial amounts of Clobetasol during the Clobetasol Period.

583. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Clobetasol Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

584. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Clobetasol Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (CLOMIPRAMINE)

**(As to Mylan, Novartis, Sandoz, and Taro)**

585. Humana incorporates by reference the preceding allegations.

586. Clomipramine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Clomipramine in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

587. Each of the Clomipramine Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Clomipramine Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Clomipramine prices throughout the United States.

588. The conspiracy realized its intended effect; Clomipramine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Clomipramine.

589. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Clomipramine;

b. Humana was deprived of the benefits of free and open competition in the sale of Clomipramine in the United States market; and

c. Competition in establishing the prices paid for Clomipramine was unlawfully restrained, suppressed, or eliminated.

590. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Clomipramine until the market achieves a steady state.

591. As a direct and proximate result of Clomipramine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Clomipramine than it would have paid in the absence of Clomipramine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

592. Clomipramine Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

593. There is no legitimate, non-pretextual, pro-competitive business justification for Clomipramine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

594. Clomipramine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

595. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Clomipramine, or by assignment from its other subsidiaries that directly purchased generic Clomipramine during the Clomipramine Period.

## COUNT XXII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (CLOMIPRAMINE)

**(As to Mylan, Novartis, Sandoz, and Taro)**

596. Humana incorporates by reference the preceding allegations.

597. Clomipramine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Clomipramine in the United States. This conspiracy was *per se* unlawful price-fixing.

598. Each of the Clomipramine Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Clomipramine Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Clomipramine prices throughout the United States.

599. The conspiracy realized its intended effect; Clomipramine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Clomipramine.

600. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Clomipramine;

b. Humana was deprived of the benefits of free and open competition in the sale of Clomipramine in the United States market; and

c. Competition in establishing the prices paid for Clomipramine was unlawfully restrained, suppressed, or eliminated.

601. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Clomipramine until the market achieves a steady state.

602. As a direct and proximate result of Clomipramine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Clomipramine than it would have paid in the absence of Clomipramine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

603. There is no legitimate, non-pretextual, pro-competitive business justification for Clomipramine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

604. Clomipramine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

605. Clomipramine Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (CLOMIPRAMINE)**

**(As to Mylan, Novartis, Sandoz, and Taro)**

606. Humana incorporates by reference the preceding allegations.

607. Clomipramine Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Clomipramine Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Clomipramine at prices restrained by competition and forced to pay artificially inflated prices.

608. There was and is a gross disparity between the price that Humana paid and continues to pay for Clomipramine, including by assignment from its subsidiaries, and the value received, given

that more cheaply priced Clomipramine should have been available, and would have been available, absent Clomipramine Defendants' illegal conduct.

609. By engaging in the foregoing conduct, Clomipramine Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (CLOMIPRAMINE)**

**(As to Mylan, Novartis, Sandoz, and Taro)**

610. Humana incorporates by reference the preceding allegations.

611. Clomipramine Defendants have benefitted from artificial prices in the sale of Clomipramine resulting from the unlawful and inequitable acts alleged in this Complaint.

612. Clomipramine Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Clomipramine by Humana.

613. Humana has conferred upon Clomipramine Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

614. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Clomipramine.

615. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Clomipramine, as it is not liable and would not compensate Humana for the impact of Clomipramine Defendants' unlawful conduct.

616. The economic benefit of overcharges derived by Clomipramine Defendants through charging supracompetitive and artificially inflated prices for Clomipramine is a direct and proximate result of Clomipramine Defendants' unlawful conduct.

617. The economic benefits derived by Clomipramine Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Clomipramine Period, benefiting Clomipramine Defendants.

618. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Clomipramine Defendants to be permitted to retain any of the overcharges for Clomipramine derived from Clomipramine Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

619. Clomipramine Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

620. Clomipramine Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

621. A constructive trust should be imposed upon all unlawful or inequitable sums received by Clomipramine Defendants traceable to Humana.

## COUNT XXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (CLOMIPRAMINE)

**(As to Mylan, Novartis, Sandoz, and Taro)**

622. Humana incorporates by reference the preceding allegations.

623. Clomipramine Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Clomipramine. Clomipramine Defendants injured Humana through this conduct.

624. But for Clomipramine Defendants' scheme to inflate the price of Clomipramine, Humana would have purchased lower-priced generic Clomipramine.

625. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Clomipramine than it would have paid absent Clomipramine Defendants' continuing anticompetitive conduct.

626. Humana has purchased substantial amounts of Clomipramine during the Clomipramine Period.

627. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Clomipramine Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

628. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Clomipramine Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (DIGOXIN)**

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

629. Humana incorporates by reference the preceding allegations.

630. Digoxin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Digoxin in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

631. Each of the Digoxin Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Digoxin Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Digoxin prices throughout the United States.

632. The conspiracy realized its intended effect; Digoxin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Digoxin.

633. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Digoxin;

b. Humana was deprived of the benefits of free and open competition in the sale of Digoxin in the United States market; and

c. Competition in establishing the prices paid for Digoxin was unlawfully restrained, suppressed, or eliminated.

634. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Digoxin until the market achieves a steady state.

635. As a direct and proximate result of Digoxin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Digoxin than it would have paid in the absence of Digoxin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

636. Digoxin Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

637. There is no legitimate, non-pretextual, pro-competitive business justification for Digoxin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

638. Digoxin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

639. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Digoxin, or by assignment from its other subsidiaries that directly purchased generic Digoxin during the Digoxin Period.

## COUNT XXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (DIGOXIN)

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

640. Humana incorporates by reference the preceding allegations.

641. Digoxin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Digoxin in the United States. This conspiracy was *per se* unlawful price-fixing.

642. Each of the Digoxin Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Digoxin Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Digoxin prices throughout the United States.

643. The conspiracy realized its intended effect; Digoxin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Digoxin.

644. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Digoxin;

b. Humana was deprived of the benefits of free and open competition in the sale of Digoxin in the United States market; and

c. Competition in establishing the prices paid for Digoxin was unlawfully restrained, suppressed, or eliminated.

645. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Digoxin until the market achieves a steady state.

646. As a direct and proximate result of Digoxin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Digoxin than it would have paid in the absence of Digoxin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

647. There is no legitimate, non-pretextual, pro-competitive business justification for Digoxin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

648. Digoxin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

649. Digoxin Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (DIGOXIN)

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

650. Humana incorporates by reference the preceding allegations.

651. Digoxin Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Digoxin Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Digoxin at prices restrained by competition and forced to pay artificially inflated prices.

652. There was and is a gross disparity between the price that Humana paid and continues to pay for Digoxin, including by assignment from its subsidiaries, and the value received, given that

more cheaply priced Digoxin should have been available, and would have been available, absent Digoxin Defendants' illegal conduct.

653. By engaging in the foregoing conduct, Digoxin Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XXIX**

**UNJUST ENRICHMENT UNDER STATE LAW (DIGOXIN)**

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

654. Humana incorporates by reference the preceding allegations.

655. Digoxin Defendants have benefitted from artificial prices in the sale of Digoxin resulting from the unlawful and inequitable acts alleged in this Complaint.

