**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724**<br>**16-MD-2724** |
| HUMANA INC.<br><br>Plaintiff,<br><br>v.<br><br>ACTAVIS ELIZABETH, LLC, ACTAVIS HOLDCO US, INC., ACTAVIS PHARMA, INC., AKORN, INC., APOTEX CORP., BRECKENRIDGE PHARMACEUTICAL, INC., DR. REDDY'S LABORATORIES INC., ENDO INTERNATIONAL PLC, EPIC PHARMA, LLC, FOUGERA PHARMACEUTICALS INC., GLENMARK PHARMACEUTICALS INC., USA, HERITAGE PHARMACEUTICALS INC., HI-TECH PHARMACAL CO., INC., IMPAX PHARMACEUTICALS, LLC F/K/A IMPAX PHARMACEUTICALS, INC., LANNETT COMPANY, INC., LUPIN PHARMACEUTICALS, INC., MAYNE PHARMA, INC., MORTON GROVE PHARMACEUTICALS, INC., MYLAN PHARMACEUTICALS, INC., MYLAN INC., MYLAN, N.V., PAR PHARMACEUTICAL, INC., PAR PHARMACEUTICAL COMPANIES, INC., PERRIGO COMPANY PLC, PERRIGO NEW YORK, INC., SANDOZ, INC., SUN PHARMACEUTICAL INDUSTRIES, INC., TARO PHARMACEUTICAL INDUSTRIES LTD., TARO PHARMACEUTICALS USA, INC., TELIGENT, INC., TEVA PHARMACEUTICALS USA, INC., UDL LABORATORIES INC., UPSHER-SMITH LABORATORIES, LLC, WEST-WARD PHARMACEUTICALS CORP., WOCKHARDT USA LLC, AND ZYDUS PHARMACEUTICALS (USA) INC.<br><br>Defendants. | No. 2:18-cv-03299-CMR<br><br>SECOND AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

## TABLE OF CONTENTS


I. NATURE OF THE CASE ..... 1

II. THE DRUGS SUBJECT TO THE CONSPIRACY ..... 5

III. JURISDICTION AND VENUE ..... 9

IV. PARTIES ..... 10

A. Plaintiff ..... 10

B. Defendants ..... 12

C. Co-Conspirators ..... 23

V. REGULATORY AND ECONOMIC BACKGROUND ..... 24

A. Generic Drugs Should Provide Lower-Priced Options for Purchasers ..... 24

B. The Prescription Drug Market ..... 26

C. The Prescription Drug Distribution System ..... 27

D. The Market for Generic Drugs is Highly Susceptible to Collusion ..... 28

VI. THE FEDERAL AND STATE INVESTIGATIONS OF THE PRICE-FIXING CONSPIRACY ..... 30

A. Congress launched an investigation into generic price hikes ..... 30

B. The DOJ Investigates Criminal Generic Drug Collusion ..... 32

C. State Attorneys General launched their own investigation into generic drug price hikes ..... 37

VII. DEFENDANTS' EXTENSIVE INTER-FIRM COMMUNICATIONS ..... 40

A. Trade Association Meetings and Conferences ..... 41

1. Generic Pharmaceutical Association ..... 42

2. Healthcare Distribution Management Association ..... 45

3. Efficient Collaborative Retail Marketing ..... 45

4. Minnesota Multistate Contracting Pharmacy Alliance ..... 46

5. Healthcare Supply Chain Association (HSCA) ..... 46

B. Industry Dinners and Private Meetings ..... 48

C. Personal Telephone Calls, Emails and Text Message Communications ..... 50

VIII. DEFENDANTS SIGNAL TO COMPETITORS THEIR INTENT TO SET AND MAINTAIN SUPRACOMPETITIVE PRICES ..... 51

IX. INDUSTRY ANALYSTS SUSPECT COLLUSION ..... 62

X. THERE IS NO JUSTIFICATION FOR THE EXTRAORDINARY PRICE INCREASES OF THE SUBJECT DRUGS ..... 63

XI. THE OVERARCHING GENERIC DRUG CONSPIRACY ..... 64

XII. ALLEGATIONS SPECIFIC TO EACH OF THE SUBJECT DRUGS....70

A. Acetazolamide....70

1. Acetazolamide tablets....71

2. Acetazolamide Capsules....75

B. Amitriptyline....78

C. Baclofen....81

D. Benazepril....82

E. Clobetasol....85

F. Clomipramine....90

G. Desonide....92

H. Digoxin....95

I. Divalproex....100

J. Doxycycline....102

1. Doxycycline Hyclate....103

2. Doxy DR....108

3. Doxycycline Monohydrate ("Doxy Mono")....120

K. Econazole....128

L. Fluocinonide....131

M. Leflunomide....134

N. Levothyroxine....137

O. Lidocaine....140

P. Nystatin....141

1. Nystatin Cream....142

2. Nystatin Ointment....144

3. Nystatin Tablets....146

Q. Pravastatin....150

R. Propranolol....154

S. Theophylline....160

T. Ursodiol....165

U. Verapamil....167

XIII. DEFENDANTS KNEW THEIR ACTIONS WERE ILLEGAL....171

XIV. HUMANA'S PURCHASES AND ANTITRUST INJURY....172

XV. INTERSTATE TRADE AND COMMERCE....177

XVI. TOLLING AND FRAUDULENT CONCEALMENT ........ 178
XVII. DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY ........ 179
XVIII. CLAIMS FOR RELIEF ........ 179
XIX. DEMAND FOR JUDGMENT ........ 379
XX. JURY TRIAL DEMANDED ........ 379

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

Plaintiff Humana Inc. ("Humana") files this Second Amended Complaint pursuant to the Court's Opinion in 16-MD-2724 dated February 15, 2019 (ECF No. 857) against Defendants Actavis Elizabeth, LLC, Actavis Holdco US, Inc., Actavis Pharma, Inc., Akorn, Inc., Apotex Corp., Breckenridge Pharmaceutical, Inc., Dr. Reddy's Laboratories Inc., Endo International plc, Epic Pharma, LLC, Fougera Pharmaceuticals Inc., Glenmark Pharmaceuticals Inc., USA, Heritage Pharmaceuticals Inc., Hi-Tech Pharmacal Co., Inc., Impax Laboratories, LLC, Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma, Inc., Morton Grove Pharmaceuticals, Inc., Mylan Pharmaceuticals, Inc., Mylan Inc., Mylan, N.V., Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Perrigo Company plc, Perrigo New York, Inc., Sandoz, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceutical Industries Ltd., Taro Pharmaceuticals USA, Inc., Teligent, Inc., Teva Pharmaceuticals USA, Inc., UDL Laboratories Inc., Upsher-Smith Laboratories, LLC, West-Ward Pharmaceuticals Corp., Wockhardt USA LLC, and Zydus Pharmaceuticals (USA) Inc. (collectively "Defendants") and alleges based on personal knowledge as to the facts pertaining to it and information made public during ongoing government investigations of Defendants and other generic drug companies, and upon information and belief as to all other matters, as follows:

## I. NATURE OF THE CASE

1. Humana brings this action to recover damages it incurred from egregious overcharges it paid for certain widely-used generic drugs, arising from a far-reaching conspiracy among Defendants and others to blatantly fix the price of such drugs. This conspiracy increased the Defendants' profits, and that of others working with them, at the expense of Humana, a private health benefit provider, as well as consumers and the government.

2. In the pharmaceutical industry, generic drug entry predictably and typically results in increased price competition, which reduces the price of drugs for wholesalers, retailers, consumers and third-party payers such as Humana. Defendants here, however, along with other generic drug

manufacturers, conspired to manipulate the relevant markets, allocate these markets amongst themselves, and obstruct generic competition in an ongoing scheme to fix, increase, stabilize, and/or maintain the price of the drugs specified below. The scheme continues to affect the generic drug markets identified in this Second Amended Complaint.

3. Defendants orchestrated their conspiracy through secret communications and meetings, both at private and public events, like trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (n/k/a Association for Accessible Medicines), the Healthcare Distribution Management Association ("HDMA") (n/k/a Healthcare Distribution Alliance), the Efficient Collaborative Retail Marketing organization ("ECRM"), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA"), among others.

4. The conduct alleged in this Second Amended Complaint is the subject of numerous federal and state investigations.

5. Two executives of Defendant Heritage Pharmaceuticals, Inc. have pleaded guilty to participating in a conspiracy to fix prices of Doxycycline—a drug subject to this Second Amended Complaint—as well as Glyburide, between at least 2013 and 2015.

6. The Attorneys General of 47 states, Washington, D.C., and Puerto Rico have filed a civil enforcement action against most of the Defendants here, alleging agreements to fix the price of 15 drugs, seven of which Humana brings this action for: Acetazolamide, Doxycycline Hyclate, Doxycycline Monohydrate, Leflunomide, Nystatin, Theophylline ER, and Verapamil. Plaintiff States' Consolidated Amended Complaint, Case No. 2:17-cv-03768-CMR, ECF No. 14 (E.D. Pa.) ("AG Complaint"). The AG Complaint is the result of information gathered in response to private Civil Investigative Demands that would otherwise remain undisclosed. The AG Complaint is not exhaustive of the generic drugs and manufacturers involved in the price-fixing conspiracy. Rather,

the AG Complaint alleges an "overarching conspiracy … to minimize if not thwart competition across the generic drug industry."[1] It also alleges that the investigation is continuing as to other drugs and manufacturers.[2]

7. The federal investigation is likewise ongoing. In a filing in *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF 561-1 (E.D. Pa. Oct. 27, 2017), the United States Department of Justice ("DOJ") stated that many generic drugs and manufacturers that have not yet been the subject of federal enforcement actions are implicated in price-fixing agreements.

8. The DOJ convened a grand jury to investigate numerous Defendants named herein. It also subpoenaed most or all of the Defendants and executed search warrants at the corporate offices of two Defendants, as alleged in more detail below.

9. Predictably, the results of the conspiracy alleged herein were severe. The prices of generic drugs skyrocketed at unprecedented rates, such as: (1) 75% for Acetazolamide; (2) 2,400% for Amitriptyline; (3) 600% for Baclofen; (4) 400% for Benazepril; (5) 1,800% for Clobetasol; (6) 2,600% for Clomipramine; (7) 140% for Desonide; (8) 630% for Digoxin; (9) 700% for Divalproex; (10) 8,000% for some forms of Doxycycline; (11) 600% for Econazole; (12) 200% for Fluocinonide; (13) 1,300% for Leflunomide; (14) 230% for Levothyroxine; (15) 300% for some forms of Lidocaine; (16) 100% for Nystatin; (17) 500% for Pravastatin; (18) 1,000% for Propranolol; (19) 150% for Theophylline ER; (20) 1,000% for Ursodiol; and (21) 100% for Verapamil (collectively the "Subject Drugs").

10. These price increases are consistent with Medicare Part D price increases found by the Government Accountability Office ("GAO") for many of the Subject Drugs.[3] Among the drugs

---

[1] AG Amended Compl. ¶ 2, No. 17-cv-3768 (ECF No. 14)
[2] *Id.* at ¶ 1.
[3] Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases, GAO-16-706 (August 2016) ("the GAO Report").

for which GAO identified "extraordinary price increases" (defined as a price increase of 100% or more between the first quarter of one year and the first quarter of the subsequent year) between the first quarter of 2011 and the first quarter of 2015 were Acetazolamide, Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Desonide, Digoxin, Divalproex, Doxycycline (in Hyclate form), Econazole, Fluocinonide, Lidocaine, Nystatin, Pravastatin, Theophylline ER, and Ursodiol.[4]

11. Defendants engaged in a broad, overarching conspiracy to inflate the prices of their generic drug products *en masse*.

12. Defendants' sinister scheme is composed of two main conduct areas with the grand objective being to avoid price erosion, increase prices for targeted products, and maintain these artificially inflated prices across their respective product portfolios without triggering a "fight to the bottom" among competitors.

13. First, Defendants would communicate with one another to determine and agree on how much market share and which customers each conspirator was entitled to. They effectuated their market allocation by either refusing to bid for particular customers or providing outrageously high cover bids. Second, competitors communicated to collectively raise and/or maintain prices for a particular generic drug.

14. The market for each of the Subject Drugs was small enough to foster collusion, but still large enough that prices should have remained at their historical, near marginal cost levels. Defendants overcame this obstacle and produced extraordinary price increases, as reflected in industry-wide data, by engaging in a concerted effort to grow their conspiracy and dominate the market for the Subject Drugs.

[4] *Id.* at Appx. III.

15. This industry-wide data is consistent with the substantial price increases Humana suffered for the Subject Drugs.

16. Defendants knew their conduct was unlawful. They limited their communications to in-person meetings, or mobile phone calls, to avoid creating a record of their conduct. When communications were reduced to writing or text messages, Defendants often destroyed the evidence of those communications. Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and unfair competition laws, as alleged herein.

17. Humana seeks treble damages and injunctive relief on account of Defendants' unlawful scheme to fix, maintain, and stabilize prices for the Subject Drugs.

## II. THE DRUGS SUBJECT TO THE CONSPIRACY

18. Humana purchased substantial quantities of the Subject Drugs described below during the relevant time period for each drug. Humana paid grossly inflated prices for these Subject Drugs due to the alleged price-fixing conspiracy, both directly from certain Defendants and from other sources.

19. **Acetazolamide ER.** Acetazolamide ER ("Acetazolamide") is an extended release anhydrase inhibitor medicine to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure.

20. **Amitriptyline.** Amitriptyline is a tricyclic antidepressant. Recognized as an "Essential Medicine" by the WHO,[5] it is used to treat symptoms of depression.

[5] According to the WHO, "Essential medicines are those that satisfy the priority health care needs of the population. They are selected with due regard to public health relevance, evidence on efficacy and safety, and comparative cost-effectiveness. Essential medicines are intended to be available within the context of functioning health systems at all times in adequate amounts, in the appropriate dosage forms, with assured quality and adequate information, and at a price the individual and the community can afford." World Health Organization, Essential medicines, *available at* .



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

21. **Baclofen**. Baclofen is a muscle relaxant and an anti-spastic agent. It is typically used to treat muscle symptoms caused by multiple sclerosis, including spasms, pain, and stiffness. It is also used to treat muscle spasms in people with spinal injury or disease.

22. **Benazepril**. Benazepril Hydrochlorothiazide ("Benazepril") is an angiotensin converting enzyme ("ACE") inhibitor. It is used to treat hypertension (high blood pressure).

23. **Clobetasol**. Clobetasol Propionate ("Clobetasol") is a steroid and anti-inflammatory agent. It is used to treat inflammation and itching caused by several skin conditions, such as allergic reactions, eczema, and psoriasis. Clobetasol is one of the most prescribed dermatological drugs in the United States. It comes in a variety of forms, including a cream, foam, gel, lotion, ointment, shampoo, solution, and spray.

24. **Clomipramine.** Clomipramine is a tricyclic antidepressant. It is used to treat symptoms of obsessive-compulsive disorder. It is included on the WHO's list of Essential Medicines.

25. **Desonide.** Desonide, which includes .05% topical ointment and .05% topical cream, is a topical corticosteroid anti-inflammatory used to treat skin disorders including eczema, psoriasis, and dermatitis. It is a low-potency medication and, therefore, is more commonly prescribed for children or for adults to use in sensitive areas like the eyelids.

26. **Digoxin.** Digoxin is a cardiotonic glycoside. It is used to treat heart failure and atrial fibrillation (irregular and/or rapid heart rate). It is included on the WHO's list of Essential Medicines.

27. **Divalproex.** Divalproex Sodium Extended Release ("Divalproex") is used to treat various types of seizure disorders, to treat manic episodes related to bipolar disorder, and to prevent migraine headaches. It works by restoring the balance of neurotransmitters in the brain.

28. **Doxycycline.** Doxycycline is a tetracycline antibiotic. It is used to treat bacterial infections, such as acne, urinary tract infections, intestinal infections, eye infections, gonorrhea, chlamydia, and periodontitis. It is also used to treat symptoms of rosacea. It is included on the WHO's list of Essential Medicines. Doxycycline Hyclate ("Doxy Hyclate") is a water-soluble form of Doxycycline that absorbs quickly into the bloodstream. A delayed release version of Doxycycline Hyclate ("Doxy DR") is used to treat acne. Doxycycline monohydrate ("Doxy Mono") is significantly less water soluble and absorbs more slowly than Doxy Hyclate. It is also used to prevent malaria.

29. **Econazole.** Econazole refers to econazole nitrate cream 1%. Econazole is a topical antifungal agent used to treat skin infections caused by fungus or yeast, including ringworm, tinea versicolor, and yeast infections. Econazole is available in topical cream, ointment, emollient-cream, or gel form.

30. **Fluocinonide.** Fluocinonide, which includes 0.05% topical cream, 0.05% topical ointment, and 0.05% topical gel, is a topical glucocorticoid used to treat psoriasis and eczema. Among other things, Fluocinonide reduces the swelling, itching, and redness that can occur in these types of skin irritations.

31. **Leflunomide**. Leflunomide is an immunosuppressive and anti-inflammatory agent. It is used to reduce inflammation that causes pain and swelling in patients with rheumatoid arthritis.

32. **Levothyroxine.** Levothyroxine is a manufactured, synthetic form of the thyroid hormone, thyroxine. It is used to treat hypothyroidism, a condition in which the thyroid gland fails to produce enough hormone. It is also used to treat goiter (enlarged thyroid gland), thyroid cancer, and cretinism (congenital hypothyroidism). First manufactured in 1927, Levothyroxine is included on the WHO's list of Essential Medicines. Levothyroxine was, by number of prescriptions, the second most popular prescription drug in the United States in the first quarter of 2016. Over 120

million prescriptions are written, *per annum*, for Levothyroxine in the U.S, treating 15% of Americans over the age of 55.

33. **Lidocaine**. Lidocaine is a local anesthetic agent. It is used to numb an area of the body to reduce pain or discomfort caused by invasive medical procedures. It is sold in several formulations and combinations, including Lidocaine-Prilocaine.

34. **Nystatin**. Nystatin is an antifungal medication. It is used to treat yeast infections, diaper rash, thrush, and esophageal candidiasis. First discovered in 1950, it is included on the WHO's list of Essential Medicines.

35. **Pravastatin.** Pravastatin is an HMG CoA reductase inhibitor (known as a statin). It is used to lower cholesterol and triglycerides in the blood. Pravastatin was, by number of prescriptions, the twenty-third most popular prescription drug in the United States in the first quarter of 2016.

36. **Propranolol.** Propranolol Hydrochloride ("Propranolol") is a beta-blocker used to treat hypertension, heart rhythm disorders, tremors, and other heart and circulatory conditions, and to prevent heart attacks, migraine headaches, and angina (chest pain caused by reduced blood flow to the heart). Propranolol is included on the WHO's list of Essential Medicines. Propranolol is available as a capsule, a tablet, an oral liquid solution, and an injection.

37. **Theophylline ER.** Theophylline ER ("Theophylline") is an extended release medication used to treat asthma and airway constriction associated with long-term asthma or other lung problems including chronic bronchitis and emphysema.

38. **Ursodiol.** Ursodiol is a naturally occurring bile acid that is manufactured and sold as a prescription medication to dissolve gallstones made of cholesterol in patients whose gallbladders do not need to be removed or where surgery is not an option. It is also used to prevent the formation of gallstones and to treat primary biliary cirrhosis (an autoimmune disease in which the


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

bile ducts in the liver are destroyed). Ursodiol can also be used to prevent organ rejection in liver transplant patients.

39. **Verapamil.** Verapamil is a calcium channel blocker. It is used to treat hypertension, angina, and certain heart rhythm disorders. It is included on the WHO's list of Essential Medicines.

## III. JURISDICTION AND VENUE

40. This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. Humana asserts claims for relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

41. This Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States (including in this District), sold and distributed one or more of the Subject Drugs throughout the United States (including in this District), has registered agents in the United States (including in this District), may be found in the United States (including in this District), engaged in an unlawful conspiracy to artificially increase prices for one or more of the Subject Drugs that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States (including in this District), and is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

42. Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1391(b)-(d). Defendants transact business within this District, have agents and can be found in this District, and the relevant interstate trade and commerce is carried out, in substantial part, in this District.

43. Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of the Subject Drugs in the United

States (including in this District). Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States (including in this District).

## IV. PARTIES

### A. Plaintiff

44. Humana Inc. is incorporated in Delaware and headquartered at 500 West Main Street, Louisville, Kentucky. Humana is publicly traded under the NYSE symbol "HUM."

45. Humana is the parent company, and assignee of the claims, of subsidiaries and affiliates that provide, *inter alia:* (1) Medicare benefits, through contracts with the Centers for Medicare and Medicaid Services ("CMS"), for Medicare beneficiaries through a variety of Medicare Advantage plans offered under Part C of Medicare, or prescription drug benefits under Part D of Medicare; and (2) private commercial health insurance plan benefits that cover the medical expenses incurred by plan beneficiaries on an individual or group basis. Humana's subsidiaries provide these benefits to beneficiaries in all 50 states, the District of Columbia, and Puerto Rico. Humana is the second largest Medicare Advantage Organization in the United States. These assignor subsidiaries and/or affiliates include: Arcadian Health Plan, Inc., CarePlus Health Plans, Inc., Cariten Health Plan Inc., Cariten Insurance Company, CHA HMO, Inc., CompBenefits Insurance Company, Emphesys Insurance Company, Health Value Management, Inc., dba ChoiceCare Network, Humana AdvantageCare Plan, Inc., Humana Behavioral Health, Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc., Humana Health Benefit Plan of Louisiana, Inc., Humana Health Company of New York, Inc., Humana Health Insurance Company of Florida, Inc., Humana Health Plan of California, Inc., Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plans of Puerto Rico, Inc., Humana Health Plan, Inc., Humana Insurance Company, Humana Insurance Company of Kentucky, Humana Insurance Company of New York, Humana Insurance of Puerto Rico, Inc., Humana Medical Plan

of Pennsylvania, Inc., Humana Medical Plan of Utah, Inc., Humana Medical Plan, Inc., Humana Regional Health Plan, Inc., Humana Wisconsin Health Organization Insurance Corporation and M.D. Care, Inc. Humana's subsidiaries and affiliates expressly have assigned the claims pleaded herein to Humana.

46. Humana is also the parent and assignee of claims of its subsidiary Humana Pharmacy, Inc. f/k/a Rightsource ("HPI"). HPI buys prescription drugs directly from manufacturers and wholesalers and dispenses them to Humana's benefits plan members on a mail-order and retail pharmacy basis, pursuant to members' doctors' prescriptions. HPI has purchased Acetazolamide, Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Desonide, Digoxin, Divalproex, Doxycycline, Econazole, Fluocinonide, Leflunomide, Levothyroxine, Lidocaine, Nystatin, Pravastatin, Propranolol, Theophylline, Ursodiol, and Verapamil from Defendants Actavis, Akorn, Apotex, Breckenridge, Dr. Reddy's, Endo, Fougera, Glenmark, Heritage, Hi-Tech, Impax, Lannett, Lupin, Mayne, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, UDL, Upsher-Smith, West-Ward, Wockhardt, and Zydus (defined below), among others, pursuant to various agreements.

47. In addition, Humana is the parent and assignee of claims of its subsidiary Humana Pharmacy Solutions, Inc. ("HPS"). HPS is a pharmacy benefit manager ("PBM") that provides Humana's benefits plan members with benefits and services including processing and pricing prescription drug claims.

48. Humana, either directly or through its health plan subsidiaries, insureds and administers health plan benefits for its members and group customers, including self-funded group customers that contract with Humana to administer claims on their behalf and pursue recoveries related to those claims. Many of these health plan benefits provide members with prescription drug coverage under which claims for drugs manufactured by Defendants were submitted and paid. Humana is pursuing recovery related to those claims.

**B. Defendants**

49. Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Defendant Actavis Holdco and is a research and development and manufacturing entity for the Actavis generic operations.

50. Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth, LLC and Actavis Pharma, Inc., merged with Allergan, Inc. and changed its name to Allergan plc ("Allergan"). In August 2016, Teva Pharmaceutical Industries Ltd., the Israeli parent company of Defendant Teva, purchased Allergan's generics business, which included Defendants Actavis Elizabeth and Actavis Pharma, Inc. The assets and liabilities of Allergan's generics business were transferred to the newly-formed Actavis Holdco. Actavis Holdco is a wholly-owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc.

51. Defendant Actavis Pharma, Inc. ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for the generic products Teva acquired from Allergan.

52. Actavis Elizabeth, Actavis Holdco, and Actavis Pharma are collectively defined as "Actavis." During the relevant time period, Actavis participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States and was a leading manufacturer of Clobetasol, Doxycycline, Fluocinonide, Nystatin, Pravastatin, Propranolol, Ursodiol, and Verapamil.

53. Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. Akorn is the parent company of Defendant Hi-Tech Pharmacal

Co., Inc. During the relevant time period, Akorn participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol and Lidocaine. Akorn sold Clobetasol and Lidocaine directly to Humana. Defendant Apotex Corp. ("Apotex") is a Delaware corporation with its principal place of business in Weston, Florida. During the relevant time period, Apotex participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Leflunomide and Pravastatin.

54. Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business in Fairfield, New Jersey. During the relevant time period, Breckenridge participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Propranolol.

55. Defendant Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey. Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India. During the relevant time period, Dr. Reddy's participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Divalproex and Pravastatin.

56. Defendant Endo International plc ("Endo") is an Irish company with global headquarters in Dublin, Ireland, and U.S. headquarters in Malvern, Pennsylvania. Endo is the parent company of Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. In August 2014, Endo's subsidiary, Generics International (US), Inc. d/b/a Qualitest Pharmaceuticals, acquired co-conspirator, DAVA Pharmaceuticals, Inc. ("DAVA"). In September 2015, Endo completed the acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc., and merged Par's

business with Endo's subsidiary co-conspirator Qualitest Pharmaceuticals, Inc. ("Qualitest"), naming the segment Par Pharmaceutical, Inc. Par is thus the successor in interest to both DAVA and Qualitest. During the relevant time period, Endo participated in the alleged conspiracy and acted to reduce the supply and/or fix the price of one or more of the Subject Drugs, including Doxycycline, and Propranolol. Endo purposefully directed these activities at the United States and this District, and derived benefits from these activities. During the relevant time period, Endo, through its subsidiaries Qualitest and DAVA, which later became Par, was a leading manufacturer of Amitriptyline, Baclofen, Digoxin, Divalproex, Doxycycline, Nystatin, and Propranolol.

57. Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. During the relevant time period, Epic participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Ursodiol.

58. Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. It is under common ownership with Defendant Sandoz, Inc., as both are wholly-owned subsidiaries of Novartis AG ("Novartis"). Fougera specializes in the production, marketing, and sale of dermatological products. During the relevant time period, Fougera participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol, Desonide, Econazole, Fluocinonide and Lidocaine.

59. Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark"), known between 2008 and 2015 as "Glenmark Generics Inc., USA," is a Delaware corporation with its principal place of business in Mahwah, New Jersey. During the relevant time period, Glenmark participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Pravastatin.

60. Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Heritage is a wholly-owned subsidiary of Defendant Emcure, an Indian company with its principal place of business in Pune, India. During the relevant time period, Heritage participated in the alleged conspiracy, marketed, and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Acetazolamide, Doxycycline, Leflunomide, Nystatin, Propranolol, Theophylline, and Verapamil.

61. Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. Hi-Tech is a wholly-owned subsidiary of Defendant Akorn. Upon information and belief, in or around 2009, Defendant Hi-Tech obtained 5 generic ANDA applications from DFB Pharmaceuticals, Inc. During the relevant time period, Hi-Tech participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol and Lidocaine.

62. Defendant Impax Laboratories, LLC, formerly known as Impax Laboratories, Inc., ("Impax") is a Delaware limited liability company with its principal place of business in Hayward, California. During the relevant time period, Impax participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Digoxin and Lidocaine.

63. Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. During the relevant time period, Lannett participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Acetazolamide, Baclofen, Digoxin, Doxycycline, Levothyroxine, and Ursodiol.

64. Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin

Limited, an Indian company with its principal place of business in Mumbai, India. During the relevant time period, Lupin participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Pravastatin.

65. Defendant Mayne Pharma, Inc. ("Mayne") is a Delaware corporation with its principal place of business in Paramus, New Jersey. Mayne is a wholly-owned subsidiary of Mayne Pharma Group Limited, an Australian company with its principal place of business in Salisbury, Australia. In 2012, Mayne acquired Metrics, Inc. and its division Midlothian Laboratories ("Midlothian") and operated under the name Midlothian since that time. During the relevant time period, Mayne participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Doxycycline.

66. Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. Morton Grove is a wholly-owned subsidiary of Wockhardt, Ltd., an Indian company with its principal place of business in Mumbai, India. During the relevant time period, Morton Grove participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol.

67. Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. It is the parent company of Defendant Mylan Pharmaceuticals, Inc. and Defendant UDL Laboratories Inc. During the relevant time period, Mylan Inc. participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

68. Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. During the relevant time period, Mylan Pharmaceuticals Inc., participated in the alleged conspiracy marketed and sold one or more of the

Subject Drugs throughout the United States, and was a leading manufacturer of Amitriptyline, Benazepril, Clomipramine, Digoxin, Divalproex, Doxycycline, Levothyroxine, Pravastatin, Propranolol, and Verapamil.

69. Mylan N.V. is a Dutch company with its principal place of business and global headquarters in Canonsburg, Pennsylvania. Mylan N.V. is the direct parent of Defendant Mylan Inc. and the ultimate parent of Defendants Mylan Pharmaceuticals, Inc. and UDL Laboratories Inc. During the relevant time period, Mylan N.V. participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

70. Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively defined as "Mylan."

71. Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business in Chestnut Ridge, New York.

72. Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation and the immediate parent of Defendant Par Pharmaceutical, Inc. with its principal place of business in Chestnut Ridge, New York.

73. Both Par Defendants are wholly-owned subsidiaries of Defendant Endo. Throughout this Second Amended Complaint, Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are collectively referred to as "Par." During the relevant time period, Par participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Amitriptyline, Baclofen, Digoxin, Divalproex, Doxycycline, Nystatin, and Propranolol.

74. Defendant Perrigo Company plc ("Perrigo plc") is an Irish company with its principal place of business in Dublin, Ireland. Perrigo plc's North American base of operations is

located at 515 Eastern Avenue, Allegan, Michigan 49010. Perrigo plc's prescription drug business focuses primarily on the manufacture and sale of extended topical prescription pharmaceuticals.

75. Defendant Perrigo New York, Inc. ("Perrigo New York") is a Delaware corporation with its principal place of business in Bronx, New York. Perrigo New York is a wholly owned subsidiary of Perrigo plc.

76. Throughout this Second Amended Complaint, Perrigo plc and Perrigo New York will be referred to collectively as "Perrigo." During the relevant time period, Perrigo participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol, Desonide, Econazole, and Nystatin.

77. Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey. During the relevant time period, Sandoz participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Amitriptyline, Benazepril, Clobetasol, Clomipramine, Desonide, Econazole, Fluocinonide, Lidocaine, Levothyroxine, and Nystatin.

78. Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd. Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendants Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997. Unless addressed individually, Sun, URL, Mutual and Caraco are collectively

referred to herein as "Sun." During the relevant time period, Sun participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Digoxin, Doxycycline, and Nystatin.

79. Defendant Taro Pharmaceuticals Industries Ltd. ("Taro Israel") is an Israeli company with its principal place of business in Haifa Bay, Israel. Throughout the relevant time period, the Indian parent company of Defendant Sun has owned a large majority stake of Taro Israel. During the relevant time period, Taro Israel participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, either on its own or through its subsidiaries, and was a leading manufacturer of Acetazolamide, Clobetasol, and Clomipramine, Desonide, Econazole, Fluocinonide, and Nystatin.

80. Defendant Taro Pharmaceuticals USA, Inc. ("Taro USA") is a New York corporation with its principal place of business in Hawthorne, New York. Its immediate parent is Defendant Taro Israel During the relevant time period, Taro USA participated in the alleged conspiracy and marketed and sold one or more of the Subject Drugs throughout the United States.

81. Throughout this Second Amended Complaint, Taro Israel and Taro USA will be collectively referred to as "Taro."

82. Defendant Teligent, Inc. (f/k/a IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business in Buena, New Jersey. During the relevant time period, Teligent participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, either on its own or through subsidiaries, and was a manufacturer of Econazole.

83. Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business in

Petah Tikva, Israel. During the relevant time period, Teva participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Acetazolamide, Baclofen, Doxycycline, Fluocinonide, Leflunomide, Nystatin, Pravastatin, and Propranolol, and Theophylline.

84. Defendant UDL Laboratories Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois. UDL is a subsidiary of Defendant Mylan Inc. During the relevant time period, UDL participated in the alleged conspiracy, produced and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Propranolol.

85. Defendant Upsher-Smith Laboratories, LLC (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota. During the relevant time period, Upsher-Smith participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Baclofen and Propranolol.

86. Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. During the relevant time period, West-Ward participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Digoxin and Doxycycline.

87. Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Wockhardt is a wholly owned subsidiary of Defendant Morton Grove. During the relevant time period, Wockhardt participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Clobetasol.

88. Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. Zydus is owned by Cadila Healthcare, an Indian company with its principal place of business in Ahmedabad, India. During the relevant time period, Zydus participated in the alleged conspiracy, marketed and sold one or more of the Subject Drugs throughout the United States, and was a leading manufacturer of Acetazolamide, Divalproex and Pravastatin.

89. All references to Defendants or any of them individually also includes their officers, managers, agents, employees, and representatives.

90. Defendants Heritage, Teva and Zydus shall collectively be referred to as the "Acetazolamide Capsules Defendants." Defendants Lannett and Taro shall collectively be referred to as the "Acetazolamide Tablet Defendants." Acetazolamide Capsules Defendants and Acetazolamide Tablet Defendants shall collectively be referred to as the "Acetazolamide Defendants."

91. Defendants Mylan, Par and Sandoz shall collectively be referred to as the "Amitriptyline Defendants."

92. Defendants Lannett, Par, Teva, and Upsher-Smith shall collectively be referred to as the "Baclofen Defendants."

93. Defendants Mylan and Sandoz shall collectively be referred to as the "Benazepril Defendants."

94. Defendants Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt shall collectively be referred to as the "Clobetasol Defendants."

95. Defendants Mylan, Sandoz, and Taro shall collectively be referred to as the "Clomipramine Defendants."

96. Defendants Actavis, Fougera, Perrigo, Sandoz, and Taro shall collectively be referred to as the "Desonide Defendants."

97. Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward shall collectively be referred to as the "Digoxin Defendants."

98. Defendants Dr. Reddy's, Mylan, Par, and Zydus shall collectively be referred to as the "Divalproex Defendants."

99. Defendants Actavis, Endo, Par, Sun, Teva, and West-Ward shall collectively be referred to as the "Doxycycline Hyclate Regular Release Defendants;" Defendants Endo, Heritage, Mayne, and Mylan shall collectively be referred to as the "Doxycycline Hyclate Delayed Release Defendants;" and Defendants Endo, Heritage, Lannett, Mylan, and Par shall collectively be referred to as the "Doxycycline Monohydrate Defendants." Doxycycline Hyclate Regular Release Defendants, Doxycycline Hyclate Delayed Release Defendants, Doxycycline Monohydrate Defendants shall collectively be referred to as the "Doxycycline Defendants."

100. Defendants Fougera, Perrigo, Sandoz, Taro, and Teligent shall collectively be referred to as the "Econazole Defendants."

101. Defendants Actavis, Fougera, Sandoz, Taro, and Teva shall collectively be referred to as the "Fluocinonide Defendants."

102. Defendants Apotex, Heritage, and Teva shall collectively be referred to as the "Leflunomide Defendants."

103. Defendants Lannett, Mylan, and Sandoz shall collectively be referred to as the "Levothyroxine Defendants."

104. Defendant Akorn, Fougera, Hi-Tech, Impax, and Sandoz shall collectively be referred to as the "Lidocaine Defendants."

105. Defendants Heritage, Sun, and Teva shall collectively be referred to as the "Nystatin Tablet Defendants;" Defendants Actavis, Perrigo, and Sandoz shall collectively be referred to as the "Nystatin Ointment Defendants;" and Defendants Actavis, Par, Perrigo, Sandoz and Taro shall collectively be referred to as the "Nystatin Cream Defendants." Nystatin Tablet Defendants, Nystatin Ointment Defendants, and Nystatin Cream Defendants shall collectively be referred to as the "Nystatin Defendants."

106. Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus shall collectively be referred to as the "Pravastatin Defendants."

107. Defendants Actavis, Breckenridge, and Upsher-Smith shall collectively be referred to as the "Propranolol Capsule Defendants." Defendants Actavis, Endo (as Par's parent), Heritage, Mylan (on its own and as UDL's parent), Par, Teva, and UDL shall collectively be referred to as the "Propranolol Tablet Defendants." Propranolol Capsule Defendants and Propranolol Tablet Defendants shall collectively be referred to as the "Propranolol Defendants."

108. Defendants Heritage and Teva shall be collectively referred to as the "Theophylline Defendants."

109. Defendants Actavis, Epic, and Lannett shall collectively be referred to as the "Ursodiol Defendants."

110. Defendants Actavis, Heritage, and Mylan shall collectively be referred to as the "Verapamil Defendants."

**C. Co-Conspirators**

111. Various other persons, firms, entities, and corporations, not named as Defendants in this Second Amended Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

112. The true names of additional co-conspirators are presently unknown to Humana. Humana may amend this Second Amended Complaint to allege the true names of additional co-conspirators as they are discovered.

113. At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

114. The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

115. The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V. REGULATORY AND ECONOMIC BACKGROUND

### A. Generic Drugs Should Provide Lower-Priced Options for Purchasers

116. Generic drugs provide a lower-cost but therapeutically equivalent substitute for brand-name drugs. Congress enacted the Hatch-Waxman Act ("Hatch-Waxman") in 1984 to encourage the production and sale of cheaper generic drugs by simplifying the regulatory hurdles that generic pharmaceutical manufacturers must clear to market and sell their drug products.[6]

---

[6] Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

117. To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the Food and Drug Administration's ("FDA") Center for Drug Evaluation and Research's ("CDER"), Office of Generic Drugs ("OGD").

118. When the FDA approves an ANDA, that generic drug receives an "AB" rating from the FDA. This signifies the drug is therapeutically equivalent to a reference listed drug ("RLD"). RLD can either be a brand-name drug or a generic drug if the brand is not currently marketed. Therapeutic equivalence indicates the generic is both pharmaceutically equivalent (having the same active ingredient(s), same dosage form and route of administration, and identical strength or concentration) and bioequivalent (no significant difference in the rate and extent of absorption of the active pharmaceutical ingredient) to the RLD.

119. Typically, AB-rated generic versions of brand-name drugs are priced significantly below their brand-name counterparts. When multiple generic manufacturers enter the market, prices erode, sometimes by as much as 90%, as price competition increases. Because of this, AB-rated generic drugs gain market share rapidly. As more generic drugs enter the market, the price of those drugs should progressively decrease, resulting in lower costs for purchasers, like Humana. These cost reductions were the intent of Hatch-Waxman's expedited generic approval pathway.

120. Because each generic of the same RLD is readily substitutable for another generic, the products behave like commodities; price is the only differentiating feature, and the basis for competition.[7] Generic competition, therefore, when functioning in a market undisturbed by

---

[7] *See, e.g.,* Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact,* at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

anticompetitive forces, reduces drug costs by driving down prices for AB-rated generic versions of brand-name drugs. Predictably, the longer generic drugs remain on the market, the lower their prices will become.

121. In the United States, a prescription drug may be dispensed to a patient only by a licensed pharmacist pursuant to a doctor's prescription that identifies the drug, and the prescription may only be filled with either the brand-name drug identified or an AB-rated generic version. Pharmacists may (and, in most states, must) substitute an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the prescribing doctor.

122. Generic competition enables purchasers like Humana to purchase a generic version of a brand-name drug at substantially lower prices. In fact, studies have shown that use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[8]

**B. The Prescription Drug Market**

123. The United States is a venue ripe for illegal anticompetitive exploitation of prescription drug prices due to laws that regulate how prescription drugs are prescribed and how the prescriptions can be filled.

124. For most consumer products, the person responsible for paying for the product selects the product. The pharmaceutical marketplace departs from this norm.

125. Prescription drugs may be dispensed only pursuant to a doctor's prescription, and a pharmacist may dispense only the brand-name drug named in the prescription or its AB-rated, FDA-approved generic equivalent, as set forth above.

---

[8] GPhA, *Generic Drug Savings in the U.S.* (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

126. In most instances, the patient and his health insurer pay for the prescription drug that a doctor prescribes. Like the pharmacist, their "choice" is limited to the brand drug named in the prescription or its AB-rated generic equivalent.

127. Therefore, the doctor's prescription defines the relevant product market, because it limits the consumer's (and the pharmacist's) choice to the drug named therein.

**C. The Prescription Drug Distribution System**

128. Drug manufacturers supply drug products. Rather than develop new drugs, generic manufacturers focus on manufacturing drugs that can be substituted for the brand drug product. Generic drugs can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, creams, solutions, emollients, and gels. A manufacturer seeking to sell a drug in the United States must obtain FDA approval. The FDA typically evaluates whether the drug is safe and efficacious, the manufacturing process, labelling and quality control.

129. Generic manufacturers operate facilities and compete with one another to sell the drugs they produce to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans. Competition among generic drug manufacturers is dictated by price and supply; as such generic manufacturers do not differentiate their products. Consequently, generic drugs are usually marketed only by the name of the active ingredient.

130. Drug suppliers can include the manufacturers or other companies that contract with a manufacturer to sell a drug product made by the manufacturer. Drug manufacturers typically sell their products through supply agreements negotiated with wholesalers, distributors, pharmacy benefit managers, mail-order or specialty pharmacies.

131. Generic manufacturers report list prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC").

Manufacturers may supply the same generic drug as several different prices depending on the customer or type of customer.

132. Generic manufacturers must also report their average manufacturer prices ("AMP") to the Centers for Medicare and Medicaid if they enter into a Medicaid rebate agreement. AMP is the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

133. Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers.

134. Pharmacies purchase drugs, either directly from manufacturers or from wholesalers/distributors. Pharmacies may be traditional retail pharmacies, specialty pharmacies, or mail-order pharmacies.

**D. The Market for Generic Drugs is Highly Susceptible to Collusion**

135. Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix prices and allocate markets and customers. As such, Humana is not required to define relevant markets. However, there are certain features characteristic of the market for generic drugs which indicate that it is susceptible to collusion and that collusion caused the price increases.

136. Factors showing that a market is susceptible to collusion include:

**a. High level of industry concentration:** A small number of competitors control roughly 100% of the market for each of the Subject Drugs.

**b. Sufficient numbers to drive competition:** While the market for each of the Subject Drugs had a small enough number of competitors to foster collusion, the number of sellers was large enough that prices should have remained at their historical, near marginal cost levels.

c. **High barriers to entry:** The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market. The Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2012. Any potential new entrant would have to go through the lengthy ANDA approval process before commercially marketing its product. This type of barrier to entry increases a market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

d. **High inelasticity of demand and lack of substitutes:** Each of the Subject Drugs are generally a necessity for each patient it is prescribed, regardless of price. Substituting non-AB rated drugs presents challenges, and both patients and physicians are unwilling to sacrifice patient wellbeing for cost savings. For many patients, one of the Subject Drugs is the only effective treatment.

e. **Commoditized market:** Defendants' products are fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one for another.

f. **Absence of departures from the market:** There were no departures from the market during the relevant period that could explain the drastic price increases.

g. **Absence of non-conspiring competitors:** Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2013 and the present. Thus, Defendants have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

h. **Opportunities for contact and communication among competitors:** Defendants participate in the committees and events of the GPhA, HDMA, ECRM, MMCAP, HSCA, and other industry groups, which provide and promote opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications further

support the existence of communication lines between competitors with respect to generic pricing and market allocation.

i. **Size of Price Increases:** The magnitude of the price increases involved in this case further differentiates it from examples of parallelism. Oligopolists seeking to test price boundaries need to take a measured approach. But here the increases are not 5% or even 10% jumps— they are of far greater magnitude. A rational company would not implement such large increases unless it was certain that its conspirator-competitors would follow.

j. **Reimbursement of Generic Drugs:** The generic market has institutional features that would inhibit non-collusive, parallel price increases. As a result, the usual hesitance of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

## VI. THE FEDERAL AND STATE INVESTIGATIONS OF THE PRICE-FIXING CONSPIRACY

137. Defendants and other generic drug makers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the DOJ Antitrust Division, the United States Senate, the United States House of Representatives, and Attorneys General of 46 states, the District of Columbia, and Puerto Rico (the "State AGs").

138. The DOJ's and State AGs' investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

### A. Congress launched an investigation into generic price hikes

139. In January 2014, the NCPA urged the Senate HELP Cmte. and the United States House Energy and Commerce Committee to hold hearings on significant spikes in generic

pharmaceutical pricing, citing surveys and data from community pharmacists. The NCPA surveyed over one thousand pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

140. On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of HELP and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Defendants Actavis, Endo, Heritage, Lannett, Mylan, Par, Sun, and Teva, requesting information about the escalating prices of generic drugs.[9]

141. Senator Sanders and Representative Cummings issued a joint press release, advising that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" and having a "very significant" impact, threatening pharmacists' ability to remain in business.[10]

142. On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[11] The OIG responded to the request on April 13, 2015,

---

[9] Press Release, U.S. Senator Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[10] *Id.*

[11] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [AMP] exceeded the specified inflation factor."[12]

143. In August 2016, the GAO issued GAO-16-706 (the "GAO Report"), a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015. The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more. Among the drugs with extraordinary price increases were 17 of the Subject Drugs: Acetazolamide, Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Desonide, Digoxin, Divalproex, Doxycycline, Econazole, Fluocinonide, Lidocaine, Nystatin, Pravastatin, Theophylline, and Ursodiol.[13]

**B. The DOJ Investigates Criminal Generic Drug Collusion**

144. The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry and empaneled a grand jury on or around November 3, 2014.

145. The DOJ initially focused on Glyburide and Subject Drug Doxycycline. However, news reports, court filings, and other public statements corroborate the sweeping nature of the DOJ's investigation. Reportedly, the DOJ believes price-fixing between generic pharmaceutical manufacturers is widespread and its investigation spans "more than a dozen companies and about two dozen drugs."[14]

146. Most of the Defendants here have come under DOJ scrutiny.

---

[12] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), *available at* https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[13] GAO Report at Appx. III.

[14] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread-source*, POLICY AND REGULATORY REPORT (June 26, 2015), available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf; David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG MARKETS (Nov. 3, 2016), available at https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

147. The DOJ first charged two Heritage executives, Jeffrey Glazer and Jason Malek, with criminal counts related to price collusion for generic Doxycycline Hyclate and Glyburide. *See United States of America v. Jeffrey A. Glazer,* No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T Malek,* No. 2:16-cr- 00508-RBS (E.D. Pa.).

148. On January 9, 2017, Glazer and Malek pleaded guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix prices, rig bids, and engage in market and customer allocation concerning Doxycycline Hyclate and Glyburide.

149. Defendants Actavis, Dr. Reddy's, Endo, Fougera (through Sandoz), Impax, Lannett, Mayne, Mylan, Par, Sandoz, Sun, Taro, Teva, and non-party to this Second Amended Complaint, Aurobindo, have admitted to receiving grand jury subpoenas from the DOJ. The DOJ executed a search warrant on Defendants Perrigo, Mylan, and non-party ACETO.[15] Finally, upon information and belief, the DOJ has granted conditional amnesty to one of the Defendants in this case.[16] That Defendant has chosen not to publicly acknowledge its amnesty at this point. Under DOJ Guidelines, for DOJ to grant a company conditional amnesty, the amnesty applicant must confess to criminal violations of the U.S. antitrust laws and inform on its co-conspirators based on information known to the amnesty applicant.

150. Information disclosed by some Defendants evidence the broad scope of the conspiracy investigated by the DOJ.

151. For example, in a quarterly report filed with the Securities and Exchange Commission ("SEC"), Lannett disclosed that on November 3, 2014, its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a

---

[15] A search warrant will only be issued if DOJ was able to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan, Perrigo, or ACETO.

[16] Upon information and belief, Defendant Heritage is participating in the DOJ's leniency program.

federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." [17] Lannett added that "[t]he subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[18]

152. In February 2016, Mylan disclosed in an annual report filed with the SEC that it received a DOJ subpoena relating to Doxycycline,[19] and disclosed in a quarterly report in November 2016 that it had received subpoenas relating to Propranolol and Verapamil.[20] In the same report, Mylan also disclosed that the DOJ executed search warrants in connection with the investigation.[21]

153. Novartis, the parent company of Sandoz and Fougera disclosed that "[i]n March 2016, Sandoz Inc. received a subpoena from the Antitrust Division of the DOJ requesting documents related to the marketing and pricing of generic pharmaceutical products sold by Sandoz Inc. and its subsidiaries, including Fougera Pharmaceuticals, Inc. (Fougera) and related communications with competitors. Sandoz Inc. is cooperating with this investigation which it believes to be part of a broader inquiry into industry practice."[22]

154. On December 5, 2014, Defendant Par received a subpoena from the DOJ Antitrust Division regarding its communications with competitors concerning Digoxin and Doxycycline.[23]

---

[17] Lannett Company, Inc., Quarterly Report (Form 10-Q) at 16 (Nov. 6, 2014).
[18] *Id.*
[19] Mylan Inc., Annual Report (Form 10-K) at 160 (Feb. 16, 2016).
[20] Mylan Inc., Quarterly Report (Form 10-Q) at 58 (Nov. 9, 2016).
[21] *Id.*
[22] Novartis, 2016 ANNUAL REPORT at 217, available at https://www.novartis.com/sites/www.novartis.com/files/novartis-20-f-2016.pdf.
[23] Par Pharmaceutical Companies, Inc., Annual Report (Form 10-K) at 37 (Mar. 12, 2015).

155. Defendant Endo, Par's parent, also received a subpoena *duces tecum* from the Connecticut AG ("CTAG") relating to the pricing of its generic products.[24]

156. On May 2, 2017, Perrigo announced that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the DOJ Antitrust Division related to drug pricing in the pharmaceutical industry. As has been previously disclosed by a number of companies, the Antitrust Division has been looking at industry-wide pricing practices."[25]

157. According to a Form 6-K filed with the SEC by Taro Israel in September 2016, on September 8, 2016 Defendant Taro USA "as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[26]

158. On June 21, 2016, Defendant Teva received a subpoena from the DOJ Antitrust Division "seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products. [Defendant] Actavis [at that point a subsidiary of Teva's Israeli parent] received a similar subpoena in June 2015."[27]

159. A DOJ grand jury subpoena is significant. Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, Section F.1, notes that when deciding whether to request the

---

[24] Endo International PLC, Quarterly Report (Form 10-Q) at 29 (May 9, 2017).

[25] *Perrigo Discloses Investigation*, PERRIGO (May 2, 2017), http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[26] Taro Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) (Sept. 9, 2016).

[27] Teva Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) at 33 (Nov. 15, 2016).

initiation of a grand jury investigation, "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[28] Recommendations are made to the Assistant Attorney General by the Deputy Assistant Attorney General ("DAAG") for Operations, the Criminal DAAG, and the Director of Criminal Enforcement. The request must be approved by the field chief and the Assistant Attorney General.[29]

160. The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings styled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724 (E.D. Pa.), stating that these cases overlap with the DOJ's ongoing criminal investigation. In a civil antitrust action related to Propranolol, for example, the DOJ intervened and requested a stay of discovery, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Heritage executives'] informations that were unsealed."[30]

161. In another civil action alleging price-fixing of Clobetasol and two other dermatological drugs, the DOJ filed a letter requesting a stay of discovery, saying "there are significant overlaps between the companies and drugs that are being investigated criminally and the defendants and drugs identified in plaintiffs' amended complaints." The lawsuit targeted manufacturers Akorn, Perrigo, Taro, Teva, Sandoz, and Wockhardt.[31]

---

[28] DOJ, ANTITRUST DIV. MANUAL (5th ed. 2015) at III-82.

[29] *Id.*

[30] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC,* No. 16-cv- 9901, ECF 112 (S.D.N.Y. Feb. 21, 2017).

[31] *Perrigo Joins Generic-Drugs Firms Under U.S. Probe*, FIRSTWORD PHARMA (Mar. 3, 2017), https://www.firstwordpharma.com/node/1454159.

162. The DOJ also filed a brief with the United States Judicial Panel on Multidistrict Litigation ("JPML") noting that, "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug – overlap significantly with aspects of the ongoing criminal investigation."[32]

163. The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines. The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[33]

**C. State Attorneys General launched their own investigation into generic drug price hikes**

164. Immediately after the DOJ filed the first criminal charges against two Heritage executives, the State AGs filed a civil action. Although the state AGs' first complaint focused on Doxycycline Hyclate and Glyburide, it also alleged that the State AGs uncovered a wide-ranging series of conspiracies implicating numerous different generic drugs and manufacturers. *The Connecticut Mirror* reported at the time that the State AGs "suspected fraud on a broader, nearly unimaginable scale," that "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[34] CTAG George Jepsen called the evidence obtained in that investigation "mind-boggling."[35]

---

[32] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re: Generic Digoxin and Doxycycline Antitrust Litig.,* MDL No. 2724, ECF 284 (PETERS (TEVA)M.L. Mar. 10, 2017).

[33] DOJ, Division Update Spring 2017 (Mar. 28, 2017), available at https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[34] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/. *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena. Id.

[35] *Id.*



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

165. Mr. Jepsen confirmed the scope of the State AGs' action in a press release in December 2016:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers - and, indeed, our healthcare system as a whole - who paid for these actions through artificially high prices for generic drugs.[36]

166. In filings with the JPML on May 16, 2017, and June 13, 2017, the State AGs reiterated that their ongoing investigation is broad in scope and goes beyond Doxycycline Hyclate and Glyburide.[37]

167. Then-New York AG Eric T. Schneiderman similarly reported that the State AGs "uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States."[38]

168. The State AGs revealed that their Doxycycline Hyclate and Glyburide action "encompass[es] illegal agreements – including with regard to Doxy DR – where prices remained constant (or remained higher than they would have been in a competitive market) as a result of customer or market allocation agreements designed specifically to avoid price erosion[.]" The State

---

[36] Press Release, Attorney General George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), available at https://portal.ct.gov/AG/Press-Releases/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

[37] *See* Brief and Reply in Support of Plaintiff States' Motion to Vacate Conditional Transfer Order (CT0-3*), In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF Nos. 321 & 334 (PETERS (TEVA)M.L. May 16, 2017 & June 13, 2017).

[38] Press Release, New York State Office of the Attorney General, A.G. Schneiderman Files Federal Antitrust Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug Companies (Dec. 15, 2016), available at https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage.

AGs also disclosed that they entered into settlements with the Heritage executives which require cooperation with the State AGs.

169. In the most recent version of their Complaint, filed on June 18, 2018, the State AGs broadened the case to include fifteen drugs, including seven of the Subject Drugs at issue in this Second Amended Complaint: Acetazolamide, Doxycycline Hyclate, Doxycycline Monohydrate, Leflunomide, Nystatin, Theophylline, and Verapamil. At the time, CTAG Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies. Way beyond…We're learning new things every day."[39]

170. Evidence reportedly uncovered in the State AGs' action shows that Malek (Heritage) compiled a large list of generic drugs Heritage targeted for price increases and instructed employees to reach agreements with competitors to increase prices and engage in market and customer allocation, and that some competitors were willing to reach such agreements. The State AG Complaint identifies at least Mayne, Mylan, and Teva (along with others) as co-conspirators with Heritage.

171. The AG Complaint includes the attorneys general of 47 states, the District of Columbia, and Puerto Rico, asserting claims against eighteen companies, including Defendants Heritage, Teva, Mylan, Actavis, Lannett, Par, and Sandoz; Rajiv Malik, the President of Defendant Mylan; and Satish Mehta, the CEO of Defendant Heritage's parent company Emcure Pharmaceuticals Ltd.[40] According to a recent interview with Joseph Nielsen, the court-appointed Liaison Counsel for the State AGs in these consolidated MDL proceedings, the State AGs have

---

[39] Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices?source=twitter&via=desktop.

[40] Dani Kass, *State AGs Triple Size of Generic Price-Fixing Litigation*, LAW360, Oct. 31, 2017, available at https://www.law360.com/articles/980102/state-ags-triple-size-of-generic-price-fixing-litigation.

expanded their investigation to include 300 drugs. "This is most likely the largest cartel in the history of the United States," Nielsen said.[41]

172. The DOJ's and the State AGs' investigations of alleged price-fixing and other unlawful collusive conduct in the generic drug industry are ongoing.

## VII. DEFENDANTS' EXTENSIVE INTER-FIRM COMMUNICATIONS

173. At all relevant times, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, along with other drugs, which had the intended and actual effect of causing Humana to pay artificially inflated prices at supracompetitive rates.

174. In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

a. Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;

b. Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs sold in the United States;

c. Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States;

---

[41] Christopher Rowland, *Investigation of Generic "Cartel" Expands to 300 Drugs,* THE WASHINGTON POST, December 9, 2018, available at https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html?utm_term=.a838a7f671cd.

d. Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers with respect to the Subject Drugs sold in the United States;

e. Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

f. Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

g. Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

175. The Defendants ensured that all conspirators were adhering to the collective scheme by communicating at (1) trade association meetings and conferences; (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) individual, private communications between and among Defendants' employees through use of the telephone, electronic messaging, and similar means.

**A. Trade Association Meetings and Conferences**

176. The Policy and Regulatory Report, an intelligence-gathering and data analytics firm, reported that the DOJ's investigation into generic drug manufacturers includes trade associations and industry conferences as "one potential avenue for facilitating the collusion between salespeople at different generic producers."[42] For example, between February 20, 2013 and December 20, 2013, there were at least forty-four different tradeshows or customer conferences where Defendants had

[42] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain,* FIERCEPHARMA, Aug. 7, 2015, https://www.fiercepharma.com/regulatory/actavis-gets-subpoena-as-doj-probe-of-generic-pricing-moves-up-food-chain.

the opportunity to meet in person, which gave rise to the opportunity to reach these agreements without fear of detection.

177. The State AGs have similarly noted the key role of trade associations and industry conferences in their investigation, including evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[43]

178. Defendants used their memberships in numerous trade organizations to facilitate conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, including, but not limited to, GPhA, HDMA, ECRM, MMCAP, and HSCA.

**1. Generic Pharmaceutical Association**

179. GPhA (now called Association for Accessible Medicines) is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs…"[44] GPhA was created in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. Regular members are "corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[45]

---

[43] Press Release, Attorney General George Jepsen, 40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit (Mar. 1, 2017), *available at* http://members.naag.org/assets/files/Antitrust/files/03-01-17%20CT%20Announces%2040%20AGs%20in%20Generic%20Drug%20case.pdf.

[44] GPhA, Membership, available at http://web.archive.org/web/2015041303008/http://www.gphaonline.org:80/about/membership.

[45] *Id.*



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

180. GPhA's website offers members the opportunity to "participate in shaping the policies that govern the generic industry." GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." It boasts networking opportunities as one of the cornerstone benefits of membership: "GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[46]

181. Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Heritage, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus are regular members of GPhA, and have been since 2013. Furthermore, executives of these companies frequently attend GPhA meetings and events.

182. Executives from Defendants Actavis, Apotex, Fougera, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, and Zydus served on GPhA's Board of Directors during overlapping times at various points both prior to and after 2013, including:

a. *2013 Board of Directors*:[47] Tony Mauro, President, Mylan North America as Chair; Don DeGolyer, President and CEO, Sandoz as Vice Chair; Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Pharmaceuticals; Carole Ben-Maimon, President, Global Pharmaceuticals (div.) of Impax[48]; Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Jeffrey Glazer, President and CEO, Heritage; Charlie Mayr, Chief Communications Officer - Global, Actavis Inc.; Joseph Renner, President & CEO, Zydus; and Jeff Watson, President, Apotex.

---

[46] *Id.*

[47] GPhA Announces 2013 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2013-board-of-directors.

[48] In 2016, Ben-Maimon joined Teligent's Board of Directors. She also previously held positions at Qualitest and Teva. While at Global Pharmaceuticals at Impax, she worked with Teligent's Grenfell-Gardner on a development, supply, and marketing agreement for another generic topical drug.

b. *2014 Board of Directors*:[49] Carole Ben-Maimon, President, Global Pharmaceuticals (div.) of Impax; Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Jeffrey Glazer, President and CEO, Heritage; Peter Goldschmidt, President, Sandoz US; Tony Mauro, President, Mylan Inc.; Allan Oberman, CEO and President, Teva Americas Generics; Joseph Renner, President & CEO, Zydus; Jeff Watson, President, Apotex; and Paul McGarty, President, Lupin as at-large director.

c. *2015 Board of Directors*:[50] Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Jeffrey Glazer, President and CEO, Heritage; Peter Goldschmidt, President, Sandoz US; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Marcie McClintic Coates, Head of Global Regulatory Affairs, Mylan Inc.; Paul McGarty, President, Lupin; Tony Pera, President, Par Pharmaceuticals; Joseph Renner, President & CEO, Zydus; and Jeff Watson, President, Apotex.

d. *2016 Board of Directors*:[51] Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Heather Bresch, CEO, Mylan N.V. as Chair; Peter Goldschmidt, President, Sandoz US; Jim Kedrowski, Executive Vice President, Sun; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Paul McGarty, President, Lupin; Tony Pera, President, Par Pharmaceuticals as Secretary-Treasurer; Joseph Renner, President & CEO, Zydus; Richard Stec, Vice President, Perrigo Company; and Jeff Watson, President, Apotex as Vice Chair.

---

[49] GPhA Announces 2014 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2014-board-of-directors.

[50] GPhA Announces 2015 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2015-board-of-directors/.

[51] GPhA Announces 2016 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2016-board-of-directors/.

**2. Healthcare Distribution Management Association**

183. The Healthcare Distribution Management Association ("HDMA") (now called the Healthcare Distribution Alliance or "HDA") is a national trade association that represents "primary pharmaceutical distributors," connecting the nation's drug manufacturers to over 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[52] HDMA holds regular conferences at which its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.

184. Several Defendants were members of HDMA at overlapping times between 2013 and the present. For instance, as of July 2015, HDMA's manufacturer membership list included Defendants Breckenridge, Par, Heritage, Lannett, Mylan, Sandoz, Teva, Upsher-Smith, and Wockhardt.[53] As of March 2016, these Defendants remained members and were joined by Defendants Akorn and Perrigo.[54] At various times relevant to this Second Amended Complaint, Defendants Apotex, Dr. Reddy's, Impax, Lupin, Mayne, Sun, and Zydus were also HDMA members.

**3. Efficient Collaborative Retail Marketing**

185. The Efficient Collaborative Retail Marketing organization ("ECRM") hosts strategic events and offers innovative technology solutions to help buyers and manufacturers improve sales, reduce expenses, and enter the market faster and more efficiently.[55] It conducts "Efficient Program

---

[52] *About*, HAD, https://healthcaredistribution.org/about.

[53] *Manufacturer Members*, HDMA, https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org:80/about/membership/manufacturer/manufacturer-members#.Wrj50y7wZpg.

[54] *Manufacturer Members,* HDMA, https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org:80/about/membership/manufacturer/manufacturer-members#.Wrj50y7wZpg.

[55] *See* Company Overview of Efficient Collaborative Retail Marketing Company, LLC, Bloomberg , https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=106996762; *See also Alkaline Water Co. Enjoys Valued Participation at National Retail Marketing Trade Show*, The Alkaline Water Co.,

Planning Sessions" ("EPPS"), in which generic drug manufacturers, purchasers, and other industry professionals meet "to discuss new business opportunities, review contracting strategies, and future business planning activities."[56] Sessions include one-on-one strategic meetings meant to maximize time, grow sales, and uncover trends.

186. At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independent pharmacies.

**4. Minnesota Multistate Contracting Pharmacy Alliance**

187. Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP") hosts various meetings and conferences throughout the year that are regularly attended by Defendants' representatives with price setting capabilities. According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare value to members since 1985. MMCAP's membership extends across nearly every state in the nation, delivering volume buying power. Members receive access to a full range of pharmaceuticals and other healthcare products and service; such as medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

**5. Healthcare Supply Chain Association (HSCA)**

188. HSCA is a trade association that represents leading healthcare group purchasing organizations ("GPOs"), including for-profit and not-for-profit corporations, purchasing groups, associations, multi-hospital systems and healthcare provider alliances. According to its website,

---

http://thealkalinewaterco.com/2013/08/06/alkaline-water-co-enjoys-valued-participation-national-retail-marketing-trade-show/.

[56] ECRM, Health System/Institutional Pharmacy EPPS, https://ecrm.marketgate.com/Sessions/2019/06/HospitalAlternateSitePharmacyPharmaceuticals.

"HSCA and its member GPOs are committed to delivering the best products at the best value to healthcare providers, to increasing competition and innovation in the market, and to being supply chain leaders in transparency and accountability." HSCA's annual event, the National Pharmacy Forum, connects supply chain professionals, pharmaceutical industry representatives, including generic drug manufacturers and suppliers, and others to provide "top-level educational opportunities coupled with one-to-one networking and business-building opportunities."

189. GPhA, HDMA, ECRM, MMCAP, and HSCA frequently held meetings and events between 2012 and the present, and high-level representatives and corporate officers from Defendants, including employees with price-setting authority, attended these meetings. A list of those meetings and attendees is attached as Exhibit A.

190. At these various conferences and trade shows, Defendants' employees and representatives, as well as representatives of other generic drug manufacturers, discussed their respective businesses and customers, and discussed each of the conspiratorial price increases alleged in this Second Amended Complaint. In many of the conferences described above, attendees for each conspirator Defendant include individuals with generic drug pricing authority. Their discussions also occurred at lunches, cocktail parties, dinners, and golf outings that would typically accompany these events. Defendants' representatives used these opportunities to discuss and share upcoming bids, generic drug markets, pricing strategies, and contractual pricing terms specific to certain customers. [57]

191. Additionally, representatives of generic drug manufacturers congregated in smaller, more limited groups. For example, high-level executives of many generic drug manufacturers periodically met for "industry dinners."[58]

---

[57] *See, e.g.,* AG Compl. at ¶ 79.
[58] *Id.* at ¶¶ 81-84

### B. Industry Dinners and Private Meetings

192. Many Defendants are headquartered in close proximity, providing them with easy and frequent access to one another. For example, Defendants Actavis, Ascend, Breckenridge, Dr. Reddy's, Fougera, Glenmark, Heritage, Hi-Tech, Lannett, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teva, and Zydus are all located in the New York/New Jersey/Pennsylvania area. Similarly, Clobetasol Defendants Akorn, Morton Grove, and Perrigo are located close to one another in Michigan and Illinois.

193. High-level executives of many generic manufacturers get together periodically for "industry dinners." In January 2014, as many generic prices were increasing, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, including at least executives from Defendants Actavis, Dr. Reddy's, Lannett, and Sun, among others, met at a steakhouse in Bridgewater, New Jersey to discuss their ongoing conspiracy.[59]

194. At the "industry dinners" one company will typically pay for all attendees. In a December 2013 group email, a high-ranking executive for Defendant Dr. Reddy's joked "[y]ou guys are still buying for Mark and I, right?" Another executive responded: "Well…I didn't think the topic would come up so quickly but…we go in alphabetical order by company and [a generic drug manufacturer] picked up the last bill….PS….no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

195. Generic drug manufacturer employees also regularly convened for "Girls' Night Out" or "Women in the Industry" meetings and dinners. At these events, generic drug companies' employees met with their competitors and discussed proprietary and competitive information. Upon

[59] *Id.* at ¶ 83.

information and belief, several of these events occurred in May 2015 in Baltimore, Maryland and in August 2015 in Denver, Colorado.[60]

196. Many "Women in the Industry" dinners were organized by a salesperson from Defendant Heritage, Anne Sather, who resides in Minnesota. Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area. Out of town representatives were also aware of these dinners and were included when in the area. In November 2014, a salesperson from Defendant Lannett sent Sather (Heritage) a text message, asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible…" Sather (Heritage) responded: "There is an Xmas [sic] party at Tanya's house on Dec 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week – this was an exception."

197. Dinners were occasionally planned around visits of out of town competitors. For example, in organizing a dinner Sather (Heritage) stated:

> Sorry if the meeting/dinner invite is a little short notice, but [Katherine Neely, a National Account Representative at Defendant Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the industry 100 – we can recap all our findings from NACDS over a martini or glass of wine! :) Plus the food is super Yummy!

198. Several Girls' Night Outs were held in 2015, including at the ECRM conference in February (involving Defendants Dr. Reddy's, Heritage, Lannett, and Teva, among others), in Baltimore in May (involving Defendants Dr. Reddy's, Heritage, Teva, and Zydus, among others), and in August (involving Defendants Dr. Reddy's and Heritage, among others).

---

[60] *Id.* at ¶¶ 85-88.

**C. Personal Telephone Calls, Emails and Text Message Communications**

199. Additionally, as the AGs' investigation uncovered, Defendants routinely conferred with one another on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.[61]

*200.* Defendants also shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate potentially better prices or terms with their customers, which ultimately harmed consumers like Humana.[62]

201. As set forth in the State AGs' Complaint, based on telephone records obtained during their investigation, representatives of several of the Defendants with pricing responsibility had frequent telephone calls with representatives of their competitors, including Defendants. Executives at Heritage, for example, had at least 513 contacts with executives from Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus. Executives at Teva had at least 1,501 contacts with executives from Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Par, Sandoz, Sun, and Zydus.[63]

202. For example, Teva's Director of Strategic Customer Marketing, Nisha Patel, met Heritage's then-Senior Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer that Malek (Heritage) managed. When Patel moved to Defendant Teva in April 2013, she contacted Malek to determine which generic drugs both Teva and Heritage sold so that they could coordinate pricing. As detailed below, Malek and Patel (Teva) orchestrated a number of price increases between 2013-present—some led by Teva, others by Heritage.

---

[61] *Id.* at ¶¶ 89-109.
[62] Id.
[63] *Id.* at ¶ 94.

203. Malek (Heritage) and Patel's (Teva) relationship was valued and accepted by Malek's supervisors. For example, in April 2014, Malek (Heritage) and Glazer (Heritage) met with the CEO (Satish Mehta) and President (Vikas Thapar) of Emcure, Heritage's parent company, to discuss potential price increases for several drugs. During that meeting, Malek (Heritage) told Mehta (Emcure) and Thapar (Emcure) about his Teva contact, Nisha Patel. Malek (Heritage), who had been discussing price increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

## VIII. DEFENDANTS SIGNAL TO COMPETITORS THEIR INTENT TO SET AND MAINTAIN SUPRACOMPETITIVE PRICES

204. Defendants' public statements and admissions contained in their investor communications indicate they realized record revenues between 2013 and the present and signaled to competitors a commitment to increasing generic drug prices to supracompetitive levels.

205. On an October 29, 2013 Actavis earnings call, Actavis Pharma Director and President Sigurdur Olafsson stated "But there's opportunities to take pricing increases, and that is what has changed since maybe five years ago when there wasn't an opportunity."

206. In Fiscal Year 2014 (ending Dec. 31, 2014), Defendant Akorn reported a revenue increase of 75% or $237.3 million (from $317.7 million in 2013 to $555 million in 2014) and gross profits increased by 52% or $89.5 million (from $171.9 million in 2013 to $261.4 million in 2014).

207. On Akorn's August 5, 2014 earnings call, Akorn CEO Raj Rai commented: "we are seeing lot of price increases that are happening in the generic space and it affects some of our products as well. So, I would say overall, there is a healthier pricing environment than it was there, I would say six to eight months ago."

208. Akorn's 2015 Annual Report stated "Our gross profit increased by $334.7 million, an increase of 128.0% over gross profit of $261.4 million in 2014. Our overall gross profit margin was 60.5% in 2015 compared to 47.1% in 2014…primarily due to the effect of price changes…"[64]

209. Upon information and belief, in or about May 2016, Akorn told industry analysts that "63% of [its] growth in 1Q16 versus 1Q15 was driven by price."

210. In August 2016, Akorn's CFO, Duane Portwood stated on a Q2 earnings call that "net revenue for the quarter ended June 30, 2016, was $281 million, an increase of $60 million or 27% over the prior-year quarter. The increase in revenue was driven by organic growth, with approximately two-thirds attributable to price."

211. On Endo's February 28, 2014 earnings call, Endo's CFO Suketu Upadhyay commented:

> [O]ur US generic pharmaceuticals business remained a source of strong organic growth in 2014. We believe the base of Qualitest products will continue to experience low-double digit revenue growth. That growth is primarily driven by an increase in demand for products but it also a result of selected pricing opportunities within the higher barrier to entry categories.

212. During Endo's May 1, 2014 earnings call, CEO Rjiv Da Silva stated that Endo's generic business, Par, was performing strongly in part because "we have been able to take advantage of some pricing opportunities."

213. In Endo's Q4 2014 earnings call on March 2, 2015, De Silva stated, "In 2015, we expect strong double-digit revenue growth for U.S. generics, as a result of consistent volume growth supplemented by recent pricing opportunities."

---

[64] Akorn, 2015 ANNUAL REPORT at 41, available at http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NjM0MjM3fENoaWxkSUQ9MzM5MzY5fFR5cGU9MQ==&t=1.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

214. During Hi-Tech's March 8, 2013 earnings call, Hi-Tech Chairman and CEO David Seltzer commented:

> So we happen to have – a number one, we happen to be doing a significant amount of topicals than – compared to several years back. So we have the Clobetasol items that we pretty much brought all in-house on the manufacturing side. We have our generic EMLA. We have licensed in a couple of Lidocaine products that are doing very well for us. So we have capacity. And it just happens to be that we were also able to purchase very recently a very high-speed filling and packaging line for creams and ointments that we needed. But that's also going to give us a tremendous amount of capacity going forward. So we are looking very hard to find additional products. We definitely see opportunity. I think everybody knows and understands that there's been some significant price changes in that market over the last couple of years.

215. Impax' President of its Global Pharmaceuticals Division Carole Ben-Maimon stated on a February 20, 2014 earnings call that "the [digoxin] market has been pretty stable…[w]e're pretty comfortable that what we have done is rational and will result in ongoing profitability for that product." By February 20, 2014, the average price of generic Digoxin had skyrocketed from its pre-conspiracy price levels and stabilized at a near 600% increase. Ben-Maimon further stated:

> Obviously, we can't really talk about, for competitive reasons, about specific products with specific prices. But as you've seen across the industry, pricing has improved and the ability to take some price increases has clearly been available. Obviously, we're really careful and we want to make sure that we do that in a very rational way so that we make sure that the price – that what we're doing sticks and that we actually do make more money in the long run. But we're pretty confident that what we did through towards the end – throughout the end of last year and the beginning of this year will result in more profitability from many other products that we have been able to take some price on.

216. On February 7, 2013, Lannett's CEO Arthur Bedrosian stated in an earnings call:

> I could just say that we're very capable of raising prices and we tend to sometimes lead the market. We see opportunities to raise a price, we take it. We don't sit back and wait for someone else to do it. So you might say we're a little more aggressive in the pricing arena. I'd just rather not focus on which products they were, which could

> negatively impact us and send the wrong message to my competitors who might think they can get my customers away by lowering the price.

217. On a September 10, 2013 earnings call, Bedrosian stated:

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process. I can reduce costs and manufacturing efficiencies, but it has to be combined with sales increase, a profit increase, as I should say, by the salespeople. And he's done a good job there. With 1 or 2 exceptions, we've tended to lead in the way of price increases. We believe that these prices are important. We need to try raising them. Sometimes, it doesn't stick and we have to go back and reduce our price, and other times it does. I am finding a climate out there has changed dramatically and I see more price increases coming from our competing - competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors will follow suit. If they don't, that's their issue. But our plan is to raise prices on any product that we think we can or we haven't raised a price.

218. On that same call, Bedrosian was asked for a reaction to a competitor's recent and significant price increase on Levothyroxine. Bedrosian joked "[y]ou mean after I sent them the thank you note," repeatedly adding that he was "grateful" for the price hike:

> I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well…So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful.…[t]his particular one that was done by a competitor was – isn't price [indiscernible] by any – just like they do any of the price increases, we don't necessarily see the benefits right away because most of the contracts that are in place usually give the customer a buy-in period. So, if you're going to raise a price on them, which is generally not the case, they have an opportunity to place an extra order. So we don't really see the benefit for usually, at least one full quarter, let's say, because there's a 60-day buy in. So I would probably be better able to answer this when we do our guidance for our first quarter sometime in November.

219. On that same call, another investor asked Bedrosian whether he has any "expectations for any new [Levothyroxine] competitors?" Bedrosian noted that two possible competitors "were in the wings…[b]ut hopefully, both companies turn out to be responsible companies and don't go into the marketplace." Bedrosian continued, "We're seeing more responsibility on the part of all of our competitors," adding that because of costs in the industry he "suspect[s] you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace."

220. At the time of this call, and for several months before and after, the price of Levothyroxine saw an approximately 100% price increase. Bedrosian commented on the durability of the price increases on a November 7, 2013 earnings call:

> I don't really see anything significant on the horizon that could cause us any pain, quite frankly. We're still conservatively run. We're still careful how we spend money. We still realize we're in a commodity business. While we're enjoying the success of the company, it's not getting to our heads in anyway.

221. On the same call, Lannett's CFO Martin P. Galvan signaled that these were just the "earlier days of the increase," which Bedrosian explained meant that the "price increases that are going on in the industry [are] going to stick for all the companies."

222. On February 6, 2014, both Bedrosian and Galvan confirmed that the price increases were driving growth at Lannett. Galvan reported that "[w]e do believe strongly that there's sustainability in some of the price increases[.]" On May 7, 2014, Bedrosian discussed the 50% price increase of Levothyroxine as part of Lannett's "selective price increases."

223. On November 3, 2014, Bedrosian described one of Lannett's "rational" competitors as one that would not do "anything crazy" such as "just going out and trying to grab market share." He continued:



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

> So, from my perspective, what we're seeing here is an opportunity to raise prices because everybody has accepted the fact that our costs are going up dramatically and less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell.
>
> So it's really a combination to those things. So I don't think Levo and Digoxin are the only products that would sit here and tell you I could raise prices on, because I believe any of the products in our product line, including products that we may have just gotten approved have those same opportunities underlying them. We look at the market and sometimes we're the first ones to raise a price, sometimes we're not. But we look at everything in line as a potential product to have a price increased on.

224. On the same call, Bedrosian replied to a question about Lannett's continued price increases on Levothyroxine. He remarked that "[i]n the case of Levo, we're already at 75% of the innovative brand," and noted that Lannett could stay at the price for the foreseeable future.

225. On a February 4, 2015 earnings call, Bedrosian explained:

> If you're saying that the price increases that we've had in place, are they sustainable, and are they maintaining? My answer would be yes, they continue to hold up.
>
> As far as whether we talked about any increases for this year, we don't usually give a guidance for that. We predict what our revenues will be for the year. We're not seeing any declines, generally speaking, on the price increase products. So, they continue to, let's say, level off at their new pricing.

226. Later, on the same call, Bedrosian stated:

> So, I'm expecting these pricings to really sustain themselves to continue. I see people raising prices further, because the generic prices were so low, when you're 10% of the brand, that's not because the brand overpriced the product by 90%. It's because the generic marketplace has so much competition sometimes, people get desperate just to unload their inventory that they cut the prices.
>
> We don't see that kind of behavior sustainable, and we don't see it going further into the future. I think you're going to find more capital pricing, more - I'll say less competition, in a sense. You won't have price wars. You are still going to have competition, because there's a lot of generic companies in the market. I just don't see the prices eroding like they did in the past.

227. On August 25, 2015, Bedrosian again signaled continuing price increases, because they have been "sustainable" and because "it's a more rational market we're in."

228. Drug price increases contributed to $157.3 million of revenue in 2015 for Lannett. Its sales volume only changed by 5%, but its sales price changed by 54%. Deutsche Bank estimates that price increases for Levothyroxine and Ursodiol accounted for half of Lannett's revenue in fiscal 2015.[65]

229. On August 23, 2016, Bedrosian summarized that price competition "usually doesn't get you to results you want. So, I think a lot of people have learned that lesson by now." He described a problem that "some of the dumber newer companies [that] continue to go down that path" of competing on price. Bedrosian equated experience and expertise with price gouging. Bedrosian also claimed that "occasional" competitors who attempted to compete on price were fortunately "maturing in the market and realizing they need to make a profit as well."

230. On October 27, 2015, Lupin's CEO Vinita Gupta stated during an earnings call:

> My sense that most of our competitors have similar challenges that they have had a lot of competitive pressures, they have had a lot of margin pressures coming out of consolidation and because of the fact that companies have been lacking meaningful product approvals, I think the majority of the industry is looking forward to more approvals when I look at some of our peers in the industry, all of them talk about similar challenges. So one would think that our competitors or peers would be rationale [sic] and be strategic in the way they price products.

231. On an October 25, 2012 earnings call, Mylan's CEO Heather Bresch stated that "[y]ou've heard me quarter after quarter coming and saying we weren't going to chase the bottom,

---

[65] Lannett Company, Inc., Annual Report (Form 10-K) at 31 (Aug. 27, 2015); Nathan Vardi, *Another Drug Company That Raises Prices Like Crazy*, FORBES, Oct. 6, 2016, available at https://www.forbes.com/sites/nathanvardi/2016/10/06/another-drug-company-that-raises-prices-like-crazy/2/#20ad900d6245.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

that there's been irrational behavior and that we would continue to hold steady and control what we can control."

232. On a February 27, 2013 earnings call, Mylan's CFO John Sheehan stated:

> 2013 will yet be another strong year for Mylan. In the U.S., we are anticipating a high volume of new product launches, and we expect to once again be agile enough to quickly seize new supply opportunities when they become available. In addition, favorable changes to the regulatory environment, including increased resources to expedite product reviews and greater oversight with respect to manufacturing, as well as an anticipated more stable pricing environment resulting in part from continued consolidation within the industry, are just two of the favorable macroeconomic factors that we see in 2013.

233. Then, on May 2, 2013, Bresch stated "From my perspective, we see the generic industry alive and well. We still see a lot of runway room here in the United States." On an earnings call one year later on May 1, 2014 Bresch stated "[w]e continue to see stability really across our entire generic line on pricing."

234. On an August 7, 2014 earnings call, Bresch stated:

> As far as pricing, look, I think that, that stability in our North American -that core business is certainly why we're able to deliver the results we have today, which, like I said, despite those product delays, we see growth year-over-year. We've seen North America continue to maximize opportunities.

235. On an October 30, 2015 earnings call, Bresch stated:

> With respect to gross margin, I guess I would start by pointing out that, since 2010, our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year–of 55%. So the gross margins have been sustained. They have steadily increased over the last five, six years. . .. It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

236. On that same call, Bresch stated "[l]ook, I would say as far as price increases, we've had a very consistent approach. We have absolutely had opportunities around generic pricing."



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

237. On February 10, 2016, Bresch stated in an earnings call that she believed Mylan had been a "very responsible generic player with hundreds of products into the market and have shown very responsibly price erosion."

238. On August 8, 2016, Par's President Paul Campanelli commented that "typically you want to just be very careful about trying to go after too much share. You just have got to take a balanced approach."

239. On February 7, 2015, Perrigo Company plc's Chairman and CEO Joseph C. Papa stated during an earnings call that, "On the question of pricing…I will say the Rx side does have, as I sit here today, the greatest upside." Papa also noted that Perrigo "achieved record results, growing sales 12% with an adjusted operating margin of 46%." On the same call, industry analyst Gregg Gilbert from Deutsche Bank commented, "Obviously, the generic side of your business and many other companies has benefited from an enhanced pricing environment, if we could call it that, in the last several years." In response, Papa affirmed the continued enhanced pricing trend: "The next year we're going to look at Rx and raise those prices."

240. In its annual 10-K filing with the SEC, Perrigo Company plc reported a 36% increase in gross profits in its prescription pharmaceuticals business from June 2014 to June 2015 ($361.5 million in fiscal year 2013 to $489.9 million in 2014), as well as an increase of $74 million in net sales, naming the launch of Clobetasol Propionate 0.05% Spray as one of the primary causes.[66]

241. Sandoz similarly boasted of increased profits since 2013 and emphasized the importance of the U.S. market in their bottom line. On April 23, 2015, Novartis CEO Joseph Jimenez stated that Sandoz had "strong financial results" and the "U.S. was up 13%...driven by…our Fougera dermatology business."

---

[66] Perrigo Company plc, Annual Report (Form 10-K) at 56 (Aug. 13, 2015).

242. On July 21, 2015, Jimenez stated that, "Sandoz delivered very strong financial results with sales and profit up double-digit; as you can see this is driven by the division's increased focus on core markets, particularly the U.S., which is up 23%."

243. On November 14, 2013, Sun's Managing Director Dilip Shanghvi commented on an earnings call "price increases [are] becoming kind of more widespread than what it used to be historically, so clearly there would be some impact going forward."

244. In November 2014, Taro Israel's CEO, Kal Sundaram, said on a Q2 2014 earnings call, "Net sales for Q2 were $251 million, up 22% over Q2 last year. As we anticipated in last quarter's earnings release, we are realizing the benefits of the previous quarter's price adjustments in the current quarter. Gross profit increased 24% to $198 million year-on-year resulting in a 130-basis-points expansion in our gross margins to 79%."

245. In May 2013, on a Q4 earnings call, Sun Pharmaceutical Industries' (parent of Defendants Sun and Taro) Whole time Director, Sudhir Valia, confirmed Sun experienced no rising manufacturing or related costs that might account for the price increases: "Material cost, as a percentage of the net sales is 18.% which is lower as compared to the previous year."[67] Likewise, in a November 2013 earnings call, Valia confirmed that material costs were "similar to Q2 last year."[68]

246. In September 2016, a Sun Pharmaceutical Industries analyst report credited Clobetasol price increases for the Company's success. Harith Ahamed and Krishna Kiran Konduri of Spark Capital Advisors noted:

> **Significant price increases across Taro's portfolio:** Price increases across its derma portfolio has been a key driver for Taro's strong performance in recent years. For instance, Clobetasol propionate, Taro's top product, accounting for [approximately] 11% of sales in FY16, has witnessed price increases of >12x between 2013 and 2015.

---

[67] http://www.sunpharma.com/Media/Press-Releases/FY13%20Q4%20Earnings%20Call%20Transcript.pdf.
[68] http://webcache.googleusercontent.com/search?q=cache:zrzEFnlr1EgJ:www.sunpharma.com/Media/Press-Releases/FY14%2520Q2%2520Earnings%2520Call%2520Transcript(1).pdf+&cd=6&hl=en&ct=clnk&gl=us

> Sustainability of Taro's price increase-driven performance has been a key concern for investors of [Sun Pharmaceutical Industries Ltd.].

247. In September 2016, *The Economic Times* reported that "While Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases"[69]

248. On an October 29, 2013 earnings call, Teligent's President and CEO Jason Grenfell-Gardner[70] noted that "there are certainly some markets there which had seen price appreciation. And that's a trend that's been happening throughout the topical market in various ways…We hope at this point that the trend will continue."

249. On an October 24, 2014 earnings call, Grenfell-Gardner announced that Teligent's 2014 year-to-date sales increased 123% "driven partially…from significant price increases for core products in the portfolio."

250. On February 6, 2014, Teva Pharmaceutical Industries Ltd.'s President and CEO Eyal Desheh stated in an earnings call that "our U.S. generic business [Defendant Teva] is definitely the most profitable part with gross margin of about 50%. Desheh went on to comment that the "U.S. generic business is highly profitable."

251. On October 29, 2015, Teva Pharmaceutical Industries Ltd.'s President and CEO of the Global Generic Medicines Group Sigurdur Olafsson stated during an earnings call that the "pricing environment has been quite favorable for generics versus six years ago."

252. On an October 31, 2013 earnings call, Executive Director of Cadila, Zydus' parent company, Ganesh Nayak noted "This quarter, the major growth has come from price improvement

---

[69] Divya Rajagopal, *Taro Pharmaceutical Industries under anti-trust scanner for price hike*, THE ECON. TIMES, Sept. 13, 2016, available at https://economictimes.indiatimes.com/industry/healthcare/biotech/pharmaceuticals/taro-pharmaceutical-industries-under-anti-trust-scanner-for-price-hike/articleshow/54302910.cms.

[70] Grenfell-Gardner joined Teligent as CEO in July 2012. He previously worked at Defendant West-Ward.

and not actually from new product." Cadila's Chairman and Managing Director Pankaj Patel then commented:

> Up to last quarter, we were [seeing] pricing pressure, but now we see that, on selective products we are able to actually up the price. So it is the kind of a mixed scenario at this moment. We are seeing some visibility where pricing are firming up given the kind of challenges companies are facing, many players are going out of the market, and as a result there are opportunities to basically- products with low margins- to increase prices. So at least in 3 or 4 products, we have seen price being better and increases are ranging between 10-15% and we also see that the trend is likely to continue given the revised wisdom the industry is getting.

253. Hikma, the parent of West-Ward, reported in 2013 that Doxycycline sales reflected "exceptional profitability" and "generated exceptionally strong cash flows."[71]

## IX. INDUSTRY ANALYSTS SUSPECT COLLUSION

254. Industry analysts agree that generic price increases are consistent with a price-fixing conspiracy. For example, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics - low sales due to either very low prices or very low volumes - accommodate price inflation.[72]

255. According to one study, since 2013, approximately 1 in 19 generic drugs sold in the United States have experienced major price increases that may be consistent with collusion:

> Fideres Partners LLP, a London-based consultancy that works with law firms to bring litigation against companies, reported "anomalous pricing patterns" in scores of generic drugs sold in the U.S. from 2013 to 2016. It identified 90 medicines whose prices rose at least 250 percent over the three-year period and were increased by at least two drug companies around the same time, even though there was no obvious market reason for the increases. The

[71] *See* Hikma Pharmaceuticals PLC 2013 Preliminary Results, available at https://www.marketscreener.com/HIKMA-PHARMACEUTICALS-9590215/pdf/424576/Hikma%20Pharmaceuticals_Slide-show-results.pdf.

[72] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?,* WALL ST. J., Apr. 22, 2015, *available at* https://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

> average price jump among the 90 drugs was 1,350 percent, Fideres found. "I don't think the public or even the politicians in the U.S. have any idea just how widespread and extreme the phenomenon is," said Alberto Thomas, one of Fideres's founders.[73]

256. Another study found that, in 2014, "292 generic medication listings went up 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[74]

257. A January 2014 survey of 1,000 members of the NCPA found that more than 75% of pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some instances.

258. Pennsylvania physicians, acting through the Pennsylvania Medical Society, called on state and federal governments to investigate surging generic prices, believing anticompetitive conduct was to blame:

> According to Robert Campbell MD, chair of Physicians Against Drug Shortages and immediate past president of the Pennsylvania Society of Anesthesiologists, surging prices have hit hundreds of mainstay generics, including anesthetics, chemotherapeutic agents, antibiotics, and nutritional intravenous solutions. He believes the surging prices are a result of anti-competitive behavior.[75]

## X. THERE IS NO JUSTIFICATION FOR THE EXTRAORDINARY PRICE INCREASES OF THE SUBJECT DRUGS

259. At all relevant times, there were no significant increases in the costs of making any of the Subject Drugs, no significant decrease in supply, and no significant increase in demand.[76]

---

[73] Liam Vaughan and Jered S. Hopkins, *Mylan, Teva Led Peers in "Anomalous" Price Moves, Study Says,* BLOOMBERG (Dec. 22, 2016) *available at* https://www.bloomberg.com/news/articles/2016-12-22/widespread-drug-price-increases-point-to-collusion-study-finds.

[74] David Belk, *Generic Medication Prices,* TRUE COST OF HEALTHCARE, *available at* http://truecostofhealthcare.net/generic_medication_prices/.

[75] Press Release, Pennsylvania Medical Society, Rising Generic Drug Costs Have Physicians Raising Red Flags (Feb. 5, 2016), *available at* http://www.prnewswire.com/news-releases/rising-generic-drug-costs-have-physicians-raising-red-flags-300216006.html.

[76] In a case alleging similar facts regarding the conspiracy to fix prices of generic Propranolol against the same Propranolol Defendants here, Judge Jed S. Rakoff held that Defendants failed to show any drug shortage sufficient to render allegations of price-fixing implausible. *In re Propranolol Antitrust Litig.*, 249 F.Supp.3d 712, 722 (S.D.N.Y. 2017) (Rakoff, J.).

Despite this, Defendants implemented extraordinary price increases on each of the Subject Drugs. Such increases would not have been possible absent the existence of a price-fixing agreement.

260. The FDA Safety and Innovation Act of 2012 requires that drug manufacturers report drug shortages.[77] Any drug shortages or supply disruptions reported to the FDA by any of the Defendants with respect to any of the Subject Drugs were temporary (unless that Defendant discontinued manufacturing the drug in furtherance of the conspiracy as set forth below), and, at all times, alternative suppliers with respect to that drug were available, as recorded in the American Society of Health-System Pharmacists' archives of its Current Drug Shortage Bulletins.

## XI. THE OVERARCHING GENERIC DRUG CONSPIRACY

261. The overarching agreement to fix prices is widespread across the generic drug industry and, upon information and belief, is broader than the Subject Drugs and Defendants named here. Each conspiracy described herein is part of a larger overarching conspiracy. This larger conspiracy was reinforced through phone calls and text messages between Defendants to discuss their "fair" market share and the desire to maintain or raise prices with respect to specific drugs. These types of communications occurred between Defendants with great frequency.

262. This overarching conspiracy consisted of several aspects, including monitoring, tracking, and maintaining each other's "fair share," in addition to price-fixing agreements for certain drugs as set forth below. Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's portfolio of drugs. If the agreement were limited to one or two drugs, it could easily fall apart. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price

[77] Pub. L. No. 112-144, §§ 1001-1008, 126 Stat. 995, 1099-1108.

competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price. Therefore, Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs.

263. The conspirator Defendants operated under a system of understandings described as "playing nice in the sandbox," whereby participating companies were guaranteed, or entitled, to their "fair share" of the market for certain generic drugs based on the number of participants in the market and the order of entry. Generally, the first generic entrant is "entitled" to more than its *pro rata* share of the market; later entrants are entitled to smaller shares.

264. Defendants all had a common understanding of what "fair share" means in different circumstances. The terminology evolved through in-person meetings, telephonic communications and other interactions between several generic manufactures over several years, but ground rules have been in place since at least 2006.

265. For each putative competitor to maintain its "fair share," Defendants frequently traded large customers among each other by exchanging information about bids and requests for proposals ("RFPs") and agreeing that a particular incumbent supplier would "walk away" from a large customer by knowingly submitting a higher bid than a competing supplier. The competing supplier looking to increase or maintain its "fair share" would then submit a bid slightly less than the suppler that "walked away," but still at a supracompetitive level. The competitors then continue to divide the market until they reach an artificial equilibrium, creating a "stable" market. Once achieved, the competitors agree not to compete on price and, at times, significantly raise prices.

266. The "fair share" scheme enabled Defendants to keep prices at supracompetitive levels despite new generic entrants to the respective generic drug markets. New competitors are approached by existing competitors, or vice versa. Existing competitors will "walk away" from

specific customers until the market reaches the artificial equilibrium. The new competitor can then charge supracompetitive prices on its newly obtained market share.

267. "Fair share" decisions can consider factors across multiple generic drug markets. Customers in one drug market might be traded for customers in another drug market so to create a global "fair share" outcome. Competitors might avoid challenging a price increase on one generic drug based on a *quid pro quo* arrangement from other competitors on different drugs. When a manufacturer complies with the scheme, it is seen as "playing nice in the sandbox."

268. In a properly competitive market, a Defendant's share of the market, which varies each year, is obtained by winning the business of various customers. But here, Defendants' shared understanding and goal is for the competitors in a particular market to discuss amongst themselves an agreement on "fair share" with the objective of attaining a state of equilibrium where no competitor is incentivized to compete for additional market share by eroding price.

269. This anticompetitive scheme is implemented by allocating markets for an individual drug based on the number of competitors and the timing of their entry, then the competitors agree on ways to avoid competition on price, and, at times, raise prices.

270. This overarching conspiracy necessarily involved more than one drug. Putative competitors declined to compete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined winning bid for a different drug.[78]

271. Similarly, an agreement by a putative competitor to join in the price increase for one drug often instigated a trade-off for that same competitor to lead a price increase for another drug.

272. The fact that an overarching conspiracy existed alongside drug-specific conspiracies is most clearly illustrated by Heritage's attempt to impose industry-wide price increases

[78] *Id.* at ¶ 103.

simultaneously on eighteen drugs, including six of the Subject Drugs in this Second Amended Complaint: Acetazolamide ER, Doxycycline Monohydrate, Leflunomide, Nystatin, Theophylline ER, and Verapamil.[79] This involved reaching out to competitors as to each of the drugs in an attempt to agree on price increases.[80]

273. In early 2014, Malek held a meeting with Heritage pricing executives, Keith Fleming, Associate Director of Pricing and Contracts, and Daniel Lukasiewicz, Heritage's Senior Manager, Marketing Operations, to ask them to begin analyzing the impact of numerous planned price increases.

274. On April 15, 2014, Heritage's Jason Malek called Nisha Patel, Teva's Director of Strategic Customer Marketing to discuss price increases on Acetazolamide, Leflunomide, Nystatin, Theophylline, and others. On their 17-minute conversation, Patel, (Teva) agreed that if Heritage increased the prices for those drugs, Teva would either follow or not challenge Heritage's price increases by underbidding.

275. Because Teva was already planning a price increase on Nystatin and Theophylline, Malek and Patel (Teva) agreed Teva would take the lead on those increases. In subsequent months, Malek and Patel (Teva) spoke several more times on Heritage's price increases and timing.

276. On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in which Malek identified 18 drugs that Heritage would target for increase. Prior to the call, Malek circulated to his sales team a spreadsheet ("the Heritage list") which listed each drug, the competitors, and their respective market share. The Heritage list included Acetazolamide, Doxycycline Monohydrate (which was slated for a "big price increase"), Leflunomide, Nystatin, Theophylline, and Verapamil, among others. Malek instructed members of the team to immediately

---

[79] *Id.* at ¶ 269.
[80] *Id.* at ¶¶ 268-93.

reach out to contacts at each competitor for the drugs on the list and attempt to reach agreement on price increases. Different Heritage employees were identified as being primarily responsible for communication with different competitors.

277. The Heritage sales team promptly began to contact their competitors. For example, Sather (Heritage) communicated with three counterparts at different competitors, reaching agreements with all of them to increase prices. First, she spoke with Knoblauch (Sun/Caraco) for 45 minutes and agreed to increase prices for Nystatin (and another drug not at issue in this Second Amended Complaint, Paromomycin). Then, she spoke to Michael Dorsey, a National Account Manager at Actavis for 9 minutes, which led to an agreement to increase prices for Verapamil and another drug not at issue in this Second Amended Complaint, Glipizide Metformin. Finally, she spoke to Sullivan (Lannett) for 29 minutes and they agreed to raise the price of Doxycycline Monohydrate.

278. Heritage's O'Mara also reached an agreement on April 23 with his Mylan counterpart, Michael Aigner, Director of National Accounts, to increase the prices of Doxycycline Monohydrate, Verapamil and another drug not at issue in this Second Amended Complaint, Glipizide-Metformin. O'Mara (Heritage) summarized in an email to Malek and Sather (Heritage) titled "Mylan": "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

279. In addition to Teva, Malek took responsibility for reaching out to Ascend regarding Nimodipine, a drug not at issue in this Second Amended Complaint. Following the market- wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to enter at a high price to avoid price erosion. In exchange, Heritage agreed to walk away from certain accounts Ascend targeted to help increase Ascend's market share. In addition to Teva, Malek took

responsibility for reaching out to Ascend regarding Nimodipine, a drug not at issue in this Second Amended Complaint. Following the market- wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to enter at a high price to avoid price erosion. In exchange, Heritage agreed to walk away from certain accounts Ascend targeted to increase market share.

280. On May 8, 2014, Malek sent an email to the Heritage sales team stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
>
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
>
> Need to move forward with the plan asap.

281. Sather (Heritage) responded: "Jason, I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details." Sather (Heritage) had been tasked with communicating with Defendants Lannett on Doxycycline Mono, Actavis on Verapamil, and Sun on Nystatin, among others.

282. On May 9, 2014, Heritage held another teleconference to discuss price hikes during which the sales team shared their results in forming agreements with competitors.

283. On June 23, 2014, Heritage employees had a "Price Change Call" to discuss the specific percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors), and the strategies for achieving this goal. The drugs discussed on the call included Acetazolamide (75% increase); Theophylline (150% increase); and Nystatin (95% increase).

284. Two days later, on June 25, 2014, Malek spoke with Patel (Teva) and informed her that Heritage would shortly be increasing prices for a number of drugs that Teva was a competitor for.

285. On June 26, 2014, Sather (Heritage) sent a text message to a large wholesaler customer stating:

> "As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTS, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases – you have those letters."

286. Sather (Heritage) quickly followed up: "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTS 200%, Glip/Met 100%, Glyburide 200%, Theo ER…150%."

287. On July 1, 2014, Malek emailed Heritages sales team:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

288. In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Heritage was ultimately able to increase prices on at least Acetazolamide, Leflunomide, and Nystatin, as well as others.

## XII. ALLEGATIONS SPECIFIC TO EACH OF THE SUBJECT DRUGS

### A. Acetazolamide

289. The Acetazolamide market is mature, as the drug has been available in the United States since 1952.

290. Acetazolamide is sold in two forms: tablets and capsules. Defendants Taro and Lannett dominate the market for Acetazolamide tablets. Defendants Heritage, Teva, and Zydus dominate the market for Acetazolamide capsules.

1. **Acetazolamide tablets**

291. Acetazolamide tablets are sold in two dosages: 125 mg and 250 mg. In the Spring of 2012, Taro was the only manufacturer of 125 mg tablets, but both Taro and Lannett manufactured the more popular 250 mg tablets. Taro and Lannett conspired to increase the price of both 125 mg and 250 mg tablets beginning in April and May of 2012.

292. Prior to the Spring of 2012, Taro and Lannett competed on pricing and market share for their Acetazolamide tablets. They implemented independent price increases in different amounts at different times. For instance, Taro increased prices in late 2009, but Lannett did not until a year later.

293. In April and May of 2012, Taro and Lannett suddenly imposed 40-50% price increases in unison, bringing their list prices for Acetazolamide 250 mg tablets to identical levels. Taro's 125 mg tablets increased in price simultaneously.

294. In early 2013, Taro slightly increased prices on both Acetazolamide tablets and by the middle of 2013, Taro and Lannett's market share stabilized as a result of their market sharing agreement. Lannett held approximately 56% of the 250 mg tablet market and Taro held approximately 44%. As the only manufacturer at this time, Taro maintained 100% of the market for 125 mg tablets. When market sales for both tablets are evaluated together, Taro and Lannett's dollar sales across both products remained virtually even. The combined market share (total dollar sales) for both 125 mg and 250 mg Acetazolamide tablets is depicted in the graph below.




295. With their respective market shares allocated by agreement, Taro and Lannett were well-positioned to raise prices without losing customers.

296. Between November of 2013 and February of 2014, Taro and Lannett both imposed over 200% price increases on their Acetazolamide tablets, bringing their 250 mg tablets to identical list prices. Taro's 125 mg tablets saw similar price increases and AWP prices for both products increased significantly.

297. The price increases imposed by Taro and Lannett, initially in 2012, then by Taro in early 2013, then most significantly in late 2013, can be seen on the graph below.







298. According to NADAC data, the average market price for generic Acetazolamide tablets saw the following price increases from November 2013 to February 2014

Acetazolamide 125mg: increased by 241%

Acetazolamide 250mg: increased by 265%

299. NADAC data shows that average market prices of Acetazolamide tablets remained artificially high thereafter, as depicted below.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER




300. Throughout this period, Lannett and Taro had ample opportunity to coordinate their market share agreements and price increases. They both attended the (i) October 1-3, 2012 GPhA Fall Technical Conference in Las Vegas, Nevada; (ii) June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; and (iii) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland. *See* Exhibit A.

301. The lockstep price increases with nearly perfect market share splits by Taro and Lannett contradicts expected pricing behaviors in a competitive market; it is, however, consistent with Defendants' "fair share" agreement.

302. This agreement between the Acetazolamide Tablet Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

2. **Acetazolamide Capsules**

303. At all relevant times, Acetazolamide Capsule Defendants Heritage, Teva, and Zydus dominated the market for Acetazolamide capsules. As of April 2014, Defendants Heritage and Teva controlled 78% of the market. At all relevant times, Acetazolamide Capsule Defendants sold Acetazolamide to Humana and others in the United States at supracompetitive levels inflated by unlawful and anticompetitive agreements.

304. Prior to this conspiracy, the prices for Acetazolamide were stable.

305. As part of the market-wide conspiracy to increase generic drug prices, Heritage began communicating with high level executives at Teva, a competitor on seven of the Heritage list drugs. On April 15, 2014, Malek spoke with Nisha Patel, Teva's Director of Strategic Customer Marketing for more than 17 minutes to discuss increasing the price of Acetazolamide capsules and other drugs. Patel (Teva) had already secured Heritage's agreement to support Teva's price increases in Nystatin and Theophylline. During the April 15th call, Patel (Teva) agreed that if Heritage raised prices for Acetazolamide capsules, Teva would follow suit or at minimum refrain from competing for Heritage's accounts. Malek and Patel's (Teva) conversations would continue through the spring and summer to coordinate and confirm their price increases.

306. After speaking with Malek on April 15, Teva executives reached out to Zydus executives to coordinate the price increases. Between April 16 and 17, 2014, Patel (Teva) and Kevin Green, the Senior Director of National Accounts at Zydus, spoke twice regarding Acetazolamide prices, first for approximately twenty minutes, then for twelve. They communicated frequently over the next several months, along with other Teva and Zydus executives, as outlined below.

307. On April 22, 2014, Malek held a telephone conference call with the Heritage sales team to dictate a pricing strategy that targeted 18 drugs for price increases, including Acetazolamide.

In order to implement the price increases without losing customers, Heritage coordinated with competitors to form agreements that prevented competition.

308. To coordinate with Zydus, Malek contacted Kristy Ronco, Zydus's Vice President of Sales, on April 24, 2014 through LinkedIn. Malek wrote: "Hi Kristy, I hope this email finds you doing well. I wanted to see if you have a few minutes to chat. Let me know when you are free." Ronco (Zydus) responded that day "Hi Jason – I'm out in Arizona. I can give you a call tomorrow afternoon or call me anytime."

309. Heritage came to agreements with both Teva and Zydus on price increases and market share. In an internal Heritage e-mail, Malek confirmed the Acetazolamide price-fixing agreements and reiterated that Heritage needed to refrain from bidding on contracts held by competitors. Malek previously asked Anne Sather (Heritage) to refrain from responding to a large GPO customer that requested a price quote on Acetazolamide. In e-mails on May 6th and 7th, 2014, Malek told Sather (Heritage) that he formed agreements to raise the price of Acetazolamide and not to compete on customers. Malek said, "[w]e have buy in from all to go up…" and Heritage agreed not to reduce its price in response to the request from the GPO customer. As Malek stated: "We are going to pass [on reducing the price] and most likely are taking an increase within the next week."

310. Defendants Teva and Zydus also remained in close contact during this time as well. On May 14, 2014, Jessica Peters, an Associate Director of National Accounts at Teva, exchanged numerous text messages with Ronco (Zydus).

311. Defendants had many opportunities to speak in person about their agreements. On May 12-15, 2014, Sather (Heritage) attended the MMCAP National Member Conference in Bloomington, Minnesota. She used this opportunity to speak in person with a number of different competitors on pricing agreements. Executives from Teva also attended, such as Nick Gerebi, National Account Manager. On June 1-4, 2014, Heritage's Sather, Glazer, and Malek all attended the

HDMA Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona, along with Teva's Patel and Gerebi and Zydus' Green, among others. At this conference, Sather (Heritage) met in person for dinner and drinks with O'Connor (Par) and Sullivan (Lannett), as well as Christopher Bihari, Director of National Accounts at Sandoz. Defendants used these meetings as an opportunity to confirm agreements on pricing and market share.

312. During these months, Heritage avoided soliciting or bidding on Acetazolamide customers supplied by Zydus in order to maintain the artificial equilibrium their conspiracy created.

313. On June 23, 2014, Heritage held a "Price Change Call" to discuss specific price increases on certain drugs and related strategies, including for Acetazolamide, which was targeted for a 75% increase. According to the discussion, the increases on the six drugs discussed would amount to an additional $16 million in profit per year for Heritage and assumed no loss in market share.

314. On June 25, 2014, Malek spoke with Nisha Patel (Teva) for approximately 14 minutes, confirming that Heritage would soon be increasing prices for a number of drugs sold by Teva.

315. On June 26, 2014, Heritage began sending out price increase notices to customers for nine different drugs, including Acetazolamide. Sather (Heritage) sent a text message to a large wholesaler customer:

> As of 7/1, [m]arket wide we are increasing prices on: Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases—you have those letters." She followed up with another text moments later, "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, Glyburide 200%, Theo ER . . . 150%.

316. On July 1, 2014, Malek e-mailed the Heritage sales team with the subject "update - price increase" that read:

> Team:

> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

317. By July 9, 2014, Heritage was able to raise Acetazolamide prices to at least 17 customers nationwide. Heritage, Teva, and Zydus collectively implemented a successful 75% on prices for Acetazolamide.

318. This agreement between the Acetazolamide Capsule Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**B. Amitriptyline**

319. The Amitriptyline market is mature, as the drug has been available in the United States since 1961. At all relevant times, there has been more than one manufacturer of Amitriptyline in the marketplace. At all relevant times, Amitriptyline Defendants Mylan, Par, and Sandoz have dominated, and continue to dominate, the market for Amitriptyline.

320. Prior to 2014, the effective prices for Amitriptyline were stable.

321. However, beginning in May 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Amitriptyline Period"), the average NADAC price for Amitriptyline rose dramatically.

322. These price increases followed the (i) April 1, 2014 HDMA Annual CEO Roundtable Fundraiser in New York, New York, at which Amitriptyline Defendants Mylan, Par, and Sandoz attended. *See* Exhibit A.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

323. According to NADAC data, the average market prices of Amitriptyline remained stable prior to May 2014 but rose dramatically and remained artificially inflated thereafter. The charts below show average price increases for various dosages of Amitriptyline tablets:






324. WAC data confirms that the Amitriptyline Defendants increased Amitriptyline prices largely in unison by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Sandoz | 00781148801 | $0.05 | $0.57 | 5/23/2014 | 1,032% |
| 1,000ct | Sandoz | 00781148810 | $0.05 | $0.48 | 5/23/2014 | 945% |
| 100ct | Mylan | 00378265001 | $0.05 | $0.57 | 7/16/2014 | 1,032% |
| 1,000ct | Mylan | 00378265010 | $0.05 | $0.57 | 7/16/2014 | 1,157% |
| 100ct | Par | 00603221421 | | $0.57 | 9/26/2014 | |
| 1,000ct | Par | 00603221432 | | $0.48 | 9/26/2014 | |

325. News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. For example, The *Financial Times* reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[81] The *Boston Globe* similarly reported, in November of the same year, "The cost of the antidepressant drug amitriptyline jumped 2,475 percent, from 4 cents for a 100-milligram pill in 2013 to $1.03 in 2015."[82]

326. The GAO identified Amitriptyline as having experienced an "extraordinary price increase."[83] These price increases impacted multiple dosages of Amitriptyline.

327. This agreement between the Amitriptyline Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

---

[81] David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, FIN. TIMES, May 12, 2015, available at https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de.

[82] Priyanka Dayal McCluskey, *As competition wanes, prices for generics skyrocket*, BOS. GLOBE, Nov. 6, 2015, available at https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

[83] GAO Report at Appx. III.

### C. Baclofen

328. The Baclofen market is mature, as the drug has been available in the United States since 1977. At all relevant times, there have been at least three manufacturers of generic Baclofen in the market.

329. At all relevant times, Baclofen Defendants Lannett, Par, Teva, and Upsher-Smith have dominated, and continue to dominate, the market for Baclofen.

330. Baclofen is available in 10mg and 20mg tablets.

331. According to NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014. From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for 20mg tablets.

332. Beginning around February 2014, however, the overall average market price rose by more than 550%. These price increases affected both dosages of Baclofen, *i.e.* 10mg and 20mg tablets.

333. According to NADAC data, the average market price for Baclofen increased by the following percentages**:**

> Baclofen 10mg tablet: Between March 2014 and April 2014, prices increased 636%; and
>
> Baclofen 20mg tablet: Between March 2014 and January 2015, prices increased 437%.

334. WAC data confirms that Baclofen Defendants Teva and Upsher-Smith both imposed dramatic price increases for Baclofen largely in unison, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 100ct | Teva | 00172409760 | $0.10 | $0.49 | 4/15/2014 | 420% |
| 1,000ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 2/21/2014 | 420% |


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

| 1,000ct | Teva | 00172409780 | $0.09 | $0.49 | 4/15/2014 | 447% |
|---|---|---|---|---|---|---|

335. Although WAC data is not available for Par and Lannett, upon information and belief, they implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.

336. The GAO Report identified Baclofen as having "experienced an extraordinary price increase" in 2014-15.[84]

337. Defendants had numerous opportunities to coordinate their price increases. All Baclofen Defendants attended the (i) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland; and executives from at least Par, Teva, and Upsher-Smith attended the (ii) February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida. Shortly thereafter, the average prices for generic Baclofen increased dramatically. *See* Exhibit A.

338. This agreement between the Baclofen Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**D. Benazepril**

339. The Benazepril market is mature, as the generic version of the drug has been available in the United States since 2004. At all relevant times, there has been more than one manufacturer of Benazepril in the market.

340. At all relevant times, Benazepril Defendants Mylan and Sandoz dominated the market for Benazepril.

341. Prior to August 2013, the effective prices for Benazepril were stable.

---

[84] GAO Report at 35.

342. Beginning in August 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Benazepril Period"), Benazepril Defendants increased their prices dramatically and in unison.

343. As a result, prices across the market rose more than 300% for Benazepril, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Dosage | Package Size | October 2013 | July 2014 | Percentage Price Increase |
|---|---|---|---|---|
| 12.5-20mg | 100 ct | $34 | $149 | 338% |
| 20-25mg | 100ct | $34 | $149 | 338% |
| 5-6.25mg | 100ct | $34 | $149 | 338% |

344. NADAC data shows that average market prices of Benazepril remained stable prior to August 2014, but rose dramatically and remained artificially high after August 2014, as depicted in certain forms and dosages below.









345. WAC data confirms that Defendants Mylan and Sandoz both imposed dramatic prices in Benazepril largely in unison, by the following amounts:

| Package Size (25mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 20ct | Mylan | 00378477501 | $0.38 | $1.65 | 8/9/2013 | 334% |
| 20ct | Sandoz | 00185027701 | $0.32 | $1.62 | 8/20/2013 | 407% |

346. The GAO Report also noted an "extraordinary price increase" for Benazepril in 2013-2014.[85]

[85] Id.

347. This price increase occurred after the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida, and the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland. Key executives from Defendants Mylan and Sandoz attended both. *See* Exhibit A.

348. This agreement between the Benazepril Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**E. Clobetasol**

349. The Clobetasol market is mature, as the drug has been available in the United States since 1985. Generic Clobetasol has been available since 1994.

350. At all relevant times, there have been more than one manufacturer of Clobetasol in the market.

351. In 2009, there were approximately ten Clobetasol manufacturers. In 2012, Novartis acquired Fougera and in 2013, Akorn acquired Hi-Tech, further consolidating the market. By 2014, many Clobetasol manufacturers exited the market, including Teva and Glenmark.

352. Since May 2014, Clobetasol Defendants Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt have dominated the market for generic Clobetasol.

353. Prior to 2014, the effective prices for Clobetasol were stable.

354. Beginning in May 2014, however, and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Clobetasol Period"), Clobetasol Defendants all increased their prices abruptly and in unison. Beginning in June 2014, however, and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Clobetasol Period"), Clobetasol Defendants all increased their prices abruptly and in unison.

355. Collectively, the Clobetasol Defendants raised prices for generic Clobetasol by approximately 1,300% between July 2014 and September 2014.

356. According to NADAC data, the average market price for generic Clobetasol saw the following price increases from July 2014 to September 2014:

Clobetasol .05% Ointment (15g): increased by 1,852%;

Clobetasol 0.05% Solution (50mL): increased by 1,176%; and

Clobetasol 0.05% Cream (30g): increased by 1,596%.

357. NADAC data shows that average market prices of Clobetasol remained stable prior to June 2014, but rose dramatically and remained artificially high after June 2014, as depicted in certain forms and dosages below.





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER












PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

358. WAC data depicted below confirms that Defendants Actavis, Hi-Tech, Sandoz, and Taro all increased prices in their Clobetasol cream largely in unison by the following amounts:

| Clobetasol cream .05%: | Defendant: | Old WAC: | New WAC: | Date of Increase: | Percentage Increase: |
|---|---|---|---|---|---|
| 15gm | Taro | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | * | $6.12 | 10-Mar-15 | * |

359. Although WAC data is not available for Akorn, Fougera, Morton Grove, Perrigo, Sandoz, Wockhardt, upon information and belief, they implemented simultaneous and identical price increases in their generic Clobetasol products.

360. News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.

361. For example, by October 2014, pharmacists expressed outrage at the dramatic price increases. Kushal Patel, a pharmacy manager at Well Future Pharmacy said "Clobetasol, which used

to cost $10 for the entire tube, now costs $300. The same exact medication we got one day. Next day, it's an increase of three thousand percent."[86]

362. Ascension Health, a hospital system based in Missouri with facilities in 23 states, reported a price increase from $2.89 in 2013 to $198.64 (or 6,773%) in 2014 for a 45-gram tube of generic Clobetasol propionate cream.[87]

363. A dermatologist, likewise, reported the experience of his patient in Tucson, Arizona in 2015. He expressed shock and dismay when his patient informed him that a 60-gram tube of Clobetasol cream would now cost him $220. The dermatologist was so surprised that he called around to other local pharmacies, all of whom were pricing the product above $200.[88]

364. Patient reports also corroborate the skyrocketing prices for Clobetasol. In 2014, Millicent Graves of Williamsburg, Virginia paid $35 for her prescription of Clobetasol solution, but in 2015, it cost $475.88. And just five weeks later, it rose to $627, overall a 1,691% increase over the course of a few months.[89]

365. Express Scripts, a PBM company that compiles its own price index for generic drugs, included Clobetasol in the top four most significant price increases for 2014[90] and in the top ten for 2015.[91]

---

[86] Dorothy Tucker, *Prices Soar For Some Generic Drugs – Why?*, CBS CHICAGO, Oct. 31, 2014, http://chicago.cbslocal.com/2014/10/31/prices-soar-for-some-generic-drugs-why/.

[87] Samantha Liss, *Hospitals and Pharmacies Grapple With Rising Drug Prices*, St. Louis Post-Dispatch, Nov. 16, 2014, http://www.stltoday.com/business/local/hospitals-and-pharmacies-grapple-with-rising-drug-prices/article_c6616678-bf8f-5b0e-8df1-9238df0f6919.html.

[88] Norman Levine, *The Tale of the $200 Tube of Clobetasol Cream*, DERMATOLOGY TIMES, Aug. 5, 2015, http://dermatologytimes.modernmedicine.com/dermatology-times/news/tale-220-tube-Clobetasol-cream-2

[89] *Unprecedented Generic Drug Price Spikes Wreaking Havoc*, THE SENIOR CITIZENS LEAGUE, Jul. 6, 2015, http://seniorsleague.org/unprecedented-generic-drug-price-spikes-wreaking-havoc/.

[90] *The Reality Behind Generic Drug Inflation,* EXPRESS SCRIPTS, Dec. 30, 2014, http://lab.express-scripts.com/lab/insights/drug-options/the-reality-behind-generic-drug-inflation.

[91] 2015 Drug Trend Report, EXPRESS SCRIPTS, March 2016, *available at* http://lab.express-scripts.com/lab/drug-trend-report/previous-reports.

366. An article in the *Boston Globe* described price changes from 2013 to 2015, when one form of Clobetasol's price spiked 1,496% from $0.23 per gram to $4.15 per gram. In response, Akorn representative Dewey Steadman said that the company simply reacted to price increases by its competitors, Novartis and Taro. In doing so, he invoked the influence of their market dominance and rejected the possibility of outside price factors: "Following price increases by others in this highly competitive market, Akorn brought Clobetasol's price in line with other generic versions of the product."[92]

367. Defendants had numerous opportunities to coordinate their price increases. Key pricing executives from at least Actavis, Sandoz, Taro, and Wockhardt attended the (i) June 1-4, 2014 HDMA Business and Leadership Conference in Phoenix, Arizona; and key executives from at least Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro attended the (ii) June 3-4, 2014 GPhA Annual CMC Workshop in Bethesda, Maryland. *See* Exhibit A.

368. This agreement between the Clobetasol Defendants was part of an overarching conspiracy of the Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**F. Clomipramine**

369. The market for generic Clomipramine is mature, as the drug has been available in the United States since 1990, and generic versions have been on the market since 1996. Hundreds of thousands of Clomipramine prescriptions are filled each year.

370. At all relevant times, there have been more than one manufacturer of Clomipramine in the market.

---

[92] Priyanka Dayal McCluskey, *As Competition Wanes, Prices for Generics Skyrocket,* THE BOSTON GLOBE, Nov. 6, 2015, https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

371. Clomipramine Defendants Mylan, Sandoz, and Taro dominate the market for Clomipramine. Their sales represent approximately 98% of total generic Clomipramine sales.

372. Prior to 2013, the effective prices for Clomipramine were stable.

373. Upon information and belief, around May 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Clomipramine Period"), Clomipramine Defendants suddenly and dramatically raised the price of Clomipramine largely in unison.

374. According to Red Book data,[93] the Average Wholesale Price ("AWP") for Clomipramine 50 mg increased by the following amounts:

| Defendant: | Old AWP price: | New AWP price: | Post-increase date: | Percentage Increase: |
|---|---|---|---|---|
| **Mylan** | $1.172 | $11.242 | May 2013 | 859% |
| **Sandoz** | $1.065 | $11.242 | July 2013 | 956% |
| **Taro** | $1.103 | $11.242 | May 2013 | 919% |

375. Upon information and belief, NADAC price data demonstrates that the average market price per unit for generic Clomipramine (50mg) increased from $0.31 in April 2013 to $9.03 in July 2013, representing a more than 2,800% increase.

376. WAC data confirms that Defendants Mylan, Sandoz, and Taro all increased their Clomipramine prices largely in unison by the following amounts:

| Package Size (25mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|

[93] "RED BOOK™ Drug References provide electronic access to current pricing and product information on prescription and over-the-counter drugs, nutraceuticals, bulk chemicals, and non-drug items. It is updated continuously." Press Release, Thomson Reuters, RED BOOK from Thomson Reuters Continues Providing Average Wholesale Prices for Drugs as Others Stop Supplying This Important Data (Apr. 8, 2010), available at https://www.fiercehealthcare.com/healthcare/red-book-from-thomson-reuters-continues-providing-average-wholesale-prices-for-drugs-as.

| | | | | | | |
|---|---|---|---|---|---|---|
| 90ct | Taro | 51672401106 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 90ct | Taro | 51672401105 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 100ct | Mylan | 378302501 | $0.30 | $8.99 | 5/16/2013 | 2,853% |
| 100ct | Sandoz | 781202701 | $0.31 | $8.99 | 7/22/2013 | 2,778% |

377. Prices for various dosages of Clomipramine increased by as much as 2,000% in one year, according to the 2016 GAO Report.[94] In 2015 alone, total sales revenue for Clomipramine spiked to $519 million, which is more than half the total sales revenue for the same products from 2011-2014 combined. This type of revenue growth in a mature market is evidence of Defendants' collusion.

378. This agreement between the Clomipramine Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**G. Desonide**

379. The Desonide market is mature, as both the ointment and cream form of the drug have been available in the United States since the 1970s, and generic Desonide has been available in the United States since 1994.

380. Consolidation in the Desonide market occurred in the years leading up to Defendants' price increases. For instance, in July 2012, Sandoz completed its acquisition of Fougera Pharmaceuticals, making Fougera the world's top manufacturer of generic dermatology medications.

381. At all relevant times, Desonide Defendants Actavis, Fougera, Perrigo, Sandoz, and Taro have dominated, and continue to dominate, the market for Desonide. During the relevant time period, Desonide Defendants sold Desonide to Humana and others in the United States at supracompetitive levels inflated by unlawful and anticompetitive agreements.

[94] GAO Report at 14.

382. Prior to May 2013, the effective prices for Desonide remained stable.

383. However, beginning in May 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Desonide Period"), the average NADAC price for Desonide rose dramatically.

384. Defendants had numerous opportunities to coordinate their price increases. Shortly before increasing prices, key pricing executives from at least Actavis, Perrigo, Sandoz, and Taro attended the February 20 -22, 2013 GPhA Annual Meeting in Orlando, Florida and the June 4-5, 2013 GPhA CMC Workshop. *See* Exhibit A.

385. According to NADAC data, the average market price for generic Desonide saw the following price increases:

> Desonide 0.05% cream: between July 11 and July 18, 2013, the average price increased by 442%
>
> Desonide 0.05% ointment: between July 11 and July 18, 2013, the average price increased by 390%

386. NADAC data shows that the average market price of Desonide remained stable prior to May 2013, but rose dramatically and remained artificially high after July 2013, as depicted in certain forms and dosages below.



387. WAC data confirms that Defendants Perrigo, Taro, and Sandoz all increased their prices in Desonide ointment in lockstep fashion in the following amounts:

| Product Package | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672128101 | $0.84 | $3.21 | 5/01/2013 | 282% |
| 60gm | Taro | 51672128103 | $0.53 | $3.21 | 5/01/2013 | 501% |
| 15gm | Perrigo | 45802042335 | $1.30 | $3.21 | 5/21/2013 | 146% |
| 60gm | Perrigo | 45802042337 | $0.31 | $3.21 | 5/21/2013 | 932% |
| 15gm | Sandoz | 00168030915 | | $3.21 | 1/17/2014 | |
| 60gm | Sandoz | 00168030960 | | $3.21 | 1/17/2014 | |

388. Although WAC data is not available for Actavis or Fougera, upon information and belief, they implemented similar price increases, largely in unison for their generic Desonide products.

389. Actavis entered the Desonide market in August 2013 and set its prices at supracompetitive levels instead of entering at a lower cost and competing for customers. Upon information and belief, Actavis contacted the other Desonide Defendants well before August 2013 and explained its intention of market entry. The Defendants then colluded to allocate market share and set supracompetitive prices. This agreement prevented Actavis' entry from eroding the artificial equilibrium the Defendants conspiratorially created.

390. News reports and testimonials from physicians corroborate these dramatic, immediate, market-wide price increases. For example, dermatologist Alan Rockoff reported in Dermatology News in February 2015:

> Then this week it happened again. I prescribed hydrocortisone valerate 0.2% for a groin rash. The patient left a message asking me for an over-the-counter suggestion, since the prescription was going to cost him $52.70 out of pocket.
>
> I asked my secretary to call the pharmacy to get a price for other generic steroid creams. Triamcinolone would cost $14.70. Alclometasone would cost $35.20. And desonide – generic desonide

> – would cost $111.70. For a 15-g tube. $111.70 for 15 g of a generic cream that's been on the market forever! Does that make any sense?

391. This agreement between the Desonide Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**H. Digoxin**

392. The Digoxin market is mature, as the drug was first approved by the FDA in 1975, and forms of it have been on the market in the United States since prior to the passage of the Federal Food, Drug, and Cosmetic Act in 1938. Variants of the drug, which is derived from the Digitalis lanata plant, have been used since the 18th century.

393. At all relevant times, there has been more than one manufacturer of Digoxin in the market. In late 2012, Impax and Lannett were the only active domestic manufacturers of Digoxin. Par and West-Ward re-entered the market in 2014 and Mylan re-entered in 2015. Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward dominate the market for Digoxin.

394. Prior to October 2013, effective prices for Digoxin were stable. Prior to November 2013, effective prices for Digoxin were stable.

395. Beginning in October 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Digoxin Period"), Impax and Lannett increased their prices abruptly and in unison. During this period, prices for generic Digoxin rose more than 630%.

396. Defendants had ample opportunity to coordinate their pricing agreements. Shortly before the price increase, key executives from at least Impax, Lannett, Mylan, Par, and Sun attended the October 28-30, 2013 GPhA Fall Technical Conference. *See* Exhibit A.

397. As a result, prices across the market rose more than 884% for Digoxin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg. Market Price Oct. 2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Digoxin (single tablet 250mcg) | $0.11 | $1.10 | 884% |

398. According to NADAC data, the average market price for generic Digoxin saw the following price increases from November 2013 to February 2014:

Digoxin 125 mcg tablets: 881%

Digoxin 250 mcg tablets: 825%

399. These dramatic price increases, initially instituted by Lannett, Impax, and Sun, were maintained even after Par's entry into the market in early 2014, West-Ward's entry soon thereafter, and Mylan's entry in early 2015. In fact, Digoxin Defendants continued to increase prices for digoxin during the first six months of 2014, including these new entrants. This is especially telling evidence of collusion, as entry of three additional competitors would typically lead to substantial price decreases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

400. NADAC data shows that average market prices for Digoxin rose dramatically and remained artificially high after November 2013, as depicted below.



401. WAC and AWP data for 0.25mg Digoxin tablets also shows that prices for Digoxin remained relatively stable prior to the November 2013 price increase. This chart was submitted by Dr. Stephen Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony at the Senate Hearing on drug price inflation.



**Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy: (January 1, 2005 to December 31, 2013)**




402. Specific WAC pricing depicted below confirms that Defendants Impax, Lannett, Mylan, Par, and West-Ward all increased their Digoxin prices substantially and largely in unison.

| Package size (0.125 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Lannett | 00527132401 | $0.14 | $1.19 | 10/16/2013 | 734% |
| 1,000ct | Lannett | 00527132410 | $0.12 | $0.99 | 10/16/2013 | 738% |
| 100ct | Impax | 00115981101 | $0.14 | $1.19 | 10/22/2013 | 734% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1,000ct | Impax | 00115981103 | $0.12 | $0.99 | 10/22/2013 | 738% |
| 100ct | Par | 49884051401 | | $1.19 | 1/17/2014 | |
| 1,000 | Par | 49884051410 | | $0.99 | 1/17/2014 | |
| 100ct | West-Ward | 00143124001 | $0.16 | $1.19 | 4/14/2014 | 638% |
| 1,000ct | West-Ward | 00143124010 | $0.13 | $0.99 | 4/14/2014 | 687% |
| 100ct | Mylan | 00378615501 | | $1.19 | 11/17/2014 | |
| 1,000ct | Mylan | 00378615510 | | $0.99 | 11/17/2014 | |

403. Although WAC data is not available for Sun, upon information and belief, Sun implemented simultaneous and identical price increases in its generic Digoxin products.

404. News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. Bill Drilling, a pharmacy owner in Sioux City, Iowa, apologized to his customers in December of 2013 because a 3-month supply of digoxin totaled $113.12, ten times its cost in August. Drilling shared in his customer's outrage, adding "I've been doing this since 1985, and the only direction that generics-drug prices have gone is down."[95]

405. Rob Frankil, another pharmacist who testified before the Senate in November 2014, offered a similar narrative: "A recent example from my own experience is the price of Digoxin—a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to pay for this drug…The patient called around to try to get the medicine at the old, lower price, but to no avail."

406. This agreement between the Digoxin Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

[95] Alan Katz, BLOOMBERG, *Surprise! Generic-Drug Prices Spike* (Dec. 12, 2013), https://www.bloomberg.com/news/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

**I. Divalproex**

407. The Divalproex market is mature, as variants of it have been in use for more than a century, and generic versions have been available in the United States since 2008.

408. At all relevant times, there has been more than one manufacturer of Divalproex in the market.

409. At all relevant times, Divalproex Defendants Dr. Reddy's, Mylan, Par, and Zydus dominated the market for Divalproex.

410. Prior to June 2013, effective prices for Divalproex were stable.

411. In June 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Divalproex Period"), Dr. Reddy's, Mylan and Par, and Zydus increased their prices for Divalproex dramatically and largely in unison.

412. As a result, Divalproex prices rose across the market by more than 700%, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg. Market Price Oct. 2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | $31 | $234 | 736% |

413. Defendants had numerous opportunities to coordinate their price increases and market share agreements. Shortly before the price increase, key pricing executives from Dr. Reddy's, Mylan, Par, and Zydus all attended the June 2-5, 2013 GPhA CMC Workshop in Bethesda, Maryland. Among others, known conspirators Burton (Par, Dr. Reddy's), Nesta (Mylan), Tighe (Mylan), Wyatt (Mylan), Aigner (Mylan), Green (Zydus), and Ronco (Zydus) all attended the June GPhA Workshop.

414. NADAC data shows that average market prices of Divalproex remained stable prior to June 2013, but rose dramatically and remained artificially high after September 2013, as depicted in a sample dosage below. For example, the average market price for generic Divalproex increased 920%, from $0.31 per tablet to $3.18 per tablet between September 12th, 2013 and September 19th, 2013.




415. These dramatic price increases, initially instituted by Mylan and Par, were maintained even after Dr. Reddy's and Zydus' entry into the market in August 2013. WAC pricing, depicted below, confirms that Defendants Dr. Reddy's, Mylan, Par, and Zydus each increased their prices uniformly and largely in unison:

| Package Size (500mg ER) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Mylan | 00378047301 | $0.74 | $3.26 | 6/14/2013 | 338% |
| 500ct | Mylan | 00378047305 | $0.71 | $3.26 | 6/14/2013 | 361% |
| 100ct | Par | 10370051110 | $0.74 | $3.26 | 6/26/2013 | 338% |
| 500ct | Par | 10370051150 | $0.71 | $3.26 | 6/26/2013 | 361% |
| 100ct | Zydus | 68382031501 | | $3.26 | 8/14/2013 | |
| 500ct | Zydus | 68382031505 | | $3.26 | 8/14/2013 | |
| 100ct | Dr. Reddy's | 55111053401 | | $3.26 | 8/14/2013 | |
| 500ct | Dr. Reddy's | 55111053405 | | $3.26 | 8/14/2013 | |

416. News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. According to Spalitto's Pharmacy in Missouri, 500 pills of Divalproex cost $122.99 in May of 2013. By August 2013, they skyrocketed to $1,629.95, an increase of 1,225%. "We've been doing this for 30 years. We've never seen anything like this," said the third-generation pharmacy owner.[96]

417. Industry experts and audit reports echoed this same narrative. The GAO Report also noted an "extraordinary price increase" for Divalproex in 2013-2014.[97] In January 2014, a Morgan Stanley analyst report found that "companies have been raising prices on divalproex….aggressively."[98]

418. This agreement between the Divalproex Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**J. Doxycycline**

419. The Doxycycline market is mature, as the drug has been available in the United States in various forms since 1967, and generic versions have been available since at least 2005.

---

[96] Rob Low, *Rising Cost Some of Generic Drugs Set to Shock Consumers*, FOX4 (Aug. 14, 2013), https://fox4kc.com/2013/08/14/rising-cost-some-of-generic-drugs-set-to-shock-consumers/.
[97] GAO Report at 38.
[98] Morgan Stanley, *Specialty Pharmaceuticals Rx Trends in Pictures* (Jan. 27, 2014).

420. 426. Doxycycline is sold primarily in three forms: Doxycycline Hyclate ("Doxy Hyclate"), Doxycycline Hyclate Delayed Release ("Doxy DR") and Doxycycline Monohydrate ("Doxy Mono").

421. At all relevant times, there has been more than one manufacturer of Doxycycline.

422. At all relevant times, Defendants Actavis, Par, Sun, Teva, and West-Ward dominated the market for Doxy Hyclate; Defendants Heritage, Mayne, and Mylan dominated the market for Doxy DR; and Defendants Heritage, Lannett, Mylan, and Par dominated the market for Doxy Mono.

1. **Doxycycline Hyclate**

423. Prior to October 2012, effective prices for Doxy Hyclate were stable.

424. Beginning in October 2012 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Doxy Hyclate Period"), Defendants Actavis, Par, Sun, and West-Ward increased their prices abruptly and largely in unison. Despite this large price increase, Teva exited the market in May of 2013. Collectively, the Doxy Hyclate Defendants raised prices for generic Doxy Hyclate by at least 2,000% (for certain dosages, as much as 8,200%) between November 2012 and March 2013.

425. As a result, prices rose dramatically and largely in unison. According to a report produced by PRIME Institute and presented by Dr. Stephen Schondelmeyer at a Senate hearing in November 2014, Doxy prices rose approximately 2,000% between December 2012 and December 2013. Dr. Shondelmeyer's report chronicled the retail prices for West-Ward's Doxy Hyclate prices, depicted in the chart below:

| Drug | Dosage | Manufacturer | NDC Code: | Usual Dose/ Day | Retail price/day (Median) Dec. 2012 | Retail price/day (Median) Dec. 2013 | Percentage Increase |
|---|---|---|---|---|---|---|---|
| Doxycycline Hyclate | 100mg tablet | West-Ward | 00143211205 | 2.00 | $0.36154 | $7.21887 | 1,896% |
| Doxycycline Hyclate | 100mg capsule | West-Ward | 00143314205 | 2.00 | $0.34746 | $7.46247 | 2,047% |

426. NADAC data shows that the average market price for Doxycycline Hyclate rose dramatically around November 2012 and remained artificially high thereafter, as depicted in the 50mg capsules below:




427. WAC and AWP data for West-Ward's 100mg Doxy Hyclate capsules show that prices for Doxy Hyclate remained relatively stable prior to the November 2012 price increase. This chart was also submitted by Dr. Stephen Schondelmeyer, as part of his testimony at the Senate Hearing on drug price inflation.

**Figure 11. Doxycycline Hyclate 100 mg Capsule (West-Ward) Price per Day of Therapy: (January 1, 2005 to December 31, 2013)**




428. Specific WAC data depicted below confirms that Defendants Actavis, Sun, and West-Ward all increased their prices in generic Doxy Hyclate by the following amounts:

| Product | Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|---|
| 100mg capsule | 50ct | West-Ward | 00143314250 | $0.10 | $4.43 | 1/21/2013 | 4,326% |
| 100mg capsule | 500ct | West-Ward | 00143314205 | $0.10 | $4.43 | 1/21/2013 | 4,370% |
| 100mg capsule | 50ct | Actavis | 00591544050 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg capsule | 500ct | Actavis | 00591544005 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg capsule | 50ct | Sun | 53489011902 | $0.10 | $4.92 | 2/5/2013 | 4,847% |
| 100mg capsule | 500ct | Sun | 53489011905 | $0.06 | $4.92 | 2/5/2013 | 7,844% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 100mg tablet | 50ct | Actavis | 00591555350 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg tablet | 500ct | Actavis | 00591555305 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg tablet | 50ct | Sun | 53489012002 | $0.09 | $4.92 | 2/5/2013 | 5,631% |
| 100mg tablet | 500ct | Sun | 53489012005 | $0.08 | $4.92 | 2/5/2013 | 6,268% |

429. Although WAC data is not available for Par, upon information and belief, Par implemented simultaneous and identical price increases in Doxy products.

430. Doxy Defendants had ample opportunity to conspire and coordinate their price increases and market share agreements. Shortly before or while implementing the price increase, key pricing executives from at least Actavis, Par, Sun, and Teva attended the October 1-3, 2012 GPhA Technical Conference in Bethesda, Maryland. *See* Exhibit A.

431. In May of 2013, after the price increase was implemented, Teva discontinued production of Doxy Hyclate – a product it had manufactured for three decades. This act contradicts Teva's self-interest, but furthered Defendants' conspiracy to coordinate pricing and allocate market share across the entire generic pharmaceutical industry.

432. In April 2014, DAVA Pharmaceuticals, Inc. ("DAVA"), a company that Endo acquired in August 2014, launched its Doxy Hyclate. Endo was already in discussions to acquire DAVA as of this time (April 2014). This launch led to litigation between DAVA and Chartwell Therapeutics Licensing, LLC ("Chartwell"). In that litigation, Chartwell alleged that DAVA and Endo refused to take delivery of Doxy Hyclate from Chartwell despite demand in the market and conspired to set Doxy Hyclate at an artificially high price.[99] For example, Chartwell cites to an e-mail

[99] See *Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC*, Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

dated on or about July 11, 2014 where Aram Moezinia[100] e-mailed Chartwell and stated that DAVA's plan was to sell doxycycline "slowly not to disturb pricing." Upon information and belief, all actions taken by DAVA as described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market. According to Chartwell, Par and Endo both produced discovery materials to the DOJ and State AGs, who's inquiries focus on at least three drugs that Endo acquired rights to through its acquisition of DAVA, including Doxy Hyclate.

433. Manufacturing or supply costs do not explain this sudden and dramatic price increase, as confirmed by Defendants Sun and West-Ward.

434. News reports and testimonials from hospitals and pharmacists corroborate these dramatic, immediate, market-wide price increases. Michael O'Neil, pharmacy manager at Vanderbilt University Medical Center, expresses his concern over the dramatic price increase for Doxy Hyclate, which increased from $10 for a 50-count bottle of 100mg tablets, to $250: "It's a change that occurred overnight," he said in the March 2013 report. Dr. Joshua Vaughn, a veterinarian with the Columbia Hospital for Animals, also lamented the dramatic price increase shortly prior to March 2013, when a doxycycline prescription increased from $77 to nearly $3,000.[101]

435. This agreement between the Doxy Hyclate Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

---

[100] Aram Moezinia was a Defendant in the litigation and a Director on DAVA's Board at the time of the merger with Endo

[101] http://www.wsmv.com/story/21616095/sudden-increase-in-cost-of-common-drug-concernsmany.

2. **Doxy DR**

436. Mylan served as the exclusive generic in the market for Doxy DR until July 2013 when Heritage entered the market. Mylan and Heritage then dominated the market for Doxy DR until Mayne entered the market in 2014.

437. While Mylan held exclusivity over the Doxy DR generic market, prices remained high, as would be expected without competition. By 2013, Heritage considered entering the Doxy DR market. Aware that the entrance of a second manufacturer typically drives down prices, Heritage contacted Mylan before entering the market for Doxy DR to coordinate pricing and market share in alignment with their "fair share" agreement to prevent price from eroding when Heritage entered.

438. In April 2013, Glazer and Malek traveled to India to meet with two executives of Heritage's parent company, Emcure. Glazer and Malek met with Satish Mehta, the CEO of Emcure, and Vikas Thapar, the President of Emcure. The purpose of their trip was to discuss Heritage's plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition. These discussions resulted in a decision to work out an agreement between Heritage and Mylan relating (at least) to Doxy DR. Mehta (Emcure) would reach out to Rajiv Malik ("Malik"), President and Executive Director at Mylan, in order to facilitate subsequent communications between Glazer and Malek and their counterparts at Mylan.

439. In early May, upon return to the United States, Heritage employees at many levels began to reach out to their counterparts at Mylan to discuss Doxy DR pricing and market allocation.

440. For instance, On May 3, 2013, Malek asked O'Mara (Heritage) to set up a call between Malek and his counterpart, the Vice President of Sales at Mylan. The next day, Malek learned that the Vice President of Sales had little to do with the National Accounts and O'Mara (Heritage) instead provided Malek with contact information for James Nesta, a Vice President and

Executive Director at Mylan. Malek immediately connected with Nesta (Mylan) through LinkedIn. Malek and Nesta (Mylan) communicated by phone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

441. Additionally, on May 7, 2013, Glazer emailed Malik (Mylan), copying both Mehta (Emcure) and Thapar (Emcure): "Rajiv [Malik (Mylan)]: Would like to schedule a time for a call to catch up and discuss some recent Heritage news. Please let me know when you are available and we'll pencil it in." Malik responded with a phone number where he could be reached in England and the two spoke the next day. During their May 8, 2013 phone call, Glazer and Malik (Mylan) reached an agreement to refrain from competing in the Doxy DR market. Glazer told Malik (Mylan) that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively comprised 30% of the market. Glazer confirmed they would not price aggressively (lower than Mylan) and Malik (Mylan) responded that Mylan would "play fair," agreeing to give up the two accounts to Heritage.

442. Over the course of several discussions, Malik (Mylan) reached an agreement with Glazer whereby Mylan would give up its accounts with McKesson and CVS based on the understanding that Heritage would coordinate with Mylan to keep prices of Doxy DR elevated. Malik (Mylan) made clear that Mylan entered this agreement willingly because Heritage had abided by its "fair share" agreements with Mylan in the past on other drugs by allowing Mylan to enter the market without competition. Malik (Mylan) told Glazer he would inform others at Mylan about their agreement. Similarly, Glazer kept Malek informed on his conversations with Mylan.

443. In the months that followed, Mylan surrendered the McKesson and CVS accounts to Heritage. In June 2013, Malek met with a senior executive from a large wholesaler account ("Wholesaler A," believed to be McKesson) at an HDMA Conference in Orlando to discuss potential product opportunities, including Doxy DR. Very shortly thereafter, Heritage submitted a

detailed product proposal to Wholesaler A and Malek continued to reiterate to them Heritage's strong interest in entering a supply agreement for Doxy DR over the following days.

444. Heritage and Mylan executives remained in touch and continued to discuss their market allocation scheme during this time. On June 11, Michael Aigner, a National Account Manager at Mylan, called Neal O'Mara (Heritage) and spoke for nearly ten minutes. O'Mara (Heritage) then immediately called Malek to report his conversation, initially leaving a voicemail, but connecting 15 minutes later for a 7-minute conversation.

445. On June 18, 2013, a senior manager at Wholesaler A contacted Lance Wyatt, a National Account Manager at Mylan, to inform him of the unsolicited bid he received from a new entrant (Heritage) on Doxy DR and offer Mylan the opportunity to submit a bid to retain the business by June 21, 2013. This is a customary practice in the industry referred to as "Right of First Refusal" ("ROFR") and if often included in the terms of supply contracts between manufacturers and their customers, allowing the incumbent manufacturer an opportunity to beat a competitor's price and retain the business. Keeping its agreement with Heritage to cede a customer, Mylan failed to submit a bid.

446. On June 27, 2013, with no counterbid from Mylan, Wholesaler A (believed to be McKesson) entered a distribution agreement with Heritage to serve as the wholesaler's primary supplier of Doxy DR. To date, Heritage maintains Wholesaler A's Doxy DR business without any competition from Mylan.

447. In a competitive market, Heritage's entry into the Doxy DR market should have spurred price competition across all customers and lowered market prices. Instead, by allocating the McKesson and CVS accounts, Mylan and Heritage were able to stabilize Doxy DR prices across the market at supracompetitive levels.

448. Doxy DR Defendants' conversations continued throughout 2013 to further their anticompetitive agreements. In July 2013, as Heritage began selling Doxy DR, Heritage contacted Mylan three times and Sun once. In August, Heritage spoke with Mylan once and Sun twice. In October, Heritage spoke with Sun once. And in November, Heritage spoke with Mylan once.

449. Doxy DR Defendants also maintained their communications at trade association events throughout this period, providing them ample opportunity to coordinate pricing and market share agreements in-person. Key pricing executives from Endo, Heritage, Mayne, Mylan all attended the Feb. 20-22, 2013 GPhA Annual Meeting in Orlando, Florida. *See* Exhibit A.

450. In July 2013, Mylan upheld its agreement with Heritage to cede a large pharmacy account (the "Pharmacy") (believed to be CVS) for Doxy DR.

451. On July 8, 2013, Heritage submitted a proposal to the pharmacy to bid for Doxy DR business. The pharmacy rejected the bid the following morning because the pricing was too high, and Heritage submitted a revised bid on July 11, 2013.

452. Heritage maintained communications with Emcure, its parent company, throughout the bidding period so that Emcure could communicate with Mylan to ensure they maintained their agreement not to compete. Satish Mehta (Emcure) spoke with Malik (Mylan) on July 18, 2013 and then Thapar (Emcure) followed up by e-mailing Glazer, "Satish spoke to Rajiv. Call me when free." Glazer spoke with Thapar (Emcure) and then emailed Malik (Mylan) asking if he had time for a call that day. Malik (Mylan) responded that he could call Glazer later that evening.

453. Malik (Mylan) called Glazer, left a voicemail, and Glazer returned the call fifteen minutes later. They had a 4-minute conversation where Glazer conveyed Heritage's strategy and position about the pharmacy bid and Doxy DR in general. Glazer told Malik (Mylan) that Mylan's reaction to Heritage's bid with the Pharmacy would "set the tone of whether this is a high priced item or more erosion."

454. Malik (Mylan) immediately spoke to certain Mylan employees and Mylan ultimately walked away from the pharmacy customer.

455. On August 6, 2013, Aigner (Mylan) called O'Mara (Heritage) and had a 13-minute conversation.

456. On August 15, 2013, an executive at the pharmacy contacted Gary Tighe, a National Account Manager at Mylan, to inform him they received an unsolicited bid for Doxy DR business and provide a short window for Mylan to submit a counter bid to retain the business. In keeping with its agreement with Heritage, Mylan submitted a counter bid, but only lowered its price by $10, knowing the price adjustment would not be enough to retain the business. The pharmacy contacted Tighe (Mylan) again later that day to notify him Mylan's price reduction would not be enough to maintain the business and offer Mylan a second opportunity to lower its price. Tighe (Mylan) responded that he would let the pharmacy know by morning. Mylan declined to submit a revised bid to retain the Doxy DR business at the pharmacy.

457. In September 2013, the pharmacy awarded its Doxy DR business to Heritage. To date, Heritage still maintains the Doxy DR business at The Pharmacy without any competition from Mylan.

458. Wholesaler A and The Pharmacy account for more than 80% of Heritage's Doxy DR business.

459. Once Heritage entered the market and Mylan allowed Heritage to obtain the business of these two large customers, Heritage maintained their agreement by ensuring the new market share equilibrium remained intact. Heritage walked away or refrained from competing on Mylan customers so as not to upset the balance.

460. In November 2013, Heritage refrained from competing against Mylan on one of their large retailer accounts for Doxy DR. Malek wanted to check in with Mylan to see if this was an

account they intended to keep as part of the market re-allocation agreement before soliciting the business. On November 25, 2013, Malek tasked O'Mara (Heritage) to check in with Mylan. Malek e-mailed O'Mara (Heritage), "can you reach out?" and O'Mara responded: "I have tried with [Aigner (Mylan)] and nothing. Will try again."

461. Malek also emailed Glazer, suggesting Heritage expected an agreement to transfer one more account from Mylan to Heritage, "Mylan is trying to protect [the one large account at issue]. We should reach out to rajiv [sic.] [Rajiv Malik (Mylan)], we need one more account and we are done." Heritage clearly sought to gain Mylan's permission before taking any action that might disrupt their market share agreement.

462. After checking in with Mylan, Heritage ultimately declined to pursue the Doxy DR business at the large retailer.

463. Throughout this period, Doxy DR Defendants had opportunities to conspire and coordinate their pricing agreements in person. Key pricing executives from at least Heritage, Mayne, and Mylan all attended the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland.

464. In February 2014, a new competitor, Mayne (formerly Midlothian Labs) entered the Doxy DR market. Even before launching their product, Mayne approached Heritage to discuss its plan, recognizing that it would need to establish an agreement to coordinate a re-balancing of market share for each company. On January 7, 2014, Gloria Peluso-Schmidt, a Director of National Accounts for Mayne, called Anne Sather, a National Account Manager at Heritage, for 12 minutes and Mayne agreed not to compete with Heritage in the Doxy DR market. Mayne's initial strategy was to target Mylan customers because Mylan held approximately 60% of the Doxy DR market at the time. This proved to be difficult, however, without an agreement yet in place with Mylan.

465. For instance, Mayne bid on a large wholesaler currently held by Mylan. The wholesaler asked Heritage to submit a competing bid as well, but Heritage declined, consistent with their arrangement not to compete against Mylan. Mylan retained the business and Mayne's Executive Vice President of Generic Products, Chris Schneider, provided Peluso-Schmidt (Mayne) his assessment of the situation based on his experience in the industry: "How I read this is Mylan has given up several large customers to Heritage and they are not giving any more. We need to go after business at Heritage also." Peluso-Schmidt (Mayne) replied "Perhaps. . . ."

466. Paluso-Schmidt (Mayne) maintained conversations with Sather (Heritage) about Doxy DR as she continued to pursue a customer base for Mayne. They spoke by phone on March 13, 2014 and again for 17 minutes on March 17, 2014. After her conversation with Paluso-Schmidt on March 17th, Sather (Heritage) emailed Malek and others at Heritage to recount their latest conversation and the understanding they reached. In an e-mail titled "Midlothian [Mayne] intel on Doxy DR," Sather stated

> I just spoke with [G.S.] of Midlothian (Mayne Pharma) about Doxy DR. She is the "one-man" show for that company -- she has all accounts including GPOs. She has not been able to get much share on the product yet, so she says.
>
> She did not bid OneStop, we have that customer. She did not bid Optisource, we have that customer, and she was aware that Rick had no interest in switching.
>
> She has been shut down at WalMart (Walmart said they couldn't go back to Mylan to reduce price again after we bid); and she was shut down at Rite Aid, Cardinal and ABC -- stating Mylan does not seem to want to give up any share. I shared info that we chose not to bid at Cardinal when asked.
>
> She will be bidding it on the HD Smith RFP. She will be targeting M&D now. She may go after NC Mutual but the usage is very small there. She already has some GPO business and they already have Publix and WinnDixie business. (Important for tracking reports). They are no where near a contract with WAG yet so she feels like that is not an option.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

> She is feeling pressure from the Mayne Pharma folks to get some share on this product asap. I let her know what accounts we had locked up -- and I got the impression she would not target those folks.

467. Malek replied "[t]hanks for the notes below. How well do you know [Paluso-Schmidt]?" And Sather responded, "I know her pretty well from over the years in the industry."

468. Two weeks later, however, Heritage learned Mayne made an unsolicited bid for Doxy DR to one of Heritage's large retail pharmacy accounts. Malek e-mailed Sather (Heritage) on March 31, 2014, saying Mayne "[t]ook a shot at our doxy dr [at the large pharmacy account]. Can you reach out?" Sather (Heritage) responded "Yes - I can."

469. On April 1, 2014, Sather (Heritage) spoke with Paluso-Schmidt (Mayne) for 27 minutes, then immediately texted Malek: "[s]poke with [Paluso-Schmidt] of Midlothian [Mayne]. Said she had to go to [the large pharmacy customer]. Just got declined at Walgreens and went back a second time to cardinal and got declined again." Malek replied, insisting that Heritage "can't walk from [the large pharmacy customer]. Tell her to try Walmart."

470. Paluso-Schmidt (Mayne) and Sather (Heritage) spoke again the next day for 11 minutes. Malek also emailed Glazer, relaying the news about Mayne and their status with the pharmacy: "[w]e are going to have to take doxy dr 30% lower at [the large pharmacy customer]. They don't pick up the phone for less than 20% difference. In this case, we spoke with Midlothian and they have struck out completely on getting share. They have gone to wag [Walgreens] and cah [Cardinal Health] twice and mylan won't budge. Please let me know your thoughts."

471. Paluso-Schmidt (Mayne) and Sather (Heritage) spoke again on April 9, 2014 for 3 minutes. Sather then reported their conversation to Malek (Heritage) and O'Mara (Heritage): "Just got a call from [Paluso-Schmidt] at Midlothian [Mayne] and she said she has offers in to [McKesson] One Stop and Econdisc."


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

472. On April 10th, 2014, Paluso-Schmidt (Mayne) and Sather (Heritage) exchanged a series of text messages. Sather (Heritage) told Paluso-Schmidt (Mayne) Heritage would "protect" the accounts they don't currently hold because they are "strategically aligned" with both, implying their ongoing agreement with Mylan:

> (1:14pm) Sather (Heritage): "Hi! It is [Sather]! Just getting back to you on our discussion yesterday. I don't have either account but my boss said since we are strategically aligned with both they will probably not move. We will protect. Sorry – I know it is not the news you wanted to hear."
>
> (1:16pm) Paluso-Schmidt (Mayne): "Thanks. Had he given up CVS we would not have gone after the other two. We'll just keep going back as soon as we can."
>
> (1:18pm) Sather (Heritage): "I am bummed for you. I am keeping my ears open to understand the landscape too. I will let you know what I find out. Best bets are the RFPs that are out now."
>
> (1:19pm) Paluso-Schmidt (Mayne): "Need volume. Need one Large account."

473. Because of the agreement between Heritage and Mayne, they were able to protect their respective Doxy DR market share and retain customers at higher prices than they could have in a competitive market.

474. Mayne continued to pursue large customers for the several months and Heritage walked away from one account in May 2014 when Mayne underbid Heritage's price. Upon learning of Mayne's bid, Keith Fleming, Associate Director of Pricing and Contracts at Heritage, asked Malek (Heritage), "[l]et me know what you want me to do on this. Would like to keep, but at the same time, Midlothian [Mayne] will keep going after accounts." Malek replied, "[w]e will walk."

475. In November 2014, Mayne again placed bids with McKesson One Stop (a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a group purchasing organization ("GPO") that includes Express Scripts, Kroger, and Supervalu). On November 20, 2014, Matthew Edelson, a Senior National Account Manager at Heritage, emailed Malek and others at Heritage,

conveying that "Midlothian [Mayne] has taken another shot at our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

476. The next morning, Sather (Heritage) sent a text message to Paluso-Schmidt (Mayne): "Happy Friday! Do you have a minute to talk about Econdisc?" Paluso-Schmidt (Mayne) responded, "Yes. Call me." Sather (Heritage) called Paluso-Schmidt (Mayne) and the two spoke for 15 minutes. Sather (Heritage) asked Paluso-Schmidt (Mayne) what her goals were for Doxy DR and Paluso-Schmidt (Mayne) responded that Mayne was looking for market share and needed a "big customer like Econdisc." She explained Mayne submitted an offer to McKesson 10 days earlier and Sather (Heritage) suggested that Heritage might be willing to walk from Econdisc if Mayne agreed to withdraw its offer from McKesson and not to price Doxy DR aggressively.

477. Right after her conversation with Paluso-Schmidt (Mayne), Sather (Heritage) emailed Malek with the subject, "spoke with [Paluso-Schmidt (Mayne)]" and saying "[c]an discuss any time." Sather (Heritage) conveyed her conversation to Malek and exchanged several text messages and voicemails with Paluso-Schmidt (Mayne) over the course of the day.

478. Later that afternoon, November 21st, O'Mara (Heritage) e-mailed Malek and others at Heritage, saying "Midlothian [Mayne] coming after us @ McKesson. Will discuss with you on Monday." Malek forwarded the e-mail to Sather (Heritage), who responded, "[Paluso-Schmidt (Mayne)] and I played phone tag after I had spoken to you for the second time so we will definitely connect Monday."

479. On November 24, 2014, Sather (Heritage) and Paluso-Schmidt (Mayne) connected and spoke for 6 minutes. Sather (Heritage) then e-mailed Malek with an update, "Just spoke with her ... can you call me anytime?" After speaking with Malek, Sather (Heritage) formally offered Paluso-Schmidt (Mayne) an agreement via text message: "If you retract McK[esson] - we will give up Econ[disc]. I can talk anytime."


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

480. On November 25, 2014, Malek emailed Sather (Heritage) asking "[d]id you speak with [Paluso-Schmidt (Mayne)]?" Sather (Heritage) responded "Yes -- told her exactly what we talked about. She is on vacation this week but was going to try to rescind McKesson. . . ." Malek ended the conversation by saying "[s]ounds like we know what we need to do."

481. In the weeks following, Glazer confirmed through internal e-mail communications that Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted to give Midlothian [Mayne] market share so they stop eroding" the price for Doxy DR.

482. Communications between Sather (Heritage) and Paluso-Schmidt (Mayne) continued throughout December, including text messages and an in-person meeting at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

483. Econdisc put the Doxy DR business out to bid again in January 2015 and Heritage intentionally bid higher than Mayne, providing a "cover bid" and fulfilling Heritage's agreement to "walk away" from Econdisc. In March 2015, a Heritage employee confirmed this, saying "[w]e basically walked from Doxy DR" at Econdisc.

484. The agreements between Heritage, Mayne, and Mylan on Doxy DR business and pricing continued and all three companies held the understanding that they would refrain from competing on market share and eroding price. In September 2015, a large nationwide pharmacy chain approached Heritage requesting a bid on Doxy DR. Sather (Heritage) confirmed internally that Heritage had the capacity to bid, but Malek cautioned that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

485. Upon learning that Mayne served as the incumbent supplier, Sather (Heritage) contacted Paluso-Schmidt (Mayne). Paluso-Schmidt (Mayne) conveyed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price. Keeping with their agreement, Heritage refused to provide a bid. Sather (Heritage) sent a follow-up text message to

Paluso-Schmidt (Mayne) reiterating Heritage's intent to keep their agreement, "Confirming we are not bidding." Paluso-Schmidt (Mayne) replied "Thank you."

486. NADAC data confirms that average market prices for Doxy DR increased dramatically between November 2012 and February of 2014 and remained artificially high thereafter. Pricing for various dosages are depicted below.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER







487. This agreement between Heritage, Mylan, and Mayne contributed to an overarching conspiracy among Defendants to unreasonably restrain trade in the generic pharmaceutical market.

3. **Doxycycline Monohydrate ("Doxy Mono")**

488. In February 2013, Heritage learned from a customer that demand for some Doxycycline products was increasing and wanted to use this as a pretext to raise the prices of Doxy


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

Mono. Heritage reached out to its competitors in the Doxy Mono market – Lannett, Mylan, and Par – to discuss and form agreements on price increases and prevent loss of market share.

489. On March 7, 2013, Sather (Heritage) spoke to Tracy Sullivan (Lannett), the Director of National Accounts at Lannett, for fourteen minutes.

490. On March 13, 2013, Sather (Heritage) e-mailed Sullivan (Lannett), saying "Hi [Sullivan (Lannett)]! I just had a question for you on Doxycycline Monohydrate. Would you have a chance to chat today? Or tomorrow? Let me know a convenient time for you…" Later that day, they spoke for five minutes and discussed Heritage's intent to increase Doxy Mono prices.

491. On March 17, 2013, Malek e-mailed himself a spreadsheet of various items for him to follow-up on, including "Price Increases: Take Doxy Mono up more than 3x asap." On March 21, 2013, Malek e-mailed Glazer that he intended to increase the price for Doxy Mono by as much as four times the current price and asked for Galzer's thoughts.

492. On March 25, 2013, Malek e-mailed his sales team, indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono and another drug. Heritage continued to contact its Doxy Mono competitors throughout 2013. Sather (Heritage) spoke, texted, and met in person with several different Lannett employees during this time.

493. On March 25, 2013, Sullivan (Lannett) e-mailed her boss relaying news of the price increase Heritage intended to institute. The email was titled "Recap" and in it she claimed to be "[w]orking on a WAC & SWP review" for certain drugs, including Doxy Mono, but heard that "there will be a price increase on Doxycycline from Heritage soon. We are waiting to find out when


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

and why." Sullivan (Lannett) and Sather (Heritage) continued to communicate through numerous phone calls, text messages, and in-person meetings over the next several months.

494. On April 25, 2013, Sather (Heritage) called Sullivan (Lannett) and left a message. When Sullivan (Lannett) returned the call the next day, they spoke for approximately eight minutes.

495. In April 2013, as outlined above, Malek and Glazer traveled to India to meet with Mehta (Emcure) and Thapar (Emcure), where they discussed how Heritage could implement price increases without instigating competition, particularly in the Doxy DR market. Afterward, Mehta (Emcure) contacted Malik (Mylan), a competitor in both the Doxy DR and Doxy Mono markets, to facilitate communications between Mylan and Heritage counterparts.

496. Continued communications between Doxy Mono competitors often overlapped with trade association meetings they attended together. For instance, on May 13, 2013, Sullivan (Lannett) and Sather (Heritage) spoke for approximately six minutes and the next day, they attended a conference together where they discussed Doxy Mono.

497. On May 14, 2013, Sather (Heritage) and Sullivan (Lannett) exchanged text messages to coordinate time to speak at the conference, which confirmed plans for a "market wide increase," seemingly in Doxy Mono:

> Sather (Heritage): "Meeting in parking lot at Cardinal at 5:45 to carpool over. Can meet you at Cardinal then or at the bar? Should be to bar a little after 6."
>
> Sullivan (Lannett): "I have a conference call in a half hour about a market wide increase. I might have to meet you at the bar."
>
> Sather (Heritage): "Ok sounds good – see u there"
>
> Sather (Heritage): "Is it doxy mono?"
>
> Sullivan (Lannett): "Headed over now."

498. On June 4, 2013, Sather (Heritage) reached out to Grace Wilks, Director of National Accounts at Lannett by phone and text message. On June 5, 2013, Sather (Heritage), Wilks

(Lannett), and Sullivan (Lannett) attended the same conference, during which Sather (Heritage) and Sullivan (Lannett) exchanged numerous calls and text messages. This conference, the HDMA June 2-5 Business and Leadership Conference in Orlando, Florida, was also attended by key executives for generic sales and pricing from Mylan and Par.

499. Doxy Mono Defendants agreed to implement their price increases during the summer of 2013 and communicated frequently throughout this period, including the days surrounding Lannett's June 12th Doxy Mono price increase.

500. On June 11, 2013, O'Mara (Heritage) spoke to Aigner (Mylan) for nearly ten minutes.

501. Sullivan (Lannett) communicated regularly with Karen O'Connor, Vice President of National Accounts at Par during this time. They were friends and saw each other frequently at trade shows and customer conferences, discussing anticompetitive information.

502. O'Connor (Par) communicated frequently with Aigner (Mylan) in June and July of 2013, including several phone calls on June 7, 2013 and June 13, 2013.

503. O'Connor (Par) also communicated frequently with Wilks (Lannett), including through nine text messages exchanged on June 11th and 12th, 2013.

504. Lannett increased its price for Doxy Mono on June 12, 2013. One customer contacted Lannett in July of 2013 to request a lower price for Doxy Mono and a Lannett National Account Manager responded, "We just took a price increase on this item effective 6/12/13. This is our standard pricing across the board going forward. Any pricing you see out there right now will not be that low for long."

505. Heritage maintained communications with Lannett and other competitors. Due to concerns about supply issues, Heritage was slower to raise its prices. In October 2013, Sather (Heritage) informed a customer that "[w]e are expecting continued supply issues with" Doxy Mono

and that "supply will be tight through Oct and Nov." In a competitive environment, other Doxy Mono competitors would have viewed Heritage's supply problems as opportunities to gain market share. However, Defendants' "fair share" agreement mitigated any customer losses for Heritage. To ensure their market share stability, Heritage kept in frequent communication with their competitors, reaffirming Heritage's commitment to their agreement. For instance, Sather (Heritage) met in person with Sullivan (Lannett) and O'Connor (Par) during a conference in Arizona on August 1st and 2nd, 2013.

506. A flurry of communications between the four competitors followed throughout August 2013. As Heritage planned its Doxy Mono price increase, Malek asked Sather (Heritage) to obtain specifics regarding Lannett's price increases. Accordingly, Sather (Heritage) and Sullivan (Lannett), while both attending the NACDS 2013 Total Store Expo August 10-13th, exchanged text messages on August 12, 2013:

> Sather (Heritage): "From our conversation, [i]ncreasing WAC too?"
>
> Sullivan (Lannett): "Yes"
>
> Sather (Heritage): "When are you guys changing WAC or have u already?"
>
> Sullivan (Lannett): "Are you free at 4:30?"
>
> Sather (Heritage): "Yes—but still need to hang around for 5pm mtg"
>
> Sullivan (Lannett): "OK I'll swing by"

507. Notably, Aigner (Mylan) and O'Connor (Par) also attended this conference.

508. On August 13th, while still together at the conference, Sather (Heritage) texted Sullivan (Lannett), saying "Let's connect sometime today—need a little more specifics on the $ we discussed." Sather (Heritage) also exchanged several text messages and phone calls with Lauren Carotenuto, National Accounts Representative for Lannett and another conference attendee.

O'Connor (Par), who also attended the conference, received a text message from Wilks (Lannett) the same day.

509. Later that evening, the Senior Vice President of Generic Sales at Par (likely Jon Holden, who attended the conference) sent an e-mail to Par's Vice President of Marketing and Business Analytics (likely Michael Altamuro, who also attended the conference), reading: "I hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The email was forwarded internally at Par with the instruction: "FYI…we will follow. . . . No new opps until we see where pricing ends up."

510. On August 20, 2013, Sather (Heritage) e-mailed Malek, confirming that Lannett "tripled WACs and did/will do similar to contract prices."

511. Mylan and Par announced their price increases for Doxy Mono in the Summer of 2013.

512. By the Spring of 2014, Heritage also increased their prices. On January 23, 2014, Sather (Heritage) informed a large supermarket chain customer that "I also wanted to let you [know] that we are looking to take a price increase on all the Doxy Monohydrate skus some time in 2014." In March 2014, Heritage increased its Doxy Mono prices with at least one customer and on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss strategy for increasing prices on eighteen drugs, including Doxy Mono, which was slated for a "big price increase."

513. Sather (Heritage) was responsible, among others, for communicating with Lannett about Doxy Mono and right after the Heritage conference call on April 22, she contacted three different competitors and reached pricing agreements covering Doxy Mono and four other drugs (Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin). One of those communications included a 29-minute phone call with Sullivan (Lannett) about pricing for Doxy Mono.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

514. O'Mara (Heritage) was primarily responsible for communicating with Mylan and contacted Aigner (Mylan) the next day (April 23rd, 2014) to reach an agreement on price increases for Doxy Mono (as well as Glipizide-Metformin and Verapamil). Immediately after his conversation, O'Mara (Heritage) e-mailed Malek and Sather (Heritage), with the subject line "Mylan:" "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

515. On May 8, 2014, Malek sent an email to O'Mara (Heritage) asking "Did you ever to [sic] with [Michael Burton] at Par?" Par was a competitor with Heritage for two of the target drugs on the list, Doxy Mono and Methimazole. O'Mara (Heritage) and Burton (Par) spoke on the phone on June 2, 2014.

516. Malek also emailed the entire Heritage sales team on May 8th, asking for confirmation on everyone's progress on speaking with their competitor counterparts about price increases. Sather (Heritage), responsible for communicating with Lannett (a Doxy Mono competitor) responded: "Jason: I made contact with all my take aways -- with positive results. I can resend those notes or talk with you on any details."

517. Sather (Heritage) then attended the MMCAP Conference in Bloomington, Minnesota May 12-15, 2014, where she met in person with numerous competitors to discuss price increases, including with Sullivan (Lannet) regarding Doxy Mono. Sather (Heritage) reported back to Malek via e-mail on her success reaching pricing agreements, including with Lannett: "Hi Jason: At the MMCAP meeting yesterday, spoke with some other industry reps and found similar like minding on the pricing strategies we discussed. Overall, spoke with … Lannett ([Sullivan])…" Par and Mylan executives also attended this conference, including O'Connor (Par).

518. Sather (Heritage) continued her outreach to other Doxy Mono competitors through joint attendance at conferences. On June 3, 2014, while attending the HDMA 2014 Business and

Leadership Conference in Arizona, Sather (Heritage) met O'Connor (Par) and Sullivan (Lannett) for dinner and drinks along with other competitors. Their continued communications during the price hike implementations provided opportunities to re-affirm their collusive agreements and coordinate pricing.

519. By way of example, Heritage's IMS NSP price for 50mg Doxy Mono tablets more than tripled between February and July 2013. Lannett's IMS NSP price for 75mg tablets steadily increased between February and July 2013, more than doubling during that period. Mylan also increased IMS NSP prices for 75mg tablets in the summer of 2013, as its prices nearly doubled from a low in June to a high in November. Lannett's IMS NSP price for 100mg Doxy Mono tablets approximately doubled between January and August of 2013. Heritage, Mylan and Par IMS NSP prices for 150mg Doxy Mono tablets all increased significantly between the spring and fall of 2013.

520. Between the summer of 2013 and Spring of 2014, Doxy Mono Defendants had ample opportunity to coordinate their price increases and market share agreements in person. Key pricing executives from at least Heritage, Mylan, and Par attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida. Key pricing executives from at least Heritage, Lannett, Mylan, and Par attended the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida; the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland; the February 23-26, 2014 ECRM Retail Pharmacy EPPS in Amelia Island, Florida; the May 12-15, 2014 MMCAP National Member Conference in Bloomington, Minnesota; the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix, Arizona; and the June 3-4, 2014 GPhA CMC Workshop in Bethesda, Maryland.

521. The unlawful agreements between Heritage, Lannett, Mylan, and Par regarding Doxy Mono contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**K. Econazole**

522. The Econazole market is mature, as the drug has been available in the United States since 2002.

523. At all relevant times, Econazole Defendants Fougera, Perrigo, Sandoz, Taro, and Teligent dominated the market for Econazole, controlling approximately 99% of the market.

524. NADAC data shows that the average market prices for Econazole remained stable prior to June 2014, but rose dramatically in July, and then remained artificially high after October 2014, as depicted in certain forms and dosages below.

525. Between January 2011 and September 2013, Econazole cost approximately 12 cents for one month's worth of treatment.

526. Starting at least as early as July 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Econazole Period"), Defendants Fougera, Perrigo, Sandoz, Taro, and Teligent increased their prices for generic Econazole abruptly and in unison. During this period, prices for generic Econazole rose more than 1,657%.

527. In 2015, Econazole Defendants total revenue from sales of only Econazole was approximately [REDACTED]. Two years prior, in 2013, that figure was only [REDACTED]

528. According to NADAC data, the average market price for generic Econazole saw the following price increases from July 2014 to March 2015:

Econazole 1% Cream (15g): increased by 853%

Econazole 1% Cream (30g): increased by 1,024%

Econazole 1% Cream (85g): increased by 929%


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER




529. WAC data depicted below confirms that Defendants Perrigo, Teligent, and Taro all increased their prices in Econazole cream between July and November 2014 by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 15gm | Perrigo | 45802046635 | $0.79 | $5.80 | 7/24/2014 | 637% |
| 30gm | Perrigo | 45802046611 | $0.69 | $5.80 | 7/24/2014 | 736% |
| 85gm | Perrigo | 45802046653 | $0.50 | $4.09 | 7/24/2014 | 719% |
| 15gm | Teligent | 52565002215 | $0.82 | $5.80 | 9/1/2014 | 610% |
| 30gm | Teligent | 52565002230 | $0.72 | $5.80 | 9/1/2014 | 704% |
| 85gm | Teligent | 52565002285 | $0.52 | $4.09 | 9/1/2014 | 688% |
| 15gm | Taro | 51672130301 | $0.66 | $5.80 | 11/18/2014 | 779% |
| 30gm | Taro | 51672130302 | $0.59 | $5.80 | 11/18/2014 | 890% |
| 85gm | Taro | 51672130308 | $0.42 | $4.09 | 11/14/2014 | 871% |

530. Although WAC data is not available for Fougera, upon information and belief, Fougera implemented simultaneous and identical price increases in their generic Econazole products.

531. No supply shortages or other market events can explain the Econazole price increases. The only significant change was Teligent's market entry in February 2013, which should have, but did not, drive prices down.

532. On February 1, 2013, Teligent obtained an ANDA for Econazole from Prasco LLC. Shortly thereafter, Teligent's CEO, Jason Grenfell-Gardner attended the 2013 GPhA Annual Meeting on February 20-22, 2013 in Orlando, Florida and the 2013 ECRM EPPS Retail Pharmacy Generics conference on February 24-27, 2013 in Dallas, Texas, along with Perrigo and Taro. Particularly, the CEOs of Perrigo (Joseph Papa) and Taro (Kal Sundaram) joined Teligent's CEO at the 2013 GPhA Annual Meeting.

533. When Teligent launched Econazole under its own ANDA, it irrationally increased effective prices immediately, rather than compete for market share on price. Here, rather than compete, when a Defendant raised its price, the market remained stable, indicating a conspiracy.

534. Significant price increases shortly followed or occurred at about the time of the following trade conferences: June 1-4, 2014 HDMA 2014 Business and Leadership Conference in Phoenix, Arizona; June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland; October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD; February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and February 22- 25, 2015 ECRM 2015 Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, FL. Key executives from Defendants Fougera, Perrigo, Sandoz, Taro, and Teligent all attended. *See* Exhibit A.

535. Prior to 2012, Teligent focused its business on contract manufacturing. But in late 2012 it sought to enter the market for numerous topical generic products. By September 2013, Teligent had 12 ANDAs pending. Teligent currently manufactures 20 topical generics covered by 33 ANDAs. For seventeen of the 20 drugs, Teligent directly competes with Taro, and for fifteen of the drugs, Teligent directly competes with Perrigo. This situation in particular lends itself to the

Defendants' "fair share" agreement, as these three Defendants can creatively allocate drugs and market share to maintain an artificial equilibrium

536. This agreement between the Econazole Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**L. Fluocinonide**

537. The Fluocinonide market is mature, as the drug has been available in the United States for more than 20 years. Fluocinonide is sold as a cream, gel, and ointment.

538. At all relevant times, Fluocinonide Defendants Actavis, Fougera, Sandoz, Taro, and Teva dominated the market for Fluocinonide.

539. Prior to June 2014, the effective prices for Fluocinonide were stable.

540. Beginning in June 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Fluocinonide Period"), Fluocinonide Defendants increased their prices dramatically and largely in unison.

541. In June 2014, Actavis planned to enter the Fluocinonide cream market. Actavis discussed its planned entry with at least Defendants Taro and Teva in advance of its entry. The conspirators coordinated price increases so that Actavis' new market entry would not erode the conspiratorial prices.

542. During the last week of July 2014, Taro, Actavis, and Teva each tripled their respective prices for Fluocinonide cream, gel, and ointment in the United States.

543. WAC data illustrates Taro and Teva's identical WAC price changes on June 3, 2014 and July 1, 2014, respectively, reflecting increases of more than 200%:

| Product Cream .05% | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 15gm | Taro | $.79 | $2.43 | June 3, 2014 | 206% |
| 30gm | Taro | $.56 | $2.43 | June 3, 2014 | 337% |
| 60gm | Taro | $.39 | $2.43 | June 3, 2014 | 524% |
| 15gm | Teva | $.79 | $2.43 | July 1, 2014 | 206% |
| 30gm | Teva | $.56 | $2.43 | July 1, 2014 | 337% |
| 60gm | Teva | $.39 | $2.43 | July 1, 2014 | 524% |

544. Although WAC data is not available for Actavis or Fougera, upon information and belief, they implemented simultaneous and identical price increases in their generic Fluocinonide.

545. These price increases followed the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix, Arizona and June 3-4, 2014 GPhA CMC Workshop in Bethesda, MD. Key executives from the Fluocinonide Defendants all attended. *See* Exhibit A.

546. The average market price for Fluocinonide remained artificially high after July 2014, according to the following NADAC data:









547. The Fluocinonide Defendants' agreement, furthered through in-person discussions conducted at dinners and meetings, as well as email and text communications, was part of Defendants' overarching conspiracy to unreasonably restrain trade in the generic pharmaceutical market.

**M. Leflunomide**

548. The market for generic Leflunomide is mature, as the drug has been available in the United States since 1998. Generic versions have been available since 2005.

549. At all relevant times, the generic market has consisted of at least three manufacturers.

550. At all relevant times, Leflunomide Defendants Apotex, Heritage, and Teva have and continue to dominate the market. Heritage held a 61% share by April 2014.

551. Prior to April 2014, the effective prices for Leflunomide were stable.

552. Beginning in April 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Leflunomide Period"), Leflunomide Defendants all increased their prices dramatically and largely in unison.

553. During Heritage's April 2014 "Price Increase Discussion" teleconference, Malek identified Leflunomide as one of the eighteen drugs targeted for a price increase. Malek was responsible for communicating with Teva about the Heritage's price increase (among others).

554. On April 15, 2014, Malek called Patel (Teva) about the drugs on his list and Patel (Teva) agreed that if Heritage increased its prices, Teva would follow or, at a minimum, would not compete with Heritage by underbidding them. In the following months, Malek and Patel (Teva) spoke frequently and Malek kept her informed on the strategy for price increases.

555. Heritage's Edelson was tasked with communicating with Defendant Apotex regarding the Leflunomide price increase. On May 2, 2014, Edelson (Heritage) called Deborah Viera, a Sales Manager at Apotex, regarding Leflunomide prices and they spoke for more than thirteen minutes.

556. Also, in May 2014, Heritage learned Teva might be leaving the Leflunomide market. On May 6, 2014, Sather (Heritage) emailed Malek that "the Teva discontinuation of Leflunomide

has everyone in a fuss! Wow – can we take more share???" Malek responded "we may give some to apotex and follow our strategy we discussed. Will have clarity by tomorrow."

557. That same day, Edelson (Heritage) had two more phone calls with Viera (Apotex). Edelson (Heritage) then reported to Malek that Apotex "has taken another shot at our Leflunomide….I am waiting for a callback from the VP of Apotex before we do anything." Malek replied, "Let's walk from leflunomide," confirming the strategy he mentioned to Sather (Heritage). Beth Hamilton, Vice President of Sales at Apotex, called Edelson (Heritage). They connected four times in two days – first for nine minutes and shortly thereafter for eight minutes on May 6th; then twice on May 7th. Heritage and Apotex representatives thereafter held four phone calls within two days. Upon information and belief, Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide during these calls.

558. In response to Malek's May 8th e-mail to the Heritage sales team requesting confirmation on agreements reached with competitors, Edelson (Heritage) responded that he spoke "with everyone" and was only waiting for feedback regarding the drug Meprobamate.

559. On Heritage's May 9th call on "Price Increases," Leflunomide remained on the list of target drugs.

560. On May 27th, 2014, Heritage learned that Apotex increased prices on Leflunomide and Malek confirmed with Edelson (Heritage), "we are going to increase." By July 9, 2014, Heritage successfully increased prices on Leflunomide for at least fifteen different customers.

561. On June 25, 2014, Malek told Patel (Teva) Heritage would be increasing prices for several drugs sold by Teva.

562. By July 2014, Teva began to exit the market. In conformity with its agreement, Teva never challenged Heritage's price increases. This decision countered Teva's self-interest, as it could

have benefitted by undercutting the higher prices charged by Apotex and Heritage and thereby gaining market share.

563. NADAC data shows the following average market price increases for Leflunomide between June 2015 and December 2015:

Leflunomide (10mg): increased by 730%; and

Leflunomide (20mg): increased by 617%.




564. Based on NADAC data, the average market price for Leflunomide rose dramatically and remained artificially high after June 2015.

565. Following the initial price spikes in June 2014, Leflunomide prices continued to increase to approximately 675% higher than their pre-conspiracy levels and to remain at artificially high levels.

566. These price increases occurred following the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix, Arizona; and the June 3-4, 2014 GPhA CMC Workshop in Bethesda, Maryland.

567. This agreement between Heritage, Teva, and Apotex was part of an overarching conspiracy of the Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**N. Levothyroxine**

568. The Levothyroxine market is mature, as the drug has been available in the United States since 1955. Generic versions have been available since 2004.

569. At all relevant times, there have been at least three manufacturers of Levothyroxine in the market.

570. Since approximately December 2010, Levothyroxine Defendants Lannett, Mylan, and Sandoz have dominated the market with a nearly 100% share.

571. Prior to 2013, the effective prices of Levothyroxine were stable.

572. Beginning in August 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Levothyroxine Period"), Levothyroxine Defendants all increased their prices dramatically and largely in unison.

573. The average prices for Levothyroxine experienced a rapid surge. According to Humana's internal data, Mylan's prices rose by approximately 225% between May and October of 2013, with an overall price hike of approximately 400% by May 2014. Defendants Lannett, and Sandoz also raised their prices for generic Levothyroxine by similar amounts between May 2013 and October 2014, as set forth below.

574. NADAC data is publicly available only for the time period between November 2013 and the present (after the initial price hike), but even this limited data shows that average market price for various dosages of Levothyroxine nearly doubled in price and then remained artificially high thereafter. For instance:

Levothyroxine 100 mcg Tablets: increased by 70% between November 2013 and September 2014; and

Levothyroxine 175 mcg Tablets: increased by 78% between November 2013 and August 2014.




575. WAC data for Levothyroxine's 0.05mg tablet demonstrates that Lannett, Mylan, and Sandoz all implemented significant price increases in virtual lock step, first in August and September of 2013, then again in April and May of 2014:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000ct | Mylan | 00378180310 | $0.18 | $0.27 | 8/9/2013 | 45% |
| 100ct | Lannett | 00527134201 | $0.18 | $0.27 | 8/14/2013 | 46% |
| 1,000ct | Lannett | 00527134210 | $0.18 | $0.27 | 8/14/2013 | 120% |
| 90ct | Sandoz | 00781518192 | $0.12 | $0.27 | 9/13/2013 | 120% |
| 1,000ct | Sandoz | 00781518110 | $0.12 | $0.27 | 9/13/2013 | 54% |
| 1,000ct | Mylan | 00378180310 | $0.27 | $0.41 | 4/25/2014 | 55% |
| 100ct | Lannett | 00527134201 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 1,000ct | Lannett | 00527134210 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 90ct | Sandoz | 00781518192 | $0.27 | $0.41 | 5/23/2014 | 54% |
| 1,000ct | Sandoz | 00781518110 | $0.27 | $0.41 | 5/23/2014 | 54% |


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

576. News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. In a November 2014 hearing in the United States Senate HELP Subcommittee, pharmacist Stephen W. Schondelmeyer testified that in the prior year, Levothyroxine experienced a 35-50% price hike. Mr. Schondelmeyer added that Mylan increased its prices for nine different strengths of Levothyroxine by between 44-63%. Pharmacist Robert Frankil also testified that in 2013, Levothyroxine experienced a dramatic price increase.[102]

577. In 2015, patients complained of a dramatic price increase for their levothyroxine medication. One patient in Detroit explained they routinely paid $20 for 90 tablets, but their cost skyrocketed to $76.77 from one refill to the next.[103] The Wisconsin Center for Investigative Journalism found that between 2011 and 2016, the price per pill for generic Levothyroxine increased from 14 cents to 46 cents.[104]

578. These price increases followed the October 28-30, 2013 GPhA Fall Technical Conference in North Bethesda, Maryland, at which key pricing executives from Lannett, Mylan, and Sandoz attended.

579. This agreement between Lannett, Mylan, and Sandoz to increase Levothyroxine prices contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

---

[102] Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the Subcomm. On Primary Health and Aging of the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 10 (2014) (statement of Stephen W. Schondelmeyer, Director, Prime Institute and statement of Robert Frankil, President, Sellersville Pharmacy, Inc.), available at https://www.gpo.gov/fdsys/pkg/CHRG-113shrg24459/pdf/CHRG-113shrg24459.pdf.

[103] Keith Roach, *Hike in prescription cost can be a hardship*, DETROIT NEWS, Mar. 29, 2015, available at https://www.detroitnews.com/story/life/advice/2015/03/29/keith-roach-health-high-prescription-cost-hardship/70639116/

[104] Sean Kirby, Dee J. Hall & Bridgit Bowden, WIS. CTR. FOR INVESTIGATIVE JOURNALISM, Nov. 28, 2016, available at https://urbanmilwaukee.com/2016/11/28/prices-of-lifesaving-drugs-skyrocketing/.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

**O. Lidocaine**

580. The Lidocaine market is mature, as the drug has been available in the United States since 1948.

581. At all relevant times, there have been more than one manufacturer of Lidocaine in the market.

582. Lidocaine Defendants Akorn, Fougera, Hi-Tech, Impax, and Sandoz dominate the market for one popular formulation of Lidocaine, Lidocaine-Prilocaine.

583. Prior to March 2014, the effective prices for Lidocaine-Prilocaine were stable.

584. Beginning in April 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Lidocaine Period"), Lidocaine Defendants increased their prices abruptly and largely in unison for Lidocaine-Prilocaine.

585. Prices for other forms of Lidocaine also experienced price increases. The GAO Report noted an "extraordinary price increase" for Lidocaine 5% ointment between in 2012-2013 and another "extraordinary price increase" for Lidocaine-Hydrochloride 3% cream in 2011-2012.[105]

[105] GAO Report at 41.

586. NADAC data shows that average market prices for Lidocaine-Prilocaine increased by almost 300% beginning in April 2014 and remained artificially high thereafter:




587. These price increases occurred following the (i) February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida, which at least representatives from Defendants Hi-Tech, Impax, and Sandoz attended.

588. This agreement between the Lidocaine Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**P. Nystatin**

589. The Nystatin market is mature, as the drug has been available in the United States since 1954. Nystatin comes in multiple forms, including cream, ointment, and oral tablets.

590. At all relevant times, there have been more than one manufacturer of Nystatin in the market.

591. During the relevant time frame, Defendants Actavis, Par, Perrigo, Sandoz, and Taro dominated the market for Nystatin cream; Defendants Actavis, Perrigo, and Sandoz dominated the

market for Nystatin ointment; and Defendants Teva, Heritage, and Sun (through Mutual) dominated the market for Nystatin tablets.

1. **Nystatin Cream**

592. Nystatin Cream Defendants Actavis, Par, Perrigo, Sandoz, and Taro all experienced fluctuations in their respective market shares until suddenly stabilizing in 2013. As detailed below, prices *increased* for all Nystatin Cream Defendants, even as those with smaller market shares captured more of the market. This runs counter to economic theory, which dictates that competitors must lower prices to gain market share.

593. As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream, Taro had 40%, Perrigo had approximately 7% and Par and Actavis controlled the remainder. Through 2009 and into 2010, Sandoz's market share began to decline. By the summer of 2010, Sandoz was effectively out of the market. By this time, Actavis and Par also were effectively out of the market. Although Sandoz, Actavis and Par appear to have continued making *de minimis* sales, they each had a market share of less than 1% by the spring of 2011. By May 2011, Taro had captured as much as 96% of the Nystatin cream market, leaving Perrigo approximately a 4% share.

594. Beginning in June of 2011 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Nystatin Cream Period"), Nystatin Cream Defendants increased their prices dramatically and largely in unison.

595. In June of 2011, Taro initiated a large price increase of more than 600%. Rather than compete on price to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and managed slowly to gain some market share over the next two years, but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

596. In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition. Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

597. In November 2011, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forego price competition and the prospect of winning a larger share of the market. Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working.

598. Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis before it, rather than compete on price to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in the market.

599. WAC prices for each Defendant demonstrate that Nystatin Cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011, remaining artificially inflated thereafter.




600. AWP prices for Nystatin Cream Defendants show the same trend of dramatically inflated and nearly identical prices.

601. These price increases followed the March 6-10, 2011 ECRM EPPS Retail Pharmacy Conference, February 2012 ECRM EPPS Retail Pharmacy Conference; October 2012 GPhA Fall Technical Conference in Bethesda, Maryland; and June 4-5, 2013 GPhA CMC Workshop in Bethesday, Maryland, among others, at which representatives from the Nystatin Cream Defendants attended.

602. This agreement between the Nystatin Cream Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

2. **Nystatin Ointment**

603. Nystatin external ointment prices followed a similar pattern to those of Nystatin external cream. Again, Nystatin Ointment Defendants Actavis, Perrigo, and Sandoz increased their prices, often while gaining market share, contrary to economic theory. In 2009, Sandoz had captured approximately 75% of the market, while Perrigo had 20% and Actavis 5%. From that point through

the summer of 2011, Actavis and Sandoz drastically reduced production until they were effectively out of the market. By the summer of 2010 Actavis had approximately a 0% market share, though *de minimis* sales appear to have continued. By the summer of 2011, Sandoz had approximately a 5% market share.

604. Beginning in June of 2011 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Nystatin Ointment Period"), Nystatin Ointment Defendants increased their prices dramatically and largely in unison.

605. In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

606. Five months later, Actavis ramped up production of Nystatin ointment. Rather than undercut Perrigo's elevated price to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo. As intended by the overarching "fair share" agreement among Defendants, the list prices and AWP price for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the market place.

607. In the summer of 2012, the pattern repeated itself. Sandoz ramped up its production of Nystatin ointment in June. Rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis. Even with a third market participant prices remained unchanged, just as devised by Defendants' agreement.

608. WAC prices for each Defendant demonstrate that Nystatin Cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011, remaining artificially inflated thereafter.




609. Again, Defendants had the opportunity to discuss pricing of Nystatin Ointment at numerous industry events during the relevant period. For example, all Nystatin Ointment Defendants attended the March 2011 ECRM EPPS Retail Pharmacy Conference, and February 2012 ECRM EPPS Retail Pharmacy Conference, among others.

610. This agreement between the Nystatin Ointment Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

3. **Nystatin Tablets**

611. Nystatin Tablet Defendants Heritage, Sun, and Teva dominate the market for Nystatin tablets. In 2010 and 2011, the Nystatin oral tablet market was split between Teva and Sun (sold at least in part through its subsidiary, Mutual). During that time, Teva held approximately 60% of the market, Sun held 40%, and they had nearly identical list prices for Nystatin tablets. In the Summer of 2012, Heritage entered the market. Rather than undercut Teva and Sun's prices to gain

market share, Heritage identically matched Teva and Sun's prices, consistent with the "fair share" agreement they maintained throughout the generics market.

612. Sun, through its division Mutual, increased Nystatin prices on April 15, 2013.

613. Patel was hired by Teva in April 2013 to "run the pricing team." On July 9th, Patel (Teva) called Malek and they spoke for 21 minutes. The two spoke again on July 23rd (for ten minutes), and twice on July 30th, 2013 (once for more than 12 minutes).

614. Between July 23rd and July 30th, 2013, Sather (Heritage) spoke with Susan Knoblauch, Senior Sales Manager at Sun for eleven minutes. Heritage remained in close contact with Sun before and after Sun (through Mutual) took its price increase in April 2013. On April 16th, 2013 – the day after Mutual increased Nystatin prices – Knoblauch (Sun) called Sather (Heritage) and they spoke for nearly 40 minutes. The two continued to communicate throughout the summer of 2013.

615. By late July 2013, Teva's "Price Increase Candidates" list, created by Patel, included Nystatin, with the note "Heritage involved; follow Mutual."

616. On August 1, 2013, Malek e-mailed O'Mara (Heritage), Edelson (Heritage), and Sather (Heritage), saying "Team: Pricing dynamics may be changing for us for Nystatin. Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they kept it." On August 20th, 2013, Malek e-mailed Fleming (Heritage) and copied Glazer with the subject "PRICE INCREASES," saying "[Fleming (Heritage)]: We need [to] analyze the following product price increases and understand how much to increase and which customers to extend." Malek provided a list of four drugs, including Nystatin.

617. Patel (Teva) was on maternity leave from August 2013 through December 2013 and decisions regarding Teva's and Heritage's Nystatin price increases were put on hold.

618. On February 7, 2014 Patel (Teva) created a spreadsheet titled "PI Candidates", which included Nystatin. The Nystatin notes read "Shared with Heritage and Mutual/Caraco" and

"WAC increase likely." Patel (Teva) called Malek on February 14, 2014 and the two connected the next day.

619. Malek and Patel (Teva) continued to talk throughout March and April of 2014. On a 17-minute phone call on April 15, 2014, Malek and Patel (Teva) came to an agreement on all of the identified drugs involving Teva (at least seven drugs, including Nystatin). They agreed Teva would take the lead on the Nystatin (and Theophylline) price increase, which Heritage would follow and match.

620. On April 4, 2014, Teva announced an increase of more than 100% on Nystatin, doubling WAC price from $47.06 to $100.30.

621. During the April 2014 Heritage "Price Increase Discussion" teleconference, Malek (Heritage) identified Nystatin as one of the eighteen drugs targeted for a price increase. Sather (Heritage) was tasked with reaching out to Sun regarding Nystatin (and other drugs). Immediately after the April call, Sather (Heritage) reached out to Knoblauch (Sun, operating under Caraco). They spoke for 45 minutes and agreed to increase prices for Nystatin (and Paromomycin). Afterward, Sather (Heritage) reported to Malek (Heritage) and Glazer (Heritage) "Caraco notified and on board." Glazer quickly responded, "No emails please."

622. On the June 23rd Heritage "Price Increase Call," Nystatin was designated for a 95% price increase. Heritage's Kate Brodowski, Associate Director of International Sales noted that Heritage had to increase its WAC pricing for Nystatin because Teva "increased WAC already."

623. On June 25, 2014, Heritage held another internal call regarding "Product Price Changes" and Nystatin again appeared on the list of drugs slated for a price increase. During the call, Sather (Heritage) texted Knoblauch (Sun) to update Sun on Heritage's anticipated Nystatin price increase:

Sather (Heritage): "Work news: we are raising price on Nystatin. Just letting you know. :)"

Knoblauch (Sun): "How much"

Sather (Heritage): "Double the price"

Sather (Heritage): "On conf call- will call you back"

Knoblauch (Sun): "Yes"

624. On June 25, 2014, Malek spoke to Patel (Teva) again for nearly 14 minutes, explaining Heritage would soon be increasing prices for a number of Teva's drugs.

625. In June 2014, Heritage announced a price increase of nearly 100% on Nystatin. By July 9, 2014, Heritage successfully raised the price for at least fourteen customers nationwide.

626. Sun implemented a similar price increase by August 2014.

627. In conformity with their agreement, Teva refused to bid or challenge Heritage's price increases when requested by incumbent Heritage customers. On July 8th, a large retail customer e-mailed Teva requesting a quote for Nystatin tablets because of a recent large price increase instituted by the incumbent supplier. A Teva representative forwarded that e-mail to Patel (Teva), asking "Are you aware of the below? Should we engage?" Patel (Teva) responded that she was aware, and that Heritage would be "following Teva on the Nystatin." She confirmed "we will not be bidding. Thanks." Teva either declined to provide a bid or provided a "cover bid" so as not to undercut Heritage's price and maintain the equilibrium in their "fair share" agreement.

628. As set forth above, beginning in April 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Nystatin Tablet Period"), the Nystatin Tablet Defendants increased their prices abruptly and largely in unison.

629. NADAC data for Nystatin tablets is only available dating back to April 2014. As depicted on the chart below, the average price for Nystatin 500,000 Unit Oral tablets continued to

increase after the first price increase implemented by Sun in April 2013 and the subsequent price increases implemented by Heritage, Sun, and Teva around April and June of 2014:




630. In addition to increasing prices, Teva also refused to bid on Heritage accounts when requested by customers.

631. The agreement between Heritage, Teva, and Sun was part of an overarching conspiracy of the Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**Q. Pravastatin**

632. The Pravastatin market is mature, as the drug has been available in the United States since 1991. Generic versions have been available since 1996.

633. At all relevant times, there has been more than one manufacturer of Pravastatin in the market.

634. Pravastatin Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus dominate the market for Pravastatin.

635. Prior to 2013, effective prices for Pravastatin were stable.

636. Beginning around May of 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Pravastatin Period"), Pravastatin Defendants increased their prices abruptly and largely in unison. Beginning around July of 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Pravastatin Period"), Pravastatin Defendants increased their prices abruptly and largely in unison.

637. As a result, prices across the market rose more than 500% for Pravastatin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings. The GAO Report also noted an "extraordinary price increase" for Pravastatin between in 2013-2014.[106]




[106] GAO Report at 43.




638. As depicted in the charts below, NADAC data demonstrates that average market prices for Pravastatin remained stable prior to July 2013, then increased dramatically and remained artificially high thereafter. For instance, the average market price for generic Pravastatin 40mg increased by over 640%, from $0.09 per tablet in July 2013 to $0.67 per tablet by December 2013.

639. WAC pricing, depicted below confirms that Defendants Apotex, Lupin, Teva, and Zydus all increased their Pravastatin prices substantially and largely in unison.

| Package Size (10mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Apotex | 60505016809 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 500ct | Apotex | 60505016805 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 90ct | Zydus | 68382007016 | $0.17 | $0.48 | 6/14/2013 | 189% |
| 500ct | Zydus | 68382007005 | $0.15 | $0.48 | 6/14/2013 | 222% |
| 90ct | Teva | 00093077198 | $0.17 | $0.48 | 8/9/2013 | 189% |
| 1,000ct | Teva | 00093077110 | $0.15 | $0.48 | 8/9/2013 | 221% |
| 90ct | Lupin | 68180048509 | $0.17 | $0.48 | 8/28/2013 | 190% |

| 500ct | Lupin | 68180048502 | $0.15 | $0.48 | 8/28/2013 | 222% |
|---|---|---|---|---|---|---|

640. Although WAC data is not available for Actavis, Dr. Reddy's, Glenmark, or Mylan, upon information and belief, they implemented virtually identical price increases at virtually the same time in their generic Pravastatin products.

641. Prices continued to increase after August of 2013. In the October 2014 letters Senator Sanders and Representative Cummings sent to generic manufacturers as part of their investigation, they outlined the price increase Pravastatin saw between October 2013 and April 2014. The sent letters to Defendants Mylan, Dr. Reddy's, Apotex, Teva, and Zydus, and depicted the following price increases during that six-month period:

| Drug | Package Size | Avg. Market Price Oct. 2013 | Avg. Market Price April 2014 | Percentage increase: |
|---|---|---|---|---|
| Pravastatin Sodium | 20mg, 1,000ct | $77 | $368 | 377% |
| Pravastatin Sodium | 40mg, 1,000ct | $114 | $540 | 373% |
| Pravastatin Sodium | 10mg, 500ct | $27 | $196 | 625% |
| Pravastatin Sodium | 80mg, 500ct | $59 | $299 | 365% |
| Pravastatin Sodium | 10mg, 90ct | $6 | $34 | 406% |
| Pravastatin Sodium | 20mg, 90ct | $7 | $35 | 400% |
| Pravastatin Sodium | 40mg, 90ct | $9 | $51 | 466% |
| Pravastatin Sodium | 80mg, 90ct | $14 | $52 | 271% |

642. These price increases cannot be explained by supply shortages or costs. According to a November 2014 report by the New York Times, a three-month supply of generic pravastatin cost $230 in the United States, but $31.50 for the branded version, Pravachol, in Canada.[107]

[107] http://www.nytimes.com/2014/11/25/us/lawmakers-look-for-wa.vs-to-provide-relief-for-rising-cost-of-generic-drugs.html?_r=0.

643. Pravastatin Defendants had numerous opportunities to coordinate their price increases and market share agreements. Key pricing representatives from all Pravastatin Defendants attended the October 1-3, 2012 GPhA Fall Technical Conference in Bethesda, Maryland, February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida, and the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland.

644. This agreement between the Pravastatin Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**R. Propranolol**

645. The Propranolol market is mature, as the drug has been available in the United States since at least 1968. Generic propranolol has been available since 2007.

646. At all relevant times, there have been at least three manufacturers of Propranolol in both capsule and tablet forms in the market. Propranolol Capsule Defendants Actavis, Breckenridge, and Upsher-Smith dominate the market for Propranolol capsules and Propranolol Tablet Defendants Actavis, Endo, Heritage, Mylan, Par, Teva, and UDL dominate the market for Propranolol tablets. This dominance was achieved by consolidation among the manufacturers: Teva Pharmaceutical Industries, Ltd., the parent of Teva, acquired Actavis in March 2015. Endo acquired Par in September 2015.

647. Beginning in November 2013 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Propranolol Period"), the Propranolol Defendants increased their prices abruptly and largely in unison.

648. The Propranolol price-fixing conspiracy was executed by two overlapping groups of Defendants in two phases. First, on or around December 2013, Propranolol Capsule Defendants colluded to increase the prices of multiple dosage levels of Propranolol capsules. Next, on or around

February 2015, Propranolol Tablet Defendants colluded to increase the prices of multiple dosage levels of Propranolol tablets.

649. Propranolol Capsule Defendants increased prices on Propranolol capsules between December 2013 and October 2014.

650. According to NADAC data, various dosage levels of Propranolol capsules saw the following average price increases:

Propranolol ER 120mg capsules: increased by 181% between December 2013 and July 2014; and

Propranolol ER 180mg capsules: increased by 174% between December 2013 and October 2014.

651. These price increases followed the October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland, which representatives from Actavis, Breckenridge, and Upsher-Smith attended.

652. Propranolol Tablet Defendants all increased prices on Propranolol tablets between February 2015 and February 2016.

653. According to NADAC data, various dosage levels of Propranolol tablets saw the following price increases:

Propranolol 10mg tablets: Between February 18, 2015 and September 23, 2015, the average price increased by 819%;

Propranolol 20mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 892%;

654. Propranolol 40mg tablets: Between February 18, 2015 and February 17, 2016, the average price increased by 1008%; and

655. Propranolol 80mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 958%.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

656. These price increases followed the February 9-11, 2015 GPhA Annual Meeting in Miami Beach, Florida, which Propranolol Tablet Defendants attended; the February 16-18, 2015 HCSCA National Pharmacy Forum at the Marriott Waterside Hotel and Marina in Tampa, Florida, which Propranolol Tablet Defendants Actavis, Mylan, and Teva attended; and the February 22-25, 2015, ECRM Retail Pharmacy Efficient Program Planning Session at the Hilton Beach Golf Resort and Spa in Destin, Florida, which Propranolol Tablet Defendants Actavis, Heritage, Par, and Teva all attended.

657. Where a group of manufacturers dominate the market, as they do here, and contemporaneously, or in quick succession, increase prices, the new higher price influences the rest of the market.

658. NADAC data shows that the average price per unit of Propranolol capsules rose dramatically and remained artificially high after December 2013, as depicted below.




659. NADAC data also shows that the average price per unit of Propranolol tablets rose dramatically and remained artificially high after February 2015, as depicted below.




660. Medicaid reimbursement data also confirms that Propranolol Defendants all increased their prices abruptly and largely in unison. The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Defendants' Propranolol capsules.




661. The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Defendants' Propranolol tablets.







662. On April 6, 2017, the United States District Court for the Southern District of New York denied a motion to dismiss an action by direct Propranolol purchasers alleging a similar Propranolol price-fixing conspiracy by the same Propranolol Defendants.[108]

663. Judge Jed S. Rakoff upheld the direct purchaser plaintiffs' federal antitrust claims against Propranolol Defendants, finding that plaintiffs had plausibly alleged "that the defendants

[108] *In re Propranolol Antitrust Litig.*, 249 F.Supp.3d 712 (S.D.N.Y. 2017) (Rakoff, J.).

illegally conspired to fix the prices of Propranolol capsules and tablets in 2013 and 2015."[109] In support of these allegations, the court credited plaintiffs' four antitrust "plus factors:" (1) "defendants had a motive to increase prices because they operate in an oligopolistic market characterized by falling prices; (2) the price increases were against defendants' self-interest because, in a competitive market, defendants should have tried to undercut each other's prices to increase their market share; (3) defendants frequently communicated at trade association meetings; and (4) there are ongoing state and federal investigations for price manipulation of generic drugs, including Propranolol."[110]

664. This agreement between the Propranolol Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**S. Theophylline**

665. The market for Theophylline is mature, as Theophylline has been available in the United states since 1900.

666. At all relevant times, there has been more than one competitor in the Theophylline market. At all relevant times, Theophylline Defendants Heritage and Teva dominated the market for Theophylline. Prior to Heritage's entry into the market for 300mg and 450mg Theophylline tablets in late 2011, Teva held nearly 100% of market share.

667. When Heritage entered the market, rather than price its product below Teva's to gain market share, it listed its products identical to or even slightly above Teva's prices. As a result,

---

[109] *Id.* at 724.
[110] *Id.* at 718-19. The court also upheld the direct purchaser plaintiffs' claims brought under the antitrust laws of fifteen states, and dismissed claims brought under the antitrust laws of twelve other states and the District of Columbia for reasons specific to those plaintiffs, e.g. those plaintiffs' injuries and the timing of their discovery of their injuries. *Propranolol*, 249 F.Supp.3d at 724-29.

Theophylline prices remained relatively stable despite the entry of a new competitor and upon information and belief, Heritage gained market share through collusive agreements in accordance with their market-wide "fair share" agreement.

668. Prior to February 2014, the effective prices for Theophylline were stable.

669. Beginning in February 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct describes herein ceases (the "Theophylline Period"), Theophylline Defendants increased their prices dramatically and in unison.

670. In early 2014, Teva began to consider raising the price of Theophylline ER. On February 4, 2014, Patel (Teva) called Malek upon her return from maternity leave and the two spoke for over an hour the next day. On February 7th, Patel (Teva) created a spreadsheet titled "PI Candidates," targeting Theophylline for a price increase.

671. Patel (Teva) and Malek spoke numerous times in February and March 2014. They came to an agreement that Teva would lead the Theophylline price increase and Heritage would follow, matching Teva's pricing.

672. Effective April 4, 2014, Teva began implementing across-the-board price increases for Theophylline. By late April 2014, Teva fully implemented a price increase for Theophylline by approximately 150% and Heritage planned to follow.

673. On April 24, 2014, shortly after implementing the price increases, Teva received the following email with the subject line "PLIVA.com [Info] Price Gouging":[111]

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover). Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A. Today, I acquired my usual Rx of Theophylline

[111] Teva marketed and/or sold its generic Theophylline, at least in part through Pliva, Inc. ("PLIVA"), a wholly-owned subsidiary of Teva USA. Teva USA acquired PLIVA's assets as part of its acquisition of Barr Pharmaceuticals, LLC.

> ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%. Costco Pharmacy confirmed that this increase is correct and was instituted sometime earlier this year (2014.). Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data. Please respond to me at the above email address. If you prefer you can respond to Senator Schumer a New York State representative.

674. A member of Teva's Government Affairs Department received the internally forwarded e-mail and responded: "Can I get some details on the specifics of this product and the price increase. I'm hoping someone increased the price and we had to follow it up. Or, API or something I can give the senate." Patel (Teva) ultimately received the correspondence and replied, "I don't have a great story. I'll take a closer look." But Patel (Teva) did know and had a great story: Teva colluded with Heritage to violate the law and set prices on generic drugs.

675. At the April 22, 2014 Heritage "Price Increase Discussion," Malek instructed his team that Heritage would follow Teva's pricing on Theophylline. On May 9, Heritage again slated Theophylline for a price increase. On June 23, during a Heritage "Price Change Call," Heritage targeted Theophylline for a 150% price increase.

676. On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented. On the same day, Malek and his co-conspirator Patel (Teva) spoke for 14 minutes. Malek reported that Heritage would be sending out its price increases in the coming weeks.

677. Heritage began sending price increase notices to customers the next day. On June 26, 2014, Sather (Heritage) texted a large wholesaler customer that "As of 7/1, [m]arket wide we are increasing prices on: …Theophylline ER…" She followed with another text message, "Here are the approximate/average $ increases on the other items: …Theo ER . . . 150%."

678. On June 30, 2014, Patel (Teva) emailed her team that "[i]t appears that Heritage took an increase to follow Teva. The new pricing looks like it will be effective tomorrow and matches Teva's WACs." She continued that this "will likely trigger some bid requests/activity," but Teva "should not be considering decreases."

679. By July 9, 2014, Heritage successfully increased prices to at least 20 customers nationwide, following in lock step with Teva.

680. The GAO Report noted that theophylline had an extraordinary price increase.

681. According to NADAC data, the average market price for generic Theophylline saw the following price increases between April 2014 and January 2015:

> Theophylline ER 100mg: increases from $0.12 per unit to $0.37 per unit, a 250% increase
>
> Theophylline ER 200mg: increases from $0.16 per unit to $0.40 per unit, a 150% increase
>
> Theophylline ER 300mg: increases from $0.20 per unit to $0.35 per unit, a 75% increase.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

682. NADAC data shows that the average market prices for Theophylline were stable prior to April 2014, then rose dramatically and remained artificially high thereafter.



683. The 300mg dosage of Theophylline saw an even larger price increase in 2016, increasing from an average of $0.36 per unit in April 2016 to $2.46 in July 2016, a 580% increase.




684. Teva and Heritage both imposed list price (WAC) increases of approximately 80% on 300mg tablets and approximately 450mg tablets. Teva and Heritage simultaneously increased the effective prices (IMS NSP) of both dosages, more than doubling the prices of the 300mg dosage.

685. This agreement between the Theophylline Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**T. Ursodiol**

686. The Ursodiol market is mature, as the drug has been available in the United States since 1987. Generic versions have been available since at least 2000.

687. At all relevant times, there has been more than one manufacturer of Ursodiol in the market.

688. At all relevant times, Ursodiol Defendants Actavis, Epic, and Lannett dominated the market for Ursodiol.

689. Prior to May 2014, prices for Ursodiol were stable.

690. Beginning in May 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Ursodiol Period"), Ursodiol Defendants increased their prices abruptly and largely in unison.

691. According to NADAC data, the average market price for generic Digoxin saw the following price increases from May 2014 to November 2014:

> Ursodiol 300mg Capsules: increased from $0.29 per unit to $4.49 per unit, a 1,448% increase.

692. NADAC data shows that average market price for Ursodiol rose dramatically and remained artificially high after May 2014, as depicted below.




693. Specific WAC pricing depicted below confirms that Defendants Actavis, Epic, and Lannett all increased their Ursodiol prices substantially and largely in unison.

| Dosage | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300mg | Lannett | 00527132601 | | $5.11 | 5/1/2014 | |
| 300mg | Epic | 42806050301 | $0.45 | $5.10 | 5/6/2014 | 1,034% |
| 300mg | Actavis | 00591315901 | $0.77 | $5.11 | 6/24/2014 | 562% |

694. News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. In November 2014, patient Barbara Heller reported that her three-month prescription for Ursodiol increased from $94.50 to $1,212.30 between refills.[112]

695. This agreement between the Ursodiol Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

**U. Verapamil**

696. The Verapamil market is mature, as the drug has been available in the United States since 1981. Generic versions have been available since 1986.

697. At all relevant times, there has been more than one manufacturer of Verapamil in the market.

698. Verapamil Defendants Actavis, Heritage, and Mylan dominate the market for Verapamil.

699. From 2009 forward, Actavis and Mylan have dominated the market for Verapamil. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain tablet share in 2013.

[112] Jonathan Lapook, Why some generic drug prices are skyrocketing, CBS News (Nov. 12, 2014), *available at* http://www.cbsnews.com/news/generic-drug-prices-skyrocketing/.

700. Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013. When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

701. In conformity with the market-wide "fair share" agreement between Defendants, when Heritage entered the market for Verapamil, it set prices at or above competitors Actavis and Mylan. In October 2012, Mylan then increased its tablet prices by approximately 50%, allowing Heritage to gain more than 25% market share. Shortly thereafter, market share between Actavis, Heritage, and Mylan quickly stabilized thereafter.

702. On Heritage's April 2014 "Price Increase Discussion," Verapamil was targeted for a price increase. O'Mara (Heritage) was primarily responsible for communicating with Mylan about Verapamil, among other drugs, and reached out to Aigner (Mylan). On an April 23rd, 2014 phone call, O'Mara (Heritage) and Aigner (Mylan) reached an agreement to raise prices for Verapamil (and two other drugs). O'Mara (Heritage) immediately sent an e-mail to Malek, titled "Mylan," saying "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

703. Sather (Heritage) was responsible for communicating with Actavis about Verapamil (and another drug). Within hours of the April 22nd call, she called Michael Dorsey, Director of National Accounts at Actavis and they spoke for nine minutes, reaching an agreement to raise the price of Verapamil (and Glyburide-Metformin).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

704. Dorsey (Actavis) immediately thereafter called Christina Koleto and Michael Reed, two Senior Pricing Managers at Actavis, to update them on the pricing strategy. In an April 28, 2014 internal e-mail, an Actavis pricing manager said "[Dorsey (Actavis)] made mention of keeping an eye out for an increase on … Verapamil IR." Marc Falkin, Actavis' Vice President of Marketing, Pricing, and Contracts, received the e-mail.

705. On May 6th, 2014, Falkin (Actavis) called Nesta (Mylan). The two spoke regularly over the next several months, including a three-minute call on May 7th and a seven-minute call on May 19th. They continued to speak regularly for the next several months.

706. In response to Malek's May 8th e-mail to the Heritage sales team trying to finalize price increase agreements, Sather (Heritage) responded, "Jason: I made contact with all my take aways -- with positive results. I can resend those notes or talk with you on any details." This would have included her conversation with Actavis on Verapamil.

707. When Heritage held another call about the "Price Increases" on May 9, 2014, Verapamil remained on the list of drugs targeted for increase.

708. Heritage did not initially increase prices market-wide for Verapamil, but it did raise prices to at least one customer as part of its price increase initiative in July 2014.

709. Heritage announced its price increase in June 2014, and Actavis and Mylan (along with Epic) soon followed with similar price increases.

710. On August 20, 2014, Sather (Heritage) exchanged text messages with Knoblauch (Sun) describing the agreements Heritage reached with Actavis to increase the prices of Verapamil (and Glyburide-Metformin):

> Knoblauch (Sun): "Have you heard anything about an Actavis price increase?"
>
> Sather (Heritage): "I heard they were on board with it. What item specifically?"

> Knoblauch (Sun): "I don't know. I am just hearing about an increase but no details. What product have you heard about"
>
> Sather (Heritage): "We were communicating on Glyburide/Metformin and Verapamil"
>
> Knoblauch (Sun): "We haven't touched verapamil yet"

711. Beginning in July 2014 and continuing until the anticompetitive effects of Defendants' unlawful conduct described herein ceases (the "Verapamil Period'), the Verapamil Defendants increased their prices abruptly and largely in unison.

712. Throughout this period, upon information and belief, Actavis, Mylan, and Teva coordinated price increases on Verapamil. These price increases occurred staggered and gradually, but caused and steady and unexplained increase, suggesting coordination.

713. NADAC data shows that average market prices for Verapamil rose dramatically, with price increases continuing throughout 2016, as depicted below.






714. This agreement between Actavis, Heritage, and Mylan was part of an overarching conspiracy between Defendants to unreasonably restrain trade in the generic pharmaceutical market.

## XIII. DEFENDANTS KNEW THEIR ACTIONS WERE ILLEGAL

715. At all times relevant, Defendants were aware that their conduct was illegal. They consistently took overt steps to conceal their illegal conduct and destroy any evidence of their agreements.

716. During all relevant times, Defendant Heritage did not have any document retention policy. Heritage executives leveraged this to routinely destroy emails that memorialized their conspiracy. Heritage's CEO Glazer even instructed Malek to "Clean your sent file out as well."

717. Glazer continued to remind Malek not to put any evidence of his illegal conduct into writing. On June 26, 2014, Glazer texted Malek: "No emails about products, price and competitors."

718. Glazer also emailed the entire sales team at Heritage: "We don't talk about pricing dynamics and competition on emails. If you have questions – you can call JM or me directly and then punch yourself in the face."

719. Other Defendants also tried to conceal their activity, aware that their conspiracy was illegal. Peluso-Schmid (Mayne) deleted several of the most incriminating text messages between her and Sather (Heritage) from her phone before the data was imaged and produced to Connecticut.

720. Concealment efforts went into overdrive in 2015, after it became public that Defendants were under state and federal investigation. On June 2, 2015, Malek texted one of his sales representatives "Just got your email on meprobamate. Let's avoid emailing about other manufacturers and having discussions with them. Can be misconstrued based on what we are hearing elsewhere…"

## XIV. HUMANA'S PURCHASES AND ANTITRUST INJURY

721. **Acetazolamide**. During the Acetazolamide Period, HPI purchased over $1.4 million worth of Acetazolamide directly from Heritage and Taro, as well as over $23.1 million worth indirectly from Acetazolamide Defendants.

722. **Amitriptyline**. During the Amitriptyline Period, HPI purchased over $5.9 million worth of Amitriptyline directly from Qualitest (now Par), Par, and non-party Accord, as well as over $48 million worth indirectly from the Amitriptyline Defendants.

723. **Baclofen**. During the Baclofen Period, HPI purchased over $3.4 million worth of Baclofen directly from Upsher-Smith, Qualitest (now Par), and Teva, as well as over $68 million worth indirectly from the Baclofen Defendants.

724. **Benazepril**. During the Benazepril Period, HPI purchased over $2 million worth of Benazepril directly from Teva, Impax, and Aurobindo, as well as over $46 million worth indirectly.

725. **Clobetasol**. During the Clobetasol Period, HPI purchased over $2.9 million worth of Clobetasol directly from Taro, Akorn, Glenmark, Sandoz, Actavis, and Hi-Tech, as well as over $168 million worth indirectly from Clobetasol Defendants.

726. **Clomipramine**. During the Clomipramine Period, HPI purchased over $200,000 worth of Clomipramine directly from Mylan and over $55 million worth indirectly from Clomipramine Defendants.

727. **Desonide**. During the Desonide Period, HPI purchased over $400,000 worth of Desonide directly from Actavis and Perrigo, as well as over $26.3 million worth indirectly from Desonide Defendants.

728. **Digoxin**. During the Digoxin Period, HPI purchased over $8.2 million worth of Digoxin directly from Impax and over $122 million worth indirectly from Digoxin Defendants.

729. **Divalproex**. During the Divalproex Period, HPI purchased over $3.7 million worth of all forms of Divalproex directly from Dr. Reddy's, Par, Sun, Zydus, and non-party Unichem Pharmaceuticals (USA), Inc., as well as over $231 million worth indirectly from Divalproex Defendants.

730. **Doxycycline**. During the Doxycycline Period, HPI purchased over $1.1 million worth of Doxycycline directly from Sun and over $142 million worth indirectly from Doxycycline Defendants.

731. **Econazole**. During the Econazole Period, HPI purchased over $400,000 worth of Econazole directly from Taro, as well as over $34.8 million indirectly from Econazole Defendants.

732. **Fluocinonide**. During the Fluocinonide Period, HPI purchased over $300,000 worth of Fluocinonide directly from Teva and Mayne, as well as over $31.8 million indirectly from Fluocinonide Defendants.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

733. **Leflunomide**. During the Leflunomide Period, HPI purchased over $860,000 worth of Leflunomide directly from Apotex and non-parties Alembic and Trigen, as well as over $43 million indirectly from Leflunomide Defendants.

734. **Levothyroxine**. Pursuant to a Pharmaceutical Purchasing Agreement effective January 1, 2010 between HPI and Mylan Pharmaceuticals, Inc. ("2010 Mylan Contract"), HPI has purchased over $127 million worth of Levothyroxine directly from Mylan during the Levothyroxine Period. HPI has also purchased over $615 million worth of Levothyroxine indirectly from the Levothyroxine Defendants.

735. Mylan's contractual price for Humana was only slightly higher in May 2013 than its contractual price for the previous two years. By the fourth quarter of 2013, Mylan's Levothyroxine prices began to skyrocket. By October 2013, Mylan increased its purchase package price for Humana by as much as 225.25%. Those prices continued to climb, increasing by as much as 452% above pre-conspiracy levels.

736. Mylan's effective Levothyroxine prices remain supracompetitive. In March 2016, for example, its prices were as much as 145% higher than in August 2013. The chart below indicates the direct purchase package price effective at various points in time between April 2011 and March 2017.

| Contractual Prices Humana Paid Mylan for Levothyroxine | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Product | Apr. 1, 2011 | May 1, 2012 | Aug. 17, 2012 | May 1, 2013 | Oct. 1, 2013 | May 27, 2014 | May 1, 2015 | Mar. 1, 2016 | Mar. 1, 2017 |
| Levo Sod 100MCG | | | | | | | | | |
| Levo Sod 112MCG | | | | | | | | | |
| Levo Sod | | | | | | | | | |


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER



| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 125 MCG | | | | | | | | | |
| Levo Sod 137 MCG | | | | | | | | | |
| Levo Sod 150 MCG | | | | | | | | | |
| Levo Sod 175 MCG | | | | | | | | | |
| Levo Sod 200 MCG | | | | | | | | | |
| Levo Sod 25 MCG | | | | | | | | | |
| Levo Sod 50 MCG | | | | | | | | | |
| Levo Sod 75 MCG | | | | | | | | | |
| Levo Sod 88 MCG | | | | | | | | | |

737. **Lidocaine**. During the Lidocaine Period, HPI purchased over $200,000 worth of Lidocaine directly from Defendant Akorn and Impax, as well as over $184 million worth indirectly from Lidocaine Defendants.

738. **Nystatin**. During the Nystatin Period, HPI purchased over $500,000 worth of Nystatin directly from Glenmark and Taro and over $87 million worth indirectly from Nystatin Defendants.

739. **Pravastatin**. During the Pravastatin Period, HPI purchased over $24 million worth of Pravastatin directly from Apotex and Teva and over $270 million worth indirectly from Pravastatin Defendants.

740. **Propranolol**. During the Propranolol Period, HPI purchased over $3 million worth of Propranolol directly from Actavis and Breckenridge and over $75 million worth indirectly Propranolol Defendants.

741. **Theophylline**. During the Theophylline Period, HPI purchased over $1 million worth of Theophylline directly from Teva, Heritage, and Glenmark, as well as over $21 million indirectly from Theophylline Defendants.

742. **Ursodiol**. During the Ursodiol Period, HPI purchased over $3.9 million worth of Ursodiol directly from Lannett, Actavis, and Impax, as well as over $49 million worth indirectly from Ursodiol Defendants.

743. **Verapamil**. During the Verapamil Period, HPI purchased over $9 million worth of Verapamil directly from Teva, Mylan, Apotex, Glenmark, and Kremers-Urban Pharmaceuticals Inc., a subsidiary of Lannett, as well as over $68 million worth indirectly from Verapamil Defendants.

744. Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for each of the Subject Drugs listed above. Those prices have been substantially higher than the prices that Humana would have paid for the Subject Drugs but for Defendants' collusion.

745. Consequently, Humana has sustained substantial losses and damages to its business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

746. Defendants' unlawful conduct has successfully eliminated competition in the market, and Humana has sustained, and continues to sustain, significant losses in the form of artificially

inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

747. Defendants, through their unlawful acts, reduced competition in the United States market for the Subject Drugs, increased prices, and caused antitrust injury to Humana.

748. Prices for the Subject Drugs have been and will continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct. The inflated prices that Humana has paid, and will continue to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct.

## XV. INTERSTATE TRADE AND COMMERCE

749. Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States. At all material times, the Subject Drugs were manufactured and sold by Defendants, directly or through one of more of their affiliates, throughout the United States in a continuous and uninterrupted flow through interstate commerce, including through and into this District.

750. Between at least 2012 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

751. Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

752. Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

753. The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Humana and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

754. Defendants' agreement to increase, fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XVI. TOLLING AND FRAUDULENT CONCEALMENT

755. The claims asserted in this Second Amended Complaint have been tolled as a matter of law by: (1) the pendency of various class actions, as to which Humana is a putative class member, alleging price-fixing of various of the Subject Drugs by Defendants, or some subset of them, and (2) the federal criminal antitrust proceedings alleged above, pursuant to 15 U.S.C. § 16(i).

756. In addition, Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Second Amended Complaint.

757. Among other things, as alleged in the AG Complaint, Heritage executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012. These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 454-462 of the AG Complaint, which are incorporated by reference. This conduct extended to Heritage's co-conspirators, including Mayne.

758. Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate trade association and industry activities as set forth above, and took


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recoded in writing. In some cases, as alleged above, price increases were staggered to conceal the existence of the price-fixing agreements. Also, as alleged above, Defendants engaged in bid coordination and straw bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

759. Humana acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment. As a result, Humana did not know or reasonably suspect the existence of the claims alleged in this Second Amended Complaint more than four years before the filing of this Second Amended Complaint, nor was Humana aware of any facts more than four years before filing this Complaint that would have put it on reasonable notice of its claims.

## XVII. DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

760. Discovery is necessary to determine the full scope of Defendants' conspiracy, including the years, products, and participants. Plaintiffs reserve all rights to amend or supplement this Complaint to add additional Defendants, claims, years, products, or other allegations based upon discovery and further investigation.

## XVIII. CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ACETAZOLAMIDE)

**(As to Heritage, Lannett, Taro, Teva, and Zydus)**

761. Humana incorporates by reference the preceding allegations.

762. Acetazolamide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Acetazolamide in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

763. Each of the Acetazolamide Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Acetazolamide Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Acetazolamide prices throughout the United States.

764. The conspiracy realized its intended effect; Acetazolamide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Acetazolamide.

765. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Acetazolamide;

b. Humana was deprived of the benefits of free and open competition in the sale of Acetazolamide in the United States market; and

c. Competition in establishing the prices paid for Acetazolamide was unlawfully restrained, suppressed, or eliminated.

766. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Acetazolamide until the market achieves a steady state.

767. As a direct and proximate result of Acetazolamide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Acetazolamide than it would have paid in the absence of Acetazolamide Defendants' unlawful conduct. The full

amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

768. Acetazolamide Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

769. There is no legitimate, non-pretextual, pro-competitive business justification for Acetazolamide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

770. Acetazolamide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

771. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Acetazolamide, or by assignment from its other subsidiaries that directly purchased generic Acetazolamide during the Acetazolamide Period.

**COUNT II**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (ACETAZOLAMIDE)**

**(As to Heritage, Lannett, Taro, Teva, and Zydus)**

772. Humana incorporates by reference the preceding allegations.

773. Acetazolamide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Acetazolamide in the United States. This conspiracy was *per se* unlawful price-fixing.

774. Each of the Acetazolamide Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Acetazolamide Defendants'

anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Acetazolamide prices throughout the United States.

775. The conspiracy realized its intended effect; Acetazolamide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Acetazolamide.

776. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Acetazolamide;

b. Humana was deprived of the benefits of free and open competition in the sale of Acetazolamide in the United States market; and

c. Competition in establishing the prices paid for Acetazolamide was unlawfully restrained, suppressed, or eliminated.

777. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Acetazolamide until the market achieves a steady state.

778. As a direct and proximate result of Acetazolamide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Acetazolamide than it would have paid in the absence of Acetazolamide Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

779. There is no legitimate, non-pretextual, pro-competitive business justification for Acetazolamide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

780. Acetazolamide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

781. Acetazolamide Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT III

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (ACETAZOLAMIDE)

**(As to Heritage, Lannett, Taro, Teva, and Zydus)**

782. Humana incorporates by reference the preceding allegations.

783. Acetazolamide Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Acetazolamide Defendants' anticompetitive, deceptive,



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Acetazolamide at prices restrained by competition and forced to pay artificially inflated prices.

784. There was and is a gross disparity between the price that Humana paid and continues to pay for Acetazolamide, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Acetazolamide should have been available, and would have been available, absent Acetazolamide Defendants' illegal conduct.

785. By engaging in the foregoing conduct, Acetazolamide Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT IV**

**<u>UNJUST ENRICHMENT UNDER STATE LAW (ACETAZOLAMIDE)</u>**

**(As to Heritage, Lannett, Taro, Teva, and Zydus)**

786. Humana incorporates by reference the preceding allegations.

787. Acetazolamide Defendants have benefitted from artificial prices in the sale of Acetazolamide resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

788. Acetazolamide Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Acetazolamide by Humana.

789. Humana has conferred upon Acetazolamide Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

790. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Acetazolamide.

791. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Acetazolamide, as it is not liable and would not compensate Humana for the impact of Acetazolamide Defendants' unlawful conduct.

792. The economic benefit of overcharges derived by Acetazolamide Defendants through charging supracompetitive and artificially inflated prices for Acetazolamide is a direct and proximate result of Acetazolamide Defendants' unlawful conduct.

793. The economic benefits derived by Acetazolamide Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Acetazolamide Period, benefiting Acetazolamide Defendants.

794. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Acetazolamide Defendants to be permitted to retain any of the overcharges for Acetazolamide derived from Acetazolamide Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

795. Acetazolamide Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

796. Acetazolamide Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

797. A constructive trust should be imposed upon all unlawful or inequitable sums received by Acetazolamide Defendants traceable to Humana.

**COUNT V**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ACETAZOLAMIDE)**

**(As to Heritage, Lannett, Taro, Teva, and Zydus)**

798. Humana incorporates by reference the preceding allegations.

799. Acetazolamide Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Acetazolamide. Acetazolamide Defendants injured Humana through this conduct.

800. But for Acetazolamide Defendants' scheme to inflate the price of Acetazolamide, Humana would have purchased lower-priced generic Acetazolamide.

801. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Acetazolamide than it would have paid absent Acetazolamide Defendants' continuing anticompetitive conduct.

802. Humana has purchased substantial amounts of Acetazolamide during the Acetazolamide Period.

803. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Acetazolamide Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

804. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Acetazolamide Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT VI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (AMITRIPTYLINE)**

**(As to Mylan, Par, and Sandoz)**

805. Humana incorporates by reference the preceding allegations.

806. Amitriptyline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Amitriptyline in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

807. Each of the Amitriptyline Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Amitriptyline Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Amitriptyline prices throughout the United States.

808. The conspiracy realized its intended effect; Amitriptyline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Amitriptyline.

809. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Amitriptyline;

b. Humana was deprived of the benefits of free and open competition in the sale of Amitriptyline in the United States market; and

c. Competition in establishing the prices paid for Amitriptyline was unlawfully restrained, suppressed, or eliminated.

810. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Amitriptyline until the market achieves a steady state.

811. As a direct and proximate result of Amitriptyline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Amitriptyline than it would have paid in the absence of Amitriptyline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

812. Amitriptyline Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

813. There is no legitimate, non-pretextual, pro-competitive business justification for Amitriptyline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

814. Amitriptyline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

815. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Amitriptyline, or by assignment from its other subsidiaries that directly purchased generic Amitriptyline during the Amitriptyline Period.

**COUNT VII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (AMITRIPTYLINE)**

**(As to Mylan, Par, and Sandoz)**

816. Humana incorporates by reference the preceding allegations.

817. Amitriptyline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Amitriptyline in the United States. This conspiracy was *per se* unlawful price-fixing.

818. Each of the Amitriptyline Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Amitriptyline Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Amitriptyline prices throughout the United States.

819. The conspiracy realized its intended effect; Amitriptyline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Amitriptyline.

820. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Amitriptyline;

b. Humana was deprived of the benefits of free and open competition in the sale of Amitriptyline in the United States market; and

c. Competition in establishing the prices paid for Amitriptyline was unlawfully restrained, suppressed, or eliminated.

821. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Amitriptyline until the market achieves a steady state.

822. As a direct and proximate result of Amitriptyline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Amitriptyline than it would have paid in the absence of Amitriptyline Defendants' unlawful conduct. The full amount

of such damages is presently unknown and will be determined after discovery and upon proof at trial.

823. There is no legitimate, non-pretextual, pro-competitive business justification for Amitriptyline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

824. Amitriptyline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

825. Amitriptyline Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

## COUNT VIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (AMITRIPTYLINE)

**(As to Mylan, Par, and Sandoz)**

826. Humana incorporates by reference the preceding allegations.

827. Amitriptyline Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Amitriptyline Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Amitriptyline at prices restrained by competition and forced to pay artificially inflated prices.

828. There was and is a gross disparity between the price that Humana paid and continues to pay for Amitriptyline, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Amitriptyline should have been available, and would have been available, absent Amitriptyline Defendants' illegal conduct.

829. By engaging in the foregoing conduct, Amitriptyline Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT IX**

**UNJUST ENRICHMENT UNDER STATE LAW (AMITRIPTYLINE)**

**(As to Mylan, Par, and Sandoz)**

830. Humana incorporates by reference the preceding allegations.

831. Amitriptyline Defendants have benefitted from artificial prices in the sale of Amitriptyline resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

832. Amitriptyline Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Amitriptyline by Humana.

833. Humana has conferred upon Amitriptyline Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

834. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Amitriptyline.

835. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Amitriptyline, as it is not liable and would not compensate Humana for the impact of Amitriptyline Defendants' unlawful conduct.

836. The economic benefit of overcharges derived by Amitriptyline Defendants through charging supracompetitive and artificially inflated prices for Amitriptyline is a direct and proximate result of Amitriptyline Defendants' unlawful conduct.

837. The economic benefits derived by Amitriptyline Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Amitriptyline Period, benefiting Amitriptyline Defendants.

838. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and

Indiana, for Amitriptyline Defendants to be permitted to retain any of the overcharges for Amitriptyline derived from Amitriptyline Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

839. Amitriptyline Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

840. Amitriptyline Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

841. A constructive trust should be imposed upon all unlawful or inequitable sums received by Amitriptyline Defendants traceable to Humana.

**COUNT X**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (AMITRIPTYLINE)**

**(As to Mylan, Par, and Sandoz)**

842. Humana incorporates by reference the preceding allegations.

843. Amitriptyline Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Amitriptyline. Amitriptyline Defendants injured Humana through this conduct.

844. But for Amitriptyline Defendants' scheme to inflate the price of Amitriptyline, Humana would have purchased lower-priced generic Amitriptyline.

845. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Amitriptyline than it would have paid absent Amitriptyline Defendants' continuing anticompetitive conduct.

846. Humana has purchased substantial amounts of Amitriptyline during the Amitriptyline Period.

847. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Amitriptyline Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

848. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Amitriptyline Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (BACLOFEN)**

**(As to Lannett, Par, Teva, and Upsher-Smith)**

849. Humana incorporates by reference the preceding allegations.

850. Baclofen Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Baclofen in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was per se unlawful price-fixing.

851. Each of the Baclofen Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Baclofen Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Baclofen prices throughout the United States.

852. The conspiracy realized its intended effect; Baclofen Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Baclofen.

853. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Baclofen;

b. Humana was deprived of the benefits of free and open competition in the sale of Baclofen in the United States market; and

c. Competition in establishing the prices paid for Baclofen was unlawfully restrained, suppressed, or eliminated.

854. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Baclofen until the market achieves a steady state.

855. As a direct and proximate result of Baclofen Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Baclofen than it would have paid in the absence of Baclofen Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

856. Baclofen Defendants are per se liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

857. There is no legitimate, non-pretextual, pro-competitive business justification for Baclofen Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

858. Baclofen Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

859. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Baclofen, or by assignment from its other subsidiaries that directly purchased generic Baclofen during the Baclofen Period.

## COUNT XII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (BACLOFEN)

**(As to Lannett, Par, Teva, and Upsher-Smith)**

860. Humana incorporates by reference the preceding allegations.

861. Baclofen Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Baclofen in the United States. This conspiracy was *per se* unlawful price-fixing.

862. Each of the Baclofen Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Baclofen Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Baclofen prices throughout the United States.

863. The conspiracy realized its intended effect; Baclofen Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Baclofen.

864. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Baclofen;

b. Humana was deprived of the benefits of free and open competition in the sale of Baclofen in the United States market; and

c. Competition in establishing the prices paid for Baclofen was unlawfully restrained, suppressed, or eliminated.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

865. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Baclofen until the market achieves a steady state.

866. As a direct and proximate result of Baclofen Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Baclofen than it would have paid in the absence of Baclofen Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

867. There is no legitimate, non-pretextual, pro-competitive business justification for Baclofen Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

868. Baclofen Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

869. Baclofen Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (BACLOFEN)**

**(As to Lannett, Par, Teva, and Upsher-Smith)**

870. Humana incorporates by reference the preceding allegations.

871. Baclofen Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Baclofen Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Baclofen at prices restrained by competition and forced to pay artificially inflated prices.

872. There was and is a gross disparity between the price that Humana paid and continues to pay for Baclofen, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Baclofen should have been available, and would have been available, absent Baclofen Defendants' illegal conduct.

873. By engaging in the foregoing conduct, Baclofen Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XIV**

**UNJUST ENRICHMENT UNDER STATE LAW (BACLOFEN)**

**(As to Lannett, Par, Teva, and Upsher-Smith)**



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

874. Humana incorporates by reference the preceding allegations.

875. Baclofen Defendants have benefitted from artificial prices in the sale of Baclofen resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

876. Baclofen Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Baclofen by Humana.

877. Humana has conferred upon Baclofen Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

878. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Baclofen.

879. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Baclofen, as it is not liable and would not compensate Humana for the impact of Baclofen Defendants' unlawful conduct.

880. The economic benefit of overcharges derived by Baclofen Defendants through charging supracompetitive and artificially inflated prices for Baclofen is a direct and proximate result of Baclofen Defendants' unlawful conduct.

881. The economic benefits derived by Baclofen Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Baclofen Period, benefiting Baclofen Defendants.

882. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Baclofen Defendants to be permitted to retain any of the overcharges for Baclofen derived from Baclofen Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

883. Baclofen Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

884. Baclofen Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

885. A constructive trust should be imposed upon all unlawful or inequitable sums received by Baclofen Defendants traceable to Humana.

**COUNT XV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (BACLOFEN)**

**(As to Lannett, Par, Teva, and Upsher-Smith)**

886. Humana incorporates by reference the preceding allegations.

887. Baclofen Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Baclofen. Baclofen Defendants injured Humana through this conduct.

888. But for Baclofen Defendants' scheme to inflate the price of Baclofen, Humana would have purchased lower-priced generic Baclofen.

889. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Baclofen than it would have paid absent Baclofen Defendants' continuing anticompetitive conduct.

890. Humana has purchased substantial amounts of Baclofen during the Baclofen Period.

891. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Baclofen Defendants' conduct violates Sections 1 and 2 of the Sherman Act.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

892. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Baclofen Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (BENAZEPRIL)**

**(As to Mylan and Sandoz)**

893. Humana incorporates by reference the preceding allegations.

894. Benazepril Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Benazepril in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

895. Each of the Benazepril Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Benazepril Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Benazepril prices throughout the United States.

896. The conspiracy realized its intended effect; Benazepril Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Benazepril.

897. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Benazepril;

b. Humana was deprived of the benefits of free and open competition in the sale of Benazepril in the United States market; and

c. Competition in establishing the prices paid for Benazepril was unlawfully restrained, suppressed, or eliminated.

898. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Benazepril until the market achieves a steady state.

899. As a direct and proximate result of Benazepril Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Benazepril than it would have paid in the absence of Benazepril Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

900. Benazepril Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

901. There is no legitimate, non-pretextual, pro-competitive business justification for Benazepril Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

902. Benazepril Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

903. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Benazepril, or by assignment from its other subsidiaries that directly purchased generic Benazepril during the Benazepril Period.

## COUNT XVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (BENAZEPRIL)

**(As to Mylan and Sandoz)**

904. Humana incorporates by reference the preceding allegations.

905. Benazepril Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Benazepril in the United States. This conspiracy was *per se* unlawful price-fixing.

906. Each of the Benazepril Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Benazepril Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Benazepril prices throughout the United States.

907. The conspiracy realized its intended effect; Benazepril Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Benazepril.

908. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Benazepril;

b. Humana was deprived of the benefits of free and open competition in the sale of Benazepril in the United States market; and

c. Competition in establishing the prices paid for Benazepril was unlawfully restrained, suppressed, or eliminated.

909. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Benazepril until the market achieves a steady state.

910. As a direct and proximate result of Benazepril Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Benazepril than it would have paid in the absence of Benazepril Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

911. There is no legitimate, non-pretextual, pro-competitive business justification for Benazepril Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

912. Benazepril Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

913. Benazepril Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (BENAZEPRIL)**

**(As to Mylan and Sandoz)**

914. Humana incorporates by reference the preceding allegations.

915. Benazepril Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Benazepril Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Benazepril at prices restrained by competition and forced to pay artificially inflated prices.

916. There was and is a gross disparity between the price that Humana paid and continues to pay for Benazepril, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Benazepril should have been available, and would have been available, absent Benazepril Defendants' illegal conduct.

917. By engaging in the foregoing conduct, Benazepril Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XIX**

**UNJUST ENRICHMENT UNDER STATE LAW (BENAZEPRIL)**

**(As to Mylan and Sandoz)**

918. Humana incorporates by reference the preceding allegations.

919. Benazepril Defendants have benefitted from artificial prices in the sale of Benazepril resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

920. Benazepril Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Benazepril by Humana.

921. Humana has conferred upon Benazepril Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

922. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Benazepril.

923. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Benazepril, as it is not liable and would not compensate Humana for the impact of Benazepril Defendants' unlawful conduct.

924. The economic benefit of overcharges derived by Benazepril Defendants through charging supracompetitive and artificially inflated prices for Benazepril is a direct and proximate result of Benazepril Defendants' unlawful conduct.

925. The economic benefits derived by Benazepril Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Benazepril Period, benefiting Benazepril Defendants.

926. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Benazepril Defendants to be permitted to retain any of the overcharges for Benazepril derived from Benazepril Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

927. Benazepril Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

928. Benazepril Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

929. A constructive trust should be imposed upon all unlawful or inequitable sums received by Benazepril Defendants traceable to Humana.

**COUNT XX**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (BENAZEPRIL)**

**(As to Mylan and Sandoz)**

930. Humana incorporates by reference the preceding allegations.

931. Benazepril Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Benazepril. Benazepril Defendants injured Humana through this conduct.

932. But for Benazepril Defendants' scheme to inflate the price of Benazepril, Humana would have purchased lower-priced generic Benazepril.

933. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Benazepril than it would have paid absent Benazepril Defendants' continuing anticompetitive conduct.

934. Humana has purchased substantial amounts of Benazepril during the Benazepril Period.

935. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Benazepril Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

936. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Benazepril Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (CLOBETASOL)**

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt)**

937. Humana incorporates by reference the preceding allegations.

938. Clobetasol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Clobetasol in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

939. Each of the Clobetasol Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Clobetasol Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Clobetasol prices throughout the United States.

940. The conspiracy realized its intended effect; Clobetasol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Clobetasol.

941. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Clobetasol;

b. Humana was deprived of the benefits of free and open competition in the sale of Clobetasol in the United States market; and

**c.** Competition in establishing the prices paid for Clobetasol was unlawfully restrained, suppressed, or eliminated.

942. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Clobetasol until the market achieves a steady state.

943. As a direct and proximate result of Clobetasol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Clobetasol than it would have paid in the absence of Clobetasol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

944. Clobetasol Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

945. There is no legitimate, non-pretextual, pro-competitive business justification for Clobetasol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

946. Clobetasol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

947. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Clobetasol, or by assignment from its other subsidiaries that directly purchased generic Clobetasol during the Clobetasol Period.

## COUNT XXII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (CLOBETASOL)

### (As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt)

948. Humana incorporates by reference the preceding allegations.

949. Clobetasol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Clobetasol in the United States. This conspiracy was *per se* unlawful price-fixing.

950. Each of the Clobetasol Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Clobetasol Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Clobetasol prices throughout the United States.

951. The conspiracy realized its intended effect; Clobetasol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Clobetasol.

952. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Clobetasol;

b. Humana was deprived of the benefits of free and open competition in the sale of Clobetasol in the United States market; and

c. Competition in establishing the prices paid for Clobetasol was unlawfully restrained, suppressed, or eliminated.

953. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Clobetasol until the market achieves a steady state.

954. As a direct and proximate result of Clobetasol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Clobetasol than it would have paid in the absence of Clobetasol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

955. There is no legitimate, non-pretextual, pro-competitive business justification for Clobetasol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

956. Clobetasol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

957. Clobetasol Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (CLOBETASOL)**

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt)**

958. Humana incorporates by reference the preceding allegations.

959. Clobetasol Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Clobetasol Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Clobetasol at prices restrained by competition and forced to pay artificially inflated prices.

960. There was and is a gross disparity between the price that Humana paid and continues to pay for Clobetasol, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Clobetasol should have been available, and would have been available, absent Clobetasol Defendants' illegal conduct.

961. By engaging in the foregoing conduct, Clobetasol Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (CLOBETASOL)**

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt)**

962. Humana incorporates by reference the preceding allegations.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

963. Clobetasol Defendants have benefitted from artificial prices in the sale of Clobetasol resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

964. Clobetasol Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Levothyroxine by Humana.

965. Humana has conferred upon Clobetasol Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

966. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Clobetasol.

967. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Clobetasol, as it is not liable and would not compensate Humana for the impact of Clobetasol Defendants' unlawful conduct.

968. The economic benefit of overcharges derived by Clobetasol Defendants through charging supracompetitive and artificially inflated prices for Clobetasol is a direct and proximate result of Clobetasol Defendants' unlawful conduct.

969. The economic benefits derived by Clobetasol Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Clobetasol Period, benefiting Clobetasol Defendants.

970. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Clobetasol Defendants to be permitted to retain any of the overcharges for Clobetasol derived from Clobetasol Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

971. Clobetasol Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

972. Clobetasol Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

973. A constructive trust should be imposed upon all unlawful or inequitable sums received by Clobetasol Defendants traceable to Humana.

**COUNT XXV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (CLOBETASOL)**

**(As to Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt)**

974. Humana incorporates by reference the preceding allegations.

975. Clobetasol Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Clobetasol. Clobetasol Defendants injured Humana through this conduct.

976. But for Clobetasol Defendants' scheme to inflate the price of Clobetasol, Humana would have purchased lower-priced generic Clobetasol.

977. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Clobetasol than it would have paid absent Clobetasol Defendants' continuing anticompetitive conduct.

978. Humana has purchased substantial amounts of Clobetasol during the Clobetasol Period.

979. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Clobetasol Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

980. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Clobetasol Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (CLOMIPRAMINE)**

**(As to Mylan, Sandoz, and Taro)**

981. Humana incorporates by reference the preceding allegations.

982. Clomipramine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Clomipramine in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

983. Each of the Clomipramine Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Clomipramine Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Clomipramine prices throughout the United States.

984. The conspiracy realized its intended effect; Clomipramine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Clomipramine.

985. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Clomipramine;

b. Humana was deprived of the benefits of free and open competition in the sale of Clomipramine in the United States market; and

c. Competition in establishing the prices paid for Clomipramine was unlawfully restrained, suppressed, or eliminated.

986. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Clomipramine until the market achieves a steady state.

987. As a direct and proximate result of Clomipramine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Clomipramine than it would have paid in the absence of Clomipramine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

988. Clomipramine Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

989. There is no legitimate, non-pretextual, pro-competitive business justification for Clomipramine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

990. Clomipramine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

991. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Clomipramine, or by assignment from its other subsidiaries that directly purchased generic Clomipramine during the Clomipramine Period.

## COUNT XXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (CLOMIPRAMINE)

**(As to Mylan, Sandoz, and Taro)**

992. Humana incorporates by reference the preceding allegations.

993. Clomipramine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Clomipramine in the United States. This conspiracy was *per se* unlawful price-fixing.

994. Each of the Clomipramine Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Clomipramine Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Clomipramine prices throughout the United States.

995. The conspiracy realized its intended effect; Clomipramine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Clomipramine.

996. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Clomipramine;

b. Humana was deprived of the benefits of free and open competition in the sale of Clomipramine in the United States market; and

c. Competition in establishing the prices paid for Clomipramine was unlawfully restrained, suppressed, or eliminated.

997. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Clomipramine until the market achieves a steady state.

998. As a direct and proximate result of Clomipramine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Clomipramine than it would have paid in the absence of Clomipramine Defendants' unlawful conduct. The full

amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

999. There is no legitimate, non-pretextual, pro-competitive business justification for Clomipramine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1000. Clomipramine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1001. Clomipramine Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XXVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (CLOMIPRAMINE)**

**(As to Mylan, Sandoz, and Taro)**

1002. Humana incorporates by reference the preceding allegations.

1003. Clomipramine Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Clomipramine Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Clomipramine at prices restrained by competition and forced to pay artificially inflated prices.

1004. There was and is a gross disparity between the price that Humana paid and continues to pay for Clomipramine, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Clomipramine should have been available, and would have been available, absent Clomipramine Defendants' illegal conduct.

1005. By engaging in the foregoing conduct, Clomipramine Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

e. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

f. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

g. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

h. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

i. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

j. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

k. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

l. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

m. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

p. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

q. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

r. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

s. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

t. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

u. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

v. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

w. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

x. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

y. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

z. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

aa. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

bb. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

cc. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XXIX**

**UNJUST ENRICHMENT UNDER STATE LAW (CLOMIPRAMINE)**

**(As to Mylan, Sandoz, and Taro)**

1006. Humana incorporates by reference the preceding allegations.

1007. Clomipramine Defendants have benefitted from artificial prices in the sale of Clomipramine resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1008. Clomipramine Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Clomipramine by Humana.

1009. Humana has conferred upon Clomipramine Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1010. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Clomipramine.

1011. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Clomipramine, as it is not liable and would not compensate Humana for the impact of Clomipramine Defendants' unlawful conduct.

1012. The economic benefit of overcharges derived by Clomipramine Defendants through charging supracompetitive and artificially inflated prices for Clomipramine is a direct and proximate result of Clomipramine Defendants' unlawful conduct.

1013. The economic benefits derived by Clomipramine Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Clomipramine Period, benefiting Clomipramine Defendants.

1014. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Clomipramine Defendants to be permitted to retain any of the overcharges for Clomipramine derived from Clomipramine Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1015. Clomipramine Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1016. Clomipramine Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1017. A constructive trust should be imposed upon all unlawful or inequitable sums received by Clomipramine Defendants traceable to Humana.

## COUNT XXX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (CLOMIPRAMINE)

**(As to Mylan, Sandoz, and Taro)**

1018. Humana incorporates by reference the preceding allegations.

1019. Clomipramine Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Clomipramine. Clomipramine Defendants injured Humana through this conduct.

1020. But for Clomipramine Defendants' scheme to inflate the price of Clomipramine, Humana would have purchased lower-priced generic Clomipramine.

1021. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Clomipramine than it would have paid absent Clomipramine Defendants' continuing anticompetitive conduct.

1022. Humana has purchased substantial amounts of Clomipramine during the Clomipramine Period.

1023. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Clomipramine Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1024. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Clomipramine Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XXXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (DESONIDE)**

**(As to Actavis, Fougera, Perrigo, Sandoz, and Taro)**

1025. Humana incorporates by reference the preceding allegations.

1026. Desonide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Desonide in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1027. Each of the Desonide Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Desonide Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Desonide prices throughout the United States.

1028. The conspiracy realized its intended effect; Desonide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Desonide.

1029. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Desonide;

b. Humana was deprived of the benefits of free and open competition in the sale of Desonide in the United States market; and

c. Competition in establishing the prices paid for Desonide was unlawfully restrained, suppressed, or eliminated.

1030. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Desonide until the market achieves a steady state.

1031. As a direct and proximate result of Desonide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Desonide than it would have paid in the absence of Desonide Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1032. Desonide Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1033. There is no legitimate, non-pretextual, pro-competitive business justification for Desonide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1034. Desonide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1035. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Desonide, or by assignment from its other subsidiaries that directly purchased generic Desonide during the Clomipramine Period.

**COUNT XXXII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (DESONIDE)**

**(As to Actavis, Fougera, Perrigo, Sandoz, and Taro)**

1036. Humana incorporates by reference the preceding allegations.

1037. Desonide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Desonide in the United States. This conspiracy was *per se* unlawful price-fixing.

1038. Each of the Desonide Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Desonide Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Desonide prices throughout the United States.

1039. The conspiracy realized its intended effect; Desonide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Desonide.

1040. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Desonide;

b. Humana was deprived of the benefits of free and open competition in the sale of Desonide in the United States market; and

c. Competition in establishing the prices paid for Desonide was unlawfully restrained, suppressed, or eliminated.

1041. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Desonide until the market achieves a steady state.

1042. As a direct and proximate result of Desonide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Desonide than it would have paid in the absence of Desonide Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1043. There is no legitimate, non-pretextual, pro-competitive business justification for Desonide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1044. Desonide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1045. Desonide Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XXXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (DESONIDE)**

**(As to Actavis, Fougera, Perrigo, Sandoz, and Taro)**

1046. Humana incorporates by reference the preceding allegations.

1047. Desonide Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Desonide Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Desonide at prices restrained by competition and forced to pay artificially inflated prices.

1048. There was and is a gross disparity between the price that Humana paid and continues to pay for Desonide, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Desonide should have been available, and would have been available, absent Desonide Defendants' illegal conduct.

1049. By engaging in the foregoing conduct, Desonide Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (DESONIDE)**

**(As to Actavis, Fougera, Perrigo, Sandoz, and Taro)**

1050. Humana incorporates by reference the preceding allegations.

1051. Desonide Defendants have benefitted from artificial prices in the sale of Desonide resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1052. Desonide Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Desonide by Humana.

1053. Humana has conferred upon Desonide Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1054. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Desonide.

1055. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Desonide, as it is not liable and would not compensate Humana for the impact of Desonide Defendants' unlawful conduct.

1056. The economic benefit of overcharges derived by Desonide Defendants through charging supracompetitive and artificially inflated prices for Desonide is a direct and proximate result of Desonide Defendants' unlawful conduct.

1057. The economic benefits derived by Desonide Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Desonide Period, benefiting Desonide Defendants.

1058. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Desonide Defendants to be permitted to retain any of the overcharges for Clomipramine derived from Desonide Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1059. Desonide Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1060. Desonide Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1061. A constructive trust should be imposed upon all unlawful or inequitable sums received by Desonide Defendants traceable to Humana.

**COUNT XXXV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (DESONIDE)**

**(As to Actavis, Fougera, Perrigo, Sandoz, and Taro)**

1062. Humana incorporates by reference the preceding allegations.

1063. Desonide Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Desonide. Desonide Defendants injured Humana through this conduct.

1064. But for Desonide Defendants' scheme to inflate the price of Desonide, Humana would have purchased lower-priced generic Desonide.

1065. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Desonide than it would have paid absent Desonide Defendants' continuing anticompetitive conduct.

1066. Humana has purchased substantial amounts of Desonide during the Desonide Period.

1067. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Desonide Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1068. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Desonide Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XXXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (DIGOXIN)**

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

1069. Humana incorporates by reference the preceding allegations.

1070. Digoxin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Digoxin in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1071. Each of the Digoxin Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Digoxin Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Digoxin prices throughout the United States.

1072. The conspiracy realized its intended effect; Digoxin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Digoxin.

1073. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Digoxin;

b. Humana was deprived of the benefits of free and open competition in the sale of Digoxin in the United States market; and

c. Competition in establishing the prices paid for Digoxin was unlawfully restrained, suppressed, or eliminated.

1074. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Digoxin until the market achieves a steady state.

1075. As a direct and proximate result of Digoxin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Digoxin than it would have paid in the absence of Digoxin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1076. Digoxin Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1077. There is no legitimate, non-pretextual, pro-competitive business justification for Digoxin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1078. Digoxin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1079. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Digoxin, or by assignment from its other subsidiaries that directly purchased generic Digoxin during the Digoxin Period.

**COUNT XXXVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (DIGOXIN)**

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

1080. Humana incorporates by reference the preceding allegations.

1081. Digoxin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Digoxin in the United States. This conspiracy was *per se* unlawful price-fixing.

1082. Each of the Digoxin Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Digoxin Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Digoxin prices throughout the United States.

1083. The conspiracy realized its intended effect; Digoxin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Digoxin.

1084. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Digoxin;

b. Humana was deprived of the benefits of free and open competition in the sale of Digoxin in the United States market; and

c. Competition in establishing the prices paid for Digoxin was unlawfully restrained, suppressed, or eliminated.

1085. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Digoxin until the market achieves a steady state.

1086. As a direct and proximate result of Digoxin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Digoxin than it would have paid in the absence of Digoxin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1087. There is no legitimate, non-pretextual, pro-competitive business justification for Digoxin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1088. Digoxin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1089. Digoxin Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XXXVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (DIGOXIN)**

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

1090. Humana incorporates by reference the preceding allegations.

1091. Digoxin Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Digoxin Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Digoxin at prices restrained by competition and forced to pay artificially inflated prices.

1092. There was and is a gross disparity between the price that Humana paid and continues to pay for Digoxin, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Digoxin should have been available, and would have been available, absent Digoxin Defendants' illegal conduct.

1093. By engaging in the foregoing conduct, Digoxin Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XXXIX**

**UNJUST ENRICHMENT UNDER STATE LAW (DIGOXIN)**

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

1094. Humana incorporates by reference the preceding allegations.

1095. Digoxin Defendants have benefitted from artificial prices in the sale of Digoxin resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1096. Digoxin Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Digoxin by Humana.

1097. Humana has conferred upon Digoxin Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1098. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Digoxin.

1099. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Digoxin, as it is not liable and would not compensate Humana for the impact of Digoxin Defendants' unlawful conduct.

1100. The economic benefit of overcharges derived by Digoxin Defendants through charging supracompetitive and artificially inflated prices for Digoxin is a direct and proximate result of Digoxin Defendants' unlawful conduct.

1101. The economic benefits derived by Digoxin Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Digoxin Period, benefiting Digoxin Defendants.

1102. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Digoxin Defendants to be permitted to retain any of the overcharges for Digoxin derived from Digoxin Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1103. Digoxin Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1104. Digoxin Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1105. A constructive trust should be imposed upon all unlawful or inequitable sums received by Digoxin Defendants traceable to Humana.

**COUNT XL**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (DIGOXIN)**

**(As to Impax, Lannett, Mylan, Par, Sun, and West-Ward)**

1106. Humana incorporates by reference the preceding allegations.

1107. Digoxin Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Digoxin. Digoxin Defendants injured Humana through this conduct.

1108. But for Digoxin Defendants' scheme to inflate the price of Digoxin, Humana would have purchased lower-priced generic Digoxin.

1109. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Digoxin than it would have paid absent Digoxin Defendants' continuing anticompetitive conduct.

1110. Humana has purchased substantial amounts of Digoxin during the Digoxin Period.

1111. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Digoxin Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1112. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Digoxin Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XLI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (DIVALPROEX)**

**(As to Dr. Reddy's, Mylan, Par, and Zydus)**

1113. Humana incorporates by reference the preceding allegations.

1114. Divalproex Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Divalproex in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1115. Each of the Divalproex Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Divalproex Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Divalproex prices throughout the United States.

1116. The conspiracy realized its intended effect; Divalproex Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Divalproex.

1117. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Divalproex;

b. Humana was deprived of the benefits of free and open competition in the sale of Divalproex in the United States market; and

c. Competition in establishing the prices paid for Divalproex was unlawfully restrained, suppressed, or eliminated.

1118. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Divalproex until the market achieves a steady state.

1119. As a direct and proximate result of Divalproex Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Divalproex than it would have paid in the absence of Divalproex Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1120. Divalproex Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1121. There is no legitimate, non-pretextual, pro-competitive business justification for Divalproex Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1122. Divalproex Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1123. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Divalproex, or by assignment from its other subsidiaries that directly purchased generic Divalproex during the Divalproex Period.

## COUNT XLII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (DIVALPROEX)

### (As to Dr. Reddy's, Mylan, Par, and Zydus)

1124. Humana incorporates by reference the preceding allegations.

1125. Divalproex Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Divalproex in the United States. This conspiracy was *per se* unlawful price-fixing.

1126. Each of the Divalproex Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Divalproex Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Divalproex prices throughout the United States.

1127. The conspiracy realized its intended effect; Divalproex Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Divalproex.

1128. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Divalproex;

b. Humana was deprived of the benefits of free and open competition in the sale of Divalproex in the United States market; and

c. Competition in establishing the prices paid for Divalproex was unlawfully restrained, suppressed, or eliminated.

1129. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Divalproex until the market achieves a steady state.

1130. As a direct and proximate result of Divalproex Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Divalproex than it would have paid in the absence of Divalproex Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1131. There is no legitimate, non-pretextual, pro-competitive business justification for Divalproex Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1132. Divalproex Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1133. Divalproex Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XLIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (DIVALPROEX)**

**(As to Dr. Reddy's, Mylan, Par, and Zydus)**

1134. Humana incorporates by reference the preceding allegations.

1135. Divalproex Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Divalproex Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Divalproex at prices restrained by competition and forced to pay artificially inflated prices.

1136. There was and is a gross disparity between the price that Humana paid and continues to pay for Divalproex, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Divalproex should have been available, and would have been available, absent Divalproex Defendants' illegal conduct.

1137. By engaging in the foregoing conduct, Divalproex Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XLIV**

**UNJUST ENRICHMENT UNDER STATE LAW (DIVALPROEX)**

**(As to Dr. Reddy's, Mylan, Par, and Zydus)**

1138. Humana incorporates by reference the preceding allegations.

1139. Divalproex Defendants have benefitted from artificial prices in the sale of Divalproex resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1140. Divalproex Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Divalproex by Humana.

1141. Humana has conferred upon Divalproex Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1142. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Divalproex.

1143. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Divalproex, as it is not liable and would not compensate Humana for the impact of Divalproex Defendants' unlawful conduct.

1144. The economic benefit of overcharges derived by Divalproex Defendants through charging supracompetitive and artificially inflated prices for Divalproex is a direct and proximate result of Divalproex Defendants' unlawful conduct.

1145. The economic benefits derived by Divalproex Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Divalproex Period, benefiting Divalproex Defendants.

1146. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Divalproex Defendants to be permitted to retain any of the overcharges for Divalproex derived from Divalproex Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1147. Divalproex Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1148. Divalproex Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1149. A constructive trust should be imposed upon all unlawful or inequitable sums received by Divalproex Defendants traceable to Humana.

**COUNT XLV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (DIVALPROEX)**

**(As to Dr. Reddy's, Mylan, Par, and Zydus)**

1150. Humana incorporates by reference the preceding allegations.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1151. Divalproex Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Divalproex. Divalproex Defendants injured Humana through this conduct.

1152. But for Divalproex Defendants' scheme to inflate the price of Divalproex, Humana would have purchased lower-priced generic Divalproex.

1153. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Divalproex than it would have paid absent Divalproex Defendants' continuing anticompetitive conduct.

1154. Humana has purchased substantial amounts of Divalproex during the Divalproex Period.

1155. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Divalproex Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1156. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Divalproex Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XLVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (DOXYCYCLINE)**

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, Teva, and West-Ward)**

1157. Humana incorporates by reference the preceding allegations.

1158. Doxycycline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Doxycycline in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1159. Each of the Doxycycline Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Doxycycline Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Doxycycline prices throughout the United States.

1160. The conspiracy realized its intended effect; Doxycycline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Doxycycline.

1161. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Doxycycline;

b. Humana was deprived of the benefits of free and open competition in the sale of Doxycycline in the United States market; and

c. Competition in establishing the prices paid for Doxycycline was unlawfully restrained, suppressed, or eliminated.

1162. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Doxycycline until the market achieves a steady state.

1163. As a direct and proximate result of Doxycycline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Doxycycline than it would have paid in the absence of Doxycycline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1164. Doxycycline Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1165. There is no legitimate, non-pretextual, pro-competitive business justification for Doxycycline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1166. Doxycycline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1167. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Doxycycline, or by assignment from its other subsidiaries that directly purchased generic Doxycycline during the Doxycycline Period.

**COUNT XLVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (DOXYCYCLINE)**

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, Teva, and West-Ward)**

1168. Humana incorporates by reference the preceding allegations.

1169. Doxycycline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Doxycycline in the United States. This conspiracy was *per se* unlawful price-fixing.

1170. Each of the Doxycycline Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Doxycycline Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Doxycycline prices throughout the United States.

1171. The conspiracy realized its intended effect; Doxycycline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Doxycycline.

1172. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Doxycycline;

b. Humana was deprived of the benefits of free and open competition in the sale of Doxycycline in the United States market; and

c. Competition in establishing the prices paid for Doxycycline was unlawfully restrained, suppressed, or eliminated.

1173. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Doxycycline until the market achieves a steady state.

1174. As a direct and proximate result of Doxycycline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Doxycycline than it would have paid in the absence of Doxycycline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1175. There is no legitimate, non-pretextual, pro-competitive business justification for Doxycycline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1176. Doxycycline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1177. Doxycycline Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XLVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (DOXYCYCLINE)**

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, Teva, and West-Ward)**

1178. Humana incorporates by reference the preceding allegations.

1179. Doxycycline Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Doxycycline Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Doxycycline at prices restrained by competition and forced to pay artificially inflated prices.

1180. There was and is a gross disparity between the price that Humana paid and continues to pay for Doxycycline, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Doxycycline should have been available, and would have been available, absent Doxycycline Defendants' illegal conduct.

1181. By engaging in the foregoing conduct, Doxycycline Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XLIX**

**UNJUST ENRICHMENT UNDER STATE LAW (DOXYCYCLINE)**

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, Teva, and West-Ward)**

1182. Humana incorporates by reference the preceding allegations.

1183. Doxycycline Defendants have benefitted from artificial prices in the sale of Doxycycline resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1184. Doxycycline Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Doxycycline by Humana.

1185. Humana has conferred upon Doxycycline Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1186. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Doxycycline.

1187. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Doxycycline, as it is not liable and would not compensate Humana for the impact of Doxycycline Defendants' unlawful conduct.

1188. The economic benefit of overcharges derived by Doxycycline Defendants through charging supracompetitive and artificially inflated prices for Doxycycline is a direct and proximate result of Doxycycline Defendants' unlawful conduct.

1189. The economic benefits derived by Doxycycline Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Doxycycline Period, benefiting Doxycycline Defendants.

1190. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Doxycycline Defendants to be permitted to retain any of the overcharges for Doxycycline derived from Doxycycline Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1191. Doxycycline Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1192. Doxycycline Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1193. A constructive trust should be imposed upon all unlawful or inequitable sums received by Doxycycline Defendants traceable to Humana.

## COUNT L

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (DOXYCYCLINE)

**(As to Actavis, Endo, Heritage, Lannett, Mayne, Mylan, Par, Sun, Teva, and West-Ward)**

1194. Humana incorporates by reference the preceding allegations.

1195. Doxycycline Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Doxycycline. Doxycycline Defendants injured Humana through this conduct.

1196. But for Doxycycline Defendants' scheme to inflate the price of Doxycycline, Humana would have purchased lower-priced generic Doxycycline.

1197. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Doxycycline than it would have paid absent Doxycycline Defendants' continuing anticompetitive conduct.

1198. Humana has purchased substantial amounts of Doxycycline during the Doxycycline Period.

1199. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Doxycycline Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1200. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Doxycycline Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ECONAZOLE)**

**(As to Fougera, Perrigo, Sandoz, Taro, and Teligent)**

1201. Humana incorporates by reference the preceding allegations.

1202. Econazole Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Econazole in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1203. Each of the Econazole Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Econazole Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Econazole prices throughout the United States.

1204. The conspiracy realized its intended effect; Econazole Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Econazole.

1205. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Econazole;

b. Humana was deprived of the benefits of free and open competition in the sale of Econazole in the United States market; and

c. Competition in establishing the prices paid for Econazole was unlawfully restrained, suppressed, or eliminated.

1206. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Econazole until the market achieves a steady state.

1207. As a direct and proximate result of Econazole Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Econazole than it would have paid in the absence of Econazole Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1208. Econazole Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1209. There is no legitimate, non-pretextual, pro-competitive business justification for Econazole Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1210. Econazole Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1211. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Econazole, or by assignment from its other subsidiaries that directly purchased generic Leflunomide during the Econazole Period.

## COUNT LII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (ECONAZOLE)

**(As to Fougera, Perrigo, Sandoz, Taro, and Teligent)**

1212. Humana incorporates by reference the preceding allegations.

1213. Econazole Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Econazole in the United States. This conspiracy was *per se* unlawful price-fixing.

1214. Each of the Econazole Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Econazole Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Econazole prices throughout the United States.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1215. The conspiracy realized its intended effect; Econazole Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Econazole.

1216. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Econazole;

b. Humana was deprived of the benefits of free and open competition in the sale of Econazole in the United States market; and

c. Competition in establishing the prices paid for Econazole was unlawfully restrained, suppressed, or eliminated.

1217. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Econazole until the market achieves a steady state.

1218. As a direct and proximate result of Econazole Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Econazole than it would have paid in the absence of Econazole Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1219. There is no legitimate, non-pretextual, pro-competitive business justification for Econazole Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1220. Econazole Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1221. Econazole Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**
**(ECONAZOLE)**

**(As to Fougera, Perrigo, Sandoz, Taro, and Teligent)**

1222. Humana incorporates by reference the preceding allegations.

1223. Econazole Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Econazole Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Econazole at prices restrained by competition and forced to pay artificially inflated prices.

1224. There was and is a gross disparity between the price that Humana paid and continues to pay for Econazole, including by assignment from its subsidiaries, and the value received, given

that more cheaply priced Econazole should have been available, and would have been available, absent Econazole Defendants' illegal conduct.

1225. By engaging in the foregoing conduct, Econazole Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LIV**

**UNJUST ENRICHMENT UNDER STATE LAW (ECONAZOLE)**

**(As to Fougera, Perrigo, Sandoz, Taro, and Teligent)**

1226. Humana incorporates by reference the preceding allegations.

1227. Econazole Defendants have benefitted from artificial prices in the sale of Econazole resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1228. Econazole Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Econazole by Humana.

1229. Humana has conferred upon Econazole Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1230. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Econazole.

1231. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Econazole, as it is not liable and would not compensate Humana for the impact of Econazole Defendants' unlawful conduct.

1232. The economic benefit of overcharges derived by Econazole Defendants through charging supracompetitive and artificially inflated prices for Econazole is a direct and proximate result of Econazole Defendants' unlawful conduct.

1233. The economic benefits derived by Econazole Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Econazole Period, benefiting Econazole Defendants.

1234. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Econazole Defendants to be permitted to retain any of the overcharges for Econazole derived from Leflunomide Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1235. Econazole Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1236. Econazole Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1237. A constructive trust should be imposed upon all unlawful or inequitable sums received by Econazole Defendants traceable to Humana.

## COUNT LV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ECONAZOLE)

**(As to Fougera, Perrigo, Sandoz, Taro, and Teligent)**


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1238. Humana incorporates by reference the preceding allegations.

1239. Econazole Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Econazole. Econazole Defendants injured Humana through this conduct.

1240. But for Econazole Defendants' scheme to inflate the price of Econazole, Humana would have purchased lower-priced generic Econazole.

1241. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Econazole than it would have paid absent Econazole Defendants' continuing anticompetitive conduct.

1242. Humana has purchased substantial amounts of Econazole during the Econazole Period.

1243. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Econazole Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1244. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Econazole Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (FLUOCINONIDE)**

**(As to Actavis, Fougera, Sandoz, Taro, and Teva)**

1245. Humana incorporates by reference the preceding allegations.

1246. Fluocinonide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Fluocinonide in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1247. Each of the Fluocinonide Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Fluocinonide Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Fluocinonide prices throughout the United States.

1248. The conspiracy realized its intended effect; Fluocinonide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Fluocinonide.

1249. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Fluocinonide;

b. Humana was deprived of the benefits of free and open competition in the sale of Fluocinonide in the United States market; and

c. Competition in establishing the prices paid for Fluocinonide was unlawfully restrained, suppressed, or eliminated.

1250. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Fluocinonide until the market achieves a steady state.

1251. As a direct and proximate result of Fluocinonide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Fluocinonide than it would have paid in the absence of Fluocinonide Defendants' unlawful conduct. The full amount

of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1252. Fluocinonide Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1253. There is no legitimate, non-pretextual, pro-competitive business justification for Fluocinonide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1254. Fluocinonide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1255. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Fluocinonide, or by assignment from its other subsidiaries that directly purchased generic Fluocinonide during the Fluocinonide Period.

**COUNT LVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (FLUOCINONIDE)**

**(As to Actavis, Fougera, Sandoz, Taro, and Teva)**

1256. Humana incorporates by reference the preceding allegations.

1257. Fluocinonide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Fluocinonide in the United States. This conspiracy was *per se* unlawful price-fixing.

1258. Each of the Fluocinonide Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Fluocinonide Defendants'


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Fluocinonide prices throughout the United States.

1259. The conspiracy realized its intended effect; Fluocinonide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Fluocinonide.

1260. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Fluocinonide;

b. Humana was deprived of the benefits of free and open competition in the sale of Fluocinonide in the United States market; and

c. Competition in establishing the prices paid for Fluocinonide was unlawfully restrained, suppressed, or eliminated.

1261. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Fluocinonide until the market achieves a steady state.

1262. As a direct and proximate result of Fluocinonide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Fluocinonide than it would have paid in the absence of Fluocinonide Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1263. There is no legitimate, non-pretextual, pro-competitive business justification for Fluocinonide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1264. Fluocinonide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1265. Fluocinonide Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (FLUOCINONIDE)**

**(As to Actavis, Fougera, Sandoz, Taro, and Teva)**

1266. Humana incorporates by reference the preceding allegations.

1267. Fluocinonide Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Fluocinonide Defendants' anticompetitive, deceptive,

unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Fluocinonide at prices restrained by competition and forced to pay artificially inflated prices.

1268. There was and is a gross disparity between the price that Humana paid and continues to pay for Fluocinonide, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Fluocinonide should have been available, and would have been available, absent Fluocinonide Defendants' illegal conduct.

1269. By engaging in the foregoing conduct, Fluocinonide Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LIX**

**UNJUST ENRICHMENT UNDER STATE LAW (FLUOCINONIDE)**

**(As to Actavis, Fougera, Sandoz, Taro, and Teva)**

1270. Humana incorporates by reference the preceding allegations.

1271. Fluocinonide Defendants have benefitted from artificial prices in the sale of Fluocinonide resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1272. Fluocinonide Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Fluocinonide by Humana.

1273. Humana has conferred upon Fluocinonide Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1274. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Fluocinonide.

1275. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Fluocinonide, as it is not liable and would not compensate Humana for the impact of Fluocinonide Defendants' unlawful conduct.

1276. The economic benefit of overcharges derived Fluocinonide Defendants through charging supracompetitive and artificially inflated prices for Fluocinonide is a direct and proximate result of Fluocinonide Defendants' unlawful conduct.

1277. The economic benefits derived by Fluocinonide Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Fluocinonide Period, benefiting Fluocinonide Defendants.

1278. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Fluocinonide Defendants to be permitted to retain any of the overcharges for Fluocinonide derived from Fluocinonide Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1279. Fluocinonide Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1280. Fluocinonide Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1281. A constructive trust should be imposed upon all unlawful or inequitable sums received by Fluocinonide Defendants traceable to Humana.

## COUNT LX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (FLUOCINONIDE)

**(As to Actavis, Fougera, Sandoz, Taro, and Teva)**

1282. Humana incorporates by reference the preceding allegations.

1283. Fluocinonide Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Fluocinonide. Fluocinonide Defendants injured Humana through this conduct.

1284. But for Fluocinonide Defendants' scheme to inflate the price of Fluocinonide, Humana would have purchased lower-priced generic Fluocinonide.

1285. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Fluocinonide than it would have paid absent Fluocinonide Defendants' continuing anticompetitive conduct.

1286. Humana has purchased substantial amounts of Fluocinonide during the Fluocinonide Period.

1287. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Fluocinonide Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1288. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Fluocinonide Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

**COUNT LXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

1289. Humana incorporates by reference the preceding allegations.

1290. Leflunomide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Leflunomide in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1291. Each of the Leflunomide Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Leflunomide Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Leflunomide prices throughout the United States.

1292. The conspiracy realized its intended effect; Leflunomide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Leflunomide.

1293. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Leflunomide;

b. Humana was deprived of the benefits of free and open competition in the sale of Leflunomide in the United States market; and

c. Competition in establishing the prices paid for Leflunomide was unlawfully restrained, suppressed, or eliminated.

1294. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Leflunomide until the market achieves a steady state.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1295. As a direct and proximate result of Leflunomide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Leflunomide than it would have paid in the absence of Leflunomide Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1296. Leflunomide Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1297. There is no legitimate, non-pretextual, pro-competitive business justification for Leflunomide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1298. Leflunomide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1299. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Leflunomide, or by assignment from its other subsidiaries that directly purchased generic Leflunomide during the Leflunomide Period.

**COUNT LXII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

1300. Humana incorporates by reference the preceding allegations.

1301. Leflunomide Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Leflunomide in the United States. This conspiracy was *per se* unlawful price-fixing.

1302. Each of the Leflunomide Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Leflunomide Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Leflunomide prices throughout the United States.

1303. The conspiracy realized its intended effect; Leflunomide Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Leflunomide.

1304. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Leflunomide;

b. Humana was deprived of the benefits of free and open competition in the sale of Leflunomide in the United States market; and

c. Competition in establishing the prices paid for Leflunomide was unlawfully restrained, suppressed, or eliminated.

1305. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Leflunomide until the market achieves a steady state.

1306. As a direct and proximate result of Leflunomide Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Leflunomide than it would have paid in the absence of Leflunomide Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1307. There is no legitimate, non-pretextual, pro-competitive business justification for Leflunomide Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1308. Leflunomide Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1309. Leflunomide Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW <u>(LEFLUNOMIDE)</u>

## (As to Apotex, Heritage, and Teva)

1310. Humana incorporates by reference the preceding allegations.

1311. Leflunomide Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Leflunomide Defendants' anticompetitive, deceptive,


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Leflunomide at prices restrained by competition and forced to pay artificially inflated prices.

1312. There was and is a gross disparity between the price that Humana paid and continues to pay for Leflunomide, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Leflunomide should have been available, and would have been available, absent Leflunomide Defendants' illegal conduct.

1313. By engaging in the foregoing conduct, Leflunomide Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

1314. Humana incorporates by reference the preceding allegations.

1315. Leflunomide Defendants have benefitted from artificial prices in the sale of Leflunomide resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1316. Leflunomide Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Leflunomide by Humana.

1317. Humana has conferred upon Leflunomide Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1318. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Leflunomide.

1319. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Leflunomide, as it is not liable and would not compensate Humana for the impact of Leflunomide Defendants' unlawful conduct.

1320. The economic benefit of overcharges derived by Leflunomide Defendants through charging supracompetitive and artificially inflated prices for Leflunomide is a direct and proximate result of Leflunomide Defendants' unlawful conduct.

1321. The economic benefits derived by Leflunomide Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Leflunomide Period, benefiting Leflunomide Defendants.

1322. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Leflunomide Defendants to be permitted to retain any of the overcharges for Leflunomide derived from Leflunomide Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1323. Leflunomide Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1324. Leflunomide Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1325. A constructive trust should be imposed upon all unlawful or inequitable sums received by Leflunomide Defendants traceable to Humana.

**COUNT LXV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (LEFLUNOMIDE)**

**(As to Apotex, Heritage, and Teva)**

1326. Humana incorporates by reference the preceding allegations.

1327. Leflunomide Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Leflunomide. Leflunomide Defendants injured Humana through this conduct.

1328. But for Leflunomide Defendants' scheme to inflate the price of Leflunomide, Humana would have purchased lower-priced generic Leflunomide.

1329. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Leflunomide than it would have paid absent Leflunomide Defendants' continuing anticompetitive conduct.

1330. Humana has purchased substantial amounts of Leflunomide during the Leflunomide Period.

1331. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Leflunomide Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1332. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Leflunomide Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (LEVOTHYORXINE)**

**(As to Lannett, Mylan, and Sandoz)**

1333. Humana incorporates by reference the preceding allegations.

1334. Levothyroxine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Levothyroxine in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1335. Each of the Levothyroxine Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Levothyroxine Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Levothyroxine prices throughout the United States.

1336. The conspiracy realized its intended effect; Levothyroxine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Levothyroxine.

1337. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Levothyroxine;

b. Humana was deprived of the benefits of free and open competition in the sale of Levothyroxine in the United States market; and

c. Competition in establishing the prices paid for Levothyroxine was unlawfully restrained, suppressed, or eliminated.

1338. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Levothyroxine until the market achieves a steady state.

1339. As a direct and proximate result of Levothyroxine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Levothyroxine than it would have paid in the absence of Levothyroxine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1340. Levothyroxine Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1341. There is no legitimate, non-pretextual, pro-competitive business justification for Levothyroxine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1342. Levothyroxine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1343. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Levothyroxine, or by assignment from its other subsidiaries that directly purchased generic Levothyroxine during the Levothyroxine Period.

## COUNT LXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (LEVOTHYROXINE)

**(As to Lannett, Mylan, and Sandoz)**

1344. Humana incorporates by reference the preceding allegations.

1345. Levothyroxine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Levothyroxine in the United States. This conspiracy was *per se* unlawful price-fixing.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1346. Each of the Levothyroxine Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Levothyroxine Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Levothyroxine prices throughout the United States.

1347. The conspiracy realized its intended effect; Levothyroxine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Levothyroxine.

1348. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Levothyroxine;

b. Humana was deprived of the benefits of free and open competition in the sale of Levothyroxine in the United States market; and

c. Competition in establishing the prices paid for Levothyroxine was unlawfully restrained, suppressed, or eliminated.

1349. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Levothyroxine until the market achieves a steady state.

1350. As a direct and proximate result of Levothyroxine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Levothyroxine than it would have paid in the absence of Levothyroxine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1351. There is no legitimate, non-pretextual, pro-competitive business justification for Levothyroxine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1352. Levothyroxine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1353. Levothyroxine Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LXVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (LEVOTHYROXINE)**

**(As to Mylan, Lannett, and Sandoz)**

1354. Humana incorporates by reference the preceding allegations.

1355. Levothyroxine Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Levothyroxine Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Levothyroxine at prices restrained by competition and forced to pay artificially inflated prices.

1356. There was and is a gross disparity between the price that Humana paid and continues to pay for Levothyroxine, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Levothyroxine should have been available, and would have been available, absent Levothyroxine Defendants' illegal conduct.

1357. By engaging in the foregoing conduct, Levothyroxine Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LXIX

## UNJUST ENRICHMENT UNDER STATE LAW (LEVOTHYROXINE)

**(As to Lannett, Mylan, and Sandoz)**

1358. Humana incorporates by reference the preceding allegations.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1359. Levothyroxine Defendants have benefitted from artificial prices in the sale of Levothyroxine resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1360. Levothyroxine Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Levothyroxine by Humana.

1361. Humana has conferred upon Levothyroxine Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1362. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Levothyroxine.

1363. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Levothyroxine, as it is not liable and would not compensate Humana for the impact of Levothyroxine Defendants' unlawful conduct.

1364. The economic benefit of overcharges derived by Levothyroxine Defendants through charging supracompetitive and artificially inflated prices for Levothyroxine is a direct and proximate result of Levothyroxine Defendants' unlawful conduct.

1365. The economic benefits derived by Levothyroxine Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Levothyroxine Period, benefiting Levothyroxine Defendants.

1366. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Levothyroxine Defendants to be permitted to retain any of the overcharges for Levothyroxine derived from Levothyroxine Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1367. Levothyroxine Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1368. Levothyroxine Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1369. A constructive trust should be imposed upon all unlawful or inequitable sums received by Levothyroxine Defendants traceable to Humana.

**COUNT LXX**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (LEVOTHYROXINE)**

**(As to Lannett, Mylan, and Sandoz)**

1370. Humana incorporates by reference the preceding allegations.

1371. Levothyroxine Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Levothyroxine. Levothyroxine Defendants injured Humana through this conduct.

1372. But for Levothyroxine Defendants' scheme to inflate the price of Levothyroxine, Humana would have purchased lower-priced generic Levothyroxine.

1373. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Levothyroxine than it would have paid absent Levothyroxine Defendants' continuing anticompetitive conduct.

1374. Humana has purchased substantial amounts of Levothyroxine during the Levothyroxine Period.

1375. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Levothyroxine Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1376. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Levothyroxine Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (LIDOCAINE)**

**(As to Akorn, Fougera, Hi-Tech, Impax, and Sandoz)**

1377. Humana incorporates by reference the preceding allegations.

1378. Lidocaine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Lidocaine in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1379. Each of the Lidocaine Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Lidocaine Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Lidocaine prices throughout the United States.

1380. The conspiracy realized its intended effect; Lidocaine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Lidocaine.

1381. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Lidocaine;

b. Humana was deprived of the benefits of free and open competition in the sale of Lidocaine in the United States market; and

c. Competition in establishing the prices paid for Lidocaine was unlawfully restrained, suppressed, or eliminated.

1382. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Lidocaine until the market achieves a steady state.

1383. As a direct and proximate result of Lidocaine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Lidocaine than it would have paid in the absence of Lidocaine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1384. Lidocaine Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1385. There is no legitimate, non-pretextual, pro-competitive business justification for Lidocaine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1386. Lidocaine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1387. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Lidocaine, or by assignment from its other subsidiaries that directly purchased generic Lidocaine during the Lidocaine Period.

**COUNT LXXII**
**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (LIDOCAINE)**

**(As to Akorn, Fougera, Hi-Tech, Impax, and Sandoz)**

1388. Humana incorporates by reference the preceding allegations.

1389. Lidocaine Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Lidocaine in the United States. This conspiracy was *per se* unlawful price-fixing.

1390. Each of the Lidocaine Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Lidocaine Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Lidocaine prices throughout the United States.

1391. The conspiracy realized its intended effect; Lidocaine Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Lidocaine.

1392. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Lidocaine;

b. Humana was deprived of the benefits of free and open competition in the sale of Lidocaine in the United States market; and

c. Competition in establishing the prices paid for Lidocaine was unlawfully restrained, suppressed, or eliminated.

1393. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Lidocaine until the market achieves a steady state.

1394. As a direct and proximate result of Lidocaine Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Lidocaine than it would have paid in the absence of Lidocaine Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1395. There is no legitimate, non-pretextual, pro-competitive business justification for Lidocaine Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1396. Lidocaine Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1397. Lidocaine Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LXXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (LIDOCAINE)**

**(As to Akorn, Fougera, Hi-Tech, Impax, and Sandoz)**

1398. Humana incorporates by reference the preceding allegations.

1399. Lidocaine Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lidocaine Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Lidocaine at prices restrained by competition and forced to pay artificially inflated prices.

1400. There was and is a gross disparity between the price that Humana paid and continues to pay for Lidocaine, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Lidocaine should have been available, and would have been available, absent Lidocaine Defendants' illegal conduct.

1401. By engaging in the foregoing conduct, Lidocaine Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (LIDOCAINE)**

**(As to Akorn, Fougera, Hi-Tech, Impax, and Sandoz)**

1402. Humana incorporates by reference the preceding allegations.

1403. Lidocaine Defendants have benefitted from artificial prices in the sale of Lidocaine resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1404. Lidocaine Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Lidocaine by Humana.

1405. Humana has conferred upon Lidocaine Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1406. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Lidocaine.

1407. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Lidocaine, as it is not liable and would not compensate Humana for the impact of Lidocaine Defendants' unlawful conduct.

1408. The economic benefit of overcharges derived by Lidocaine Defendants through charging supracompetitive and artificially inflated prices for Lidocaine is a direct and proximate result of Lidocaine Defendants' unlawful conduct.

1409. The economic benefits derived by Lidocaine Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Lidocaine Period, benefiting Lidocaine Defendants.

1410. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lidocaine Defendants to be permitted to retain any of the overcharges for Lidocaine derived from Lidocaine Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1411. Lidocaine Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1412. Lidocaine Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1413. A constructive trust should be imposed upon all unlawful or inequitable sums received by Lidocaine Defendants traceable to Humana.

**COUNT LXXV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (LIDOCAINE)**

**(As to Akorn, Fougera, Hi-Tech, Impax, and Sandoz)**

1414. Humana incorporates by reference the preceding allegations.

1415. Lidocaine Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Lidocaine. Lidocaine Defendants injured Humana through this conduct.

1416. But for Lidocaine Defendants' scheme to inflate the price of Lidocaine, Humana would have purchased lower-priced generic Lidocaine.

1417. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Lidocaine than it would have paid absent Lidocaine Defendants' continuing anticompetitive conduct.

1418. Humana has purchased substantial amounts of Lidocaine during the Lidocaine Period.

1419. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lidocaine Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1420. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Lidocaine Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (NYSTATIN)**

**(As to Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, and Teva)**

1421. Humana incorporates by reference the preceding allegations.

1422. Nystatin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Nystatin in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1423. Each of the Nystatin Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Nystatin Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Nystatin prices throughout the United States.

1424. The conspiracy realized its intended effect; Nystatin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Nystatin.

1425. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Nystatin;

b. Humana was deprived of the benefits of free and open competition in the sale of Nystatin in the United States market; and

c. Competition in establishing the prices paid for Nystatin was unlawfully restrained, suppressed, or eliminated.

1426. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Nystatin until the market achieves a steady state.

1427. As a direct and proximate result of Nystatin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Nystatin than it would have paid in the absence of Nystatin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1428. Nystatin Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1429. There is no legitimate, non-pretextual, pro-competitive business justification for Nystatin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1430. Nystatin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1431. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Nystatin, or by assignment from its other subsidiaries that directly purchased generic Nystatin during the Nystatin Period.

**COUNT LXXVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (NYSTATIN)**

**(As to Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, and Teva)**

1432. Humana incorporates by reference the preceding allegations.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1433. Nystatin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Nystatin in the United States. This conspiracy was *per se* unlawful price-fixing.

1434. Each of the Nystatin Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Nystatin Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Nystatin prices throughout the United States.

1435. The conspiracy realized its intended effect; Nystatin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Nystatin.

1436. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Nystatin;

b. Humana was deprived of the benefits of free and open competition in the sale of Nystatin in the United States market; and

c. Competition in establishing the prices paid for Nystatin was unlawfully restrained, suppressed, or eliminated.

1437. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Nystatin until the market achieves a steady state.

1438. As a direct and proximate result of Nystatin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Nystatin than it would have paid in the absence of Nystatin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1439. There is no legitimate, non-pretextual, pro-competitive business justification for Nystatin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1440. Nystatin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1441. Nystatin Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LVXXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (NYSTATIN)**

**(As to Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, and Teva)**

1442. Humana incorporates by reference the preceding allegations.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1443. Nystatin Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Nystatin Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Nystatin at prices restrained by competition and forced to pay artificially inflated prices.

1444. There was and is a gross disparity between the price that Humana paid and continues to pay for Nystatin, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Nystatin should have been available, and would have been available, absent Nystatin Defendants' illegal conduct.

1445. By engaging in the foregoing conduct, Nystatin Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXXIX**

**UNJUST ENRICHMENT UNDER STATE LAW (NYSTATIN)**

**(As to Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, and Teva)**

1446. Humana incorporates by reference the preceding allegations.

1447. Nystatin Defendants have benefitted from artificial prices in the sale of Nystatin resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1448. Nystatin Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Nystatin by Humana.

1449. Humana has conferred upon Nystatin Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1450. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Nystatin.

1451. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Nystatin, as it is not liable and would not compensate Humana for the impact of Nystatin Defendants' unlawful conduct.

1452. The economic benefit of overcharges derived by Nystatin Defendants through charging supracompetitive and artificially inflated prices for Nystatin is a direct and proximate result of Nystatin Defendants' unlawful conduct.

1453. The economic benefits derived by Nystatin Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Nystatin Period, benefiting Nystatin Defendants.

1454. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Nystatin Defendants to be permitted to retain any of the overcharges for Nystatin derived from Nystatin Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1455. Nystatin Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1456. Nystatin Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1457. A constructive trust should be imposed upon all unlawful or inequitable sums received by Nystatin Defendants traceable to Humana.

**COUNT LXXX**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (NYSTATIN)**

**(As to Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, and Teva)**

1458. Humana incorporates by reference the preceding allegations.

1459. Nystatin Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Nystatin. Nystatin Defendants injured Humana through this conduct.

1460. But for Nystatin Defendants' scheme to inflate the price of Nystatin, Humana would have purchased lower-priced generic Nystatin.

1461. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Nystatin than it would have paid absent Nystatin Defendants' continuing anticompetitive conduct.

1462. Humana has purchased substantial amounts of Nystatin during the Nystatin Period.

1463. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Nystatin Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1464. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Nystatin Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXXXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (PRAVASTATIN)**

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

1465. Humana incorporates by reference the preceding allegations.

1466. Pravastatin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Pravastatin in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1467. Each of the Pravastatin Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Pravastatin Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Pravastatin prices throughout the United States.

1468. The conspiracy realized its intended effect; Pravastatin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Pravastatin.

1469. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Pravastatin;

b. Humana was deprived of the benefits of free and open competition in the sale of Pravastatin in the United States market; and

c. Competition in establishing the prices paid for Pravastatin was unlawfully restrained, suppressed, or eliminated.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1470. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Pravastatin until the market achieves a steady state.

1471. As a direct and proximate result of Pravastatin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Pravastatin than it would have paid in the absence of Pravastatin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1472. Pravastatin Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1473. There is no legitimate, non-pretextual, pro-competitive business justification for Pravastatin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1474. Pravastatin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1475. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Pravastatin, or by assignment from its other subsidiaries that directly purchased generic Pravastatin during the Pravastatin Period.

## COUNT LXXXII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (PRAVASTATIN)

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

1476. Humana incorporates by reference the preceding allegations.

1477. Pravastatin Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Pravastatin in the United States. This conspiracy was *per se* unlawful price-fixing.

1478. Each of the Pravastatin Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Pravastatin Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Pravastatin prices throughout the United States.

1479. The conspiracy realized its intended effect; Pravastatin Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Pravastatin.

1480. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Pravastatin;

b. Humana was deprived of the benefits of free and open competition in the sale of Pravastatin in the United States market; and

c. Competition in establishing the prices paid for Pravastatin was unlawfully restrained, suppressed, or eliminated.

1481. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Pravastatin until the market achieves a steady state.

1482. As a direct and proximate result of Pravastatin Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Pravastatin than it would have paid in the absence of Pravastatin Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1483. There is no legitimate, non-pretextual, pro-competitive business justification for Pravastatin Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1484. Pravastatin Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1485. Pravastatin Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LXXXIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (PRAVASTATIN)**

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

1486. Humana incorporates by reference the preceding allegations.

1487. Pravastatin Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Pravastatin Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Pravastatin at prices restrained by competition and forced to pay artificially inflated prices.

1488. There was and is a gross disparity between the price that Humana paid and continues to pay for Pravastatin, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Pravastatin should have been available, and would have been available, absent Pravastatin Defendants' illegal conduct.

1489. By engaging in the foregoing conduct, Pravastatin Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXXXIV**

**UNJUST ENRICHMENT UNDER STATE LAW (PRAVASTATIN)**

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

1490. Humana incorporates by reference the preceding allegations.

1491. Pravastatin Defendants have benefitted from artificial prices in the sale of Pravastatin resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1492. Pravastatin Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Pravastatin by Humana.

1493. Humana has conferred upon Pravastatin Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1494. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Pravastatin.

1495. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Pravastatin, as it is not liable and would not compensate Humana for the impact of Pravastatin Defendants' unlawful conduct.

1496. The economic benefit of overcharges derived by Pravastatin Defendants through charging supracompetitive and artificially inflated prices for Pravastatin is a direct and proximate result of Pravastatin Defendants' unlawful conduct.

1497. The economic benefits derived by Pravastatin Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Pravastatin Period, benefiting Pravastatin Defendants.

1498. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Pravastatin Defendants to be permitted to retain any of the overcharges for Pravastatin derived from Pravastatin Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1499. Pravastatin Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1500. Pravastatin Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1501. A constructive trust should be imposed upon all unlawful or inequitable sums received by Pravastatin Defendants traceable to Humana.

**COUNT LXXXV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (PRAVASTAIN)**

**(As to Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus)**

1502. Humana incorporates by reference the preceding allegations.

1503.

1504. Pravastatin Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Pravastatin. Pravastatin Defendants injured Humana through this conduct.

1505. But for Pravastatin Defendants' scheme to inflate the price of Pravastatin, Humana would have purchased lower-priced generic Pravastatin.

1506. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Pravastatin than it would have paid absent Pravastatin Defendants' continuing anticompetitive conduct.

1507. Humana has purchased substantial amounts of Pravastatin during the Pravastatin Period.

1508. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Pravastatin Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1509. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Pravastatin Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXXXVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (PROPRANOLOL)**

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

1510. Humana incorporates by reference the preceding allegations.

1511. Propranolol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Propranolol in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1512. Each of the Propranolol Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Propranolol Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Propranolol prices throughout the United States.

1513. The conspiracy realized its intended effect; Propranolol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Propranolol.

1514. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Propranolol;

b. Humana was deprived of the benefits of free and open competition in the sale of Propranolol in the United States market; and

c. Competition in establishing the prices paid for Propranolol was unlawfully restrained, suppressed, or eliminated.

1515. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Propranolol until the market achieves a steady state.

1516. As a direct and proximate result of Propranolol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Propranolol than it would have paid in the absence of Propranolol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1517. Propranolol Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1518. There is no legitimate, non-pretextual, pro-competitive business justification for Propranolol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1519. Propranolol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1520. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Propranolol, or by assignment from its other subsidiaries that directly purchased generic Propranolol during the Propranolol Period.

**COUNT LXXXVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (PROPRANOLOL)**

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

1521. Humana incorporates by reference the preceding allegations.

1522. Propranolol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Propranolol in the United States. This conspiracy was *per se* unlawful price-fixing.

1523. Each of the Propranolol Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Propranolol Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Propranolol prices throughout the United States.

1524. The conspiracy realized its intended effect; Propranolol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Propranolol.

1525. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Propranolol;

b. Humana was deprived of the benefits of free and open competition in the sale of Propranolol in the United States market; and

c. Competition in establishing the prices paid for Propranolol was unlawfully restrained, suppressed, or eliminated.

1526. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Propranolol until the market achieves a steady state.

1527. As a direct and proximate result of Propranolol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Propranolol than it would have paid in the absence of Propranolol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1528. There is no legitimate, non-pretextual, pro-competitive business justification for Propranolol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1529. Propranolol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1530. Propranolol Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT LXXXVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (PROPRANOLOL)**

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

1531. Humana incorporates by reference the preceding allegations.

1532. Propranolol Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Propranolol Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Propranolol at prices restrained by competition and forced to pay artificially inflated prices.

1533. There was and is a gross disparity between the price that Humana paid and continues to pay for Propranolol, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Propranolol should have been available, and would have been available, absent Propranolol Defendants' illegal conduct.

1534. By engaging in the foregoing conduct, Propranolol Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT LXXXIX**

**UNJUST ENRICHMENT UNDER STATE LAW (PROPRANOLOL)**

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

1535. Humana incorporates by reference the preceding allegations.

1536. Propranolol Defendants have benefitted from artificial prices in the sale of Propranolol resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1537. Propranolol Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Propranolol by Humana.

1538. Humana has conferred upon Propranolol Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1539. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Propranolol.

1540. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Propranolol, as it is not liable and would not compensate Humana for the impact of Propranolol Defendants' unlawful conduct.

1541. The economic benefit of overcharges derived by Propranolol Defendants through charging supracompetitive and artificially inflated prices for Propranolol is a direct and proximate result of Propranolol Defendants' unlawful conduct.

1542. The economic benefits derived by Propranolol Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Propranolol Period, benefiting Propranolol Defendants.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1543. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Propranolol Defendants to be permitted to retain any of the overcharges for Propranolol derived from Propranolol Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1544. Propranolol Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1545. Propranolol Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1546. A constructive trust should be imposed upon all unlawful or inequitable sums received by Propranolol Defendants traceable to Humana.

## COUNT XC

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (PROPRANOLOL)

**(As to Actavis, Breckenridge, Endo, Heritage, Mylan, Par, Teva, UDL, and Upsher-Smith)**

1547. Humana incorporates by reference the preceding allegations.

1548. Propranolol Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Propranolol. Propranolol Defendants injured Humana through this conduct.

1549. But for Propranolol Defendants' scheme to inflate the price of Propranolol, Humana would have purchased lower-priced generic Propranolol.

1550. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Propranolol than it would have paid absent Propranolol Defendants' continuing anticompetitive conduct.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1551. Humana has purchased substantial amounts of Propranolol during the Propranolol Period.

1552. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Propranolol Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1553. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Propranolol Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XCI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (THEOPHYLLINE)**

**(As to Heritage and Teva)**

1554. Humana incorporates by reference the preceding allegations.

1555. Theophylline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Theophylline in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1556. Each of the Theophylline Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Theophylline Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Theophylline prices throughout the United States.

1557. The conspiracy realized its intended effect; Theophylline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Theophylline.

1558. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Theophylline;

b. Humana was deprived of the benefits of free and open competition in the sale of Theophylline in the United States market; and

c. Competition in establishing the prices paid for Theophylline was unlawfully restrained, suppressed, or eliminated.

1559. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Theophylline until the market achieves a steady state.

1560. As a direct and proximate result of Theophylline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Theophylline han it would have paid in the absence of Theophylline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1561. Theophylline Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1562. There is no legitimate, non-pretextual, pro-competitive business justification for Theophylline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1563. Theophylline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1564. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Theophylline, or by assignment from its other subsidiaries that directly purchased generic Theophylline during the Theophylline Period.

**COUNT XCII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (THEOPHYLLINE)**

**(As to Heritage and Teva)**

1565. Humana incorporates by reference the preceding allegations.

1566. Theophylline Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Theophylline in the United States. This conspiracy was *per se* unlawful price-fixing.

1567. Each of the Theophylline Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Theophylline Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Theophylline prices throughout the United States.

1568. The conspiracy realized its intended effect; Theophylline Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Theophylline.

1569. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Theophylline;

b. Humana was deprived of the benefits of free and open competition in the sale of Theophylline in the United States market; and

c. Competition in establishing the prices paid for Theophylline was unlawfully restrained, suppressed, or eliminated.

1570. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Theophylline until the market achieves a steady state.

1571. As a direct and proximate result of Theophylline Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Theophylline than it would have paid in the absence of Theophylline Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1572. There is no legitimate, non-pretextual, pro-competitive business justification for Theophylline Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1573. Theophylline Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1574. Theophylline Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XCIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (THEOPHYLLINE)**

**(As to Heritage and Teva)**

1575. Humana incorporates by reference the preceding allegations.

1576. Theophylline Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Theophylline Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Theophylline at prices restrained by competition and forced to pay artificially inflated prices.

1577. There was and is a gross disparity between the price that Humana paid and continues to pay for Theophylline, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Theophylline should have been available, and would have been available, absent Theophylline Defendants' illegal conduct.

1578. By engaging in the foregoing conduct, Theophylline Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XCIV**

**UNJUST ENRICHMENT UNDER STATE LAW (THEOPHYLLINE)**

**(As to Heritage and Teva)**

1579. Humana incorporates by reference the preceding allegations.

1580. Theophylline Defendants have benefitted from artificial prices in the sale of Theophylline resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1581. Theophylline Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Theophylline by Humana.

1582. Humana has conferred upon Theophylline Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1583. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Theophylline.

1584. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Theophylline, as it is not liable and would not compensate Humana for the impact of Theophylline Defendants' unlawful conduct.

1585. The economic benefit of overcharges derived by Theophylline Defendants through charging supracompetitive and artificially inflated prices for Theophylline is a direct and proximate result of Theophylline Defendants' unlawful conduct.

1586. The economic benefits derived by Theophylline Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Theophylline Period, benefiting Theophylline Defendants.

1587. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Theophylline Defendants to be permitted to retain any of the overcharges for Theophylline derived from Theophylline Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1588. Theophylline Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1589. Theophylline Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1590. A constructive trust should be imposed upon all unlawful or inequitable sums received by Theophylline Defendants traceable to Humana.

**COUNT XCV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (THEOPHYLLINE)**

**(As to Heritage and Teva)**

1591. Humana incorporates by reference the preceding allegations.

1592. Theophylline Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Theophylline. Theophylline Defendants injured Humana through this conduct.

1593. But for Theophylline Defendants' scheme to inflate the price of Theophylline, Humana would have purchased lower-priced generic Theophylline.

1594. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Theophylline than it would have paid absent Theophylline Defendants' continuing anticompetitive conduct.

1595. Humana has purchased substantial amounts of Theophylline during the Theophylline Period.

1596. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Theophylline Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1597. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Theophylline Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT XCVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1598. Humana incorporates by reference the preceding allegations.

1599. Ursodiol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Ursodiol in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1600. Each of the Ursodiol Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Ursodiol Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Ursodiol prices throughout the United States.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1601. The conspiracy realized its intended effect; Ursodiol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Ursodiol.

1602. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Ursodiol;

b. Humana was deprived of the benefits of free and open competition in the sale of Ursodiol in the United States market; and

c. Competition in establishing the prices paid for Ursodiol was unlawfully restrained, suppressed, or eliminated.

1603. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Ursodiol until the market achieves a steady state.

1604. As a direct and proximate result of Ursodiol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Ursodiol than it would have paid in the absence of Ursodiol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1605. Ursodiol Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1606. There is no legitimate, non-pretextual, pro-competitive business justification for Ursodiol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1607. Ursodiol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1608. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Ursodiol, or by assignment from its other subsidiaries that directly purchased generic Ursodiol during the Ursodiol Period.

**COUNT XCVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1609. Humana incorporates by reference the preceding allegations.

1610. Ursodiol Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Ursodiol in the United States. This conspiracy was *per se* unlawful price-fixing.

1611. Each of the Ursodiol Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Ursodiol Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Ursodiol prices throughout the United States.

1612. The conspiracy realized its intended effect; Ursodiol Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Ursodiol.

1613. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Ursodiol;

b. Humana was deprived of the benefits of free and open competition in the sale of Ursodiol in the United States market; and

c. Competition in establishing the prices paid for Ursodiol was unlawfully restrained, suppressed, or eliminated.

1614. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Ursodiol until the market achieves a steady state.

1615. As a direct and proximate result of Ursodiol Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Ursodiol than it would have paid in the absence of Ursodiol Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1616. There is no legitimate, non-pretextual, pro-competitive business justification for Ursodiol Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1617. Ursodiol Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1618. Ursodiol Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XCVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1619. Humana incorporates by reference the preceding allegations.

1620. Ursodiol Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Ursodiol Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Ursodiol at prices restrained by competition and forced to pay artificially inflated prices.

1621. There was and is a gross disparity between the price that Humana paid and continues to pay for Ursodiol, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Ursodiol should have been available, and would have been available, absent Ursodiol Defendants' illegal conduct.

1622. By engaging in the foregoing conduct, Ursodiol Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT XCIX**

**UNJUST ENRICHMENT UNDER STATE LAW (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1623. Humana incorporates by reference the preceding allegations.

1624. Ursodiol Defendants have benefitted from artificial prices in the sale of Ursodiol resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1625. Ursodiol Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Ursodiol by Humana.

1626. Humana has conferred upon Ursodiol Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1627. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Ursodiol.

1628. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Ursodiol, as it is not liable and would not compensate Humana for the impact of Ursodiol Defendants' unlawful conduct.

1629. The economic benefit of overcharges derived by Ursodiol Defendants through charging supracompetitive and artificially inflated prices for Ursodiol is a direct and proximate result of Ursodiol Defendants' unlawful conduct.

1630. The economic benefits derived by Ursodiol Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Ursodiol Period, benefiting Ursodiol Defendants.

1631. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Ursodiol Defendants to be permitted to retain any of the overcharges for Ursodiol derived from Ursodiol Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1632. Ursodiol Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1633. Ursodiol Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1634. A constructive trust should be imposed upon all unlawful or inequitable sums received by Ursodiol Defendants traceable to Humana.

**COUNT C**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (URSODIOL)**

**(As to Actavis, Epic, and Lannett)**

1635. Humana incorporates by reference the preceding allegations.

1636. Ursodiol Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Ursodiol. Ursodiol Defendants injured Humana through this conduct.

1637. But for Ursodiol Defendants' scheme to inflate the price of Ursodiol, Humana would have purchased lower-priced generic Ursodiol.

1638. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Ursodiol than it would have paid absent Ursodiol Defendants' continuing anticompetitive conduct.

1639. Humana has purchased substantial amounts of Ursodiol during the Ursodiol Period.

1640. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Ursodiol Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1641. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Ursodiol Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT CI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (VERAPAMIL)**

**(As to Actavis, Heritage, and Mylan)**

1642. Humana incorporates by reference the preceding allegations.

1643. Verapamil Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Verapamil in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1644. Each of the Verapamil Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Verapamil Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Verapamil prices throughout the United States.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1645. The conspiracy realized its intended effect; Verapamil Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Verapamil.

1646. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Verapamil;

b. Humana was deprived of the benefits of free and open competition in the sale of Verapamil in the United States market; and

c. Competition in establishing the prices paid for Verapamil was unlawfully restrained, suppressed, or eliminated.

1647. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Verapamil until the market achieves a steady state.

1648. As a direct and proximate result of Verapamil Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Verapamil than it would have paid in the absence of Verapamil Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1649. Verapamil Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1650. There is no legitimate, non-pretextual, pro-competitive business justification for Verapamil Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1651. Verapamil Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1652. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic Verapamil, or by assignment from its other subsidiaries that directly purchased generic Verapamil during the Verapamil Period.

**COUNT CII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (VERAPAMIL)**

**(As to Actavis, Heritage, and Mylan)**

1653. Humana incorporates by reference the preceding allegations.

1654. Verapamil Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of generic Verapamil in the United States. This conspiracy was *per se* unlawful price-fixing.

1655. Each of the Verapamil Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Verapamil Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Verapamil prices throughout the United States.

1656. The conspiracy realized its intended effect; Verapamil Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of Verapamil.

1657. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for generic Verapamil;

b. Humana was deprived of the benefits of free and open competition in the sale of Verapamil in the United States market; and

c. Competition in establishing the prices paid for Verapamil was unlawfully restrained, suppressed, or eliminated.

1658. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for generic Verapamil until the market achieves a steady state.

1659. As a direct and proximate result of Verapamil Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for Verapamil than it would have paid in the absence of Verapamil Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1660. There is no legitimate, non-pretextual, pro-competitive business justification for Verapamil Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1661. Verapamil Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1662. Verapamil Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (VERAPAMIL)

**(As to Actavis, Heritage, and Mylan)**

1663. Humana incorporates by reference the preceding allegations.

1664. Verapamil Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Verapamil Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase generic Verapamil at prices restrained by competition and forced to pay artificially inflated prices.

1665. There was and is a gross disparity between the price that Humana paid and continues to pay for Verapamil, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Verapamil should have been available, and would have been available, absent Verapamil Defendants' illegal conduct.

1666. By engaging in the foregoing conduct, Verapamil Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT CIV**

**UNJUST ENRICHMENT UNDER STATE LAW (VERAPAMIL)**

**(As to Actavis, Heritage, and Mylan)**

1667. Humana incorporates by reference the preceding allegations.

1668. Verapamil Defendants have benefitted from artificial prices in the sale of Verapamil resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1669. Verapamil Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for Verapamil by Humana.

1670. Humana has conferred upon Verapamil Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1671. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Verapamil.

1672. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased Verapamil, as it is not liable and would not compensate Humana for the impact of Verapamil Defendants' unlawful conduct.

1673. The economic benefit of overcharges derived by Verapamil Defendants through charging supracompetitive and artificially inflated prices for Verapamil is a direct and proximate result of Verapamil Defendants' unlawful conduct.

1674. The economic benefits derived by Verapamil Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the Verapamil Period, benefiting Verapamil Defendants.

1675. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Verapamil Defendants to be permitted to retain any of the overcharges for Verapamil derived from Verapamil Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1676. Verapamil Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1677. Verapamil Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1678. A constructive trust should be imposed upon all unlawful or inequitable sums received by Verapamil Defendants traceable to Humana.

**COUNT CV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (VERAPAMIL)**

**(As to Actavis, Heritage, and Mylan)**

1679. Humana incorporates by reference the preceding allegations.

1680. Verapamil Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of Verapamil. Verapamil Defendants injured Humana through this conduct.

1681. But for Verapamil Defendants' scheme to inflate the price of Verapamil, Humana would have purchased lower-priced generic Verapamil.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1682. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for Verapamil than it would have paid absent Verapamil Defendants' continuing anticompetitive conduct.

1683. Humana has purchased substantial amounts of Verapamil during the Verapamil Period.

1684. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Verapamil Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1685. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Verapamil Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT CVI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1686. Humana incorporates by reference the preceding allegations.

1687. Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1688. Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing Subject Drug prices throughout the United States.

1689. The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

1690. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

b. Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

c. Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

1691. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

1692. As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1693. Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1694. There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1695. Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1696. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Subject Drugs, or by assignment from its other subsidiaries that directly purchased the Subject Drugs during the periods alleged above for each of the Subject Drugs.

**COUNT CVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1697. Humana incorporates by reference the preceding allegations.

1698. Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1699. Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Second Amended Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Subject Drug prices throughout the United States.

1700. The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

1701. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

b. Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

c. Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

1702. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

1703. As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1704. There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1705. Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1706. Defendants' conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT CVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1707. Humana incorporates by reference the preceding allegations.

1708. Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Subject Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1709. There was and is a gross disparity between the price that Humana paid and continues to pay for the Subject Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

1710. By engaging in the foregoing conduct, Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v. R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w. S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x. Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

y. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

**COUNT CIX**

**UNJUST ENRICHMENT UNDER STATE LAW (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1711. Humana incorporates by reference the preceding allegations.

1712. Defendants have benefitted from artificial prices in the sale of the Subject Drugs resulting from the unlawful and inequitable acts alleged in this Second Amended Complaint.

1713. Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for the Subject Drugs by Humana.

1714. Humana has conferred upon Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1715. It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Subject Drugs.

1716. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Subject Drugs, as it is not liable and would not compensate Humana for the impact of Defendants' unlawful conduct.

1717. The economic benefit of overcharges derived by Defendants through charging supracompetitive and artificially inflated prices for the Subject Drugs is a direct and proximate result of Defendants' unlawful conduct.


PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTICE ORDER

1718. The economic benefits derived by Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the periods alleged above for each of the Subject Drugs, benefiting Defendants.

1719. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Subject Drugs derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Second Amended Complaint.

1720. Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1721. Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1722. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Humana.

**COUNT CX**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

1723. Humana incorporates by reference the preceding allegations.

1724. Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Subject Drugs. Defendants injured Humana through this conduct.

1725. But for Defendants' scheme to inflate the price of the Subject Drugs, Humana would have purchased lower-priced Subject Drugs.

1726. Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Subject Drugs than it would have paid absent Defendants' continuing anticompetitive conduct.

1727. Humana has purchased substantial amounts of the Subject Drugs during the periods alleged above for each of the Subject Drugs.

1728. Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1729. Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## XIX. DEMAND FOR JUDGMENT

WHEREFORE, Humana demands judgment against Defendants, as follows:

A. Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1-2;

B. A judgment against Defendants, jointly and severally, for the damages sustained by Humana, and for awarding Humana actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C. Awarding Humana its reasonable costs and expenses, including attorneys' fees; and

D. Awarding all other legal or equitable relief as the Court deems just and proper.

## XX. JURY TRIAL DEMANDED

Humana demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: April 1, 2019

Respectfully submitted:

LOWEY DANNENBERG, P.C.

By: ______________________________
Peter D. St. Phillip, PA ID # 70027
Jennifer Risener (admitted *pro hac vice*)
Lee Yun Kim (admitted *pro hac vice*)
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel. 914-997-0500
PStPhillip@lowey.com
JRisener@lowey.com
LKim@lowey.com

LOWEY DANNEBERG, P.C.

Laura K. Mummert, PA ID # 85964
Julia Rebekah McGrath, PA ID #323771
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
Tel: 215-399-4770
LMummert@lowey.com
JMcGrath@lowey.com

SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP

Todd Schneider (admitted *pro hac vice*)
Jason Kim (admitted *pro hac vice*)
Kyle Bates (admitted *pro hac vice*)
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel.: 415-421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com
kbates@schneiderwallace.com

Garrett W. Wotkyns (admitted *pro hac vice*)
8501 North Scottsdale Road
Suite 270
Scottsdale, Arizona 85253
Tel. : 480-428-0144

GWotkyns@schneiderwallace.com

HUMANA INC.

Matthew R. Varzally
Senior Counsel—Litigation & Investigations
500 West Main Street
Louisville, Kentucky 40202

*Counsel for Humana Inc.*