**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO:<br><br>*HUMANA INC.*<br>*PLAINTIFF,*<br><br>*V.*<br><br>*ACTAVIS ELIZABETH, LLC, ET AL.,*<br>*DEFENDANTS.* | Case No. 2:18-cv-03299 |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT AS TO HUMANA'S OVERARCHING CONSPIRACY CLAIM, CAUSATION, AND INJUNCTIVE RELIEF CLAIMS**

**FILED WITH REDACTIONS – PUBLIC VERSION**

**TABLE OF CONTENTS**

**Page**


INTRODUCTION ... 1

FACTUAL BACKGROUND ... 5

I. Humana's Overarching Conspiracy Theory ... 5

II. Oligopolistic Competition in the Generic Drug Industry ... 7

III. Experts ... 8

LEGAL STANDARD ... 10

ARGUMENT ... 14

I. Humana Has No Evidence of an Agreement ... 14

A. The Alleged Overarching Conspiracy Has No Viable Definition or Scope ... 14

1. Humana Cannot Establish Who Entered into the Alleged Overarching Agreement, When They Did So, and What Those Individuals Agreed to Do ... 14

2. Humana Cannot Explain Why, If There Was a Conspiracy, It Was Not Implemented Consistently ... 16

3. No Evidence Exists of Key Elements Necessary to Maintain a Cartel ... 18

B. The Record Evidence Does Not Support the Overarching Conspiracy Claim ... 19

1. There is No Direct Evidence of the Alleged Overarching Conspiracy ... 19

a) No Testimony Demonstrates Humana's Overarching Conspiracy ... 19

b) No Documents Provide Direct Evidence of an Overarching Conspiracy ... 21

2. No Circumstantial Evidence Creates a Genuine Dispute of Material Fact Regarding the Alleged Overarching Conspiracy ... 22

a) The Alleged Rules of the Overarching Conspiracy Restate Lawful Oligopolistic Competition, So Without Evidence

Tending to Exclude the Possibility of Independent Conduct, the Claim Fails ........ 22

b) There is No Evidence that Defendants Shared a Common Understanding of "Fair Share" or Other "Rules of Engagement" ........ 23

c) Humana Failed to Establish Any "Plus Factors" Indicative of An Overarching Conspiracy ........ 27

3. The Limited DPAs and Guilty Pleas Provide No Evidence of an Overarching Conspiracy ........ 29

II. Humana Fails to Demonstrate Interdependence, Overlap, and a Common Goal ........ 30

A. Lack of Interdependence ........ 31

1. Success of One Drug-Specific Agreement Did Not Depend on the Success of Another, and There Were No Cross-Conspiracy Benefits ........ 31

2. Humana Cannot Show Continuous Cooperation ........ 34

B. Humana Cannot Show Sufficient Overlap Across the Subject Drugs ........ 35

C. The Alleged Overarching Conspiracy Lacks a Common Goal ........ 36

III. Humana's Overarching Conspiracy Fails if a Claim on a Particular Drug Fails ........ 37

IV. Humana Fails to Establish Causation ........ 38

V. Summary Judgment is Warranted on Humana's Injunctive Relief Claims ........ 39

CONCLUSION ........ 39

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994) ........ 24

*Avirgan v. Hull*,
932 F.2d 1572 (11th Cir. 1991) ........ 19

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ........ 13

*Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*,
2005 WL 3988699 (D.N.J. Jan. 28, 2005) ........ 39

*Connecticut, et al., v. Sandoz Inc., et al.*,
No. 3:20-CV-00802-MPS, ECF 1123 (D. Conn. Nov. 22, 2025) ........ 4

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ........ *passim*

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015) ........ *passim*

*In re Chocolate Confectionary Antitrust Litig.*,
999 F. Supp. 2d 777 (M.D. Pa. 2014),
*aff'd*, 801 F.3d 383 (3d Cir. 2015) ........ 11, 14, 15, 16

*In re Citric Acid Litig.*,
996 F. Supp. 951 (N.D. Cal. 1998)
*aff'd*, 191 F.3d 1090 (9th Cir. 1999) ........ 21

*In re Concrete & Cement Additives Antitrust Litig.*,
2025 WL 1755193 (S.D.N.Y. June 25, 2025) ........ 25

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) ........ 23

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004) ........ 8, 12, 27

*In re Generic Pharms. Pricing Antitrust Litig.*,
394 F. Supp. 3d 509 (E.D. Pa. 2019) ........ 30, 35

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ........ 12, 13, 36

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
768 F. Supp. 2d 961 (N.D. Iowa 2011)........................................................................ 29

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*,
553 F. Supp. 3d 211 (D.N.J. 2021)............................................................................ 37

*In re K-Dur Antitrust Litig.*,
2016 WL 755623 (D.N.J. Feb. 25, 2016)................................................ 13, 14, 30, 36

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993)...................................................................................... 38

*In re Mylan N.V. Secs. Litig.*,
666 F. Supp. 3d 266 (S.D.N.Y. 2023),
*aff'd sub nom., Menorah Mivtachim Ins. Ltd. v. Sheehan*,
2024 WL 1613907 (2d Cir. Apr. 15, 2024)................................................................. 28

*In re Vitamins Antitrust Litig.*,
320 F. Supp. 2d 1 (D.D.C. 2004)................................................................................ 26

*In re Wellbutrin XL Antitrust Litig.*,
2012 WL 1657734 (E.D. Pa. May 11, 2012)......................................................... 38, 39

*In re Wellbutrin XL Antitrust Litig.*,
868 F.3d 132 (3d Cir. 2017)........................................................................................ 13

*InterVest, Inc. v. Bloomberg, L.P.*,
340 F.3d 144 (3d Cir. 2003)........................................................................................ 11

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017),
*aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*,
910 F.3d 927 (7th Cir. 2018)........................................................................................ 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................. *passim*

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
629 F.3d 697 (7th Cir. 2011)........................................................................................ 21

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
998 F.2d 1224 (3d Cir. 1993)...................................................................... 18, 21, 27

*Precision Assocs., Inc. v. Panalpina World Transp. Ltd.*,
2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *report & recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 12, 2012)............................. 13, 17, 35, 37

*Pro-Spec Corp. v. Chester Water Auth.*,
2017 WL 2797897 (E.D. Pa. June 28, 2017)........................................................... 37

*Taylor v. Gural*,
2025 WL 638596 (E.D. Pa. Feb. 27, 2025)............................................................ 27

*United States v. Smith*,
82 F.3d 1261 (3d Cir. 1996)....................................................................................... 33

*United States v. Chandler*,
388 F.3d 796 (11th Cir. 2004)..................................................................................... 37

*United States v. Kelly*,
892 F.2d 255 (3d Cir. 1989)................................................................... 14, 30, 33, 37

*United States v. Kemp*,
500 F.3d 257 (3d Cir. 2007)................................................................... 30, 31, 33, 34

*United States v. Local 560 Int'l Bhd. of Teamsters*,
780 F.2d 267 (3d Cir. 1985)....................................................................................... 19

*United States v. Rigas*,
605 F.3d 194 (3d Cir. 2010)....................................................................................... 30

*United States v. Sargent Elec. Co.*,
785 F.2d 1123 (3d Cir. 1986).............................................................................. 11, 37

*Valspar Corp. v. E.I. Du Pone De Nemours and Co.*,
873 F.3d 185 (3d Cir. 2017)....................................................................... *passim*

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*,
513 F. Supp. 1100 (E.D. Pa. 1981),
*aff'd in part, rev'd in part sub nom., In re Japanese Elec. Prod. Antitrust Litig.*,
723 F.2d 238 (3d Cir. 1983),
*rev'd sub nom., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).............................................................................................. 11, 15

## STATUTES

15 U.S.C. § 26............................................................................................................ 39

Sherman Act............................................................................................ 10, 11, 12, 37

## RULES

Fed. R. Civ. P. 56(c)................................................................................................... 10

**INDEX TO EXHIBITS**

| Exhibit | Description of Exhibits |
|---|---|
| 1 | Certain Defendants Pierre-Yves Cremieux Report, dated January 9, 2026 |
| 2 | Corrected Expert Report of W. David Bradford, dated December 10, 2025 |
| 3 | Excerpts from W. David Bradford Deposition Transcript, dated December 18-19, 2025 |
| 4 | Certain Defendants Richard J. Gilbert Report, dated January 9, 2026 |
| 5 | Excerpts from Aaron Kesselheim Deposition Transcript, dated December 5, 2025 |
| 6 | Expert Report of Lauren Stiroh, dated January 9, 2026 |
| 7 | Rebuttal Expert Report of W. David Bradford, dated February, 27, 2026 |
| 8 | Excerpts from William B. Vogt Deposition Transcript, dated December 11, 2025 |
| 9 | Expert Report of Professor William B. Vogt, Ph.D., dated November 7, 2025 |
| 10 | Excerpts from Michael Vezza Deposition Transcript, dated May 1-3, 8-9, and 11, 2023 |
| 11 | Excerpts from Della Lubke Deposition Transcript, dated May 16-17, 19, 22-23, and 25, 2023 |
| 12 | Excerpts from Paul Krauthauser Deposition Transcript, dated July 31 and August 1, 3-4, 2023 |
| 13 | Excerpts from Christopher Bihari Deposition Transcript, dated May 31 and June 1, 5-6, 8, 2023 |
| 14 | Excerpts from Anthony Thomassey Deposition Transcript, dated July 18-19, 20-21, 24, and August 10, 2023 |
| 15 | Excerpts from Maureen Cavanaugh Deposition Transcript, dated March 5, 2025 |
| 16 | Excerpts from Marc Falkin Deposition Transcript, dated October 18-20, 2022 |
| 17 | Excerpts from Karen O'Connor Deposition Transcript, dated February 1, 2022 |
| 18 | Excerpts from Kristy Ronco Deposition Transcript, dated May 16, 2024 |
| 19 | Excerpts from Michael Dorsey Deposition Transcript, dated December 13, 2021 |
| 20 | Excerpts from Tracy Sullivan Deposition Transcript, dated September 20-21, 2023 |
| 21 | Excerpts from Paul Dutra Deposition Transcript, dated August 28-31, 2023 |
| 22 | Excerpts from Rajiv Malik Deposition Transcript, dated December 4, 2025 |
| 23 | Expert Report of Dr. Bonnie Levin, Ph.D., dated January 9, 2026 |
| 24 | Nisha Patel Deposition Exhibits 10145 |
| 25 | Nisha Patel Deposition Exhibits 10145A |
| 26 | Excerpts from Nisha Patel Deposition Transcript, dated August 14-15, and 21, 2024 |
| 27 | Document bates numbered MYLGP0006478673, produced in the course of this litigation |
| 28 | Excerpts from Joel Rosenstack Deposition Transcript, dated November 4, 2025 |