656. Digoxin Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Digoxin by Humana.

657. Humana has conferred upon Digoxin Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

658. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Digoxin.

659. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Digoxin, as it is not liable and would not compensate Humana for the impact of Digoxin Defendants' unlawful conduct.

660. The economic benefit of overcharges derived by Digoxin Defendants through charging supracompetitive and artificially inflated prices for Digoxin is a direct and proximate result of Digoxin Defendants' unlawful conduct.

661. The economic benefits derived by Digoxin Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Digoxin Period, benefiting Digoxin Defendants.

662. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Digoxin Defendants to be permitted to retain any of the overcharges for Digoxin derived from Digoxin Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

663. Digoxin Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

664. Digoxin Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

665. A constructive trust should be imposed upon all unlawful or inequitable sums received by Digoxin Defendants traceable to Humana.

## COUNT XXX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (DIGOXIN)

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

666. Humana incorporates by reference the preceding allegations.

667. Digoxin Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Digoxin. Digoxin Defendants injured Humana through this conduct.

668. But for Digoxin Defendants' scheme to inflate the price of Digoxin, Humana would have purchased lower-priced generic Digoxin.

669. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Digoxin than it would have paid absent Digoxin Defendants' continuing anticompetitive conduct.

670. Humana has purchased substantial amounts of Digoxin during the Digoxin Period.

671. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Digoxin Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

672. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Digoxin Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XXXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (DIVALPROEX)**

**(As to Dr. Reddy's, Mylan, Par, and Zydus)**

673. Humana incorporates by reference the preceding allegations.

674. Divalproex Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Divalproex in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

675. Each of the Divalproex Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Divalproex Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Divalproex prices throughout the United States.

676. The conspiracy realized its intended effect; Divalproex Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Divalproex.

677. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Divalproex;

b. Humana was deprived of the benefits of free and open competition in the sale of Divalproex in the United States market; and

c. Competition in establishing the prices paid for Divalproex was unlawfully restrained, suppressed, or eliminated.

678. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Divalproex until the market achieves a steady state.

679. As a direct and proximate result of Divalproex Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Divalproex than it would have paid in the absence of Divalproex Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

680. Divalproex Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

681. There is no legitimate, non-pretextual, pro-competitive business justification for Divalproex Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

682. Divalproex Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

683. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Divalproex, or by assignment from its other subsidiaries that directly purchased generic Divalproex during the Divalproex Period.

**COUNT XXXII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (DIVALPROEX)**

**(As to Dr. Reddy's, Mylan, Par, and Zydus)**

684. Humana incorporates by reference the preceding allegations.

685. Divalproex Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Divalproex in the United States. This conspiracy was *per se* unlawful price-fixing.

686. Each of the Divalproex Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Divalproex Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Divalproex prices throughout the United States.

687. The conspiracy realized its intended effect; Divalproex Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Divalproex.

688. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Divalproex;

b. Humana was deprived of the benefits of free and open competition in the sale of Divalproex in the United States market; and

c. Competition in establishing the prices paid for Divalproex was unlawfully restrained, suppressed, or eliminated.

689. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Divalproex until the market achieves a steady state.

690. As a direct and proximate result of Divalproex Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Divalproex than it would have paid in the absence of Divalproex Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

691. There is no legitimate, non-pretextual, pro-competitive business justification for Divalproex Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

692. Divalproex Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

693. Divalproex Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XXXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (DIVALPROEX)

### (As to Dr. Reddy's, Mylan, Par, and Zydus)

694. Humana incorporates by reference the preceding allegations.

695. Divalproex Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Divalproex Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Divalproex at prices restrained by competition and forced to pay artificially inflated prices.

696. There was and is a gross disparity between the price that Humana paid and continues to pay for Divalproex, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Divalproex should have been available, and would have been available, absent Divalproex Defendants' illegal conduct.

697. By engaging in the foregoing conduct, Divalproex Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XXXIV

## UNJUST ENRICHMENT UNDER STATE LAW (DIVALPROEX)

**(As to Dr. Reddy's, Mylan, Par, and Zydus)**

698. Humana incorporates by reference the preceding allegations.

699. Divalproex Defendants have benefitted from artificial prices in the sale of Divalproex resulting from the unlawful and inequitable acts alleged in this Complaint.

700. Divalproex Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Divalproex by Humana.

701. Humana has conferred upon Divalproex Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

702. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Divalproex.

703. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Divalproex, as it is not liable and would not compensate Humana for the impact of Divalproex Defendants' unlawful conduct.

704. The economic benefit of overcharges derived by Divalproex Defendants through charging supracompetitive and artificially inflated prices for Divalproex is a direct and proximate result of Divalproex Defendants' unlawful conduct.

705. The economic benefits derived by Divalproex Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Divalproex Period, benefiting Divalproex Defendants.

706. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Divalproex Defendants to be permitted to retain any of the overcharges for Divalproex derived from Divalproex Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

707. Divalproex Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

708. Divalproex Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

709. A constructive trust should be imposed upon all unlawful or inequitable sums received by Divalproex Defendants traceable to Humana.

## COUNT XXXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (DIVALPROEX)

**(As to Dr. Reddy's, Mylan, Par, and Zydus)**

710. Humana incorporates by reference the preceding allegations.

711. Divalproex Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Divalproex. Divalproex Defendants injured Humana through this conduct.

712. But for Divalproex Defendants' scheme to inflate the price of Divalproex, Humana would have purchased lower-priced generic Divalproex.

713. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Divalproex than it would have paid absent Divalproex Defendants' continuing anticompetitive conduct.

714. Humana has purchased substantial amounts of Divalproex during the Divalproex Period.

715. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Divalproex Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

716. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Divalproex Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XXXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (DOXYCYCLINE)**

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, and West-Ward)**

717. Humana incorporates by reference the preceding allegations.

718. Doxycycline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Doxycycline in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

719. Each of the Doxycycline Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Doxycycline Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Doxycycline prices throughout the United States.

720. The conspiracy realized its intended effect; Doxycycline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Doxycycline.

721. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Doxycycline;

b. Humana was deprived of the benefits of free and open competition in the sale of Doxycycline in the United States market; and

c. Competition in establishing the prices paid for Doxycycline was unlawfully restrained, suppressed, or eliminated.

722. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Doxycycline until the market achieves a steady state.

723. As a direct and proximate result of Doxycycline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Doxycycline than it would have paid in the absence of Doxycycline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

724. Doxycycline Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

725. There is no legitimate, non-pretextual, pro-competitive business justification for Doxycycline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

726. Doxycycline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

727. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Doxycycline, or by assignment from its other subsidiaries that directly purchased generic Doxycycline during the Doxycycline Period.

## COUNT XXXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (DOXYCYCLINE)

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, and West-Ward)**

728. Humana incorporates by reference the preceding allegations.

729. Doxycycline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Doxycycline in the United States. This conspiracy was *per se* unlawful price-fixing.