FILED WITH REDACTIONS – PUBLIC VERSION

| Exhibit | Description of Exhibits |
|---|---|
| 29 | Excerpts from Armando Kellum Deposition Transcript, dated April 7-10, 2025 |
| 30 | Excerpts from Amanda Rebnicky Deposition Transcript, dated December 12, 2024 |
| 31 | Excerpts from Neal O'Mara Deposition Transcript, dated March 25, 2025 |
| 32 | Excerpts from Kevin Smith Deposition Transcript, dated September 12, 2023 |
| 33 | Excerpts from Lisa Pehlke Deposition Transcript, dated February 18, 2026 |
| 34 | Excerpts from Jason Malek Deposition Transcript, dated April 8, 2025 |
| 35 | Excerpts from Billy Seiden Deposition Transcript, dated June 21, 2022 |
| 36 | Excerpts from Kevin McElfresh Deposition Transcript, dated August 25, 2021 |
| 37 | Excerpts from Matt Whitt Deposition Transcript, dated August 1, 2023 |
| 38 | Document bates numbered PAR_MDL_00474476, produced in the course of this litigation |
| 39 | Document bates numbered PAR_MDL_02627542, produced in the course of this litigation |
| 40 | Tony Braun Deposition Exhibit 0021 |
| 41 | Keith Dostal Deposition Exhibit 0016 |
| 42 | Excerpts from Keith Dostal Deposition Transcript, dated September 30, 2025 |
| 43 | Excerpts from William Fleming Deposition Transcript, dated October 30, 2025 |
| 44 | James Nesta Deposition Exhibit 3618 |
| 45 | Excerpts from Tony Braun Deposition Transcript, dated September 23, 2025 |
| 46 | Excerpts from Jeffrey Glazer Deposition Transcript, dated April 16, 2025 |
| 47 | Expert Report of Amitabh Chandra, Ph.D., dated January 9, 2026 |
| 48 | Document bates numbered MYLGP0004044690 |
| 49 | Document bates numbered MYLGP0000879853 |
| 50 | Document bates numbered SDZMDL-010695178 |
| 51 | Document bates numbered HUM-GEN-MDL-002826244 |
| 52 | Expert Report of Christopher Stomberg, Ph.D., dated January 9, 2026 |
| 53 | Expert Report of Mathis Wagner, Ph.D., dated January 9, 2026 |
| 54 | Expert Report of Lawrence Wu, Ph.D., dated January 14, 2026 |
| 55 | Corrected Expert Report of Jonathan Orszag, dated January 14, 2026 |
| 56 | Expert Report of Dr. Anupam B. Jena, M.D., Ph.D, dated January 9, 2026 |
| 57 | Plaintiff Humana Inc.'s Supplemental Responses and Objections to Defendants Mylan Inc., Mylan Pharmaceuticals, Inc., Mylan N.V., and UDL Laboratories, Inc.'s First Set of Interrogatories, dated February 27, 2026 |
| 58 | Expert Report of Erika Jensen, dated January 9, 2026 |

## INTRODUCTION

Humana's Complaint rests on the proposition that 24 Defendants allegedly engaged in a single, "overarching," years-long conspiracy to raise the prices of roughly two dozen unrelated generic drugs—drugs that the large majority of Defendants did not even make or sell. Yet Humana has failed to produce any evidence of such an agreement. Its Complaint identified—without any discernible rhyme or reason—nearly two dozen individual generic drugs ("Subject Drugs") and 24 Defendants as participants in the alleged overarching conspiracy. The drugs include everything from ingestible tablets for heart failure (Digoxin), to an anesthetic cream (Lidocaine), to an ointment for eczema (Fluocinonide), among many others. There is no pattern of overlap among the Defendants—in fact, of the 24 Defendant corporate families, a third have only one Subject Drug at issue. No thread ties together this alleged overarching conspiracy, and Humana cannot explain why any Defendant would conspire to raise prices for drugs it never made or sold. For several independent reasons Defendants are entitled to summary judgment.

*First*, Humana's claim fails out of the box because it is lacking evidence of the most basic elements of any conspiracy. Humana has no evidence of when the alleged overarching conspiracy began, who formed it, when each Defendant supposedly joined it, or who agreed to bind each Defendant. Indeed, Humana has no proof of what it is that each Defendant purportedly agreed to do. Nor is there evidence of any monitoring or enforcement mechanism that would allow such a broad conspiracy to endure for years, as alleged. Absent any evidence of the basic who, what, when, and where of the alleged conspiracy, Defendants are entitled to summary judgment.

*Second*, Humana also cannot show an agreement because it has failed to marshal direct or circumstantial evidence of the claimed overarching conspiracy. On direct evidence, none exists. Humana promised to prove a "fair share" conspiracy in which all 24 Defendants agreed on a

"common understanding" of what shares each should have across all 22 drugs "to avoid competition on price." No. 2:18-cv-3299, Second Amended Complaint (ECF 106) (April 1, 2019) ("Compl"). ¶¶ 263-69. But after nearly a decade of discovery, that promise proved empty; no witness testified to such an agreement and no document reveals one. Just the opposite: the record shows that Defendants had no shared definition of "fair share" and that markets did not follow such principles. Even cooperating witnesses deny the overarching conspiracy that Humana presses.

Humana fares no better on circumstantial evidence. Humana's Complaint alleges certain market features that purportedly defined the overarching conspiracy, including that Defendants sought to achieve their "fair share" in various markets, followed certain list price increases, and did not undercut each other on price in a race to the bottom that would sacrifice profits for market share. Upon examination of the evidence, however, there is no parallel conduct that would support Humana's 22-drug claim. Defendants' pricing and sales decisions across the drugs followed no pattern whatsoever: shares fluctuated wildly; list prices increased for some Subject Drugs but not all (and other prices decreased); Defendants sometimes followed those increases and sometimes did not; even where Defendants did follow, the timing varied from days to years later; some purchasers saw net price increases and some did not; and competition remained robust. Nor can Humana show any "traditional" evidence that Defendants exchanged assurances that they would conspire across the drugs, particularly given the diversity of the drugs and entities. It is black-letter law that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Valspar Corp. v. E.I. Du Pone De Nemours and Co.*, 873 F.3d 185, 199 (3d Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). But even Humana's expert witness (Professor Bradford) could not offer a viable economic theory supporting the existence of the alleged overarching

conspiracy, resorting to characterizing the alleged overarching conspiracy as merely "possible." Under *Matsushita*, that sort of speculation does not create a genuine issue of material fact.

With no viable definition of the overarching conspiracy, and no direct or circumstantial evidence of an agreement, this Court must grant Defendants summary judgment on the claim.

However, as a *third* independent basis for summary judgment, Humana cannot establish a conspiracy that is "overarching" by knitting together the 22 separate individual drug "sub-conspiracies" it alleged into a single agreement. Beyond the lack of evidence of a common goal among Defendants, there is no evidence of sufficient overlap and interdependence among the alleged drug-specific agreements. Humana makes no attempt to reconcile the overarching conspiracy claim with the fact that each Subject Drug had distinct uses, distinct regulatory approvals, different demand and supply factors, and was sold by different sets of Defendants. Nor does Humana grapple with the fact that most Defendants manufactured only a handful of the Subject Drugs—with a third of the Defendants accused of wrongdoing on *only one drug*. Humana also cannot explain why Defendants supposedly joined drug-specific conspiracies for some—but not all—drugs that they manufactured, a fact that would cause any overarching conspiracy to unravel. At bottom, Humana has no evidence that (1) a Defendant accused of wrongdoing on certain Subject Drugs (or one Subject Drug) benefitted from the outcomes of any other alleged wrongdoing on other Subject Drugs, or (2) the success of one alleged sub-conspiracy depended on the outcome of another.

Notably, Humana's "overarching conspiracy" expert stopped well short of opining that the evidence is sufficient to corroborate Humana's 24-Defendant/22-Drug single conspiracy. Professor Bradford's opening report briefly provides only a limited review of select documents from a subset of Defendants and concerning only some Subject Drugs. The most he would say was

that he observed conduct "indicative of" collusion in some *distinct* markets, and he steadfastly ignored all evidence that showed the very opposite. Moreover, he performed no analysis that could support a finding of interdependence—he conceded that he [redacted] to identify collusive links between each of the Subject Drugs. Ex. 3, 434:19-23—let alone a finding that any Defendant had an incentive to conspire on drugs it did not sell. Then, his rebuttal report only *weakened* his position: He admitted the most he could conclude was that the evidence he examined might be consistent with "the possibility" of an overarching conspiracy. But he could not determine which drugs and Defendants, if any, were part of the alleged overarching conspiracy. That empty conclusion falls far short of Humana's burden of proof under *Matsushita*.

Humana's overarching conspiracy claim fails for a *fourth* reason as well: it cannot survive if a single underlying claim fails. Because Humana is bound to the Complaint it pled, it must now show evidence of its alleged 22-drug overarching conspiracy. *See* No. 2:16-md-02724, ECF No. 4073 at 5 ("Each complaint stands or falls on its own.").[1] Thus, the failure to prove any of its drug sub-conspiracies (or multiple ones) leaves Humana's 22-drug overarching conspiracy claim with insurmountable gaps, and Humana cannot re-cast that claim based on what (if anything) remains standing of its drug-specific conspiracies after summary judgment or trial.

*Fifth*, Humana's overarching conspiracy and drug-specific conspiracy claims also fail because Humana cannot establish that any of the allegedly unlawful conduct *caused* Humana harm. Indeed, no Humana expert opines on causation.

[1] Humana's case involves a different set of Defendants, mostly different drugs, and different allegations than the State Attorneys' General case where Judge Shea recently granted summary judgment as to certain claims. *See Connecticut, et al., v. Sandoz Inc., et al.*, No. 3:20-CV-00802-MPS, ECF 1123 (D. Conn. Nov. 22, 2025). Accordingly, the inquiry here must be on the sufficiency of the evidence as to Humana's Subject Drugs and Defendants.

Finally, summary judgment is warranted as to Humana's injunctive relief claims because Humana offers no evidence of purportedly unlawful conduct after 2015.

Although the Court allowed Humana's overarching conspiracy claim to proceed at the motion-to-dismiss phase, Humana has failed to back up its allegations with evidence. For example, Humana alleged that "[c]ustomers in one drug market might be traded for customers in another drug market." Compl. ¶ 267. Now that discovery is complete, there is no *evidence* that the alleged individual drug agreements were interconnected in any meaningful way, including any such "trading." Humana's other allegations fare no better. Because Humana's overarching conspiracy claim lacks support in the millions of documents produced, terabytes of data analyzed, and hundreds of depositions taken, Defendants are entitled to summary judgment.

## FACTUAL BACKGROUND

### I. Humana's Overarching Conspiracy Theory

Humana filed its initial Complaint on August 3, 2018, its first amended complaint on December 21, 2018, and its second amended complaint ("Compl.") on April 1, 2019.[2] Humana alleges individual drug-specific conspiracy claims, and a separate overarching conspiracy claim covering all drugs and all Defendants. Compl. ¶¶ 9, 261-88. According to Humana, 37 Defendants[3] "conspired to manipulate the relevant markets, allocate these markets amongst themselves, and obstruct generic competition in an ongoing scheme to fix, increase, stabilize, and/or maintain the price" of 21 Subject Drugs.[4] *Id*. ¶ 2.