730. Each of the Doxycycline Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Doxycycline Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Doxycycline prices throughout the United States.

731. The conspiracy realized its intended effect; Doxycycline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Doxycycline.

732. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Doxycycline;

b. Humana was deprived of the benefits of free and open competition in the sale of Doxycycline in the United States market; and

c. Competition in establishing the prices paid for Doxycycline was unlawfully restrained, suppressed, or eliminated.

733. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Doxycycline until the market achieves a steady state.

734. As a direct and proximate result of Doxycycline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Doxycycline than it would have paid in the absence of Doxycycline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

735. There is no legitimate, non-pretextual, pro-competitive business justification for Doxycycline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

736. Doxycycline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

737. Doxycycline Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XXXVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**
**(DOXYCYCLINE)**

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, and West-Ward)**

738. Humana incorporates by reference the preceding allegations.

739. Doxycycline Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Doxycycline Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Doxycycline at prices restrained by competition and forced to pay artificially inflated prices.

740. There was and is a gross disparity between the price that Humana paid and continues to pay for Doxycycline, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Doxycycline should have been available, and would have been available, absent Doxycycline Defendants' illegal conduct.

741. By engaging in the foregoing conduct, Doxycycline Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XXXIX**

**UNJUST ENRICHMENT UNDER STATE LAW (DOXYCYCLINE)**

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, and West-Ward)**

742. Humana incorporates by reference the preceding allegations.

743. Doxycycline Defendants have benefitted from artificial prices in the sale of Doxycycline resulting from the unlawful and inequitable acts alleged in this Complaint.

744. Doxycycline Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Doxycycline by Humana.

745. Humana has conferred upon Doxycycline Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

746. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Doxycycline.

747. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Doxycycline, as it is not liable and would not compensate Humana for the impact of Doxycycline Defendants' unlawful conduct.

748. The economic benefit of overcharges derived by Doxycycline Defendants through charging supracompetitive and artificially inflated prices for Doxycycline is a direct and proximate result of Doxycycline Defendants' unlawful conduct.

749. The economic benefits derived by Doxycycline Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Doxycycline Period, benefiting Doxycycline Defendants.

750. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Doxycycline Defendants to be permitted to retain any of the overcharges for Doxycycline derived from Doxycycline Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

751. Doxycycline Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

752. Doxycycline Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

753. A constructive trust should be imposed upon all unlawful or inequitable sums received by Doxycycline Defendants traceable to Humana.

## COUNT XL

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (DOXYCYCLINE)

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, and West-Ward)**

754. Humana incorporates by reference the preceding allegations.

755. Doxycycline Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Doxycycline. Doxycycline Defendants injured Humana through this conduct.

756. But for Doxycycline Defendants' scheme to inflate the price of Doxycycline, Humana would have purchased lower-priced generic Doxycycline.

757. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Doxycycline than it would have paid absent Doxycycline Defendants' continuing anticompetitive conduct.

758. Humana has purchased substantial amounts of Doxycycline during the Doxycycline Period.

759. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Doxycycline Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

760. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Doxycycline Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XLI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

761. Humana incorporates by reference the preceding allegations.

762. Leflunomide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Leflunomide in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

763. Each of the Leflunomide Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Leflunomide Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Levothyroxine prices throughout the United States.

764. The conspiracy realized its intended effect; Leflunomide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Levothyroxine.

765. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Leflunomide;

b. Humana was deprived of the benefits of free and open competition in the sale of Leflunomide in the United States market; and

c. Competition in establishing the prices paid for Leflunomide was unlawfully restrained, suppressed, or eliminated.

766. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Leflunomide until the market achieves a steady state.

767. As a direct and proximate result of Leflunomide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Leflunomide than it would have paid in the absence of Leflunomide Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

768. Leflunomide Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

769. There is no legitimate, non-pretextual, pro-competitive business justification for Leflunomide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

770. Leflunomide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

771. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Leflunomide, or by assignment from its other subsidiaries that directly purchased generic Leflunomide during the Leflunomide Period.

**COUNT XLII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

772. Humana incorporates by reference the preceding allegations.

773. Leflunomide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Leflunomide in the United States. This conspiracy was *per se* unlawful price-fixing.

774. Each of the Leflunomide Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Leflunomide Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Leflunomide prices throughout the United States.

775. The conspiracy realized its intended effect; Leflunomide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Leflunomide.

776. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Leflunomide;

b. Humana was deprived of the benefits of free and open competition in the sale of Leflunomide in the United States market; and

c. Competition in establishing the prices paid for Leflunomide was unlawfully restrained, suppressed, or eliminated.

777. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Leflunomide until the market achieves a steady state.

778. As a direct and proximate result of Leflunomide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Leflunomide than it would have paid in the absence of Leflunomide Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

779. There is no legitimate, non-pretextual, pro-competitive business justification for Leflunomide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

780. Leflunomide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

781. Leflunomide Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XLIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**
**(LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

782. Humana incorporates by reference the preceding allegations.

783. Leflunomide Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Leflunomide Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Leflunomide at prices restrained by competition and forced to pay artificially inflated prices.

784. There was and is a gross disparity between the price that Humana paid and continues to pay for Leflunomide, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Leflunomide should have been available, and would have been available, absent Leflunomide Defendants' illegal conduct.

785. By engaging in the foregoing conduct, Leflunomide Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XLIV**

**UNJUST ENRICHMENT UNDER STATE LAW (LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

786. Humana incorporates by reference the preceding allegations.

787. Leflunomide Defendants have benefitted from artificial prices in the sale of Leflunomide resulting from the unlawful and inequitable acts alleged in this Complaint.

788. Leflunomide Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Leflunomide by Humana.

789. Humana has conferred upon Leflunomide Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

790. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Leflunomide.

791. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Leflunomide, as it is not liable and would not compensate Humana for the impact of Leflunomide Defendants' unlawful conduct.

792. The economic benefit of overcharges derived by Leflunomide Defendants through charging supracompetitive and artificially inflated prices for Leflunomide is a direct and proximate result of Leflunomide Defendants' unlawful conduct.

793. The economic benefits derived by Leflunomide Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Leflunomide Period, benefiting Leflunomide Defendants.

794. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Leflunomide Defendants to be permitted to retain any of the overcharges for Leflunomide derived from Leflunomide Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

795. Leflunomide Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

796. Leflunomide Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

797. A constructive trust should be imposed upon all unlawful or inequitable sums received by Leflunomide Defendants traceable to Humana.

**COUNT XLV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

798. Humana incorporates by reference the preceding allegations.

799. Leflunomide Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Leflunomide. Leflunomide Defendants injured Humana through this conduct.

800. But for Leflunomide Defendants' scheme to inflate the price of Leflunomide, Humana would have purchased lower-priced generic Leflunomide.

801. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Leflunomide than it would have paid absent Leflunomide Defendants' continuing anticompetitive conduct.