---

[2] Humana has filed two separate actions concerning other drugs. No. 2:19-cv-04862-CMR (E.D. Pa.) ("*Humana II*"); No. 2:20-cv-6303-CMR (E.D. Pa.) ("*Humana III*").
[3] The Complaint identifies 37 Defendants, comprising 24 generic manufacturer corporate families. Compl. ¶¶ 49-88; Ex. 1 ¶ 5.
[4] The 21 "Subject Drugs" alleged in Humana's Complaint include Acetazolamide ER, Amitriptyline, Baclofen, Benazepril, Clobetasol, Clomipramine, Desonide, Digoxin, Divalproex, Doxycycline, Econazole, Fluocinonide, Leflunomide, Levothyroxine, Lidocaine, Nystatin, Pravastatin, Propranolol, Theophylline ER, Ursodiol, and Verapamil. Compl. ¶¶ 19-39. Humana's experts consider Lidocaine/Prilocaine to be distinct from Lidocaine and thus

Humana alleges that different sets of Defendants entered into separate unlawful agreements for each Subject Drug. *Id*. ¶¶ 90-110. Humana does not allege that each Defendant participated in Subject-Drug-specific conspiracies for each Subject Drug it sold. Ex. 1 Fig. 10. For example, Mylan sold Ursodiol during the alleged period of collusion, but Humana does not allege that Mylan participated in the alleged Ursodiol conspiracy. *See* Ex. 1 E-1. Humana does not allege that any Defendant engaged in wrongdoing as to all Subject Drugs, and most are accused of product-specific wrongdoing on relatively few. Indeed, eight of the 24 Defendants are accused of wrongdoing on only a single Subject Drug. Ex. 1 ¶ 172. Overlap among the Defendants is lacking: For example, Mayne is named as a Defendant as to only one Subject Drug, and it is alleged to have conspired with only one Defendant, so it has no link to 22 other Defendants. As another example, Zydus is named as a Subject-Drug Defendant as to three drugs, but Zydus is not alleged to have entered any Subject-Drug-specific conspiracy with 15 of the 23 other Defendants. *See* Ex. 1 E-1.

Humana's separate "overarching conspiracy" claim alleges a single agreement to fix prices across the 22 Subject Drugs. It also vaguely alleges that the overarching conspiracy was "broader than the Subject Drugs and Defendants named," Compl. ¶ 261, but it did not identify any additional drugs or defendants. Humana alleged that Defendants "operated under a system of understandings described as 'playing nice in the sandbox,' where companies were entitled to their 'fair share' of a generic drug market based on the number of participants in the market and the order of entry." *Id*. ¶ 263. Further, Humana alleges that "Defendants all had a common understanding of what 'fair share' means in different circumstances," *id*. ¶ 264, though "fair shares" were not always achieved on a drug-by-drug basis but could instead be achieved across different drugs, *id*. ¶¶ 267, 270-71.

identify 22 Subject Drugs. *See* Vogt Rep. Table 1; Bradford Rep. Table 1. In this brief, "Subject Drugs" refers to the 22 drugs at issue identified by Humana's experts.

Once a "stable" market was purportedly achieved, Defendants allegedly "agree[d] not to compete on price, and, at times, significantly raise[d] prices." *Id*. ¶ 265. The alleged "shared understanding and goal is for the competitors in a particular market to discuss amongst themselves an agreement on 'fair share' with the objective of attaining a state of equilibrium where no competitor is incentivized to compete for additional market share by eroding price." *Id*. ¶ 268.

Humana did not allege when the overarching conspiracy began, when any Defendant supposedly joined, or who entered into the overarching agreement on behalf of each Defendant. Instead, Humana broadly claimed that, at different points, discrete sets of Defendants engaged in anticompetitive conduct on particular Subject Drugs, and that a jury can stitch together such discrete and disparate conduct into an overarching conspiracy. Ex. 2 Table 2.[5]

## II. Oligopolistic Competition in the Generic Drug Industry

Oligopolies are characterized by a relatively small number of firms making individually rational production and pricing choices that strategically consider the response of rival firms. Ex. 1 ¶ 58; Ex. 3, 17:18-18:14, 177:5-178:19. In oligopolies, unilaterally determined prices can be significantly higher than in markets with more participants, and such prices can even approach monopoly prices. Ex. 4 at V.B.; Ex. 1 ¶¶ 67-68; *see* Ex. 5, 103:19-22. This reflects the interdependent nature of oligopolies, where the few competitors anticipate other competitors' behavior and plan accordingly, including expecting that others may follow a price increase. Ex. 4 ¶¶ 152-56; Ex. 1 ¶¶ 74, 128. Economists refer to this behavior as "conscious parallelism" or "tacit collusion" which can be a result of oligopolistic competition. Ex. 1 ¶ 13; Ex. 4 ¶ 13 n.7; Ex. 6 ¶ 30;

[5] In *Humana II* and *Humana III*, Humana also advances claims of an overarching conspiracy. It is unclear whether Humana alleges the same overarching conspiracy across all three of its complaints, or whether Humana alleges different overarching conspiracies. If Humana is pursuing the same overarching conspiracy claim in each of its three Complaints, claim splitting precedent would bar most of Humana's claims.

Ex. 2 ¶ 70. No matter what you call it, such conduct is lawful. *Valspar*, 873 F.3d at 193; *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359 (3d Cir. 2004).

Seeking to supply 100% of the market—or agreeing to take on every marginally profitable additional business opportunity—is typically not a rational business strategy for any business, let alone a profit-maximizing oligopolist. Ex. 4 at VII.D. Doing so could trigger a "race to the bottom," on price, resulting in reduced profits for a given drug. Ex. 4 ¶ 186. In a price war, both manufacturers would become worse off; and because both manufacturers know that, neither will reduce price in the first place. This is especially true if the manufacturers repeatedly compete. These tenets form the bedrock basis for oligopoly economics. Ex. 1 ¶¶ 69, 75-76; Ex. 4 at V.B; Ex. 1 at 5.1. They explain why oligopolists do not always reduce price to compete for more business, why it makes sense to match a competitor's price change, and why it is unilaterally profit-maximizing to "give up" business in some cases, rather than engaging in price wars that are contrary to the profit-maximizing oligopolistic behavior. Ex. 4 at VII.E. As the Third Circuit has explained, "if the oligopolists independently conclude that the industry as a whole would be better off by raising price," they "may maintain supracompetitive prices through rational, interdependent decision-making, as opposed to unlawful concerted action." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015).

The parties do not dispute that each of the Subject Drug markets was an oligopoly because there were a low number of competitors that could make strategic pricing and sales decisions by considering the expected responses of competitors. Ex. 4 at V.C; Ex. 1 ¶ 13; Ex. 2 ¶ 76.

## III. Experts

Of Humana's five experts, only Bradford addressed Humana's overarching conspiracy claims—and only in seven of the 426 paragraphs in his report. Ex. 2 ¶¶ 420-26. [redacted]



FILED WITH REDACTIONS – PUBLIC VERSION

[redacted] Ex. 3, 296:5-15.[6] [redacted]. *See* Ex. 2 ¶¶ 420-26; Ex. 1 ¶ 160; Ex. 3, 442:5-19. Notably, Bradford did not [redacted] Ex. 3, 434:19-435:5, 469:22-471:5, 487:3-5, 487:14-488:11. He also did not [redacted] Ex. 3, 488:3-11, 488:22-489:1. Finally, Bradford elected not [redacted] Ex. 3, 443:12-444:10. He did [redacted] Ex. 3, 89:11-91:14, 432:4-443:10.

Humana's expert Dr. Kesselheim offers no opinion as to the alleged overarching conspiracy and admitted that he conducted no analysis specific to the facts or allegations of

[6] "Q. You've stopped when you hit evidence consistent with plaintiff's claims without looking to see whether there was contrary evidence in the record? [...] A. My charge was to identify whether there was a basis for moving forward with an assessment, a determination as to whether there was collusion. And if there is evidence consistent with collusion, then I'm saying that's -- there is evidence. There may be counterevidence that someone else will present and talk about. But that wasn't my charge."

*Humana I*. Ex. 5, 169:20-170:7, 45:2-47:21. Dr. Vogt, Humana's damages expert, likewise does not [redacted] Ex. 8, 113:15-17. Rather, Vogt calculated [redacted] Ex. 9, ¶ 75, Table 3; Ex. 8, 113:9-14, 115:17-23; and, like Bradford, he did no econometric or causation analysis as to the alleged overarching conspiracy or any harm purportedly suffered from it. Ex. 8, 111:21-115:20.[7]

Defendants' expert Dr. Crémieux responded to the opinions of Bradford, Vogt, and Kesselheim that pertained to antitrust liability.[8] Ex. 1 ¶ 9. Dr. Crémieux concluded that Bradford failed to conduct any test, let alone a scientifically valid one, that could support a finding that the evidence is consistent with Humana's 22-Drug overarching conspiracy claim. *Id.* ¶¶ 154-75.

## LEGAL STANDARD

To survive summary judgment on its overarching conspiracy claim, Humana must "establish that there is a genuine issue of material fact as to whether" Defendants entered into the overarching conspiracy it alleged "that caused respondents to suffer a cognizable injury." *Matsushita*, 475 U.S. at 585-86; *see* Fed. R. Civ. P. 56(c). To demonstrate that a dispute is "genuine," the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" and must instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586-87.

To establish a violation of Section 1 of the Sherman Act, Humana must prove that Defendants engaged in "concerted action," that "amounts to an unreasonable restraint" on trade. *In re Baby Food Antitrust Litig*., 166 F.3d 112, 117 (3d Cir. 1999). Proof of "concerted action" requires showing "unity of purpose or a common design and understanding or a meeting of the

[7] Humana's remaining experts, Stacy Arruda and Dr. Richard Frank, do not opine on the alleged overarching conspiracy.

[8] Defendants submitted other joint and individual expert reports, and some also addressed Humana's claims.

minds in an unlawful arrangement." *Id.*; *Chocolate*, 801 F.3d at 395. Courts grant summary judgment when Plaintiffs present no evidence of "how, when, or where" of an alleged unlawful agreement. S*ee, e.g.*, *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 513 F. Supp. 1100, 1310 (E.D. Pa. 1981), *aff'd in part, rev'd in part sub nom.*, *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd sub nom.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ("We have looked for evidence of when this conspiracy began and when the various parties entered it, but again we have found none. That is, we suppose, because there is no evidence of agreement or of concerted action."); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 805 (M.D. Pa. 2014) (no reasonable inference of price-fixing agreement when plaintiffs offered "nothing more than speculation as to the who, what, when, where, and how of the communications that allegedly facilitated the parallel price increases"), *aff'd*, 801 F.3d 383 (3d Cir. 2015) ("*Chocolate II*"); *see also United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986) ("An agreement 'to rig bids wherever and whenever possible' is meaningless for Sherman Act purposes unless there are in the real world of the marketplace some 'whens' and 'wheres.'").

Concerted action may be established through direct or circumstantial evidence. *Baby Food*, 166 F.3d at 121-22. To establish the existence of an agreement through direct evidence, Humana must present "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* at 118; *see also InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 149 (3d Cir. 2003) (holding that "cases require that direct evidence of an illegal agreement [must] be established with much greater clarity" than the ambiguous statements plaintiffs offered to show an agreement). To raise a reasonable inference of a conspiracy by relying on circumstantial evidence, Humana must prove concerted action through evidence of parallel conduct combined

with "plus factors" that "tend to exclude the possibility" that the alleged conspirators acted independently. *Valspar*, 873 F.3d at 194; *Baby Food*, 166 F.3d at 122. The Third Circuit has identified three "plus" factors: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'" *Chocolate II*, 801 F.3d at 398 (quoting *Flat Glass*, 385 F.3d at 360). However, in cases involving oligopolies, "care must be taken with the first two types of evidence, each of which may indicate simply that the defendants operate in an oligopolistic market," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010). Moreover, the "mere presence of one or more of these 'plus factors' does not necessarily mandate the conclusion that there was an illegal conspiracy between the parties, for the court may still conclude, based upon the evidence before it, that the defendants acted independently of one another and not in violation of antitrust laws." *Baby Food*, 116 F.3d at 122 (cleaned up).