802. Humana has purchased substantial amounts of Leflunomide during the Leflunomide Period.

803. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Leflunomide Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

804. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Leflunomide Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XLVI**

**<u>VIOLATION OF SECTION 1 OF THE SHERMAN ACT (LEVOTHYORXINE)</u>**

**(As to Lannett, Mylan, Novartis, and Sandoz)**

805. Humana incorporates by reference the preceding allegations.

806. Levothyroxine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Levothyroxine in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

807. Each of the Levothyroxine Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Levothyroxine Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Levothyroxine prices throughout the United States.

808. The conspiracy realized its intended effect; Levothyroxine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Levothyroxine.

809. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Levothyroxine;

b. Humana was deprived of the benefits of free and open competition in the sale of Levothyroxine in the United States market; and

c. Competition in establishing the prices paid for Levothyroxine was unlawfully restrained, suppressed, or eliminated.

810. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Levothyroxine until the market achieves a steady state.

811. As a direct and proximate result of Levothyroxine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Levothyroxine than it would have paid in the absence of Levothyroxine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

812. Levothyroxine Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

813. There is no legitimate, non-pretextual, pro-competitive business justification for Levothyroxine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

814. Levothyroxine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

815. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Levothyroxine, or by assignment from its other subsidiaries that directly purchased generic Levothyroxine during the Levothyroxine Period.

**COUNT XLVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (LEVOTHYROXINE)**

**(As to Lannett, Mylan, Novartis, and Sandoz)**

816. Humana incorporates by reference the preceding allegations.

817. Levothyroxine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Levothyroxine in the United States. This conspiracy was *per se* unlawful price-fixing.

818. Each of the Levothyroxine Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Levothyroxine Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Levothyroxine prices throughout the United States.

819. The conspiracy realized its intended effect; Levothyroxine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Levothyroxine.

820. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Levothyroxine;

b. Humana was deprived of the benefits of free and open competition in the sale of Levothyroxine in the United States market; and

c. Competition in establishing the prices paid for Levothyroxine was unlawfully restrained, suppressed, or eliminated.

821. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Levothyroxine until the market achieves a steady state.

822. As a direct and proximate result of Levothyroxine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Levothyroxine than it would have paid in the absence of Levothyroxine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

823. There is no legitimate, non-pretextual, pro-competitive business justification for Levothyroxine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

824. Levothyroxine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

825. Levothyroxine Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XLVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (LEVOTHYROXINE)**

**(As to Mylan, Lannett, Novartis, and Sandoz)**

826. Humana incorporates by reference the preceding allegations.

827. Levothyroxine Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Levothyroxine Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Levothyroxine at prices restrained by competition and forced to pay artificially inflated prices.

828. There was and is a gross disparity between the price that Humana paid and continues to pay for Levothyroxine, including by assignment from its subsidiaries, and the value received,

given that more cheaply priced Levothyroxine should have been available, and would have been available, absent Levothyroxine Defendants' illegal conduct.

829. By engaging in the foregoing conduct, Levothyroxine Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XLIX**

**UNJUST ENRICHMENT UNDER STATE LAW (LEVOTHYROXINE)**

**(As to Lannett, Mylan, Novartis, and Sandoz)**

830. Humana incorporates by reference the preceding allegations.

831. Levothyroxine Defendants have benefitted from artificial prices in the sale of Levothyroxine resulting from the unlawful and inequitable acts alleged in this Complaint.

832. Levothyroxine Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Levothyroxine by Humana.

833. Humana has conferred upon Levothyroxine Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

834. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Levothyroxine.

835. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Levothyroxine, as it is not liable and would not compensate Humana for the impact of Levothyroxine Defendants' unlawful conduct.

836. The economic benefit of overcharges derived by Levothyroxine Defendants through charging supracompetitive and artificially inflated prices for Levothyroxine is a direct and proximate result of Levothyroxine Defendants' unlawful conduct.

837. The economic benefits derived by Levothyroxine Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Levothyroxine Period, benefiting Levothyroxine Defendants.

838. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Levothyroxine Defendants to be permitted to retain any of the overcharges for Levothyroxine derived from Levothyroxine Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

839. Levothyroxine Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

840. Levothyroxine Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

841. A constructive trust should be imposed upon all unlawful or inequitable sums received by Levothyroxine Defendants traceable to Humana.

## COUNT L

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (LEVOTHYROXINE)

**(As to Lannett, Mylan, Novartis, and Sandoz)**

842. Humana incorporates by reference the preceding allegations.

843. Levothyroxine Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Levothyroxine. Levothyroxine Defendants injured Humana through this conduct.

844. But for Levothyroxine Defendants' scheme to inflate the price of Levothyroxine, Humana would have purchased lower-priced generic Levothyroxine.

845. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Levothyroxine than it would have paid absent Levothyroxine Defendants' continuing anticompetitive conduct.

846. Humana has purchased substantial amounts of Levothyroxine during the Levothyroxine Period.

847. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Levothyroxine Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

848. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Levothyroxine Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (LIDOCAINE)

**(As to Akorn, Fougera, Hi-Tech, Impax, Novartis, and Sandoz)**

849. Humana incorporates by reference the preceding allegations.

850. Lidocaine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Lidocaine in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

851. Each of the Lidocaine Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Lidocaine Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Lidocaine prices throughout the United States.

852. The conspiracy realized its intended effect; Lidocaine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Lidocaine.

853. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Lidocaine;

b. Humana was deprived of the benefits of free and open competition in the sale of Lidocaine in the United States market; and

c. Competition in establishing the prices paid for Lidocaine was unlawfully restrained, suppressed, or eliminated.

854. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Lidocaine until the market achieves a steady state.

855. As a direct and proximate result of Lidocaine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Lidocaine than it would have paid in the absence of Lidocaine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

856. Lidocaine Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

857. There is no legitimate, non-pretextual, pro-competitive business justification for Lidocaine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

858. Lidocaine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

859. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Lidocaine, or by assignment from its other subsidiaries that directly purchased generic Lidocaine during the Lidocaine Period.

**COUNT LII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (LIDOCAINE)**

**(As to Akorn, Fougera, Hi-Tech, Impax, Novartis, and Sandoz)**

860. Humana incorporates by reference the preceding allegations.

861. Lidocaine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Lidocaine in the United States. This conspiracy was *per se* unlawful price-fixing.

862. Each of the Lidocaine Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Lidocaine Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Lidocaine prices throughout the United States.

863. The conspiracy realized its intended effect; Lidocaine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Lidocaine.

864. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Lidocaine;

b. Humana was deprived of the benefits of free and open competition in the sale of Lidocaine in the United States market; and

c. Competition in establishing the prices paid for Lidocaine was unlawfully restrained, suppressed, or eliminated.

865. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Lidocaine until the market achieves a steady state.