Courts are cautious about inferring a conspiracy from circumstantial evidence in cases alleging price-fixing by oligopolists. *Flat Glass*, 385 F.3d at 358. "Oligopolies pose a special problem under [Sherman Act] § 1 because rational, independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing. . . [as a] result of 'interdependence,' which occurs because 'any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms.'" *Valspar*, 873 F.3d at 191 (quoting *Flat Glass*, 385 F.3d at 359). In oligopolies, "[a] firm is unlikely to lower its price in an effort to win market share because its competitors will quickly learn of that reduction and match it, causing the first mover's profits to decline." *Id.* In contrast, when "a firm announces a price increase," its competitors "will know that if they do not increase their prices to [that] level, the first-mover may be forced to reduce its price." *Id.* Each firm "will consider whether it is better off when all are charging the old price or the new

one" and will "choose the new price" when they believe that it will maximize profits. *Id.* (cleaned up). "The Supreme Court has explained that this behavior does not violate antitrust laws." *Id.* (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)).

Given these dynamics, courts have repeatedly recognized that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 192 (quoting *Matsushita*, 475 U.S. at 588); *see Chocolate II*, 801 F.3d at 398; *Baby Food*, 166 F.3d at 122. Courts further require antitrust plaintiffs, "in oligopoly cases in particular," to satisfy "specialized evidentiary standards," *Valspar*, 873 F.3d at 193, including presenting "evidence [that] tends to exclude the possibility that [defendants] acted independently" of their competitors, *Matsushita,* 475 U.S. at 588 (emphasis added) (cleaned up). In the absence of such evidence, summary judgment is appropriate. *Id.* at 598.

To survive summary judgment on its overarching conspiracy claim, it is not sufficient for Humana to proffer evidence of one or more drug-specific agreements. Instead, Humana must show evidence of the "overarching" agreement that it pled. *See In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *23 (D.N.J. Feb. 25, 2016) ("[T]he presence of a single party common to several illegal agreements with other parties does not necessarily establish a single conspiracy."); *Precision Assocs., Inc. v. Panalpina World Transp. Ltd.*, 2011 WL 7053807, at *27-30 (E.D.N.Y. Jan. 4, 2011), *report & recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 12, 2012) ("ten local conspiracies" were "'parallel' conduct" that, absent more, could not prove overarching conspiracy). "Bare allegations" of a "larger, overarching conspiracy" cannot defeat summary judgment. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 154 (3d Cir. 2017); *see Ins. Brokerage*, 618 F.3d at 348-51 (affirming dismissal of alleged "industry-wide conspiracy").

Instead, to determine whether evidence of drug-specific agreements can support a finding of an overarching conspiracy, courts consider (1) whether there was a common goal among all of the alleged conspirators; (2) whether the drug-specific agreements were interdependent; and (3) the extent to which the participants overlap in the various dealings. *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989). Courts apply these factors when evaluating alleged civil conspiracies, including in antitrust cases. *See e.g.*, *K-Dur*, 2016 WL 755623, at *18.

## ARGUMENT

### I. Humana Has No Evidence of an Agreement

#### A. The Alleged Overarching Conspiracy Has No Viable Definition or Scope

To meet its evidentiary burden, a plaintiff in a conspiracy case must show what the co-conspirators agreed to do, who agreed to do it on behalf of each defendant, and when they agreed to do it. *Chocolate*, 999 F. Supp. 2d at 805. Without evidence that could answer those questions, no reasonable jury could find that the alleged conspiracy existed. *Id*. Humana lacks the most basic proof of its alleged overarching conspiracy: It has no evidence concerning the formation of the alleged overarching conspiracy, no explanation for why (if it existed) such an overarching conspiracy would be implemented inconsistently across Subject Drugs and Defendants, and no evidence of the monitoring and enforcement mechanisms required for the alleged overarching conspiracy to function. These failures warrant summary judgment.

##### *1. Humana Cannot Establish Who Entered into the Alleged Overarching Agreement, When They Did So, and What Those Individuals Agreed to Do*

Having chosen to proceed against these 24 Defendants, Humana must establish through evidence what those 24 Defendants agreed to do *collectively*, who from each Defendant agreed to do it, and when they agreed to do it. After years of discovery, Humana cannot meet that burden.



FILED WITH REDACTIONS – PUBLIC VERSION

No evidence establishes the place, time, or setting in which *any* Defendant entered into the supposed overarching agreement—let alone when every Defendant did. Humana's failure to uncover any such evidence mandates summary judgment. *See, e.g.*, *Zenith Radio Corp.*, 513 F. Supp. at 1310 ("We have looked for evidence of when this conspiracy began and when the various parties entered it, but again we have found none. That is, we suppose, because there is no evidence of agreement or of concerted action."); *Chocolate*, 999 F. Supp. 2d at 805 (granting summary judgment when plaintiffs offered "nothing more than speculation as to the who, what, when, where, and how of the communications that allegedly facilitated the parallel price increases").

Despite access to millions of Defendants' documents, and hundreds of depositions, Humana has no evidence of how the alleged overarching conspiracy formed or how it continued for years. Not a single document references an overarching agreement, and no witness testified to entering into an overarching conspiracy. In fact, even cooperating witnesses deny Humana's alleged overarching agreement. *See, e.g.*, Ex. 10, 703:10-704:10; Ex. 11, 527:9-528:4; Ex. 12, 451:15-452:22; Ex. 13, 1264:12-1265:21. Instead, those witnesses testified that any conduct was on a drug-by-drug basis. *See* Ex. 13, 1264:12-1265:21; Ex. 14, 925:16-20.

Furthermore, many of the communications that Humana (through its expert) points to as evidence of actions in furtherance of an overarching conspiracy involve individuals who indisputably lacked pricing or decision-making authority, so those individuals could not bind their employers to an overarching conspiracy. *See, e.g.*, Ex. 2 ¶ 425; Ex. 11, 1224:8-1225:20; Ex. 15, 322:14-21, 325:11-19, 321:10-13; Ex. 16, 757:11-25; Ex. 17, 326:13-22; Ex. 18, 34:20-35:2; *see Baby Food*, 166 F.3d at 125 (evidence of calls "among field sales representatives who lack pricing authority is insufficient to survive summary judgment"). In all events, none of the evidence cited by the experts supports a finding of the alleged *overarching* conspiracy.

In addition, no evidence establishes exactly *what* Defendants allegedly agreed to do. Despite the extensive record, the parameters of the alleged overarching conspiracy remain elusive. Humana alleges that the Defendants "operated under a system of understandings described as 'playing nice in the sandbox,' whereby participating companies were guaranteed, or entitled, to their 'fair share' of the market," Compl. ¶ 263, yet Humana has uncovered no evidence of what these "understandings" entail or why Defendants supposedly participated in a conspiracy with respect to only some (not all) of the drugs they manufactured and sold. As several witnesses testified, "fair share" had no common industry-wide understanding, and witnesses consistently denied reaching any overarching agreement to allocate market share. *See infra* pp. 19-20, 24.

The record is likewise bereft of evidence of *when* or *where* Defendants supposedly entered into the overarching conspiracy. Instead, Humana alleges that different groups of Defendants separately conspired to raise prices for 22 apparently random Subject Drugs beginning at various points from January 2011 through December 2014. Humana does not posit whether the alleged overarching conspiracy began before 2011, in 2014, or sometime in between, or whether the alleged overarching conspiracy began with all drugs or a single drug. Because Humana offers "nothing more than speculation as to the who, what, when, where, and how" of the overarching conspiracy, Defendants are entitled to summary judgment. *Chocolate*, 999 F. Supp. 2d at 805.

### ***2. Humana Cannot Explain Why, If There Was a Conspiracy, It Was Not Implemented Consistently***

Another flaw with Humana's overarching conspiracy claim is that it cannot explain why the alleged overarching conspiracy was supposedly implemented only as to certain drugs and certain Defendants. *First,* Humana offers no evidence explaining why Defendants would implement the "overarching conspiracy" only as to certain drugs that they sold, but not others. For example, Mylan sold Subject Drugs Theophylline and Ursodiol during the alleged collusion period,

yet Humana does not allege (and has no evidence) that Mylan participated in a conspiracy to raise prices for those drugs. Compl. ¶¶ 108-09.

Similarly, for several Subject Drugs, the evidence shows that a *Humana I* Defendant that was *not* named as a Defendant for a particular Subject Drug supplied the Subject Drug at prices lower than Subject Drug-specific Defendants. Ex. 1 ¶ 19. For example, Defendants Upsher-Smith and Zydus (who are not named as Clomipramine Defendants) sold Clomipramine during the alleged collusion period at prices lower than Clomipramine Defendants. *Id*. G-18 and I-10. And non-Benazepril HCTZ Defendant Apotex sold Benazepril HCTZ during the alleged collusion period at prices lower than Benazepril HCTZ Defendants. *Id*. G-11 and I-5. Needless to say, an "overarching" agreement covering 22 drugs could not survive if alleged conspirators undersold other alleged conspirators on the very drugs covered by the agreement. The evidence in the record undermines Humana's overarching conspiracy because Defendants like Upsher-Smith, Zydus, and Apotex acted in contravention to the alleged "understandings" of the purported agreement.

*Second*, the evidence set forth by Bradford is limited to 10 of the 24 Defendant families. Ex. 1 ¶ 160. That evidence cannot support the existence of an overarching conspiracy as to all Defendants in the case. Courts reject overarching conspiracy claims where, as here, Plaintiffs cannot link all Defendants to the same common agreement. *See Precision Assocs.*, 2011 WL 7053807, at *28-30 (declining to find a "global conspiracy" because "the plaintiffs have not provided the court with anything more than the overlap of some of the sixty-five defendants in some of the ten alleged local conspiracies").

*Third*, Humana's concocted overarching conspiracy claim fails to account for the fact that there were other competitors besides Defendants in the Subject Drug markets. *See e.g.*, Ex. 1, App'x G. Bradford conceded that the existence of additional competitors would make any cartel

"harder to maintain." Ex. 3, 254:22-255:21. That is an understatement. It is impossible to maintain an agreement on pricing and market share for 22 drugs if there are other competitors selling those drugs who are not part of the agreement. Here, the evidence shows that beyond the named Defendants, numerous firms competed on the Subject Drugs, including by selling generics, brands, authorized generics, and other molecules. Ex. 1, App'x I and J. Bradford never addressed this point, and Humana has no evidence explaining how its proposed conspiracy was accomplished in light of these other competitors, thus warranting dismissal.

#### ***3. No Evidence Exists of Key Elements Necessary to Maintain a Cartel***

Humana alleged that the overarching conspiracy consisted of Defendants "monitoring, tracking, and maintaining each other's 'fair share,'" Compl. ¶ 262, yet there is no evidence—none—of any monitoring, tracking, or enforcement mechanism. Without any such features in place, Defendants could not measure gains or losses or otherwise uphold the alleged overarching agreement. *See* Ex. 1 ¶ 173. Because the incentive to cheat grows as the number of firms in a cartel increases, *Id.* ¶ 170, the absence of evidence showing how an overarching agreement could be enforced strongly suggests that no overarching agreement existed. *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1233 (3d Cir. 1993); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017) (where, as here, the evidence reveals "no punishment, or even a mechanism to punish, the inference tends toward no agreement"), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018).

Further, it would be practically impossible to initiate and maintain an overarching conspiracy of the magnitude alleged without oversight from high-level executives at each Defendant. No such evidence exists, and Humana can proffer no evidence showing which individuals supposedly entered into the alleged overarching conspiracy on behalf of each

Defendant. Most of the individuals that Humana claims entered into Subject Drug-specific conspiracies could not have entered an overarching conspiracy on behalf of their companies because they lacked authority to do so. *See, e.g.*, Ex. 19, 350:8-15; Ex. 20, 598:16-25; *see also supra* p. 15; *Baby Food*, 166 F.3d at 125 (lack of pricing authority is a key fact in determining whether a conspiracy could be maintained).