866. As a direct and proximate result of Lidocaine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Lidocaine than it would have paid in the absence of Lidocaine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

867. There is no legitimate, non-pretextual, pro-competitive business justification for Lidocaine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

868. Lidocaine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

869. Lidocaine Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW <u>(LIDOCAINE)</u>**

**(As to Akorn, Fougera, Hi-Tech, Impax, Novartis, and Sandoz)**

870. Humana incorporates by reference the preceding allegations.

871. Lidocaine Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lidocaine Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Lidocaine at prices restrained by competition and forced to pay artificially inflated prices.

872. There was and is a gross disparity between the price that Humana paid and continues to pay for Lidocaine, including by assignment from its subsidiaries, and the value received, given that

more cheaply priced Lidocaine should have been available, and would have been available, absent Lidocaine Defendants' illegal conduct.

873. By engaging in the foregoing conduct, Lidocaine Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LIV**

**UNJUST ENRICHMENT UNDER STATE LAW (LIDOCAINE)**

**(As to Akorn, Fougera, Hi-Tech, Impax, Novartis, and Sandoz)**

874. Humana incorporates by reference the preceding allegations.

875. Lidocaine Defendants have benefitted from artificial prices in the sale of Lidocaine resulting from the unlawful and inequitable acts alleged in this Complaint.

876. Lidocaine Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Lidocaine by Humana.

877. Humana has conferred upon Lidocaine Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

878. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Lidocaine.

879. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Lidocaine, as it is not liable and would not compensate Humana for the impact of Lidocaine Defendants' unlawful conduct.

880. The economic benefit of overcharges derived by Lidocaine Defendants through charging supracompetitive and artificially inflated prices for Lidocaine is a direct and proximate result of Lidocaine Defendants' unlawful conduct.

881. The economic benefits derived by Lidocaine Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Lidocaine Period, benefiting Lidocaine Defendants.

882. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lidocaine Defendants to be permitted to retain any of the overcharges for Lidocaine derived from Lidocaine Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

883. Lidocaine Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

884. Lidocaine Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

885. A constructive trust should be imposed upon all unlawful or inequitable sums received by Lidocaine Defendants traceable to Humana.

## COUNT LV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (LIDOCAINE)

**(As to Akorn, Fougera, Hi-Tech, Impax, Novartis, and Sandoz)**

886. Humana incorporates by reference the preceding allegations.

887. Lidocaine Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Lidocaine. Lidocaine Defendants injured Humana through this conduct.

888. But for Lidocaine Defendants' scheme to inflate the price of Lidocaine, Humana would have purchased lower-priced generic Lidocaine.

889. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Lidocaine than it would have paid absent Lidocaine Defendants' continuing anticompetitive conduct.

890. Humana has purchased substantial amounts of Lidocaine during the Lidocaine Period.

891. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lidocaine Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

892. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Lidocaine Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (NYSTATIN)**

**(As to Heritage, Sun, and Teva)**

893. Humana incorporates by reference the preceding allegations.

894. Nystatin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Nystatin in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

895. Each of the Nystatin Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Nystatin Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Nystatin prices throughout the United States.

896. The conspiracy realized its intended effect; Nystatin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Nystatin.

897. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Nystatin;

b. Humana was deprived of the benefits of free and open competition in the sale of Nystatin in the United States market; and

c. Competition in establishing the prices paid for Nystatin was unlawfully restrained, suppressed, or eliminated.

898. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Nystatin until the market achieves a steady state.

899. As a direct and proximate result of Nystatin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Nystatin than it would have paid in the absence of Nystatin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

900. Nystatin Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

901. There is no legitimate, non-pretextual, pro-competitive business justification for Nystatin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

902. Nystatin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

903. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Nystatin, or by assignment from its other subsidiaries that directly purchased generic Nystatin during the Nystatin Period.

**COUNT LVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (NYSTATIN)**

**(As to Heritage, Sun, and Teva)**

904. Humana incorporates by reference the preceding allegations.

905. Nystatin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Nystatin in the United States. This conspiracy was *per se* unlawful price-fixing.

906. Each of the Nystatin Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Nystatin Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Nystatin prices throughout the United States.

907. The conspiracy realized its intended effect; Nystatin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Nystatin.

908. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Nystatin;

b. Humana was deprived of the benefits of free and open competition in the sale of Nystatin in the United States market; and

c. Competition in establishing the prices paid for Nystatin was unlawfully restrained, suppressed, or eliminated.

909. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Nystatin until the market achieves a steady state.

910. As a direct and proximate result of Nystatin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Nystatin than it would have paid in the absence of Nystatin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

911. There is no legitimate, non-pretextual, pro-competitive business justification for Nystatin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

912. Nystatin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

913. Nystatin Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (NYSTATIN)**

**(As to Heritage, Sun, and Teva)**

914. Humana incorporates by reference the preceding allegations.

915. Nystatin Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Nystatin Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Nystatin at prices restrained by competition and forced to pay artificially inflated prices.

916. There was and is a gross disparity between the price that Humana paid and continues to pay for Nystatin, including by assignment from its subsidiaries, and the value received, given that

more cheaply priced Nystatin should have been available, and would have been available, absent Nystatin Defendants' illegal conduct.

917. By engaging in the foregoing conduct, Nystatin Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LIX**

**UNJUST ENRICHMENT UNDER STATE LAW (NYSTATIN)**

**(As to Heritage, Sun, and Teva)**

918. Humana incorporates by reference the preceding allegations.

919. Nystatin Defendants have benefitted from artificial prices in the sale of Nystatin resulting from the unlawful and inequitable acts alleged in this Complaint.

920. Nystatin Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Nystatin by Humana.

921. Humana has conferred upon Nystatin Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

922. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Nystatin.

923. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Nystatin, as it is not liable and would not compensate Humana for the impact of Nystatin Defendants' unlawful conduct.

924. The economic benefit of overcharges derived by Nystatin Defendants through charging supracompetitive and artificially inflated prices for Nystatin is a direct and proximate result of Nystatin Defendants' unlawful conduct.

925. The economic benefits derived by Nystatin Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Nystatin Period, benefiting Nystatin Defendants.

926. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Nystatin Defendants to be permitted to retain any of the overcharges for Nystatin derived from Nystatin Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

927. Nystatin Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

928. Nystatin Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

929. A constructive trust should be imposed upon all unlawful or inequitable sums received by Nystatin Defendants traceable to Humana.

## COUNT LX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (NYSTATIN)

### (As to Heritage, Sun, and Teva)

930. Humana incorporates by reference the preceding allegations.

931. Nystatin Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Nystatin. Nystatin Defendants injured Humana through this conduct.

932. But for Nystatin Defendants' scheme to inflate the price of Nystatin, Humana would have purchased lower-priced generic Nystatin.

933. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Nystatin than it would have paid absent Nystatin Defendants' continuing anticompetitive conduct.

934. Humana has purchased substantial amounts of Nystatin during the Nystatin Period.

935. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Nystatin Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

936. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Nystatin Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (PRAVASTATIN)

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

937. Humana incorporates by reference the preceding allegations.

938. Pravastatin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Pravastatin in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

939. Each of the Pravastatin Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Pravastatin Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Pravastatin prices throughout the United States.