**B. The Record Evidence Does Not Support the Overarching Conspiracy Claim**

***1. There is No Direct Evidence of the Alleged Overarching Conspiracy***

To prove an agreement with direct evidence, Humana must present "evidence that is explicit and requires *no inferences* to establish the proposition or conclusion being asserted." *Baby Food*, 166 F.3d at 118 (emphasis added). Humana cannot do so.

*a) <u>No Testimony Demonstrates Humana's Overarching Conspiracy</u>*

No testimony supports the existence of any overarching agreement. At most, a couple of witnesses testified to purportedly engaging in *bilateral* conduct between two Defendants on certain drugs—which is a far cry from Humana's overarching conspiracy claim. But every witness asked about an "overarching" conspiracy spanning nearly two dozen drugs and dozens of Defendants denied its existence. Across more than a hundred depositions of Defendants' current and former employees, not a single witness testified to conduct reflecting Humana's overarching conspiracy claim.[9] Even the cooperating witnesses, who would be incentivized to testify as to any overarching conspiracy (if it existed), admitted that there was no overarching conspiracy involving all Defendants. *See* Ex. 10, 703:10-704:10 (no "overarching conspiracy with all of the companies" or "one big agreement among all of those companies."); Ex. 11, 527:9-528:4 (no knowledge of a

[9] To the extent Humana intends to rely on any Fifth Amendment invocations by witnesses, that effort fails. Not only is that insufficient to defeat summary judgment, *see Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991), but there is not "sufficient independent evidence—besides the mere invocation of the privilege—upon which to base the negative inference." *United States v. Local 560 Int'l Bhd. of Teamsters*, 780 F.2d 267, 292 n.32 (3d Cir. 1985).

"larger overarching agreement among all of those companies."); Ex. 12, 451:15-452:22 (same), 403:17-438:17 (denying any agreement with nearly all Defendants); Ex. 13, 1264:12-1265:21 (an alleged agreement with one other Defendant was "a la carte," any discussions were on a "product-by-product basis and situation-by-situation."); Ex. 21, 933:19-24 (no testimony regarding Humana's overarching conspiracy); Ex. 14, 919:16-925:20, 1192:15-19, 1196:10-16; 1203:19-23 (during his time at Fougera, any alleged agreement was "on a product-by-product basis to make an agreement on that product," and any nominal references to an "overarching agreement" describe only separate alleged *bilateral* agreements between Fougera and other Defendants).[10]

The testimony Bradford cites is not direct evidence of an overarching agreement among all Defendants covering all 22 Subject Drugs. For example, Bradford asserts [redacted] Ex. 2 ¶ 426. But even if that were true (and there is no evidence it is), it is not direct evidence of an overarching conspiracy—*both* because it requires inferences to reach that conclusion, *and* because it concerns only two Defendants and two drugs, one of which is not among the 22 Subject Drugs. Moreover, Malik was "not aware of [an agreement to allocate customers] between Mylan or Heritage or any other company for any product." Ex. 22, 154:15-155:5. Critically, Humana offers no evidence that the alleged agreement was broader than Doxy DR (let alone that it included all 22 Subject Drugs) or that Mylan's

[10] In May 2013, Mr. Anthony Thomassey suffered a significant brain injury due to a hemorrhagic stroke resulting in enduring cognitive deficits and symptoms of anosognosia. Ex. 23 ¶ 13. Defendants' expert, neuropsychologist Dr. Bonnie Levin, concluded that Thomassey's cognitive deficits make it implausible that he could accurately and reliably recall certain information addressed during his deposition, or distinguish true recollections from information provided to him in preparation for, or during, his deposition. *Id.* Humana has not rebutted this expert testimony.

reductions in profits in Doxy DR from the alleged customer allocation would have been somehow offset by profit increases on Mylan's other Subject Drugs.

There is no testimony that could support a finding that each of the Defendants entered into a single overarching agreement covering 22 drugs. And where, as here, alleged co-conspirators all deny the existence of the alleged conspiracy (here, the overarching conspiracy), courts grant summary judgment to defendants. *See, e.g.*, *In re Citric Acid Litig.*, 996 F. Supp. 951, 955-56 (N.D. Cal. 1998) *aff'd*, 191 F.3d 1090 (9th Cir. 1999).

*b) <u>No Documents Provide Direct Evidence of an Overarching Conspiracy</u>*

The record also lacks any document containing a "smoking gun" as to the existence of the supposed overarching conspiracy. *See Petruzzi's IGA Supermarkets*, 998 F.2d at 1230; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011). Humana's expert cites a handful of documents, related to only several Defendants, as evidence of the purported overarching conspiracy, but none suffice. First, Bradford [redacted] Ex. 24; Ex. 25; Ex. 26, 324:14-325:16, 335:19-336:6; Ex. 2 ¶ 422. That document does not suggest any agreement; it simply records historical behavior, based on publicly available pricing information, consistent with oligopolistic competition. Moreover, the document shows a Teva employee analyzing competitors' likely response to a price change—an analysis that would make no sense if there were an industry-wide agreement.

Second, Humana points to documents allegedly referencing multiple Subject Drugs, such as emails related to Heritage's internal plan to increase prices for eighteen drugs, including six Subject Drugs, beginning in late April 2014. *See* Compl. ¶¶ 272-76. Yet these documents do not

say anything about an agreement with any competitor—let alone with 23 competitors—and thus are not direct evidence of the alleged overarching conspiracy.

### *2. No Circumstantial Evidence Creates a Genuine Dispute of Material Fact Regarding the Alleged Overarching Conspiracy*

Humana's circumstantial evidence also does not raise a genuine dispute of fact. A plaintiff relying on circumstantial evidence must prove concerted action through evidence of parallel conduct along with certain other "plus factors" that "tend to exclude the possibility" that the alleged conspirators acted independently. *Valspar*, 873 F.3d at 194; *Baby Food*, 166 F.3d at 122. Humana has no evidence of parallel conduct among the 24 Defendants and across the 22 Subject Drugs, let alone evidence to carry its burden on plus factors.

#### *a) The Alleged Rules of the Overarching Conspiracy Restate Lawful Oligopolistic Competition, So Without Evidence Tending to Exclude the Possibility of Independent Conduct, the Claim Fails*

Humana's Complaint set out "understandings" that Defendants allegedly shared, but those "understandings" simply restate the ground rules of lawful oligopolistic competition. And Humana's overarching conspiracy evidence, as described by Bradford, merely shows drug-specific decision-making consistent with those alleged "understandings." The fact that Defendants acted as oligopolists in the various Subject Drug markets is unremarkable and does not support a finding of parallel conduct. All agree that Defendants operate in oligopolistic markets, where the supply of the Subject Drugs is characterized by a high degree of concentration and a small number of firms. *See* Ex. 2 ¶ 76; Ex. 3, 177:5-15. "[B]ecause rational, independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," *Valspar*, 873 F.3d at 191, Humana must present "evidence that tends to exclude the possibility that [defendants] acted independently" of their competitors, *Matsushita*, 475 U.S. at 588 (cleaned up).

Even if Humana were able to show unlawful conduct with respect to certain individual Subject Drugs, that does not suffice to prove the purported overarching conspiracy covering 22 drugs and 24 Defendants. Compl. ¶¶ 261-88. Evidence arguably suggesting that there may have been bilateral agreements covering one or two drugs does not establish the overarching agreement alleged. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting plaintiff's attempt to imply coordinated wrongdoing solely because of some other alleged bad act, reasoning that amounted to the improper speculation that "if it happened there, it could have happened here").

Bradford identified six factors that allegedly [redacted] Ex. 2 ¶ 75. But his assessment of these factors did not distinguish between explicit collusion resulting from the alleged agreements and tacit collusion resulting from oligopolistic competition. Ex. 3, 20:10-17. And in his non-economic review of the record, Bradford merely identified [redacted] *Id.* 296:5-15. Critically, he failed to [redacted] Ex. 2 ¶ 13; Ex. 1 ¶ 52, rendering his opinion useless for Humana's overarching conspiracy claim. *See Matsushita*, 475 U.S. at 588 (requiring "evidence that tends to exclude the possibility that [defendants] acted independently" (cleaned up)); *see also* Ex. 5, 103:19-22 [redacted] Evidence "consistent with" conscious parallelism does not, "standing alone," create a triable issue of fact. *See Valspar*, 873 F.3d at 192.

*b)* <u>*There is No Evidence that Defendants Shared a Common Understanding of "Fair Share" or Other "Rules of Engagement"*</u>

The crux of Humana's alleged overarching conspiracy claim is that each Defendant agreed to divide up various drug markets according to principles of "fair share." Compl. ¶¶ 263-71. For

such a claim to be actionable, Humana must produce "proof of a 'unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement.'" *Chocolate II*, 801 F.3d at 395 (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994)). Here, however, the undisputed record shows that Defendants did not share any "common understanding of what 'fair share' means," Compl. ¶ 264, and thus could not have entered into an overarching agreement to divide markets by "fair share."

The testimony shows that Defendants' employees had different understandings of what constitutes a "fair share" of a given market, based on unilateral, internal business objectives—and several Defendants did not even subscribe to the concept at all. For example, Kevin Smith of Lannett noted that his "definition of fair share varied on each and every product" and was internally determined based on upwards of 20 different variables. Ex. 32, 111:4-19. Billy Seiden of Taro noted that "fair share [was] an academic exercise, . . . not reality." Ex. 35, 115:5-115:15; *see also, e.g.*, Ex. 29, 296:6-297:13 (fair share was a term used by a third party consultant); Ex. 30, 70:5-70:21 (fair share depended on "many, many different factors" and was part of an "internal strategy"); Ex. 31, 74:8-74:18 (fair share based on his own "common sense"); Ex. 33, 106:16-107:3 (fair share depended on who the competition was, including whether there was an authorized generic); Ex. 34, 94:13-94:23 (fair share was not a "clearly defined term"); Ex. 36, 62:2-12 (Mylan used a different term, "targeted market share," to determine "how much market share they [] feel like they can obtain based on the production"); Ex. 28, 86:15-88:15 (fair share is only a "starting point"). Other employees of Defendants had never heard or used the term "fair share." *See* Ex. 37, 94:22-25 (testifying that he was "not familiar" with a "fair market share" term).

Moreover, the record shows that the drug markets at issue did not behave according to any conception of "fair share." On the contrary, market shares for the Subject Drugs fluctuated in a

manner that is inconsistent with an agreement to carve up markets by "fair share." *See* Ex. 1, App'x K. For example, for Levothyroxine, a drug sold by just three Defendants (Mylan, Sandoz, and Lannett), the shares for the companies were not close to the same. Mylan had more than 50% share both before and after (and years after) the start of the alleged conspiracy period. *Id*. K-22. Despite Sandoz's purported entitlement to its "fair share" of a three-player market, Sandoz languished with around 10% or less share until 2014. *Id*. Meanwhile, Lannett had little change in market share, hovering between 20-30% before and after the start of the alleged conspiracy period. *Id.* Similarly, for Amitriptyline, another drug with three generic sellers, the shares were not the same between the competitors. After the start of the alleged conspiracy period, Par lost share, dropping from around half the market to less than 40% market share. *Id*. K-3. Mylan increased its market share and within months overtook Par as the leading seller, with more than 40% share. *Id*. Meanwhile, Sandoz was apparently unaffected by the alleged conspiracy, hovering between 20-30% market share both before and after the start of the alleged collusion. *Id*.