940. The conspiracy realized its intended effect; Pravastatin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Pravastatin.

941. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Pravastatin;

b. Humana was deprived of the benefits of free and open competition in the sale of Pravastatin in the United States market; and

c. Competition in establishing the prices paid for Pravastatin was unlawfully restrained, suppressed, or eliminated.

942. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Pravastatin until the market achieves a steady state.

943. As a direct and proximate result of Pravastatin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Pravastatin than it would have paid in the absence of Pravastatin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

944. Pravastatin Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

945. There is no legitimate, non-pretextual, pro-competitive business justification for Pravastatin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

946. Pravastatin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

947. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Pravastatin, or by assignment from its other subsidiaries that directly purchased generic Pravastatin during the Pravastatin Period.

**COUNT LXII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (PRAVASTATIN)**

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

948. Humana incorporates by reference the preceding allegations.

949. Pravastatin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Pravastatin in the United States. This conspiracy was *per se* unlawful price-fixing.

950. Each of the Pravastatin Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Pravastatin Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Pravastatin prices throughout the United States.

951. The conspiracy realized its intended effect; Pravastatin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Pravastatin.

952. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Pravastatin;

b. Humana was deprived of the benefits of free and open competition in the sale of Pravastatin in the United States market; and

c. Competition in establishing the prices paid for Pravastatin was unlawfully restrained, suppressed, or eliminated.

953. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Pravastatin until the market achieves a steady state.

954. As a direct and proximate result of Pravastatin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Pravastatin than it would have paid in the absence of Pravastatin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

955. There is no legitimate, non-pretextual, pro-competitive business justification for Pravastatin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

956. Pravastatin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

957. Pravastatin Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**
**(PRAVASTATIN)**

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

958. Humana incorporates by reference the preceding allegations.

959. Pravastatin Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Pravastatin Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Pravastatin at prices restrained by competition and forced to pay artificially inflated prices.

960. There was and is a gross disparity between the price that Humana paid and continues to pay for Pravastatin, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Pravastatin should have been available, and would have been available, absent Pravastatin Defendants' illegal conduct.

961. By engaging in the foregoing conduct, Pravastatin Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (PRAVASTATIN)**

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

962. Humana incorporates by reference the preceding allegations.

963. Pravastatin Defendants have benefitted from artificial prices in the sale of Pravastatin resulting from the unlawful and inequitable acts alleged in this Complaint.

964. Pravastatin Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Pravastatin by Humana.

965. Humana has conferred upon Pravastatin Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

966. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Pravastatin.

967. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Pravastatin, as it is not liable and would not compensate Humana for the impact of Pravastatin Defendants' unlawful conduct.

968. The economic benefit of overcharges derived by Pravastatin Defendants through charging supracompetitive and artificially inflated prices for Pravastatin is a direct and proximate result of Pravastatin Defendants' unlawful conduct.

969. The economic benefits derived by Pravastatin Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Pravastatin Period, benefiting Pravastatin Defendants.

970. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Pravastatin Defendants to be permitted to retain any of the overcharges for Pravastatin derived from Pravastatin Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

971. Pravastatin Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

972. Pravastatin Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

973. A constructive trust should be imposed upon all unlawful or inequitable sums received by Pravastatin Defendants traceable to Humana.

## COUNT LXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (PRAVASTAIN)

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

974. Humana incorporates by reference the preceding allegations.

975. Pravastatin Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Pravastatin. Pravastatin Defendants injured Humana through this conduct.

976. But for Pravastatin Defendants' scheme to inflate the price of Pravastatin, Humana would have purchased lower-priced generic Pravastatin.

977. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Pravastatin than it would have paid absent Pravastatin Defendants' continuing anticompetitive conduct.

978. Humana has purchased substantial amounts of Pravastatin during the Pravastatin Period.

979. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Pravastatin Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

980. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Pravastatin Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (PROPRANOLOL)**

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

981. Humana incorporates by reference the preceding allegations.

982. Propranolol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Propranolol in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

983. Each of the Propranolol Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Propranolol Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Propranolol prices throughout the United States.

984. The conspiracy realized its intended effect; Propranolol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Propranolol.

985. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Propranolol;

b. Humana was deprived of the benefits of free and open competition in the sale of Propranolol in the United States market; and

c. Competition in establishing the prices paid for Propranolol was unlawfully restrained, suppressed, or eliminated.

986. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Propranolol until the market achieves a steady state.

987. As a direct and proximate result of Propranolol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Propranolol than it would have paid in the absence of Propranolol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

988. Propranolol Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

989. There is no legitimate, non-pretextual, pro-competitive business justification for Propranolol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

990. Propranolol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

991. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Propranolol, or by assignment from its other subsidiaries that directly purchased generic Propranolol during the Propranolol Period.

**COUNT LXVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (PROPRANOLOL)**

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

992. Humana incorporates by reference the preceding allegations.

993. Propranolol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Propranolol in the United States. This conspiracy was *per se* unlawful price-fixing.

994. Each of the Propranolol Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Propranolol Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Propranolol prices throughout the United States.

995. The conspiracy realized its intended effect; Propranolol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Propranolol.

996. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Propranolol;

b. Humana was deprived of the benefits of free and open competition in the sale of Propranolol in the United States market; and

c. Competition in establishing the prices paid for Propranolol was unlawfully restrained, suppressed, or eliminated.

997. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Propranolol until the market achieves a steady state.

998. As a direct and proximate result of Propranolol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Propranolol than it would have paid in the absence of Propranolol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

999. There is no legitimate, non-pretextual, pro-competitive business justification for Propranolol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1000. Propranolol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1001. Propranolol Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (PROPRANOLOL)

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

1002. Humana incorporates by reference the preceding allegations.

1003. Propranolol Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Propranolol Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Propranolol at prices restrained by competition and forced to pay artificially inflated prices.

1004. There was and is a gross disparity between the price that Humana paid and continues to pay for Propranolol, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Propranolol should have been available, and would have been available, absent Propranolol Defendants' illegal conduct.

1005. By engaging in the foregoing conduct, Propranolol Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXIX**

**UNJUST ENRICHMENT UNDER STATE LAW (PROPRANOLOL)**

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

1006. Humana incorporates by reference the preceding allegations.

1007. Propranolol Defendants have benefitted from artificial prices in the sale of Propranolol resulting from the unlawful and inequitable acts alleged in this Complaint.

1008. Propranolol Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Propranolol by Humana.

1009. Humana has conferred upon Propranolol Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1010. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Propranolol.

1011. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Propranolol, as it is not liable and would not compensate Humana for the impact of Propranolol Defendants' unlawful conduct.

1012. The economic benefit of overcharges derived by Propranolol Defendants through charging supracompetitive and artificially inflated prices for Propranolol is a direct and proximate result of Propranolol Defendants' unlawful conduct.

1013. The economic benefits derived by Propranolol Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Propranolol Period, benefiting Propranolol Defendants.