As these examples show, the shares of different Subject Drugs did not behave consistently with Humana's fair share theory, even for drugs with the same number of sellers. In a typical price fixing case, if two competitors are accused of price-fixing and only one competitor increased its price, the conspiracy claim fails for lack of parallel conduct. *See In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *14 (S.D.N.Y. June 25, 2025) ("It is definitional that where a company increases prices for a product and its competitor does not increase prices for that product, those companies have not engaged in parallel conduct with respect to that product."). Here, Humana alleged that Defendants agreed to fix prices and allocate customers across 22 drugs according to a "fair-share" formula, but the evidence disproves the alleged parallel conduct because no Defendant followed any formula to determine who gets what share of any market.

Bradford cannot help Humana on this point because he conceded that he conducted no economic analysis to assess whether any of the economic evidence in this case is indicative of Humana's alleged overarching conspiracy, nor did he conduct any economic analysis of individual Defendant's decision-making process, prices, or sales. Ex. 3, 434:2-18, 434:19-23, 434:25-435:5, 437:23-438:2, 438:4-8, 438:10-15, 488:10-20.

In fact, to the extent the term "fair share" has any meaning at all, it is clearly an innocuous one. The undisputed record shows that many companies—including Humana itself—considered the term to be a strategic concept used to approximate a company's market share goals. Ex. 40; Ex. 41; Ex. 42, 185:14-186:15 (conceded to using the term fair share "a lot during my time at Humana."); Ex. 43, Tr. 242:11-243:7. Accordingly, the mere fact that certain Defendants' documents reference the concept of "fair share" does not give rise to any inference of an overarching conspiracy. *Cf. In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 20 (D.D.C. 2004) (finding that defendants' use of the word "club" to refer to a group of vitamin producers did not establish "knowledge of or participation in an all-vitamins conspiracy" where the term likely referred to defendants discussing strategic approaches beneficial to the vitamin industry).

In addition to the dearth of evidence showing a common understanding of or agreement concerning "fair share," Humana can point to no evidence that each Defendant committed to a broader "system of understandings," Compl. ¶ 263, or "rules of engagement," Ex. 2, ¶ 421, across all Subject Drugs. As with "fair share," Humana has no evidence that all 24 Defendants shared a common understanding of the so-called "rules of engagement"—let alone that they reached any agreement to follow such "rules." Moreover, as discussed *supra*, the very "rules of engagement" that Humana claims are unlawful reflect rational, independent decision-making in an oligopoly. *See also* Ex. 12, 1092:1-6 ("Q. When a company acts consistently with the rules of engagement,

you're describing behaviors consistent with basic economic principles. Correct?" . . . A. "Yes."). Conduct such as following a price increase is not illegal; it is rational behavior in an oligopoly, *Chocolate II*, 801 F.3d at 397, and Humana has adduced no evidence to distinguish the framework for oligopolistic competition from unlawful collusion, *see* Ex. 3, 20:10-17.

*c)* *<u>Humana Failed to Establish Any "Plus Factors" Indicative of An Overarching Conspiracy</u>*

Beyond the absence of any parallel conduct, Humana fails to show any "plus factors" as well—an independent basis for granting Defendants' summary judgment on the overarching conspiracy claim. Because no evidence exists of Defendants' "motive to enter into a price fixing conspiracy" for products that they did not sell, and there is no evidence of Defendants "act[ing] contrary to their [individual] interest[s]" with respect to such products, *Chocolate II*, 801 F.3d at 398-99, neither of the first two plus factors can help Humana.

Turning to the third factor—the existence of "evidence implying a traditional conspiracy," *id.* at 398—Humana must "pro[ve] that the [alleged conspirators] got together and exchanged assurances of common action or otherwise adopted a common plan." *Flat Glass*, 385 F.3d at 361. Importantly, the "opportunity to conspire, without more," is insufficient. *Taylor v. Gural*, 2025 WL 638596, at *25 (E.D. Pa. Feb. 27, 2025) (quoting *Petruzzi's IGA Supermarkets*, 998 F.2d at 1235). No evidence that Humana might point to is probative of an overarching conspiracy. *Id.*

For example, phone log records purportedly reflecting competitor communications between two people do not, without more, establish the existence of the alleged conspiracy. Humana cannot proffer evidence that "those communications rise to the level of an agreement, tacit or otherwise." *Baby Food*, 166 F.3d at 126. Notably, there is no evidence that any call—even if it occurred—related to the alleged overarching conspiracy, and for the vast majority of calls, there is no evidence of the contents at all. Ex. 58 ¶¶ 16, 28. Many of the calls listed in Plaintiffs'

deposition exhibits did not even connect or lasted less than a minute. *See, e.g.*, Ex. 44; Ex. 2 ¶ 272. Here, to prove its overarching conspiracy, Humana would have to adduce evidence showing how the agreement was formed, on which phone calls individuals agreed to it, and how and when additional individuals were brought into the agreement. No such evidence exists, and simply pointing to the existence of various calls—no matter the volume—is insufficient evidence of any conspiracy, let alone the specific overarching conspiracy alleged. *See, e.g.*, *Baby Food*, 166 F.3d at 126 ("[C]ommunications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of agreement, tacit or otherwise.'"); *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 321 (S.D.N.Y. 2023) (logs showing calls between employees of competitors insufficient to infer conspiracy); *aff'd sub nom.*, *Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024). Furthermore, even if one could reasonably infer that a call between two competitors related to a drug that they both sold, such records would not lead to any inference at all about the broader set of Defendants and Drugs.

Nor is there evidence that Defendants discussed any overarching conspiracy, or agreed to enter such an overarching conspiracy, at any industry meetings or other gatherings. Defendants' mere attendance at industry events (which Humana and other customers also attended, Ex. 43, 252:11-253:12; Ex. 45, 297:10-298:21) does not tend to show an overarching conspiracy. *See, e.g.*, *Valspar*, 873 F.3d at 199-200 (no inference of conspiracy arose from fact that competitors attended the same trade organization meetings because there was "no evidence that there was any discussion of prices during these meeting and certainly no evidence of an agreement"). Allegations no longer suffice, and Humana has failed to come forward with any evidence supporting its claim.

### 3. *The Limited DPAs and Guilty Pleas Provide No Evidence of an Overarching Conspiracy*

A minority of Defendants (Apotex, Glenmark, Heritage, Sandoz, Taro, and Teva) entered into deferred prosecution agreements ("DPAs") with the Antitrust Division of the Department of Justice, and three individuals (Sandoz's Armando Kellum and Heritage's Jason Malek and Jeffrey Glazer) signed plea agreements. These related to a small, discrete number of Subject Drugs and limited time periods. Neither the DPAs nor the pleas support the existence of the alleged overarching conspiracy. Indeed, none make any mention of an overarching conspiracy. Although Bradford claims that the DPAs "entered into by Sandoz and Taro with respect to multiple overlapping drugs support the existence of a common understanding among the Defendants," Ex. 2 ¶ 423, at most that evidence pertains to two Defendants and says nothing about the others. Evidence of separate guilty pleas does not support a finding of a "wider conspiracy." *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011) (dismissing overarching conspiracy claim because guilty pleas to separate bilateral conspiracies failed to establish a "wider conspiracy"). Deposition testimony from the individuals who signed plea agreements likewise fails to help Humana: Kellum and Glazer both unequivocally denied the existence of an overarching conspiracy like the one alleged here; Ex. 29, 337:7-24; Ex. 46, 330:11-331:5; and Malek testified that fair share was not "a clearly defined term," and "was probably different for each product," undermining the existence of any agreement among all Defendants; Ex. 34, 94:13-95:11. Moreover, at least 18 Defendants have not been the subject of any DOJ proceedings, and the vast majority of Subject Drugs are not at issue in any DPA or plea agreement.

***

Humana promised it would unearth evidence of a broad overarching agreement, purportedly hatched at trade events, between 24 companies to collude on 22 Subject Drugs. No

such evidence has materialized, and its expert put it best: all Humana is left with is the hypothetical "possibility" of such an agreement. But that does not satisfy black-letter antitrust law, and Defendants are thus entitled to summary judgment on the overarching conspiracy claim.

## II. Humana Fails to Demonstrate Interdependence, Overlap, and a Common Goal

Even if Humana could establish the existence of individual-drug agreements, it would be insufficient to establish its overarching conspiracy claim. To demonstrate an overarching conspiracy, Humana must proffer evidence of a single, industry-wide agreement rather than a series of smaller drug-specific agreements. Summary judgment is warranted because Humana cannot establish the factors required to stitch together individual agreements into an overarching conspiracy, including (1) interdependence between the alleged individual conspiracies, (2) sufficient overlap across markets, and (3) a common goal. *See Kelly*, 892 F.2d at 259; *United States v. Kemp*, 500 F.3d 257, 288-89 (3d Cir. 2007). The "totality of the circumstances" confirms that Humana cannot prove its overarching conspiracy theory. *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 528 (E.D. Pa. 2019).

### A. Lack of Interdependence

To establish interdependence, Humana must show that the putative overarching conspiracy "contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators." *Kemp*, 500 F.3d at 287. "In evaluating the 'cooperation' part of this factor, . . . [courts] consider whether all aspects of the scheme were interdependent." *United States v. Rigas*, 605 F.3d 194, 214-15 (3d Cir. 2010); *see also K-Dur*, 2016 WL 755623, at *21 ("To evaluate interdependence, the court engages in an inquiry focused on 'the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other'"). If the alleged co-conspirators derive no benefit from other agreements to which they are

not a party—or if the success of one alleged agreement is not dependent on the success of another—the alleged agreements are not interdependent. *Kemp*, 500 F.3d at 288-89.

### ***1. Success of One Drug-Specific Agreement Did Not Depend on the Success of Another, and There Were No Cross-Conspiracy Benefits***

Humana has no evidence showing that the success of any one alleged drug-specific conspiracy affected the outcome of any other alleged drug-specific conspiracy. A chronological examination of Humana's allegations reveals the lack of cohesion among its drug-specific claims and lays bare that the drug-specific claims do not support its overarching conspiracy claim. For example, alleged individual conspiracies for Desonide, Nystatin, and Lidocaine all purportedly started in 2011. Ex. 2, Table 2. However, Humana alleges that different groups of Defendants joined each of these Subject Drug conspiracies, and Humana offers no evidence that any Defendant for one of these three Subject Drugs communicated about one of these Subject Drugs with Defendants who purportedly engaged in a different Subject Drug conspiracy. Humana does not allege that any new drugs were added to the purported overarching conspiracy in 2012. The next alleged conduct is on Levothyroxine in 2013, which is the first time Humana names Lannett and Mylan in any alleged conspiracy. *Id*. Humana offers no evidence linking the alleged Levothyroxine conspiracy or Defendants to the earlier alleged conspiracies and Defendants for Desonide, Nystatin, and Lidocaine. Going one step further, if Humana's Levothyroxine claim fails (as it should), Humana would need to adopt an entirely new chronology of its overarching conspiracy and tell a brand-new story about when each of those Defendants supposedly agreed to join the overarching conspiracy and who agreed on their behalf. The same is true as to other Subject Drugs.

Notably, eight Defendant families allegedly entered into Subject-Drug specific conspiracies for only a *single* Subject Drug. Ex. 1 ¶ 172. For example, Humana alleges that Mayne conspired for only a single Subject Drug: Doxy DR. *See* Compl. ¶ 99. Humana offers no evidence

that Mayne entered into the alleged Doxy DR conspiracy based on knowledge of alleged conduct involving other Defendants for other Subject Drugs or that the success of the alleged Doxy DR agreement in any way depended on the success of the other alleged agreements. Nor does Humana offer any evidence that Mayne believed it was entering an alleged conspiracy that was broader than Doxy DR, or that Mayne would have benefited from participating in an alleged overarching conspiracy when it manufactured only one Subject Drug. *See also* Ex. 1, B-1. The same is true for the seven other single-drug Defendants, as well as all the others.