1014. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Propranolol Defendants to be permitted to retain any of the overcharges for Propranolol derived from Propranolol Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1015. Propranolol Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1016. Propranolol Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1017. A constructive trust should be imposed upon all unlawful or inequitable sums received by Propranolol Defendants traceable to Humana.

**COUNT LXX**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (PROPRANOLOL)**

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

1018. Humana incorporates by reference the preceding allegations.

1019. Propranolol Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Propranolol. Propranolol Defendants injured Humana through this conduct.

1020. But for Propranolol Defendants' scheme to inflate the price of Propranolol, Humana would have purchased lower-priced generic Propranolol.

1021. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Propranolol than it would have paid absent Propranolol Defendants' continuing anticompetitive conduct.

1022. Humana has purchased substantial amounts of Propranolol during the Propranolol Period.

1023. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Propranolol Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1024. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Propranolol Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1025. Humana incorporates by reference the preceding allegations.

1026. Ursodiol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Ursodiol in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1027. Each of the Ursodiol Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Ursodiol Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Ursodiol prices throughout the United States.

1028. The conspiracy realized its intended effect; Ursodiol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Ursodiol.

1029. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Ursodiol;

b. Humana was deprived of the benefits of free and open competition in the sale of Ursodiol in the United States market; and

c. Competition in establishing the prices paid for Ursodiol was unlawfully restrained, suppressed, or eliminated.

1030. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Ursodiol until the market achieves a steady state.

1031. As a direct and proximate result of Ursodiol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Ursodiol than it would have paid in the absence of Ursodiol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1032. Ursodiol Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1033. There is no legitimate, non-pretextual, pro-competitive business justification for Ursodiol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1034. Ursodiol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1035. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Ursodiol, or by assignment from its other subsidiaries that directly purchased generic Ursodiol during the Ursodiol Period.

**COUNT LXXII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1036. Humana incorporates by reference the preceding allegations.

1037. Ursodiol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Ursodiol in the United States. This conspiracy was *per se* unlawful price-fixing.

1038. Each of the Ursodiol Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Ursodiol Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Ursodiol prices throughout the United States.

1039. The conspiracy realized its intended effect; Ursodiol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Ursodiol.

1040. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Ursodiol;

b. Humana was deprived of the benefits of free and open competition in the sale of Ursodiol in the United States market; and

c. Competition in establishing the prices paid for Ursodiol was unlawfully restrained, suppressed, or eliminated.

1041. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Ursodiol until the market achieves a steady state.

1042. As a direct and proximate result of Ursodiol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Ursodiol than it would have paid in the absence of Ursodiol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1043. There is no legitimate, non-pretextual, pro-competitive business justification for Ursodiol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1044. Ursodiol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1045. Ursodiol Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LXXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1046. Humana incorporates by reference the preceding allegations.

1047. Ursodiol Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Ursodiol Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Ursodiol at prices restrained by competition and forced to pay artificially inflated prices.

1048. There was and is a gross disparity between the price that Humana paid and continues to pay for Ursodiol, including by assignment from its subsidiaries, and the value received, given that

more cheaply priced Ursodiol should have been available, and would have been available, absent Ursodiol Defendants' illegal conduct.

1049. By engaging in the foregoing conduct, Ursodiol Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1050. Humana incorporates by reference the preceding allegations.

1051. Ursodiol Defendants have benefitted from artificial prices in the sale of Ursodiol resulting from the unlawful and inequitable acts alleged in this Complaint.

1052. Ursodiol Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Ursodiol by Humana.

1053. Humana has conferred upon Ursodiol Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1054. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Ursodiol.

1055. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Ursodiol, as it is not liable and would not compensate Humana for the impact of Ursodiol Defendants' unlawful conduct.

1056. The economic benefit of overcharges derived by Ursodiol Defendants through charging supracompetitive and artificially inflated prices for Ursodiol is a direct and proximate result of Ursodiol Defendants' unlawful conduct.

1057. The economic benefits derived by Ursodiol Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Ursodiol Period, benefiting Ursodiol Defendants.

1058. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Ursodiol Defendants to be permitted to retain any of the overcharges for Ursodiol derived from Ursodiol Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1059. Ursodiol Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1060. Ursodiol Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1061. A constructive trust should be imposed upon all unlawful or inequitable sums received by Ursodiol Defendants traceable to Humana.

## COUNT LXXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (URSODIOL)

**(As to Actavis, Epic, and Lannett)**

1062. Humana incorporates by reference the preceding allegations.

1063. Ursodiol Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Ursodiol. Ursodiol Defendants injured Humana through this conduct.

1064. But for Ursodiol Defendants' scheme to inflate the price of Ursodiol, Humana would have purchased lower-priced generic Ursodiol.

1065. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Ursodiol than it would have paid absent Ursodiol Defendants' continuing anticompetitive conduct.

1066. Humana has purchased substantial amounts of Ursodiol during the Ursodiol Period.

1067. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Ursodiol Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1068. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Ursodiol Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (VERAPAMIL)**

**(As to Actavis, Heritage, and Mylan)**

1069. Humana incorporates by reference the preceding allegations.

1070. Verapamil Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Verapamil in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1071. Each of the Verapamil Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Verapamil Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Verapamil prices throughout the United States.

1072. The conspiracy realized its intended effect; Verapamil Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Verapamil.

1073. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Verapamil;

b. Humana was deprived of the benefits of free and open competition in the sale of Verapamil in the United States market; and

c. Competition in establishing the prices paid for Verapamil was unlawfully restrained, suppressed, or eliminated.

1074. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Verapamil until the market achieves a steady state.

1075. As a direct and proximate result of Verapamil Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Verapamil than it would have paid in the absence of Verapamil Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1076. Verapamil Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1077. There is no legitimate, non-pretextual, pro-competitive business justification for Verapamil Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1078. Verapamil Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1079. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Verapamil, or by assignment from its other subsidiaries that directly purchased generic Verapamil during the Verapamil Period.

## COUNT LXXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (VERAPAMIL)

### (As to Actavis, Heritage, and Mylan)

1080. Humana incorporates by reference the preceding allegations.

1081. Verapamil Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Verapamil in the United States. This conspiracy was *per se* unlawful price-fixing.

1082. Each of the Verapamil Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Verapamil Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Verapamil prices throughout the United States.

1083. The conspiracy realized its intended effect; Verapamil Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Verapamil.

1084. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Verapamil;

b. Humana was deprived of the benefits of free and open competition in the sale of Verapamil in the United States market; and

c. Competition in establishing the prices paid for Verapamil was unlawfully restrained, suppressed, or eliminated.

1085. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Verapamil until the market achieves a steady state.

1086. As a direct and proximate result of Verapamil Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Verapamil than it would have paid in the absence of Verapamil Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1087. There is no legitimate, non-pretextual, pro-competitive business justification for Verapamil Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1088. Verapamil Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1089. Verapamil Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LXXVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**
**(VERAPAMIL)**

**(As to Actavis, Heritage, and Mylan)**

1090. Humana incorporates by reference the preceding allegations.

1091. Verapamil Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Verapamil Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Verapamil at prices restrained by competition and forced to pay artificially inflated prices.