Likewise, no evidence links the outcomes of alleged Subject-Drug conspiracies involving Defendants who purportedly conspired on more than one Subject Drug. Humana alleged that "[c]ustomers in one drug market might be traded for customers in another drug market so to create a global 'fair share' outcome," Compl. ¶ 267, yet it has no evidence of such activity, or any evidence linking the success of one purported Subject Drug conspiracy to another. To take just one example, there is no evidence that the success of the alleged Theophylline conspiracy (involving Heritage and Teva), which purportedly began in February 2014, depended in any way on the success of the alleged Levothyroxine conspiracy (involving Mylan, Lannett, and Sandoz), which purportedly began in January 2013. Furthermore, given the lack of overlap among certain Defendants, there is no evidence that they benefited from the participation of others. For example, there is no evidence that Mylan derived any benefit from any participation by Akorn, Hi-Tech, Morton Grove, Wockhardt, Perrigo, Teligent, Apotex, Glenmark, Lupin, or Epic, as Mylan has no overlap with those entities on *any* drug at issue.

Even for alleged conspiracies involving Defendants who sold some of the same Subject Drugs, there is no evidence of interdependence. For example, no evidence exists showing that the success of an alleged Baclofen conspiracy (involving Lannett, Par, Teva, and Upsher-Smith),

which purportedly began in June 2014, depended on the success of an alleged Digoxin conspiracy (involving Impax, Lannett, Mylan, Par, and West-ward), which purportedly began in October 2013. *See United States v. Smith*, 82 F.3d 1261, 1271 (3d Cir. 1996) (finding no single conspiracy because "[t]he co-conspirators in each state derived no benefit, financial or otherwise, from Smith's activities in the other state, nor was the success of the conspiracy in one state contingent on the success of the conspiracy in the other"). Bradford offers no support for a finding of interdependence. Ex. 3, 434:19-23 ("Q. [redacted]"). Nor did he analyze whether "[redacted]" Ex. 3, 470:11-23. And, he has no analysis supporting Humana's allegation that an overarching conspiracy was maintained by Defendants' "[redacted]'" across 22 drugs. Compl. ¶ 262; Ex. 2, ¶¶ 79-81.

Moreover, when calculating alleged damages, Humana's damages expert performed no analysis specific to its overarching conspiracy claim, and the amounts would not change regardless of whether Humana's overarching conspiracy is eventually proven. Ex. 47, ¶ 15; Ex. 8, 111:21-112:3. That is, Humana provides no evidence that the alleged overarching conspiracy facilitated any alleged drug-specific agreement beyond what each alleged agreement supposedly achieved on its own. Absent some additional benefit, Humana has adduced nothing showing that the alleged drug-specific agreements were interdependent. *See Kemp*, 500 F.3d at 290-91.

Finally, if some sub-conspiracies fail on their proof, it further confirms that the alleged sub-conspiracies operated independently. Unlike *Kelly*, in which a finding that proof failed as to one sub-conspiracy would not necessarily have undermined the larger conspiracy, here, removing any Subject Drug leaves Humana with insurmountable gaps in its conspiracy theory.

### *2. Humana Cannot Show Continuous Cooperation*

Interdependence requires evidence of continuous cooperation among Defendants. *Kemp*, 500 F.3d at 287. The record, by contrast, contains myriad examples of competition among Defendants rather than cooperation. For example, Mylan and Sandoz competed to win customers for Benazepril HCTZ upon Sandoz's re-entry on August 20, 2013. Ex. 6, ¶ 111. In March 2014, Humana asked Mylan for a lower price on Benazepril, and Mylan complied. Ex. 48; Ex. 49. Despite this price decrease, Sandoz undercut Mylan's pricing two months later and took Humana as a customer for certain formulations on which Mylan and Sandoz competed. Ex. 50; Ex. 51. When Mylan re-launched Digoxin, it competed for (and won) business from Par and Lannett despite both incumbents offering price reductions to retain their customer's business. Ex. 6 ¶ 146. Despite allegedly agreeing to cede customers for Divalproex ER after the entry of Zydus and Dr. Reddy's, Mylan agreed to decrease its price to several major customers, including Walgreens and ABC, based on offers from competitors. *Id.* ¶ 162. Similarly, Mylan and Zydus each submitted competing offers to Cardinal, forcing Par to lower its price to retain Cardinal. *Id.* ¶ 161.

For Nystatin Cream, Perrigo attempted to undercut Taro's price at Walgreens in March 2011. Ex. 52 ¶ 100. Because Perrigo could not guarantee supply, Walgreens decided to remain with Taro at a higher price. *Id.* But Perrigo kept trying to win Walgreens from Taro and ultimately did so by offering a lower price. *Id.* ¶ 105.

As yet another example, when Heritage attempted to increase its price for Acetazolamide ER Capsules, Teva reduced its contract pricing and secured awards from additional customers. Ex. 53 ¶ 157. Due to competition from Teva, Heritage was forced to decrease its price to Harvard Drug, which continued to purchase from Heritage at a reduced price. *Id.* Competition abounds across the Subject Drugs. *See, e.g.*, Ex. 6 ¶¶ 89-228; Ex. 54 ¶¶ 168-75; Ex. 55 ¶¶ 18-38; Ex. 52 ¶¶ 90-138.

Moreover, the record shows that for some customers, the prices of the Subject Drugs did *not* increase. For example, Dr. Vogt did not find statistically significant increases on Doxycycline, and there is no indication that Mylan ever increased prices for that drug during the alleged collusive period. *See* Ex. 9 Table 2; Ex. 6 ¶¶ 179, 189. Impax's net price to CVS for Lidocaine/Prilocaine decreased during the alleged conspiracy period. Ex. 1 ¶ 148; Ex. 47 ¶ 193. And CVS avoided any price increases during the alleged collusive period on Mylan's direct sales of a handful of Subject Drugs. Ex. 6 ¶¶ 101, 118, 159, 164. Cardinal maintained the same dead net pricing on indirect purchases of Econazole from Taro following Taro's November 2014 WAC increase. Ex. 1 ¶ 118.

All of this evidence directly undercuts Humana's overarching conspiracy theory. Indeed, the undisputed record shows pervasive competition rather than continuous cooperation.

**B. Humana Cannot Show Sufficient Overlap Across the Subject Drugs**

As this Court has recognized, the "mere overlap of some defendants in some of the transactions is, on its own, insufficient to establish an overarching agreement." *Generic Pharms. Pricing*, 394 F. Supp. 3d at 531; *see also Precision Assocs.*, 2011 WL 7053807, at *28-30 (declining to find a "global conspiracy" because "the plaintiffs have not provided the court with anything more than the overlap of some of the sixty-five defendants in some of the ten alleged local conspiracies"). Any overlap here is immaterial.

The record reflects that the 22 Subject Drugs differ greatly from one another, treat different conditions, are administered in a variety of forms and strengths, are sold by disparate groups of suppliers, face different competitive forces (including from brands and authorized generics), and are priced independently from one another. Ex. 56 ¶¶ 14, 33-41; Ex. 6, Ex. 3. No two of the Subject Drugs are alike: Each had different competitors and different considerations that affected each Defendant's pricing and market share. Ex. 4 ¶¶ 196, 245-47; Ex. 1, App'x G. No Defendant

manufactured each at-issue formulation, overlap among Defendants is scattershot, and most Defendants are alleged, at most, to have entered into a few Subject Drug-specific conspiracies. Ex. 1 ¶¶ 172-174, App'x E, and Fig. 10. No evidence explains these differences or draws any line connecting the 22 Subject Drugs to indicate why the Subject Drugs were supposedly part of the alleged overarching conspiracy and other drugs are not.

Unlike other cases, there are no "hubs" to support the existence of an overarching conspiracy. Humana suggests that Teva and Heritage were somehow key to the alleged overarching conspiracy, *see* Compl. ¶¶ 270-88, but the evidence fails to support that speculation. The record shows that Teva sold fewer than half of the at-issue formulations, and Heritage sold fewer than a quarter. Ex. 1, Fig. 10 and App'x E. Several other Defendants, including Dr. Reddy's, Teligent, and Epic, have no overlap with Teva or Heritage and thus no link to any alleged hub. *Id.* As a matter of law, "the presence of a single party common to several illegal agreements with other parties does not necessarily establish a single conspiracy." *K-Dur*, 2016 WL 755623, at *23. Humana must establish both the agreement between the hub and each spoke and an agreement among the spokes, *Ins. Brokerage*, 618 F.3d at 347, but no such evidence exists.

### C. The Alleged Overarching Conspiracy Lacks a Common Goal

According to Humana, Defendants' shared goal was "an agreement on 'fair share' with the objective of attaining a state of equilibrium where no competitor is incentivized to compete for additional market share by eroding price." Compl. ¶ 268. But nothing in the record—no witness, no document, no statement—establishes that any Defendant, much less all Defendants, had that goal. On the contrary, the record shows that many markets did not behave according to "fair share" principles. *See supra* pp. 24-25. Accordingly, Humana's claim fails. *See Baby Food*, 166 F.3d at 117.

At summary judgment, Humana's burden is to proffer evidence showing that each of the 24 Defendants shared a single, specific aim. *See United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004) (stating that "although each of these alleged spoke conspiracies had the same goal, there was no evidence that this was a common goal"). Separate alleged agreements to impose a surcharge on distinct products do not become a single agreement merely because each agreement would "raise prices generally." *Precision Assocs.*, 2011 WL 7053807, at *29 ("While there are some overlapping parties in the conspiracy, there are no allegations in the Complaint that lead to the conclusion that the various local conspiracies were formulated pursuant to an overarching scheme to raise prices generally. Rather, the ten local conspiracies allege that different groups of defendants conspired to impose separate surcharges on various different routes."). Humana's broad assertion that the alleged overarching conspiracy was meant to "fix, increase, stabilize, and/or maintain the price of the drugs," Compl. ¶ 2, is far too broad to support the kind of common goal contemplated by *Kelly*. *See Sargent Elec.*, 785 F.2d at 1127 ("the elimination of price competition whenever and wherever possible" is not a "common purpose" that is "alone sufficient to establish a violation of section 1 of the Sherman Act").

## III. Humana's Overarching Conspiracy Fails if a Claim on a Particular Drug Fails

A conspiracy claim cannot proceed absent evidence to support the alleged acts composing the conspiracy. *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 232-33 (D.N.J. 2021) (granting summary judgment for defendant on civil conspiracy claim because the court granted summary judgment on predicate claims); *Pro-Spec Corp. v. Chester Water Auth.*, 2017 WL 2797897, at *7 (E.D. Pa. June 28, 2017) (same). Accordingly, the dismissal of any Subject Drug-specific agreement undermines Humana's overarching conspiracy claim as well. Humana's theory is that a single agreement existed covering

22 drugs. If there is no evidence of collusion with respect to any one of those 22 drugs, the overarching conspiracy fails. At the summary judgment stage (or later), Humana cannot re-mold its overarching conspiracy theory into a new shape, one with something fewer than 24 Defendants and 22 Drugs based on what Subject Drug claims (if any) remain. Either the overarching conspiracy Humana alleges existed or it did not. The fragility of Humana's overarching conspiracy claim is exposed when one examines its shifting scope if Humana loses even a single underlying claim. The overarching conspiracy claim must fall either way, but the failure of any Subject Drug conspiracy claim emphasizes that the overarching conspiracy—as alleged—cannot stand.