1092. There was and is a gross disparity between the price that Humana paid and continues to pay for Verapamil, including by assignment from its subsidiaries, and the value received, given

that more cheaply priced Verapamil should have been available, and would have been available, absent Verapamil Defendants' illegal conduct.

1093. By engaging in the foregoing conduct, Verapamil Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXXIX**

**UNJUST ENRICHMENT UNDER STATE LAW (VERAPAMIL)**

**(As to Actavis, Heritage, and Mylan)**

1094. Humana incorporates by reference the preceding allegations.

1095. Verapamil Defendants have benefitted from artificial prices in the sale of Verapamil resulting from the unlawful and inequitable acts alleged in this Complaint.

1096. Verapamil Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Verapamil by Humana.

1097. Humana has conferred upon Verapamil Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1098. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Verapamil.

1099. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Verapamil, as it is not liable and would not compensate Humana for the impact of Verapamil Defendants' unlawful conduct.

1100. The economic benefit of overcharges derived by Verapamil Defendants through charging supracompetitive and artificially inflated prices for Verapamil is a direct and proximate result of Verapamil Defendants' unlawful conduct.

1101. The economic benefits derived by Verapamil Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Verapamil Period, benefiting Verapamil Defendants.

1102. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Verapamil Defendants to be permitted to retain any of the overcharges for Verapamil derived from Verapamil Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1103. Verapamil Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1104. Verapamil Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1105. A constructive trust should be imposed upon all unlawful or inequitable sums received by Verapamil Defendants traceable to Humana.

## COUNT LXXX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (VERAPAMIL)

**(As to Actavis, Heritage, and Mylan)**

1106. Humana incorporates by reference the preceding allegations.

1107. Verapamil Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Verapamil. Verapamil Defendants injured Humana through this conduct.

1108. But for Verapamil Defendants' scheme to inflate the price of Verapamil, Humana would have purchased lower-priced generic Verapamil.

1109. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Verapamil than it would have paid absent Verapamil Defendants' continuing anticompetitive conduct.

1110. Humana has purchased substantial amounts of Verapamil during the Verapamil Period.

1111. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Verapamil Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1112. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Verapamil Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXXXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1113. Humana incorporates by reference the preceding allegations.

1114. Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1115. Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Subject Drug prices throughout the United States.

1116. The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

1117. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

d. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

e. Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

f. Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

1118. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

1119. As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1120. Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1121. There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1122. Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1123. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Subject Drugs, or by assignment from its other subsidiaries that directly purchased the Subject Drugs during the periods alleged above for each of the Subject Drugs.

**COUNT LXXXII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1124. Humana incorporates by reference the preceding allegations.

1125. Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1126. Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Subject Drug prices throughout the United States.

1127. The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

1128. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

d. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

e. Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

f. Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

1129. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

1130. As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1131. There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1132. Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1133. Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

e. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

f. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

g. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

h. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

i. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

k. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

n. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

o. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

q. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

r. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

s. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

t. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

u. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

v. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

w. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

x. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

y. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

z. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

aa. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

bb. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

cc. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LXXXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**
**(ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1134. Humana incorporates by reference the preceding allegations.

1135. Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Subject Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1136. There was and is a gross disparity between the price that Humana paid and continues to pay for the Subject Drugs, including by assignment from its subsidiaries, and the value received,

given that more cheaply priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

1137. By engaging in the foregoing conduct, Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXXXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1138. Humana incorporates by reference the preceding allegations.

1139. Defendants have benefitted from artificial prices in the sale of the Subject Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1140. Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for the Subject Drugs by Humana.

1141. Humana has conferred upon Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1142. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Subject Drugs.

1143. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Subject Drugs, as it is not liable and would not compensate Humana for the impact of Defendants' unlawful conduct.

1144. The economic benefit of overcharges derived by Defendants through charging supracompetitive and artificially inflated prices for the Subject Drugs is a direct and proximate result of Defendants' unlawful conduct.

1145. The economic benefits derived by Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the periods alleged above for each of the Subject Drugs, benefiting Defendants.

1146. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Subject Drugs derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1147. Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1148. Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1149. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Humana.

## COUNT LXXXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

**(As to All Defendants)**

1150. Humana incorporates by reference the preceding allegations.

1151. Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Subject Drugs. Defendants injured Humana through this conduct.

1152. But for Defendants' scheme to inflate the price of the Subject Drugs, Humana would have purchased lower-priced Subject Drugs.

1153. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Subject Drugs than it would have paid absent Defendants' continuing anticompetitive conduct.

1154. Humana has purchased substantial amounts of the Subject Drugs during the periods alleged above for each of the Subject Drugs.

1155. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1156. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## DEMAND FOR JUDGMENT

WHEREFORE, Humana demands judgment against Defendants, as follows:

A. Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1-2;

B. A judgment against Defendants, jointly and severally, for the damages sustained by Humana, and for awarding Humana actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C. Awarding Humana its reasonable costs and expenses, including attorneys' fees; and

D. Awarding all other legal or equitable relief as the Court deems just and proper.

## XVII. JURY TRIAL DEMANDED

Humana demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: August 3, 2018

Respectfully submitted:

**LOWEY DANNENBERG, P.C.**

By: */s/ Peter D. St. Phillip*
Peter D. St. Phillip, PA ID # 70027
Uriel Rabinovitz *(pro hac vice forthcoming)*
Jennifer Risener *(pro hac vice forthcoming)*
44 South Broadway
Suite 1100
White Plains, New York 10601
Tel. 914-997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com
JRisener@lowey.com

Laura K. Mummert, PA ID # 85964
Anthony M. Christina, PA ID #322528
Charles Z. Kopel, PA ID # 324805
Julia Rebekah McGrath, PA ID #323771
William J. Olson, PA ID # 322948
200 Barr Harbor Drive
Suite 400
West Conshohocken, Pennsylvania 19428

Tel: 610-941-2760
LMummert@lowey.com
AChristina@lowey.com
CKopel@lowey.com
JMcGrath@lowey.com
WOlson@lowey.com

**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**

By: */s/ Todd Schneider*
Todd Schneider *(pro hac vice forthcoming)*
Jason Kim *(pro hac vice forthcoming)*
Kyle Bates *(pro hac vice forthcoming)*
2000 Powell Street
Suite 1400
Emeryville, California 94608
Tel.: 415-421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
kbates@schneiderwallace.com

Garrett W. Wotkyns (*Pro hac vice* to be filed)
8501 North Scottsdale Road
Suite 270
Scottsdale, Arizona 85253
480-428-0144
GWotkyns@schneiderwallace.com

**HUMANA INC.**

Matthew R. Varzally
Senior Counsel—Litigation & Investigations
500 West Main Street
Louisville, Kentucky 40202

*Counsel for Humana Inc.*