## IV. Humana Fails to Establish Causation

Summary judgment is also warranted because Humana cannot establish causation. *See Chocolate II*, 801 F.3d at 395 (plaintiff must prove that "this conspiracy was the proximate cause of the plaintiff's injury"); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993). No testimony, documents, or expert established that the alleged overarching conspiracy between all Defendants and involving all Subject Drugs *caused* harm to Humana. Ex. 3, 20:10-17, 367:7-17, 395:9-396:1, 107:2-6 (Bradford did not distinguish between lawful and unlawful conduct and offered no opinion on causation); Ex. 5, 155:6-14 (Kesselheim offered no opinion on causation), Ex. 8, 103:3-107:16, 139:7-13 (Vogt did not distinguish between collusion and oligopolistic competition); Ex. 9 (no mention of overarching conspiracy claim in Vogt report). Bradford conceded that "someone needs to do a causal study. But I'm not doing it." Ex. 8, 395:22-396:1. In fact, *no one* opined on causation as it relates to the overarching conspiracy, and that alone is grounds to grant Defendants' motion. *In re Wellbutrin XL Antitrust Litig.*, 2012 WL 1657734, at *33 (E.D. Pa. May 11, 2012) ("An antitrust plaintiff must prove a causal connection between the antitrust violation and actual damages suffered.").



FILED WITH REDACTIONS – PUBLIC VERSION

The same is true as to each Subject Drug. Although Vogt ran a (flawed) regression model purportedly to measure the overcharge associated with price increases, he conceded that he did not distinguish between collusion and lawful behavior. Ex. 8, 103:3-107:16. In fact, he says he relied on Bradford for that analysis. Ex. 9 ¶ 9. However, Bradford admitted that he did not conduct that analysis, and he could not say whether the conduct at issue tended to exclude the possibility of independent lawful behavior. Ex. 3, 20:10-17, 367:7-17, 395:9-396:1, 107:2-6. Humana is left with two experts pointing at each other saying the other one did the necessary causation analysis, but neither did. Because Humana offers no expert to establish causation and "ha[s] not pointed to any other evidence in the record" to prove causation, summary judgment is warranted as to its overarching conspiracy and Subject Drug-specific claims. *Wellbutrin*, 2012 WL 1657734, at *34.

## V. Summary Judgment is Warranted on Humana's Injunctive Relief Claims

Finally, because there is no evidence to suggest Humana faces a "present harm" from any of its alleged conspiracies, Defendants are entitled to summary judgment on Humana's claims for injunctive relief. *See Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 2005 WL 3988699, at *9 (D.N.J. Jan. 28, 2005); *see also* 15 U.S.C. § 26. For its injunctive relief claims to survive summary judgment, Humana must provide evidence that it faces a "present" and "actual threat of injury," *Carpet Grp.*, 2005 WL 3988699, at *9, but neither Humana nor its experts have proffered any evidence that any alleged unlawful act occurred after 2015. *See*, Ex. 2 ¶¶ 110-397; Ex. 57. Nor has Humana shown how acts occurring over a decade ago can pose a "present harm." Accordingly, summary judgment should be granted as to all of Humana's injunctive relief claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants summary judgment on Humana's overarching conspiracy claim, drug-specific claims, and injunctive relief claims.

Dated: March 26, 2026

Respectfully submitted,


_/s/ Jeffrey C. Bank_
Jeffrey C. Bank
Seth C. Silber
WILSON SONSINI GOODRICH & ROSATI
1700 K Street, NW, 5th Floor
Washington, D.C. 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
jbank@wsgr.com
ssilber@wsgr.com

Chul Pak
Michael Sommer
WILSON SONSINI GOODRICH & ROSATI
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
cpak@wsgr.com
msommer@wsgr.com

*Counsel for the Mylan Defendants*

_/s/ Seth Davis_
Seth Davis
Sheron Korpus
Seth A. Moskowitz
David M. Max
KASOWITZ LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
skorpus@kasowitz.com
smoskowitz@kasowitz.com
sdavis@kasowitz.com
dmax@kasowitz.com

*Counsel for Defendants Actavis Elizabeth LLC, Actavis Holdco U.S., Inc., Actavis Pharma, Inc., and Teva Pharmaceuticals USA, Inc.*

_/s/ Mary Pat Brogan_
Mary Pat Brogan
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Telephone: 216.621.0200
mbrogan@bakerlaw.com

Carlos F. Ortiz
Kayley B. Sullivan
BAKER & HOSTETLER LLP
45 Rockefeller Center
New York, NY 10111-0100
Telephone: 212.589.4200
cortiz@bakerlaw.com
kbsullivan@bakerlaw.com

*Counsel for Defendant Heritage Pharmaceuticals, Inc.*




**FILED WITH REDACTIONS – PUBLIC VERSION**

*<u>/s/ Donald W. Hawthorne</u>*
Donald W. Hawthorne
CARTER LEDYARD & MILBURN LLP
28 Liberty Street
New York, NY 10005
212-238-868
hawthorne@clm.com

*Counsel for Defendant Breckenridge Pharmaceutical, Inc.*

*<u>/s/ David Fioccola</u>*
Grant Esposito
David Fioccola
PROSKAUER ROSE LLP
Eleven Times Square New York, NY 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
gesposito@proskauer.com
dfioccola@proskauer.com

Christopher Ondeck
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-5865
Facsimile: (202) 416-6899
ondeck@proskauer.com

*Counsel for Defendants Sandoz Inc. and Fougera Pharmaceuticals Inc.*

*<u>/s/ John M. Taladay</u>*
John M. Taladay
Christopher P. Wilson
Edward W. Duffy
JoAnna B. Adkisson
Michael A. Munoz
BAKER BOTTS LLP
700 K Street NW
Washington, DC 20001
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
john.taladay@bakerbotts.com

*<u>/s/ Brian T. Feeney</u>*
Brian T. Feeney
GREENBERG TRAURIG, LLP
1717 Arch Street, Suite 400
Philadelphia, PA 19103
Telephone: (215) 988-7812
Facsimile: (215) 717-5265
Brian.feeney@gtlaw.com

Roger Kaplan
Aaron Van Nostrand
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932-067
Telephone: (973) 360-7900
Facsimile: (973) 295-1321
kaplanr@gtlaw.com
aaron.vannostrand@gtlaw.com

*Counsel for Defendant Dr. Reddy's Laboratories, Inc.*

*<u>/s/ Robert W. Manoso</u>*
Robert W. Manoso
Dimitra Doufekias
MORRISON & FOERSTER LLP
2100 L Street, NW Suite 900
Washington, DC 20037
Telephone: (202) 887-1500
Facsimile: (202) 887-0763
rmanoso@mofo.com
ddoufekias@mofo.com

Michael B. Miller
MORRISON & FOERSTER LLP
250 W 55th Street
New York, NY 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
mbmiller@mofo.com

*Counsel for Defendant Glenmark Pharmaceuticals Inc., USA*

christopher.wilson@bakerbotts.com
ed.duffy@bakerbotts.com
joanna.adkisson@bakerbotts.com
michael.munoz@bakerbotts.com

Lauri A. Kavulich
CLARK HILL PLC
2001 Market Street, Suite 2620
Philadelphia, PA 19103
Telephone: (215) 640-8500
Facsimile: (215) 640-8501
lkavulich@clarkhill.com

Lindsay S. Fouse
CLARK HILL PLC
301 Grant St, 14th Floor
Pittsburgh, PA 15219
Telephone: (412) 394-7711
Facsimile: (412) 394-2555
lfouse@clarkhill.com

*Counsel for Defendants Taro Pharmaceuticals U.S.A., Inc., Taro Pharmaceutical Industries Ltd., and Sun Pharmaceutical Industries Inc.*

*/s/ Devora W. Allon*
Devora W. Allon, P.C.
Alexia R. Brancato, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
devora.allon@kirkland.com
alexia.brancato@kirkland.com

*Counsel for Defendant Upsher-Smith Laboratories, LLC*

*/s/ J. Clayton Everett Jr.*
J. Clayton Everett, Jr.
William S.D. Cravens
Y. Frank Ren
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW

*/s/ George G. Gordon*
George G. Gordon
Julia Chapman
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104-2808
Tel: (215) 994-2382
Fax: (215) 944-2222
george.gordon@dechert.com
julia.chapman@dechert.com

D. Brett Kohlhofer
DECHERT LLP
1900 K Street NW
Washington, D.C.
Tel: (202) 261-3349
Fax: (202) 261-3333
d.brett.kohlhofer@dechert.com

*Attorneys for Defendant Lannett Company, Inc.*

*/s/ Brian J. Smith*
Brian J. Smith*
Jordanne M. Steiner
WILSON SONSINI GOODRICH & ROSATI
1700 K Street, NW, 5th Floor
Washington, D.C. 20006
Telephone: (302)502-8417
brian.smith@wsgr.com
jsteiner@wsgr.com
*Admitted only in Illinois & Maine

Angela L. Brown
WILSON SONSINI GOODRICH & ROSATI
31 West 52nd Street, Fifth Floor
New York, NY 10019
Telephone: (212) 999-5800
Angela.brown@wsgr.com

*Counsel for Defendant Mayne Pharma Inc.*

Washington, DC 20004
Telephone: +1.202.739.3000
Facsimile: +1.202.739.3001
clay.everett@morganlewis.com
william.cravens@morganlewis.com
frank.ren@morganlewis.com

Stephen D. LaBrecque
MORGAN, LEWIS & BOCKIUS LLP
1 Federal Street
Boston, MA 02110
Telephone: +1.617.341.7700
Facsimile: +1.617.341.7701
stephen.labrecque@morganlewis.com

Harvey Bartle IV
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001
harvey.bartle@morganlewis.com

*Counsel for Defendants Perrigo Company plc and Perrigo New York, Inc.*

*/s/ Jason R. Parish*
Jason R. Parish
BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW, Suite 300
Washington, D.C. 20006
Telephone: (202) 452-7900
Facsimile: (202) 452-7989
jason.parish@bipc.com

Gretchen L. Jankowski
Bradley J. Kitlowski
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501Grant Street, Suite 200
Pittsburgh, PA 15219
Telephone: (412) 562-8800
Facsimile: (412) 562-1041
gretchen.jankowksi@bipc.com
bradley.kitlowski@bipc.com

*/s/ Robin P. Summer*
Robin P. Sumner
Michael J. Hartman
Melissa Hatch O'Donnell
TROUTMAN PEPPER LOCKE LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone: (215) 981-4000
Facsimile: (215) 981-4750
robin.sumner@troutman.com
michael.hartman@troutman.com
melissa.odonnell@troutman.com

*Attorneys for Defendants Impax Laboratories, LLC and West-Ward Pharmaceuticals Corp.*

*/s/ Peter G. Siachos*
Peter G. Siachos
GORDON REES SCULLY MANSUKHANI LLP
677 King Street, Suite 450
Charleston, SC 29403
Telephone: (843) 714-25
psiachos@grsm.com

Clair E. Wischusen
GORDON REES SCULLY MANSUKHANI LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Telephone: (703) 650-7030
cwischusen@grsm.com

*Attorneys for Defendant, Epic Pharma, LLC*

Caroline B. Warren
BUCHANAN INGERSOLL & ROONEY PC
Carillon Tower
227 West Trade Street, Suite 600
Charlotte, NC 28202
Telephone: (704) 444-3371
Facsimile: (704) 444-3490
caroline.warren@bipc.com

*Counsel for Defendant Zydus Pharmaceuticals (USA) Inc.*