**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>16-MD-2724 |
| THIS DOCUMENT RELATES TO:<br>*HUMANA INC.,*<br>*PLAINTIFF,*<br>v.<br>*ACTAVIS ELIZABETH, LLC, ET AL.,*<br>*DEFENDANTS.* | Case No. 2:18-cv-03299-CMR<br>**HON. CYNTHIA M. RUFE** |

**MYLAN DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**FILED WITH REDACTIONS – PUBLIC VERSION**

**TABLE OF CONTENTS**


**Page**

INTRODUCTION ..... 1

HUMANA'S ALLEGATIONS AGAINST MYLAN ..... 5

LEGAL STANDARD ..... 6

ARGUMENT ..... 7

I. THERE IS NO REASONABLE INFERENCE REGARDING ANY PRODUCT-SPECIFIC CONSPIRACY INVOLVING MYLAN ..... 7

A. Evidence Pertinent to All of Mylan's Subject Drugs ..... 8

1. No Direct Evidence for any Product-Specific Claim Against Mylan ..... 8

2. Trade show attendance does not support conspiracy ..... 9

3. Fifth Amendment invocations do not support an inference of conspiracy ..... 10

4. Evidence Supporting an Inference of Independent Action is Overwhelming ..... 10

5. Humana Ignores the Impact of Brand Pricing and Competition ..... 12

B. There is no Evidence of Mylan's Involvement in an Amitriptyline Conspiracy ..... 12

1. Amitriptyline Factual Background ..... 12

2. No Direct Evidence as to Amitriptyline ..... 13

3. No Circumstantial Evidence as to Amitriptyline ..... 14

i. No Parallel Conduct ..... 14

ii. No Plus Factors ..... 14

C. There is no Evidence of Mylan's Involvement in a Benazepril Conspiracy ..... 16

1. Benazepril Factual Background ..... 16

2. No Direct Evidence as to Benazepril ..... 18

3. No Circumstantial Evidence as to Benazepril ..... 18

i. No Parallel Conduct .......... 18

ii. No Plus Factors .......... 19

D. Additional Evidence Confirms Mylan Did Not Conspire as to Clomipramine .......... 21

E. There is no Evidence of Mylan's Involvement in a Digoxin Conspiracy .......... 23

1. Digoxin Factual Background .......... 24

2. No Direct Evidence Supports the Existence of a Digoxin Conspiracy .......... 25

3. No Circumstantial Evidence: Mylan Acted in its Independent Interests .......... 26

i. No Parallel Conduct .......... 26

ii. No Plus Factors .......... 27

F. There is no Evidence of Mylan's Involvement in a Divalproex Conspiracy .......... 30

1. Divalproex Factual Background .......... 30

2. There is No Direct Evidence of a Divalproex Conspiracy .......... 31

3. No Circumstantial Evidence of a Divalproex Conspiracy .......... 32

i. No Parallel Conduct .......... 32

ii. No Plus Factors .......... 32

G. There is no Evidence of Mylan's Involvement in a Doxycycline Conspiracy .......... 34

1. There is no Evidence of Mylan's Involvement in a Doxy Mono Conspiracy .......... 35

i. Doxy Mono Factual Background .......... 35

ii. No Direct Evidence .......... 36

iii. No Circumstantial Evidence of a Doxy Mono Conspiracy .......... 36

a) No Parallel Conduct .......... 36

b) No Plus Factors .......... 37

2. There is no Evidence of Mylan's Involvement in a Doxy DR Conspiracy ..... 39

i. Doxy DR Factual Background ..... 39

ii. No Direct Evidence of a Doxy DR Conspiracy ..... 41

iii. No Circumstantial Evidence of a Doxy DR Conspiracy ..... 42

a) No Parallel Conduct ..... 42

b) No Plus Factors ..... 42

H. There is no Evidence of Mylan's Involvement in a Levothyroxine Conspiracy ..... 44

1. Levothyroxine Factual Background ..... 44

2. No Direct Evidence as to Levothyroxine ..... 47

3. No Circumstantial Evidence as to Levothyroxine ..... 47

i. No Parallel Conduct ..... 47

ii. No Plus Factors ..... 48

I. There is no Evidence of Mylan's Involvement in a Propranolol Conspiracy ..... 49

1. Propranolol Tablets Factual Background ..... 50

2. No Conspiracy on Either At-Issue Propranolol Form ..... 52

3. No Direct Evidence of a Propranolol Tablets Conspiracy ..... 53

4. No Circumstantial Evidence of a Propranolol Tablets Conspiracy ..... 53

i. No Parallel Conduct ..... 53

ii. No Plus Factors ..... 54

J. There is no Evidence of Mylan's Involvement in a Verapamil Conspiracy ..... 56

1. Verapamil Factual Background ..... 56

2. No Conspiracy on Either At-Issue Verapamil Product ..... 57

3. No Direct Evidence ..... 58

4. No Circumstantial Evidence ..... 59

i. No Parallel Conduct ........ 59

ii. No Plus Factors ........ 59

II. THERE IS NO EVIDENCE MYLAN PARTICIPATED IN AN OVERARCHING CONSPIRACY ........ 60

A. There is No Evidence Mylan Joined the Alleged Overarching Conspiracy ........ 61

B. The DPAs or Plea Agreements Do Not Make Humana's Case ........ 62

C. Mylan was a Victim On At Least One Product Humana Claims Was Part of the Overarching Conspiracy ........ 62

D. There is No Evidence of The Three *Kelly* Factors ........ 63

E. Humana Cannot Add New Claims Against Mylan Via Its Expert ........ 65

III. HUMANA CANNOT ESTABLISH CAUSATION ........ 66

IV. HUMANA FAILS TO PLEAD OR MEET THE RULE OF REASON STANDARD ........ 67

V. MYLAN CANNOT BE LIABLE FOR CONDUCT THAT OCCURRED BEFORE IT ALLEGEDLY JOINED ANY PURPORTED CONSPIRACY ........ 67

VI. HUMANA HAS NO TRIABLE CLAIMS AFTER 2015 AT THE LATEST ........ 68

VII. NO EVIDENCE REGARDING MYLAN N.V. OR MYLAN INC. ........ 69

CONCLUSION ........ 70




**FILED WITH REDACTIONS – PUBLIC VERSION**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
228 F.3d 429 (3d Cir. 2000).....66

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994).....34

*Anderson News, L.L.C. v. Am. Media, Inc.*,
899 F.3d 87 (2d Cir. 2018).....6

*AT&T Corp. v. JMC Telecom, LLC*,
470 F.3d 525 (3d Cir. 2006).....67

*Avirgan v. Hull*,
932 F.2d 1572 (11th Cir. 1991).....10

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962).....52

*Carr v. Gillis Associated Indus., Inc.*,
227 F. App'x 172 (3d Cir. 2007).....65

*César Castillo, Inc., v. Actavis Elizabeth, LLC*,
No. 17-cv-00078-JSR (S.D.N.Y. Feb. 28, 2017).....50

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*,
92 F.4th 381 (2d Cir. 2024).....20

*Fried v. JPMorgan Chase & Co.*,
850 F.3d 590 (3d Cir. 2017).....70

*FTC v. AbbVie Inc.*,
976 F.3d 327 (3d Cir. 2020).....52

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
386 F.3d 485 (2d Cir. 2004).....53, 58

*Great Western Mining & Mineral Co. v. Fox Rothschild LLP*,
615 F.3d 159 (3d Cir. 2010).....68

*Holiday Wholesale Grocery Co. v. Philip Morris Inc.*,
231 F. Supp. 2d 1253 (N.D. Ga. 2002),
*aff'd sub nom. Williamson Oil. Co. v. Philip Morris USA*
346 F.3d 1287 (11th Cir. 2003) ....................................................................46

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999).......................................................................... *passim*

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015).......................................................................... *passim*

*In re Chocolate Confectionary Antitrust Litig.*,
999 F. Supp. 2d 777 (M.D. Pa. 2014) ........................................................54, 61

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ......................................................................10

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) ...................................................................14, 54

*In re Domestic Drywall Antitrust Litig.*,
2016 WL 3453147 (E.D. Pa. June 22, 2016) ..............................................68, 69

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004).......................................................................... *passim*

*In re Generic Pharms. Pricing Antitrust Litig.*,
2022 WL 1664456 (E.D. Pa. May 25, 2022) (Rufe, J.) .....................................67

*In re Generic Pharms. Pricing Antitrust Litig.*,
2025 WL 2483981 (E.D. Pa. Aug. 27, 2025) ..................................................66

*In re Generic Pharms. Pricing Antitrust Litig.*,
338 F. Supp. 3d 404 (E.D. Pa. 2018) ..........................................................10, 26

*In re Generic Pharms. Pricing Antitrust Litig.*,
394 F. Supp. 3d 509 (E.D. Pa. 2019) ..............................................................64

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................10

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010).......................................................................... *passim*

*In re Japanese Elec. Prods. Antitrust Litig.*,
723 F.2d 238 (3d Cir. 1983),
*rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..........................................................................63



**FILED WITH REDACTIONS – PUBLIC VERSION**

*In re K-Dur Antitrust Litig.*,
2016 WL 755623 (D.N.J. Feb. 25, 2016) ....................................................................63

*In re Lithium Ion Batteries Antitrust Litig.*,
2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ...............................................................68

*In re Optical Disk Drive Antitrust Litig.*,
2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ..............................................................63

*In re Processed Egg Prods. Antitrust Litig.*,
206 F. Supp. 3d 1033 (E.D. Pa. 2016) .......................................................................67

*In re Wellbutrin XL Antitrust Litig.*,
868 F.3d 132 (3d Cir. 2017)........................................................................... *passim*

*Int'l Constr. Prods. LLC v. Ring Power Corp.*,
2021 WL 6755717 (N.D. Fla. Dec. 23, 2021) ..........................................................6, 7

*InterVest, Inc. v. Bloomberg, L.P.*,
340 F.3d 144 (3d Cir. 2003)..........................................................................................32

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017),
*aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*,
910 F.3d 927 (7th Cir. 2018) ........................................................................................65

*Levine v. United States*,
383 U.S. 265 (1966)......................................................................................................68

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................ *passim*

*Nitkin v. Main Line Health*,
67 F.4th 565 (3d Cir. 2023) ..........................................................................................16

*Oliver v. Ralphs Grocery Co.*,
654 F.3d 903 (9th Cir. 2011) ........................................................................................65

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*,
998 F.2d 1224 (3d Cir. 1993)........................................................................................38

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ................................................................64

*Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*,
2015 WL 4987751 (E.D.N.Y. Aug. 19, 2015)......................................................68, 69



**FILED WITH REDACTIONS – PUBLIC VERSION**

*Rabin v. NASDAQ OMX PHLX LLC*,
182 F. Supp. 3d 220 (E.D. Pa. 2016),
*aff'd*, 712 F. App'x 188 (3d Cir. 2017)....................67, 68

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024) ....................52, 57, 58

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ....................70

*SmithKline Beecham Corp. v. Apotex Corp.*,
383 F. Supp. 2d 686 (E.D. Pa. 2004) ....................6

*SmithKline Corp. v. Eli Lilly & Co.*,
575 F.2d 1056 (3d Cir. 1978)....................52

*Snyder v. Farnam Cos.*,
792 F. Supp. 2d 712 (D.N.J. 2011) ....................70

*Taylor v. Gural*,
2025 WL 638596 (E.D. Pa. Feb. 27, 2025) ....................37, 38

*Todorov v. DCH Healthcare Auth.*,
921 F.2d 1438 (11th Cir. 1991) ....................11

*United States of America v. Teva Pharms. USA, Inc.*,
No. 2:20-cr-00200-RBS, ECF No. 186 (E.D. Pa. Sept. 11, 2020) ....................62, 63

*United States v. Kelly*,
892 F.2d 255 (3d Cir. 1989)....................63

*United States v. Kemp*,
500 F.3d 257 (3d Cir. 2007)....................63, 64

*United States v. Local 560 Int'l Bhd. of Teamsters*,
780 F.2d 267 (3d Cir. 1985)....................10, 21, 55

*United States v. United States Gypsum Co.*,
438 U.S. 422 (1978)....................67

*United States v. Uvino*,
2025 WL 1932448 (2d Cir. Apr. 25, 2025) ....................68

*Valspar Corp. v. E.I. Du Pone De Nemours and Co.*,
873 F.3d 185 (3d Cir. 2017).................... *passim*

**STATUTES**

Sherman Act....................67

**RULES**

Fed. R. Civ. P. 56(a) ....................................................................................................................6

Fed. R. Civ. P. 56(c) ....................................................................................................................6

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Amitriptyline | Amitriptyline Hydrochloride |
| API | Active Pharmaceutical Ingredient |
| AWP | Average Wholesale Price |
| Benazepril | Benazepril Hydrochloride and Hydrochlorothiazide Tablets<br>*Humana refers to Benazepril HCTZ as "Benazepril." SAC ¶ 22. For the avoidance of confusion, Mylan does the same.* |
| Clomipramine | Clomipramine Hydrochloride |
| Clomipramine MSJ | 16-CM-27241, Doc. No. 150 and 16-CM-27242, Doc. 302, collectively |
| Clomipramine MSJ Opinion (Clomip. Op.) | Summary Judgment Opinion, *In Re Clomipramine Cases*, No. 2:16-MD-02724, Dkt. 3616 (E.D. Pa. Aug. 27, 2025) |
| Complaint | Second Amended Complaint, *Humana Inc. v. Actavis Elizabeth, LLC et al*, No. 2:18-cv-03299, Dkt. 109 (E.D. Pa. April 1, 2019) |
| Digoxin | Digoxin |
| Divalproex | Divalproex Sodium Extended-Release |
| Doxy DR | Doxycycline Hyclate Delayed Release |
| Doxy Mono | Doxycycline Monohydrate |
| DPA | Deferred Prosecution Agreement(s)<br>*United States v. Glenmark Pharmaceuticals Inc., USA*, No. 2:20-cr-200-RBS, Dkts. 186 and 188 (E.D. Pa.)<br>*United States v. Taro Pharmaceuticals U.S.A., Inc.*, No. 2:20-cr-214-RBS, Dkt. 2 (E.D. Pa.)<br>*United States v. Sandoz Inc.*, No. 2:20-cr-111-RBS, Dkt. 2 (E.D. Pa.)<br>*United States v. Apotex Corp.*, No. 2:20-cr-169-RBS, Dkt. 2 (E.D. Pa.)<br>*United States v. Heritage Pharmaceuticals Inc.*, No. 2:19-cr-316-RBS, Dkt. 4 (E.D. Pa.)<br>*United States v. Teva Pharmaceuticals USA, Inc.*, No. 2:20-cr-200-RBS, Dkt. 186 (E.D. Pa.) |
| ER | Extended Release |
| FDA | United States Food and Drug Administration |
| IR | Immediate Release |
| Levothyroxine | Levothyroxine Sodium |
| Mylan | Mylan Pharmaceuticals, Inc. |

| | |
|---|---|
| OCD | obsessive compulsive disorder |
| P&C | Mylan Pricing and Contracts |
| Propranolol | Propranolol Hydrochloride |
| ROFR | Right of First Refusal |
| Sec. Op. | Summary Judgment Opinion, *In re Mylan N.V. Securities Litigation*, No. 16-cv-7926, Dkt. 463 (S.D.N.Y. Mar. 30, 2023), *aff'd. sub nom.*, *Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 U.S. App. LEXIS 8978 (2d Cir. April 15, 2024) |
| Verapamil | Verapamil Hydrochloride |
| WAC | Wholesale Acquisition Cost |

**RELEVANT INDIVIDUALS**

| | | |
|---|---|---|
| Aigner | Michael Aigner | Mylan |
| Aprahamian | Ara Aprahamian | Taro |
| Austin | Jake Austin | Dr. Reddy’s |
| Bihari | Chris Bihari | Sandoz |
| Couchman | Dawn Couchman | Perrigo |
| Duda | Joe Duda | Mylan |
| Emerson | Rodney Emerson | Mylan |
| Glazer | Jeffrey Glazer | Heritage |
| Kellum | Armando Kellum | Sandoz |
| Krauthauser | Paul Krauthauser | Sandoz |
| Lubke | Della Lubke | Sandoz |
| Malek | Jason Malek | Heritage |
| Malik | Rajiv Malik | Mylan |
| McManus | Justin McManus | Lannett |
| Nesta | James (Jim) Nesta | Mylan |
| O’Connor | Karen O’Connor | Par |
| O’Mara | Neal O’Mara | Heritage |
| Rekenthaler | David Rekenthaler | Teva |
| Ronco | Kristy Ronco | Zydus |
| Sather | Anne Sather | Heritage |
| Sharif | Amir Sharif | United Healthcare |
| Smith | Kevin Smith | Lannett |
| Spina | Robert Spina | CVS |
| Sullivan | Tracy Sullivan | Lannett |
| Vezza | Mike Vezza | Sandoz |
| Wyatt | Lance Wyatt | Mylan |

**EXPERT WITNESSES**

| | | |
|---|---|---|
| Arruda | Stacy Arruda | Humana |
| Bradford | Dr. W. David Bradford | Humana |
| Jensen | Erika Jensen | Defendants |
| Stiroh | Dr. Lauren Stiroh | Mylan |
| Vogt | Dr. William Vogt | Humana |



FILED WITH REDACTIONS – PUBLIC VERSION

## INTRODUCTION

Humana claimed that it would come forward with evidence that Mylan joined 10 different product-specific conspiracies. After nearly a decade of discovery—involving millions of documents and hundreds of depositions—Humana has not come close. No document shows that Mylan entered an agreement to conspire as to any drug, no witness says they came to such an agreement with Mylan, and Humana's experts did not even look at any of Mylan's prices or how it made the decisions that Humana claims were unlawful. If such an analysis were undertaken by Humana it would have revealed that for certain products, like Doxycycline Mono, Mylan never raised its price at all and for many others, such as Clomipramine, Mylan never raised prices for one of its largest customers, CVS. Indeed, what the unrebutted evidence overwhelmingly reflects is Mylan's lawful, unilateral, independent decision-making.

Humana has nothing more than unproven allegations, baseless speculation, and an improper attempt to paint Mylan together with other Defendants. None of that is sufficient to avoid summary judgment.

**Amitriptyline.** Humana accused Mylan of conspiring with Sandoz and Qualitest (now Par), alleging only that the "average" price increased following a fundraising dinner that certain of Defendants' employees attended. Compl. ¶¶ 322-23. Humana did not allege what was said at the dinner or what, if anything, each party supposedly agreed to. A decade later, Humana has nothing more. It has no testimony supporting its claim. It has no documents supporting its claim. And while Humana still urges some significance to that same fundraising dinner, there is no evidence that Amitriptyline was even mentioned. Moreover, the single phone call that Humana points to as somehow involving a Mylan employee, is nothing of the sort—which Humana's own expert has admitted. The only development over the last decade is that it is now undisputed that Mylan raised prices on a product that was unprofitable—economically rational, self-interested



**FILED WITH REDACTIONS – PUBLIC VERSION**

behavior that does not support any inference of conspiracy. Supreme Court precedent mandates that for completely unsupported claims like this—with no direct evidence, no circumstantial evidence, and no proof that "tends to exclude the possibility that [Mylan] acted independently"—summary judgment is required. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 588 (1986).

**Digoxin.** Mylan re-entered the market at the publicly known list price *more than a year after* the alleged unlawful price increase occurred. Thus, unsurprisingly, Humana identifies no evidence that any Mylan employee entered into an agreement or acted in furtherance of any agreement. Humana Response to Rog 2. That alone requires summary judgment.

**Divalproex.** Humana's corporate representative admitted under oath that Humana's allegation that no supply disruptions "justified" Mylan's price increase was false. In fact, Humana knew back in 2013 that Wockhardt—the market leader at the time—was subject to an import ban that forced it to exit the market. Supply was thereby constrained, and the remaining manufacturers, including Mylan, increased list prices, as basic economic principles would predict. That inconvenient fact was omitted both from Humana's complaint and from its expert reports. But Humana pretending that there was no supply disruption does not create a genuine issue of fact.

**Propranolol.** Similarly, Humana alleged that there was no supply issue with respect to Propranolol, but the undisputed evidence shows that Mylan—which had barely 3% of the market—was told by its API supplier that a disruption would impact its ability to sell the product. The supply issue persisted for more than a year, and the product was unprofitable; Humana offers no evidence that tends to exclude independent decision making as the explanation for Mylan's price increase.

**Benazepril**, **Levothyroxine**, and **Clomipramine.** Humana pins its case on some phone

calls alleged to have occurred in July 2013. But those phone calls do not show that there were any agreements made by anyone from Mylan. On Benazepril, Mylan raised prices because it was the sole generic on the market, and Lubke conceded she did not agree that Sandoz, which was not selling the product at the time, would re-enter or follow Mylan's lead. On Levothyroxine, Mylan's pricing decisions reflected that Mylan was the only generic authorized by FDA to compete with all relevant branded products. On Clomipramine, additional witnesses (beyond those addressed by the Court in an earlier ruling) have testified and confirmed that they did not agree on behalf of Mylan to collude with Taro or Sandoz, Mylan's price increase pre-dated by two months the July 2013 phone calls pointed to by Humana, Sandoz had no agreement with Mylan, and Sandoz's employee accused of conspiring (Lubke) did not have authority to bind Sandoz.

**Doxy DR.** Humana promised the evidence would show an agreement between Mylan's former President (Malik) and Heritage's CEO (Glazer). But that too did not materialize; Malik denied any such agreement, and Glazer confirmed that Malik was "noncommittal." As the federal judge in New York who was presiding over securities claims based on the same record found in granting summary judgment for Mylan, "noncommittal" is hardly agreement. Sec. Op. at 62.

**Doxy Mono.** Witnesses for Mylan and Heritage deny reaching any agreement, it is undisputed that the Mylan employee accused of conspiring (Aigner) had no authority to bind Mylan, and Mylan never raised its prices.

**Verapamil ER Capsules**. Mylan's price increase (responsive to a supply shortage) for Verapamil ER capsules cannot be linked to an alleged conspiracy with Heritage as Humana alleges because Heritage (which only made Verapamil IR tablets) never made ER capsules.

Apart from its claims that Mylan joined 10 separate drug-specific conspiracies, Humana also advances an overarching conspiracy claim that Mylan conspired with 23 other defendants

relating to at least 22 products—the majority of which Mylan never manufactured and sold. This claim too has failed. As an initial matter, the overarching conspiracy claim as to Mylan is nonsensical given that the conspiracy allegedly included pravastatin, a product for which the DOJ identified Mylan as a *victim*. Beyond that, the millions of documents, hundreds of depositions, and thousands of paragraphs of expert reports provide not a shred of evidence that connects Mylan to any such overarching conspiracy. To the contrary, Humana's cooperating witnesses denied engaging in this conspiracy with anyone, including Mylan, and Mylan's fact and expert witnesses explained how Mylan's decision-making does not fit Humana's conspiracy theory. Of Mylan's 30,000+ employees worldwide, Humana's allegations overwhelmingly center around just two, neither of whom even had the authority to set Mylan's prices, select or cede customers, or approve bids. Summary judgment for Mylan should be granted as to the overarching conspiracy claim.

This motion addresses five additional grounds for summary judgment. **First**, Humana cannot show causation on transactions where it reimbursed CVS for products for which Mylan did not raise CVS's prices. As this Court held—no price increase to CVS means no overcharge to CVS and therefore no overcharge passed through by CVS. **Second**, for several products, Humana's evidence (if credited) would constitute nothing more than lawful information exchange or, even less, the one-way provision of information. The law is clear that such evidence requires application of the rule of reason, which Humana has not pled and cannot prove; that alone is dispositive.[1] **Third** and **fourth**, Mylan cannot be liable for Humana's alleged damages incurred *before* any allegation that Mylan joined any conspiracy and *after* any conduct that forms the bases of Humana's claims. **Fifth**, there is zero evidence of unlawful conduct by three Mylan entities: Mylan N.V. which is no longer in existence, Mylan Inc., or UDL Laboratories Ins. Accordingly, summary

[1] Humana has not presented any evidence supporting the elements of such a claim, including, for example, relevant markets and anticompetitive effects that outweigh procompetitive benefits.

judgment as to all three is proper.

## HUMANA'S ALLEGATIONS AGAINST MYLAN

Humana alleges 37 defendants, including four Mylan entities, engaged in (1) conspiracies with respect to each of 22 "Subject Drugs,"[2] and (2) an overarching conspiracy beginning as early as 2011 encompassing all defendants and every "Subject Drug." Compl. ¶¶ 9; 261-88; 594.

Humana's product-specific conspiracy allegations encompass almost two dozen drugs that are sold in separate markets, treat different conditions, come in a variety of dosage forms and strengths (only some of which are the subject of Humana's allegations), and are priced independently. With respect to Mylan, Humana alleges conspiracies related to 10 drugs—Amitriptyline, Benazepril, Clomipramine, Digoxin, Divalproex, Doxy DR, Doxy Mono, Levothyroxine, Propranolol, and Verapamil. Compl. ¶¶ 19-39; 90-110. Mylan did not sell every formulation or strength of these 10 drugs, and for the ones it sold, sales did not cover the entire alleged relevant time.

Humana's overarching conspiracy claim alleges a single price-fixing agreement that was purportedly "broader than the Subject Drugs and Defendants named." Compl. ¶ 261. To facilitate such a conspiracy, Humana posits that defendants "operated under a system of understandings" lacking any specifics other than vague references to "playing nice in the sandbox," and maintaining "fair share[s]" of the market.[3] Compl. ¶ 263. There are no allegations specifying when Mylan allegedly joined any conspiracy or who purportedly agreed to it on behalf of any Mylan entity.

[2] In this brief, "Subject Drugs" refers to the 22 at-issue drugs identified by Humana's experts, who consider Lidocaine/Prilocaine to be distinct from Lidocaine. *See* Vogt Rep. Table 1; Bradford Rep. Table 1. Humana's Complaint identifies 21 "Subject Drugs." Compl. ¶¶ 19-39.

[3] *See* Defendants' Joint Motion for Summary Judgment on Humana's Overarching Conspiracy Claim, Causation, And Injunctive Relief Claims.

**LEGAL STANDARD**

Summary judgment "shall" be granted where "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, Humana must "establish that there is a genuine issue of material fact as to whether" Mylan joined a conspiracy "that caused [Humana] to suffer a cognizable injury." *Matsushita*, 475 U.S. at 585-86; Fed. R. Civ. P. 56(c). Although the record is reviewed on summary judgment "in the light most favorable to the nonmovant, drawing reasonable inferences in its favor… '[a]ntitrust law limits the range of permissible inferences from ambiguous evidence.'" *Valspar Corp. v. E.I. Du Pone De Nemours and Co*., 873 F.3d 185, 192 (3d Cir. 2017) (quoting *Matsushita*, 475 U.S. at 588).

Humana must offer sufficient "evidence that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 153 (3d Cir. 2017); *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 348-51 (3d Cir. 2010). Proof of Humana's claims must be direct or circumstantial, showing that each defendant (including each separate Mylan entity) "each defendant knowingly joined or agreed to participate in the conspiracy." *SmithKline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686, 701 (E.D. Pa. 2004); *Ins. Brokerage*, 618 F.3d at 341 n.44 ("[A] subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship."). Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).

Humana may not solely rely on parallel price movements (*Id*.), because they may be "the result of independent pricing decisions," especially in a market with few sellers like the generic drug industry. Humana's allegations must thus be "supplemented with 'plus factors.'" *Id*. at 122; *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 105 (2d Cir. 2018) (granting summary

judgment where "defendants' conduct was not, in fact, parallel"); *Int'l Constr. Prods. LLC v. Ring Power Corp.*, 2021 WL 6755717, at *8 (N.D. Fla. Dec. 23, 2021) (granting summary judgment where alleged conduct was not "sufficiently uniform to qualify as parallel"). "Plus factors" include "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015) ("*Chocolate I*"). "Bare allegations" of a "larger, overarching conspiracy" cannot defeat summary judgment." *Wellbutrin*, 868 F.3d at 154.

In oligopolistic markets, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Valspar*, 873 F.3d at 193 (quoting *Matsushita*, 475 U.S. at 588); *Chocolate I*, 801 F.3d at 398; *Baby Food*, 166 F.3d at 122. Courts further require plaintiffs "in oligopoly cases in particular," to satisfy "specialized evidentiary standards," *Valspar*, 873 F.3d at 193, including presenting "evidence that tends to exclude the possibility that [defendants] acted independently" of their competitors, *Matsushita*, 475 U.S. at 588 (citation omitted). Summary judgment is warranted when such evidence is absent. *Id.* at 598.

Here, Humana must come forward with evidence sufficient to prove (1) the who, what, where, when, why, and how of each product-specific conspiracy it alleged; (2) that each Mylan entity knowingly and intentionally joined each individual conspiracy; (3) the time period for which each individual Mylan participated; (4) the existence of the alleged overarching conspiracy, and (5) that each individual Mylan entity knowingly and intentionally joined that overarching conspiracy . As explained below, Humana cannot do so.

## ARGUMENT

### I. THERE IS NO REASONABLE INFERENCE REGARDING ANY PRODUCT-

**SPECIFIC CONSPIRACY INVOLVING MYLAN**

There is no evidence to show "that the inference of conspiracy is reasonable in light of the competing inferences of independent action." *Wellbutrin*, 868 F.3d at 153.

**A. Evidence Pertinent to All of Mylan's Subject Drugs**

***1. No Direct Evidence for any Product-Specific Claim Against Mylan***

There is no direct evidence that supports Humana's claims against Mylan. Direct evidence must be "explicit" and "**require[] no inferences** to establish the proposition or conclusion being asserted … direct evidence must plainly show that a conspiracy existed." Clomip. Op. at 16 (quoting *Baby Food*, 166 F.3d at 118) (emphasis added). Direct evidence is generally "an explicit admission from a participant" or "a document or conversation explicitly manifesting the existence of the agreement in question." *Chocolate I*, 801 F.3d at 396; *Ins. Brokerage*, 618 F.3d at 324 n.23.

First, there is no documentary direct evidence against Mylan. Indeed, while Humana has failed to come forward with a single witness to say that an agreement was made with Mylan on any drug. Humana's own witnesses confirm that no agreement existed. The testimony of Lubke, Bihari, and Vezza "does not constitute direct evidence of an agreement between Mylan and either Sandoz or Taro." Clomip. Op. at 17. This is hardly surprising as all three expressly disclaimed any agreement with Mylan. Ex. 2, 1224:22-1225:4; Ex. 3, 1610:12-1610:15; Ex. 4, 701:22-702:4. Lubke's claim that she spoke with Nesta about certain drugs is unavailing. Lubke admitted she did not have authority to "make any commitment . . . on behalf of Sandoz," she did not know what authority, if any, Nesta had; and she never asked for any commitment from Nesta. Ex. 2, 1223:22-1226:8. Moreover, even accepting Humana's position that there was an exchange of price information between Lubke and Nesta, that is not sufficient as a matter of law to survive summary judgment. *Baby Food*, 166 F.3d at 126. And Lubke affirmatively denied agreeing with Nesta or anyone else from Mylan, and she denied the existence of any overarching conspiracy. Ex. 2,

527:19-528:4.

Glazer's testimony regarding an alleged agreement with Mylan is similarly unpersuasive. When granting summary judgment in a securities class action, Judge Oetken analyzed that same testimony and concluded it does not constitute direct evidence. Sec. Op. at 62. The court stated: "Glazer himself noted that Mylan's representative… was non-committal. Thus...a finder of fact would need to *infer* that a subsequent communication or action represented Mylan's at least tacit assent to the agreement." *Id.* (emphasis added). No witness—from Mylan or a competitor—provides any direct evidence. Rather, Mylan employees confirmed there was no agreement on any drug. Ex. 5, 176:15-177:13, 178:7-12; Ex. 6, 154:15-155:5; Ex. 7, 300:17-22, 301:23-302:2; Ex. 8, 314:24-315-11, 316:13-25. Witnesses from Mylan's alleged co-conspirators disclaimed any agreements with Mylan. *E.g.*, Ex. 9, 226:21-228:8; Ex. 10, 332:7-336:8; 343:23-345:2; Ex. 11, 269:25-271:2; Ex. 12, 281:18-284:13; Ex. 13, 213:10-215:4; Ex. 14, 277:10-284:1; Ex. 15, at 126:23-136:24; Ex. 16, 140:4-7; Ex. 10, 332:7-336:8, 343:23-346:2; Ex. 17, 245:21-248:4; Ex. 18, 489:3-490:22; Ex. 19. 431:13-432:1; Ex. 20, 174:23-175:17; Ex. 21. 758:1-759:12; Ex. 22, 616:12-618:12.

### *2. Trade show attendance does not support conspiracy*

Humana relies[4] on limited attendance by certain Mylan employees (some unidentified) at trade events between 2011 and 2018. Humana, however, failed to provide evidence that wrongdoing occurred at those events, relying only on the fact that some employees of Mylan's competitors may have been present too. The fact that employees were in the same place, cannot support an inference of concerted action. *Chocolate I*, 801 F.3d at 409 ("The Plaintiffs' evidence is essentially that the executives from the Chocolate Manufacturers were in the same place at the

---

[4] Amitriptyline, Benazepril, Digoxin, Divalproex, Doxy DR, Doxy Mono, Levothyroxine, and Propranolol Tablets.

same time, which is insufficient to support a reasonable inference of concerted activity."); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 439 (E.D. Pa. 2018) ("[P]articipation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of agreement to the conspiracy.") (internal quotations omitted); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more.") (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1097-98 (9th Cir. 1999)).

***3. Fifth Amendment invocations do not support an inference of conspiracy***

At summary judgment, "[t]he negative inference, if any, to be drawn from the assertion of the fifth amendment does not substitute for evidence needed to meet the burden of production." *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991). Nesta and Aigner's invocation of their right to not testify as to certain drugs does not relieve Humana of the burden of providing evidence. *Id.* Indeed, "[b]ecause there are a number of reasons an employee might assert the Fifth Amendment privilege" the Nesta and Aigner invocations are "not sufficiently probative to give rise to a genuine issue of material fact." Sec. Op. at 48-49. Moreover, Nesta and Aigner's Fifth Amendment invocations do not support an adverse inference against Mylan because there is not "sufficient independent evidence—besides the mere invocation of the privilege—upon which to base the negative inference." *United States v. Local 560 Int'l Bhd. of Teamsters,* 780 F.2d 267, 292 n.32 (3d Cir. 1985); *Baby Food*, 166 F.3d at 125 ("Evidence of sporadic exchanges of shop talk among field sales representatives who lack pricing authority is insufficient to survive summary judgment.").

***4. Evidence Supporting an Inference of Independent Action is***

***Overwhelming***

Mylan's actions were conducted unilaterally based on internal procedures and rational self-interest. Ex. 23 ¶ 12. Mylan's robust and comprehensive internal pricing procedures involved multiple individuals, departments, and committees, required to approve any decisions. No single individual had the authority to change pricing, decide which customers to pursue, or respond to a customer's bid request. Ex. 24, at 943-44. Rather, Mylan had a separate Pricing & Contracts ("P&C") team that assessed pricing in accord with Mylan's comprehensive guidelines. Ex. 25, at -649-58; Ex. 26, 102:22-103:13. Changes to list prices had to be approved by Mylan's cross-functional Pricing Committee. Ex. 27, at -584. Changes with an estimated impact on gross margin over $10M were approved by the separate, three-member Executive Pricing Committee. *Id.*

Mylan's guidelines included specific "Pricing Analysis" and "Opportunity Analysis" processes that the P&C team—with review by other departments, used for their evaluations. Ex. 23 ¶ 77; Ex. 25, at -649-58; Ex. 26, 102:22-103:13. Each evaluation was unique and considered multiple factors including projected and historical usage and contract supply terms. *Id.*, 104:21-105:15, 107:15-18; Ex. 7, 137:18-21. Mylan's process—followed for every drug at issue—establishes Mylan's independent pricing decisions. *Valspar*, 873 F.3d at 200 (evidence of "internal deliberation may negate an inference of conspiracy"). There is no evidence that "tends to exclude the possibility" that Mylan acted consistent with its independent pricing procedures and economic self-interest. *Matsushita*, 475 U.S. at 588; *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991) ("[W]hen the defendant puts forth a plausible, procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred; the plaintiff must produce more probative evidence that the law has been violated."); Ex. 23 ¶ 83 ("Mylan's guidelines for evaluating opportunities and products are consistent with economic incentives under oligopolistic competition . . . .").

### *5. Humana Ignores the Impact of Brand Pricing and Competition*

Generic drug pricing does not occur in a vacuum. List prices for branded products are widely available through pricing compendia and serve as a benchmark for generic prices. Mylan regularly assessed brand WAC when making pricing decisions. Ex. 28 ¶ 194 n.244; Ex. 29 ¶ 34. Mylan witnesses explained that brand pricing was a key input in evaluating pricing opportunities. Ex. 23 ¶ 33. For multiple drugs at issue, including at least Divalproex, Levothyroxine, and Verapamil, brand list prices increased shortly before the generics and quantitative analysis shows a strong correlation between Mylan's prices and brand prices. Ex. 23 ¶¶ 50-54. Humana fails to account for brand pricing at all, ignoring their impact on the timing or magnitude of generic price movements. *Id.* Humana's failure to address these key facts shows that it cannot carry its burden at summary judgment.

## B. There is no Evidence of Mylan's Involvement in an Amitriptyline Conspiracy

Mylan was not involved in an Amitriptyline conspiracy. When asked who participated in reaching an alleged agreement to fix prices on Amitriptyline, Humana identified no Mylan employees. Ex. 1. The sole phone call Humana's expert cited was between two Sandoz employees using a Mylan employee's former landline number from when he worked at Sandoz years prior. Humana's cherry-picking of call records close in time to price increases cannot support a conspiracy. The record reflects ordinary competitive behavior in an oligopoly—Mylan was selling Amitriptyline at a loss and implemented a price increase months after its competitors, following its own internal pricing analysis. Because Humana presents no direct or circumstantial evidence in support of its Amitriptyline claims, summary judgment is required.

### *1. Amitriptyline Factual Background*

Humana's theory depends entirely on a single call that its expert incorrectly asserts involved Mylan's Wyatt and a Sandoz employee, Ex. 30 ¶ 188. Humana's expert has now

conceded that this call was between two Sandoz employees. Ex. 31 ¶ 59; Ex. 5, 31:5-7, 35:6-7, 99:20-102:14; Ex. 32; Ex. 33. Humana is left only with the argument that the increases were "close in time" to two industry events. Ex. 30 ¶ 187; Compl. ¶ 322. There is no evidence that Amitriptyline was discussed at these events—let alone that an agreement was made.

The record reflects independent pricing decisions by each Amitriptyline Defendant. Qualitest began evaluating potential WAC and AWP increases in January 2014 due to manufacturing delays and increased costs. Ex. 34; Ex. 35; Ex. 36. It conducted a financial impact analysis and finalized the increases by April 23. *E.g.*, Ex. 37; Ex. 38. Qualitest sent out customer notices and published the AWP change in a public pricing source on April 29, which became effective on April 30. Ex. 39; Ex. 40. There is no evidence the increases were based on an agreement—and there is no evidence connecting Qualitest and Mylan.

After selling Amitriptyline at a loss, Ex. 41 ¶ 188, Sandoz matched Qualitest's WAC and AWP increases a month later, on May 23, after receiving approval from its pricing committee. Ex. 42; Ex. 43; Ex. 44. There is no evidence Sandoz increased its list price based on an agreement with Mylan (or Qualitest). To the contrary, Sandoz obtained Qualitest's WAC from a customer, which would have been unnecessary if there were a Sandoz-Qualitest agreement. Ex. 45; Ex. 46.

Mylan also initially sold Amitriptyline at a loss—losing approximately $0.65 for every $1.00 in revenue. Ex. 23 ¶¶ 97-98. After learning of its competitors' price increases from public sources and customers, Ex. 39; Ex. 47; Ex. 48, Mylan took months to review, analyze, and approve its own increases, utilizing multiple departments and committees. Ex. 49; Ex. 50; Ex. 51; Ex. 52; Ex. 53. The increases were effective on July 15, matching Qualitest's April 30 and Sandoz's May 23 increases. There is no evidence that Mylan approved the increases based on any agreement.

#### ***2. No Direct Evidence as to Amitriptyline***

No testimony or document explicitly evidences Humana's alleged Amitriptyline



**FILED WITH REDACTIONS – PUBLIC VERSION**

conspiracy. *Supra* § I.A.1.

### ***3. No Circumstantial Evidence as to Amitriptyline***

i. No Parallel Conduct

The record reflects independent pricing decisions made many weeks apart and based on public information about list prices. Conduct consistent with permissible competition does not support an inference of antitrust conspiracy. *Valspar*, 873 F.3d at 193. The list price increases did not translate into uniform net pricing. For example, Mylan did not increase direct net prices for CVS, 42% of all Amitriptyline doses sold by Mylan in July 2014, Ex. 23 ¶ 101; Ex. 54—and Humana's expert conducted *no* analysis of Defendant-specific pricing or customer pricing variation. Ex. 55, 30:13-21. That omission underscores the speculative nature of Humana's theory.

The magnitude of the Amitriptyline increases likewise fails to support an inference of conspiracy. *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 445 (9th Cir. 1990) ("were we to permit [a theory that price hikes were "too high"], few pricing decisions would be immune from antitrust scrutiny"). The magnitude is explained by independent decisions based on market forces—both Mylan and Sandoz had negative profit margins on the product, Ex. 23 ¶¶ 97-98; Ex. 41 ¶ 188, and Qualitest was concerned about higher manufacturing costs. Ex. 40.

ii. No Plus Factors

***No Motive to Conspire***. Evidence of Mylan's motive indicates it acknowledged the change in market dynamics, reviewed the financial impact of following its competitors' increases on an unprofitable drug, and then independently determined that following would be profit-maximizing. This "motive" indicates Mylan "operated[d] in an oligopolistic market" where "market behavior is interdependent," *Ins. Brokerage*, 618 F.3d at 322; *Valspar*, 873 F.3d at 193, and does not support an inference of conspiracy. Ex. 23 ¶¶ 218, 220; Ex. 28, § V.C. Moreover, Humana's merits expert



**FILED WITH REDACTIONS – PUBLIC VERSION**

did not conduct any analysis of individual Defendant pricing decisions, Ex. 55, 67:19-68:8, so he ignored that Amitriptyline was unprofitable for Mylan and Sandoz and that Qualitest's manufacturing costs had increased.

***No Conduct Contrary to Self-Interest***. Humana also cannot show than Mylan, or any Defendant, acted contrary to its self-interest. Following its increases, Mylan continued to compete for business, as evidenced by its changing market shares. Ex. 23, Fig. 1.

***No Traditional-Conspiracy Evidence***. After a decade of discovery, Humana cannot point to any document or testimony suggesting an Amitriptyline agreement, much less one involving Mylan. Humana's purported evidence is (1) one phone call misattributed to a Mylan employee; (2) certain calls between Sandoz and Qualitest (not connected to Mylan); and (3) attendance at two industry events. *First*, as discussed *supra*, there are no calls with anyone from Mylan that Humana alleges are about Amitriptyline. The sole call allegedly involving Mylan was an *internal* Sandoz call, and there were *no* calls between Mylan and Qualitest in 2014. *Second*, Humana presents *no* evidence of what was discussed during the calls between Qualitest and Sandoz, does not explain why Sandoz asked a customer for Qualitest's WACs *after* the calls if a pricing agreement had been made, and does not acknowledge that the Sandoz employee allegedly involved *denied* the existence of an agreement. Ex. 18, 1299:5-1301:4. *Third*, as discussed *supra* § I.A.2, Humana likewise presents *no* evidence of what, if anything, was discussed at the industry events. And it does not allege who from Mylan supposedly participated in the alleged agreement. Ex. 56. Humana cannot show these communications related to Amitriptyline or "rise to the level of an agreement, tacit or otherwise." *Baby Food*, 166 F.3d at 126 (citation omitted).

Furthermore, all witnesses asked about Amitriptyline denied conspiracy. Since the record reflects that each Defendant independently analyzed and then increased prices, *Matsushita*, 475



FILED WITH REDACTIONS – PUBLIC VERSION

U.S. at 588 (evidence must "tend[] to exclude the possibility that [defendants] acted independently") (citation omitted), no inference of conspiracy is appropriate., *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) ("general, unsubstantiated allegations" should be excluded at summary judgment). Summary judgment should therefore be granted.

### C. There is no Evidence of Mylan's Involvement in a Benazepril Conspiracy

Humana has no evidence to support an alleged Benazepril conspiracy. In 2012, Sandoz experienced FDA regulatory issues and exited the Benazepril market, leaving Mylan as the sole supplier for over a year serving nearly 99% of the market. During that time, Mylan independently decided to increase prices. The evidence demonstrates that Mylan anticipated remaining the sole supplier and had no knowledge that Sandoz planned to reenter the market. Humana has not identified any evidence to the contrary. The undisputed evidence also reveals that Sandoz was independently assessing when to reenter the market and relied on publicly available data sources and customers for market intelligence, which led Sandoz to determine that it would wait to relaunch to see if Mylan increased prices.

Humana's case hinges on a single phone call during which Lubke claims she discussed Benazepril with Nesta. But even crediting Lubke's testimony that the two discussed Benazepril, the call occurred *after* Sandoz decided to wait to reenter the market (based on its market intelligence from other sources). Furthermore, Lubke admits that Nesta did not provide her any pricing information, nor did she or Nesta make any agreements. Thus, the fact of this single phone call does not and cannot support a conspiracy.

#### *1. Benazepril Factual Background*

Benazepril is a hypertension drug sold in four strengths. Ex. 23 ¶ 16. Humana alleges that Mylan and Sandoz entered a Benazepril agreement in August 2013 to "increase[] their prices



FILED WITH REDACTIONS – PUBLIC VERSION

dramatically and in unison." Compl. ¶¶ 93, 340-42, 348.[5] However, Humana ignores market dynamics and Mylan and Sandoz's independent pricing decisions. After receiving an FDA warning letter in late 2011, Sandoz suspended production, confirming it could no longer offer Benazepril beginning in May 2012. Ex. 58; Ex. 59; Ex. 60; Ex. 61. In analyzing the financial impact of its exit, Sandoz examined Mylan's past pricing during periods of exclusivity and confirmed several instances where Sandoz later re-entered at prevailing prices, considering the potential for higher future profits as the only meaningful benefit of having to leave the Benazepril market. Ex. 62. After Sandoz exited the market, Mylan became the exclusive generic supplier of all strengths until the summer of 2013 and certain strengths through 2014 and 2015. Ex. 23 ¶ 107.

On May 16, 2012, Mylan's customer, Cardinal, informed Mylan of Sandoz's exit. Ex. 63. In response, Mylan instituted a 15% WAC increase within a few weeks. Ex. 64. After a year of continued exclusivity while priced 80% lower than the brand's WAC, Ex. 65, Mylan again analyzed a price increase, assuming it would remain exclusive and with no knowledge of Sandoz's planned re-entry. Ex. 66. Following Pricing Committee and Executive Pricing Committee approval, Mylan implemented that increase on August 9, 2013. Ex. 67.

Meanwhile, Sandoz independently prepared for reentry on two of the four strengths of Benazepril starting in June 2013. Ex. 69. There is no evidence Sandoz knew of an upcoming Mylan increase, instead focusing on regaining market share. Vezza wrote in late June, "I don't think it's worth a price increase at this time, rather just try to pick up customers." *Id*. Sandoz's approach changed after it reviewed a July 10 AnalySource email identifying unspecified "changes" affecting multiple products, including Benazepril. Ex. 70. Because Mylan was the only generic supplier of Benazepril at the time, Sandoz employees speculated that the "change" indicated

[5] Vogt defines a "start date" of July 2013 for the period during which the alleged conduct affected Benazepril. Ex. 57, Appendix 2 Table 1. No end date is specified.

Mylan's price increases, *id.*, and believed that Mylan had already or would soon increase Benazepril prices. That speculation occurred before any alleged Nesta-Lubke communication in mid-July, 2013, and was based on public information, not coordination. Lubke testified that no agreement was reached, no pricing information was exchanged, and Sandoz conducted its pricing analysis only after Mylan's list prices became public through AnalySource on August 16, 2013. Lubke Tr. 478:8-14; 493:5-13; 1120:3-22; Ex. 71; Ex. 72.

When Sandoz re-entered the market in August 2013, the companies competed aggressively. Despite its WAC increase, Mylan never increased its price to CVS and Econdisc, accounting for 35% of all Benazepril doses sold by Mylan in August 2013. Ex. 73; Ex. 74; Ex. 75; Ex. 76. Moreover, Sandoz undercut Mylan's pricing to gain market share and won by offering lower contract pricing (*e.g.*, $30 lower per bottle to OptiSource) and rebates (*e.g.*, [redacted]. Ex. 77 (OCEO); Ex. 78 (OCEO); Ex. 79 (OCEO). Mylan and Sandoz also competed for Humana's Benazepril business—in 2014, Mylan initially bid $104 per bottle but later reduced its pricing to $77 in response to Humana's "meet competition" price reduction request. Ex. 80 (OCEO); Ex. 81 (OCEO). However, Sandoz undercut Myan's pricing and won the business by offering $61 per bottle. Ex. 82 (OCEO). Humana itself recorded the result as a "price decrease." Ex. 83.

***2. No Direct Evidence as to Benazepril***

No testimony or document explicitly evidences Humana's alleged Benazepril conspiracy. Instead, Lubke's testimony confirms that no agreement existed. *Supra* § I.A.1.

***3. No Circumstantial Evidence as to Benazepril***

i. <u>No Parallel Conduct</u>

There was no "parallel" price increase. Mylan raised prices in August 2013 without knowing when—or if—Sandoz would re-enter the market. Mylan's decision was based on



**FILED WITH REDACTIONS – PUBLIC VERSION**

independent internal analysis, its exclusivity, and the expectation of continued exclusivity. Ex. 84; Ex. 66. Sandoz only performed its analysis as to whether to follow Mylan's price increase *after* Mylan's price changes became publicly available. Ex. 2, 1120:3-22; Ex. 71; Ex. 85. These decisions reflect independent self-interest, not coordination. *Ins. Brokerage*, 618 F.3d at 326 ("[A] claim of conspiracy predicated on parallel conduct" is insufficient when "facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior.") (internal quotations omitted).

ii. No Plus Factors

***No Motive to Conspire***. Mylan had monopoly status and was unaware of Sandoz's planned re-entry and therefore had no motive to conspire. Sandoz likewise anticipated—as early as May 2012—that Mylan might raise prices during exclusivity, Ex. 62, and independently planned re-entry upon securing supply in June 2013. Ex. 69. The "motive" Humana identifies is merely evidence of ordinary oligopolistic interdependence.

***No Conduct Contrary to Self-Interest.*** Mylan's pricing behavior was consistent with its economic self-interest. Prior to the August 2013 increases, Mylan's Benazepril WAC remained at 80% below the brand's, despite generic exclusivity. Ex. 65. Bradford conducted no analysis of Mylan-specific factors such as Mylan's exclusivity or profitability prior to price increases, which he acknowledged. Ex. 57 67:19–68:8.

***No Traditional-Conspiracy Evidence***. Humana fails to prove that Mylan and Sandoz "got together and exchanged assurances of common action." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004). None of Humana's evidence—Lubke's testimony, phone logs, internal emails, trade show attendance, or Nesta's Fifth Amendment invocation—supports an agreement.

*First*, Lubke denied receiving any pricing information or reaching any agreement regarding Benazepril with Nesta. Ex.2, 475:21-477:22; 1224:22-1228:17. Other cooperating witnesses—



FILED WITH REDACTIONS – PUBLIC VERSION

Vezza and Bihari—also denied agreement with Mylan. Ex. 4, 701:22-702:4; Ex. 3, 1610:12-15.

*Second*, phone log records purportedly reflecting competitor communications do not support the existence of the alleged conspiracy because Humana cannot show that "those communications rise to the level of an agreement, tacit or otherwise." *Baby Food*, 166 F.3d at 126 (citation omitted). Nesta-Lubke communications in July 2013 had no impact on either company's independent behavior. As detailed *supra*, Mylan unilaterally planned its WAC increase with exclusivity, and Sandoz independently prepared for reentry in June 2013 and analyzed a potential price increase only after Mylan publicly announced its increase. The two brief August 6, 2013 calls (one and five seconds) cited by Bradford and Arruda on the date of Mylan's Pricing Committee approval likewise do not support an agreement. Even after overlooking the duration and whether these calls even connected, no testimony suggests these calls involved Benazepril (indeed, the committee discussed several drugs, some of which Sandoz did not sell, Ex. 86), and the phone log records cannot "exclude the possibility that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (citation omitted).

*Third*, no email or internal document from either company evidences an agreement. Humana points to internal Sandoz emails incorrectly speculating that certain July 2, 2013 price increases were about Benazepril, when in fact the emails were about unrelated drugs. Ex. 30 ¶ 193. *See City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*, 92 F.4th 381, 398 (2d Cir. 2024) (explaining that employees' "expressions of uncertainty" about what other market participants are doing "undercut any argument that their outcomes were controlled by planned collus[ion].") As detailed *supra* § I.C.1, Sandoz assumed that the July 10, 2013 AnalySource notification about unspecified "changes" affecting several products referred to a Mylan price increase, as Mylan was the only generic Benazepril supplier at the time. Sandoz took a publicly

available document and attempted to understand public market activity affecting a product where its only competitor was Mylan. Sandoz's speculation, if anything, shows that no coordination existed. Moreover, investigating a competitor's possible price move from public sources and customers is lawful and routine competitive conduct, not evidence of coordination. *E.g.*, Ex. 88 (Vezza suggesting Sandoz inquire about Benazepril in meeting with ABC).

*Fourth*, as discussed *supra* § I.A.2, there is no evidence to support Humana's contention that certain Mylan employees attended and discussed Benazepril during the June 2013 HDMA and GPhA conferences. Compl. ¶ 347.

*Fifth*, as discussed *supra* § I.A.3, Nesta's Fifth Amendment invocation cannot have any adverse inference drawn against Mylan because Humana fails to show any independent evidence supporting any negative inference. *Local 560 Int'l Bhd. Of Teamsters*, 780 F.2d at 292 n.32 (explaining that "there must be sufficient independent evidence—besides the mere invocation of the privilege—upon which to base the negative inference"). The price change decision was ultimately made by the Executive Pricing Committee, of which Nesta was not a member, and Lubke testified that Nesta did not disclose when, by how much, or through which price categories (*e.g.*, contract price or WAC) Mylan's increase would occur. Ex. 2, 1112:11-24. There is no evidence corroborating that a Benazepril agreement was reached, and any adverse inference is improper. Summary judgment should therefore be granted.

**D. Additional Evidence Confirms Mylan Did Not Conspire as to Clomipramine**

Humana alleges that Mylan, Sandoz, and Taro conspired regarding Clomipramine, the generic version of Anafranil®, an antidepressant prescribed to treat OCD as 25mg, 50mg, and 75mg oral capsules. Stiroh Report, para 17. The relevant facts regarding Mylan's manufacture and sale of Clomipramine are detailed in Mylan's DPP and EPP Motions for Summary Judgment and the Court's August 27, 2025 Opinion. Clomip. Op. at 6-14.

Though this Court previously denied in part the Clomipramine MSJ (finding no direct evidence of conspiracy and the circumstantial evidence "weighs only slightly in [Plaintiffs'] favor"), new testimony evidencing independent action, taken with the Clomipramine MSJ record, shows that Humana lacks sufficient evidence to go to trial.[6] After Mylan's Clomipramine MSJ, Nesta and Aigner were deposed regarding the Clomipramine conspiracy allegations. Both denied any agreement as to Mylan and Clomipramine. Ex. 89, 50:3-4; 95:18-96:9 (Aigner "100%" would not have spoken to Aprahamian about Clomipramine); Ex. 90 147:2-3 ("Again I didn't speak to Della Lubke about Clomipramine."). Moreover, the Court's Clomipramine MSJ Opinion did not take into account the testimony of Lubke's supervisor, Kellum, who had pricing authority (Ex. 18, 19:16-17) and denied (1) any agreement between Sandoz and Mylan, including on Clomipramine (*Id.*, 489:3-490:22) and (2) any knowledge of Lubke's alleged May 2013 activities (*Id.*, 1143:2-18). Thus, even if Lubke's testimony about May 2013 is given any weight, the fact Lubke acted independently—without any input or knowledge of anyone else at Sandoz—shows that there could not have been an agreement between Mylan and Sandoz or Mylan and Taro as to Clomipramine.

**No Direct Evidence.** This Court determined that there is no direct evidence that Mylan was party to a Clomipramine conspiracy. Clomip. Op. at 39. Humana does not allege any facts that were not considered in that ruling.

**No Circumstantial Evidence.** The circumstantial evidence, including new evidence not yet available in the Clomipramine MSJ, also does not support a reasonable inference of a Clomipramine conspiracy. This Court determined that the facts related to Clomipramine satisfy the "motive to conspire" factor but noted that "does not itself create a reasonable inference of concerted action because it merely restates interdependence." Clomip. Op. at 24. Likewise, this

[6] Mylan intends to move to reopen summary judgment briefing to address new discovery, including the Nesta and Aigner depositions. *See* No. 2:16-MD-02724-CMR, Dkts. 371, 374.

Court found that the facts satisfy the "action contrary to interests" factor but noted it "weighs only slightly in [Plaintiffs'] favor." *Id*. at 26.

Regarding evidence implying a traditional conspiracy, this Court found that the evidence was not "ironclad," but nevertheless the counter evidence was insufficient to render the conspiracy inference unreasonable. Clomip. Op. at 32-33. However, there is now significant additional counter evidence that, taken with the record previously considered by the Court, renders Humana's conspiracy inference unreasonable—the testimony of Aigner, Nesta, and Kellum.

*First*, the testimony of Aigner and Nesta is strong counter evidence. Both denied talking to competitors about Clomipramine and denied agreement. Ex. 89, 50:3-4; 95:18-96:9 (testifying that he "100%" would not have spoken to Aprahamian about Clomipramine); Ex. 90, 147:2-3 ("Again I didn't speak to Della Lubke about Clomipramine.").

*Second*, the Court's Clomipramine MSJ holding did not consider the testimony of Lubke's supervisor, Kellum, who testified that (1) Lubke's superiors did not ask her to contact Mylan, (2) he "didn't even know that [Lubke] even knew Jim Nesta," and (3) he was not aware of any agreements with Mylan and would have been aware if there had been any type of anticompetitive agreement between Sandoz and Mylan, by virtue of his position within the company. Kellum Tr. 1341:5-18; 1143:5-11; 489:3-490:22. No reasonable inference of conspiracy can be drawn from Lubke's testimony; Lubke had no direction or authority to enter an agreement on behalf of Sandoz.

This additional, significant evidence renders Humana's conspiracy inference unreasonable and therefore summary judgment should be granted.

### E. There is no Evidence of Mylan's Involvement in a Digoxin Conspiracy

Humana fails to establish a conspiracy on Digoxin or that Mylan had any involvement in an alleged Digoxin conspiracy. Mylan was not on the market when Lannett and Impax—the only two generic manufacturers remaining on the market at the time—increased list prices. After

Lannett and Impax's WAC increases, multiple competitors reentered the market at the new prevailing WAC. Due to delays in gaining FDA approval, Mylan did not reenter the market until over a year after the price increase and, when it did, Mylan independently decided to enter at the prevailing WAC of all generic competitors. Humana's case relies entirely on alleged phone calls with competitors and attendance at one conference. But there is no evidence that Digoxin was ever discussed, and none of the alleged communications occurred close in time to Mylan's relaunch of the product. When Mylan relaunched, it also fiercely competed in the Digoxin market, including undercutting competitor contract prices to obtain business. There is no evidence supporting Mylan's alleged participation in this conspiracy.

***1. Digoxin Factual Background***

Digoxin Defendants are Impax, Lannett, Mylan, Par, Sun, and West-Ward. Compl. ¶ 393. Although Digoxin comes in various strengths and forms, Humana alleges a Digoxin conspiracy involving only 125mcg and 250mcg Digoxin tablets. Ex. 30, Table 1. Humana alleges that WAC data show that Defendants "all increased their Digoxin prices substantially and largely in unison" beginning in October 2013. Compl. ¶ 402. The evidence shows otherwise.

Over the years, several manufacturers exited the Digoxin market because of manufacturing and API supply issues, until only two generics remained, Lannett and Impax. Ex. 29 ¶¶ 39-40; Ex. 91, 386:14-18 (agreeing Impax "was Lannett's only competitor on Digoxin in October of 2013").[7] During that time, generic prices had stayed the same while the brand repeatedly increased its price. In August 2013, the brand manufacturer (which is not an alleged conspirator) [redacted] Ex. 92. In October 2013, Lannett and Impax responded by increasing their WACs to approximately 50% of the brand price. Ex. 93F-8-9; Ex. 23, Ex. 4. Lannett raised its

[7] West-Ward temporarily discontinued Digoxin following a February 2012 FDA warning letter. Ex. 101; Ex. 102.

WAC on October 16, 2013, and Impax followed on October 22, 2013 amid market-wide API supply constraints. Compl. ¶ 402; Ex. 94; Ex. 95. Other Defendants entered later and matched the prevailing generic WAC—Par in January 2014, West-Ward in April 2014, Compl. ¶ 402, Mylan in November 2014, and Sun in March 2015. Compl. ¶ 402; Ex. 93, App'x F.

Mylan had planned nearly eight months before the beginning of the alleged Digoxin conspiracy, in February 2013, to reenter the Digoxin market at the prevailing WAC. Ex. 96, at -596.[8] After years of seeking FDA approval for its manufacturing site, Mylan reentered the market in November 2014. Ex. 97. Mylan rationally and independently determined a strategy, targeting 20% market share based on factors such as API and manufacturing constraints. Ex. 98; Ex. 99. Internal notes from O'Connor at Par in November 2014 speculated that Mylan was reentering the Digoxin market and sought "20-25 share." Ex. 100. The notes contained no information about Mylan's pricing, and there is no evidence that this information came from Mylan.

After launch, Mylan competed for customers with its alleged co-conspirators by offering reduced prices. It won Econdisc from Lannett and McKesson from Par by offering lower contract prices, despite the incumbents lowering their prices to attempt to retain the business. Ex.105; Ex. 106; Ex. 107; Ex. 108; Ex. 109; Ex. 110. At the same time, Mylan's ability to gain additional customers was limited by supply and API issues that emerged soon after launch and continued through 2015. Ex. 111; Ex. 112; Ex. 113; Ex. 114; Ex. 29 ¶ 38; Ex. 115.

#### *2. No Direct Evidence Supports the Existence of a Digoxin Conspiracy*

Humana identified no explicit evidence supporting its Digoxin conspiracy allegation. To the contrary, testimony of the accused conspirators confirms there was no Digoxin conspiracy. *Supra* § I.A.1. Mylan deponents were never even *asked* about a Digoxin conspiracy.

---

[8] Mylan's subsidiary Bertek Pharm. distributed Digitek, a branded generic version of Digoxin manufactured by another company. Mylan ceased distribution of Digitek in April 2008 following a nationwide recall. Ex. 103; Ex. 104.

Humana points to conversations in April to June of 2014 between O'Connor and Lannett's Tracy Sullivan, but this is not direct evidence as it occurred after the at-issue price increases and both Par and Lannett confirmed there was no agreement between the two, much less with Mylan. Ex. 10, 337:16-338:8; Ex. 116, 652:7-653:17.

### *3. No Circumstantial Evidence: Mylan Acted in its Independent Interests*

i. No Parallel Conduct

Humana's reliance on evidence of purported parallel conduct fails because the evidence shows that Defendants' pricing was not coordinated, and lawful interdependence readily explains the conduct. *Ins. Brokerage*, 618 F.3d at 326 ("a claim of conspiracy predicated on parallel conduct" is insufficient when "common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for [the] defendants' common behavior") (internal quotations omitted).

*First*, there was no "parallel" conduct involving Mylan. Several of the alleged unlawful list price increases were months or years apart. This Court has recognized that parallel conduct requires price changes to be "reasonably proximate in time and value." *In re Generic Pharms.*, 338 F. Supp. 3d at 441. Increases over years are not "reasonably proximate in time." *Id.* The WAC price increases across the six Defendants spanned over 18 months. Mylan did not even reenter the Digoxin market until over *one year* after the first of the allegedly unlawful WAC increases.

*Second*, Defendants' decisions to increase WAC to the same level is consistent with lawful strategic "follow the leader" behavior in oligopolies. *Valspar*, 873 F.3d at 193 ("evidence of conscious parallelism cannot alone create a reasonable inference of a conspiracy") (citation omitted); Gilbert Rep. V.C. By October 2013, Digoxin was a two-player market where Digoxin API issues hamstringed Defendants' ability to gain new business. Ex. 117; Ex. 91, 358:13-361:6. Lannett raised WAC on October 16, 2013 to follow brand WAC increases. Ex. 91, 362:8-13;

363:5-365:11; Ex. 118. Impax independently chose to raise WAC soon after, following an API issue that left Impax unable to pick up significant new Digoxin business. Ex. 94; Ex. 95. Entry by subsequent competitors at the prevailing generic WAC is consistent with rational oligopolistic behavior. Ex. 28 ¶¶ 228-29. Mylan's decision to match the prevailing generic WAC upon reentering was based on its internal analysis, months before the October 2013 WAC increases by Lannett and Impax (and before any alleged communications related to Digoxin). Ex. 96, at -596. Accordingly, Mylan's decision was consistent with both its conduct prior to the alleged conspiracy and its unilateral economic self-interest in an oligopolistic market. Ex. 23, § VIII.D.2.

ii. No Plus Factors

***No Motive to Conspire***. Evidence of Mylan's motive to enter into an alleged Digoxin conspiracy merely "restate[s] the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *Ins. Brokerage*, 618 F.3d at 322. Mylan followed its competitors in setting a list price that would be profit-maximizing while avoiding potential failure-to-supply penalties in a market with unsteady API supply. Rather than evidencing a motive to conspire, the facts lead only to the conclusion that Mylan was independently motivated to match its competitors' list prices. *Valspar*, 873 F.3d at 193.

***No Conduct Contrary to Self-Interest***. As explained above, Mylan's pricing behavior was in line with its self-interest, and Humana advances no evidence to the contrary. *Baby Food*, 166 F.3d at 122 ("no conspiracy should be inferred from ambiguous evidence or from mere parallelism when defendants' conduct can be explained by independent business reasons"); *Chocolate I*, 801 F.3d at 401 ("That [defendant] may have maintained a temporary cost advantage over its rivals did not make it irrational for [defendant] to follow a price increase if it believed it would ultimately be better off by doing so."). Moreover, following its 2014 reentry into the Digoxin market, Mylan aggressively competed for business. For example, Mylan won McKesson's Rite Aid business and

Econdisc's business by offering lower prices than the incumbent suppliers (Par and Lannett, respectively). Ex. 23 ¶ 146. In both instances, Par and Lannett submitted a lower bid to retain the business, yet Mylan's offer was lowest overall and secured the contract. Ex. 23 ¶ 146. These actions are fully consistent with legitimate competition and reflect Mylan's unilateral business judgment in pursuing its target market share.

***No Traditional-Conspiracy Evidence***. Humana points to no evidence showing any "common plan" between Mylan and other Defendants concerning Digoxin. *Flat Glass*, 385 F.3d at 361. Instead, Humana and its experts point to (1) attendance at the October 2013 GPhA Fall Technical Conference; (2) phone records; and (3) internal Par notes discussing Mylan's reentry, but none of this evidence supports the existence of a Digoxin conspiracy.

*First*, Humana points to Defendants' attendance at an October 2013 GPhA conference, but that conference took place after Lannett and Impax raised WAC and long before Mylan was back in the market, and there is no evidence that Digoxin was discussed there. Mere attendance at the same industry event is insufficient to suggest a conspiracy. Moreover, the alleged Mylan attendees held technical or regulatory roles, with no responsibility for Mylan's sales or pricing. Ex. 23 ¶ 138.

*Second*, Humana has not offered any phone records that support the alleged Digoxin conspiracy, let alone a conspiracy involving Mylan. This is confirmed by Humana's inability to identify *any* Mylan employee who entered into an alleged agreement for Digoxin or acted in furtherance of the alleged agreement. Ex. 1. Although Humana's expert points to October 2013 phone calls between Smith of Lannett and Nesta of Mylan as evidence suggesting a Digoxin conspiracy, Ex. 30 ¶ 260, there is no indication that the calls concerned Digoxin. The "[m]ere communication between alleged co-conspirators, without more, is not sufficient to defeat the presumption of independent action." *Wellbutrin*, 868 F.3d at 153. Humana's expert also ignores

Smith's testimony that the "phone calls [he] had with Jim Nesta were related to arranging golf games at certain events," Ex. 91, 587:11-14; Ex. 119 ¶ 53, and Mylan did not reenter the Digoxin market until over a year after the calls took place. Following those calls, Lannett was not expecting Mylan to enter the Digoxin market in 2014, as evidenced by Lannett's CEO Arthur Bedrosian's public statement, "Mylan could come into the [Digoxin] market, [but] I'm not expecting it," made two months prior to Mylan's launch. Ex. 118.

*Third*, notes from Par's O'Connor do not support an inference of collusion. Indeed, Humana does not allege (and no evidence suggests) that any Par and Mylan employees communicated in the months surrounding Mylan's relaunch and the date of these notes. Customers frequently shared this type of market intelligence to obtain lower prices. *E.g.*, Ex. 120 (Humana requesting Digoxin price reduction from Impax and noting "In 2013, Digoxin dropped to two players. Now competition looks to reach four by the end of the quarter."). In any event, there is no evidence that this information impacted pricing or was material to any Defendant's decision making, and thus the notes do not support the inference of a conspiracy. *Baby Food*, 166 F.3d at 125 ("[T]o survive summary judgment, there must be evidence that the exchanges of information had an impact on pricing decisions.").

Humana's evidence as to a Digoxin conspiracy involving Mylan boils down to one fact: Mylan reentered the Digoxin market in November 2014 at the prevailing generic WAC. Matching the public list price of competitors is precisely what is expected in oligopolistic competition and cannot support the inference of a conspiracy. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Valspar*, 873 F.3d at 193 (quoting *Matsushita*, 475 U.S. at 588). In the absence of evidence to "exclude the possibility" that Mylan acted independently, summary judgment is

appropriate. *Matsushita*, 475 U.S. at 588 (citation omitted).

**F. There is no Evidence of Mylan's Involvement in a Divalproex Conspiracy**

Humana offers no evidence of a Divalproex conspiracy. In asserting that price increases were the result of collusion, Humana ignores a significant market factor—Wockhardt's sudden exit following an import ban. Wockhardt was the market leader with over 30% share, and its exit resulted in increased demand to Mylan and Par—the two remaining generics. Tens of millions of documents and hundreds of depositions establish that Mylan acted independently and consistent with economically rational behavior based on the conditions of the market. The same witnesses that Humana says participated in the alleged conspiracy *deny* Mylan's involvement.

***1. Divalproex Factual Background***

In May 2013, the generic suppliers of Divalproex were Mylan, Par, and non-Divalproex Defendant Wockhardt.[9] On May 23, 2013, news outlets reported that Wockhardt was facing an import ban that would prevent Wockhardt from importing any additional supply of Divalproex.[10] As a result, Wockhardt exited the market, and its customers immediately began approaching Mylan and Par for supply. Ex. 121; Ex. 122; Ex. 123; Ex. 124. A week later, citing the brand manufacturer's January 2013 WAC increase and Wockhardt's exit, Mylan internally proposed and approved a WAC increase for Divalproex. Ex. 125. On June 13, 2013, Mylan announced its WAC increase to its customers,[11] at least one of whom informed Par. Ex. 126.

Following Wockhardt's exit, Par gained new customers but soon experienced supply constraints. Ex. 127; Ex. 128; Ex. 129, Ex. 130. After learning of Mylan's price increase from a customer, Par performed its own financial analysis and approved a WAC increase, announcing it

[9] Divalproex is manufactured in an ER tablet (250mg, 500mg), a DR capsule (125mg), and a DR tablet (125mg, 250mg, 500mg), but Humana includes allegations as to the ER formulation only. Ex. 23 ¶19; Compl. ¶ 27.
[10] https://www.reuters.com/article/world/wockhardt-hit-by-fda-import-alert-on-drug-plant-idUSDEE94M095/.
[11] Mylan did not increase the contract price for CVS Pharmacy. MYLGP0006285783; MYLGP0006292796. CVS accounted for 24.09% of all Divalproex doses sold by Mylan in June 2013. MYLGP0001621212.



FILED WITH REDACTIONS – PUBLIC VERSION

on June 25, 2013. Ex. 131; Ex. 132; Ex. 133; Ex. 134. Even then, Par continued to struggle with supply. For example, in July, Cardinal informed Mylan that Par had limited supply, and by late July, Mylan, as the secondary supplier, was supplying half of Cardinal's business. Ex. 135; Ex. 136; Ex. 137.

Two new entrants, Zydus and Dr. Reddy's, launched Divalproex at the prevailing WAC on August 14 and 19, 2013, respectively. Ex. 138. Their entry prompted additional price competition in the market. Zydus offered lower prices to Rite Aid and Walmart, taking the customers from Mylan. Ex. 139; Ex. 140; Ex. 141. Zydus and Mylan competed for Cardinal's primary position, forcing Par to offer a larger rebate to retain the business. Ex. 142; Ex. 143; Ex. 144; Ex. 145; Ex. 146. Meanwhile, Dr. Reddy's undercut Mylan's pricing at McKesson, which elected to return Mylan to a secondary position. Ex. 147; Ex. 148; Ex. 149.

Competition continued through late 2013 and early 2014. Mylan reduced prices for Walgreens and ABC in response to lower market pricing following the new entries. Ex. 150; Ex. 151. When Dr. Reddy's approached Walgreens, one of Mylan's largest customers, Walgreens issued a ROFR to Mylan, prompting Mylan to decrease its price. Ex. 150; Ex. 152. ABC likewise received competitive offers, forcing Mylan to decrease ABC's price again. Ex. 153, Ex. 154.

#### *2. There is No Direct Evidence of a Divalproex Conspiracy*

No document or witness even suggests that a Divalproex conspiracy existed. Rather, the record abounds with discussions in which Mylan explains its actions on Divalproex as the result of independent decision-making. For example—before any of the allegedly relevant phone calls described below—Mylan approved the WAC increase for Divalproex based on the brand WAC increase and Wockhardt's import ban. Ex. 155. Similarly, witnesses from all four Divalproex Defendants disclaim any agreement in which Mylan participated. *Supra* § I.A.1.

### *3. No Circumstantial Evidence of a Divalproex Conspiracy*

i. <u>No Parallel Conduct</u>

Humana cites no evidence that Dr. Reddy's, Mylan, Par, and Zydus (collectively, the "Divalproex Defendants") "each increased their prices uniformly and largely in unison." Compl. ¶ 415. Rather, the record shows independent pricing decisions driven by market changes. Mylan independently raised WAC after Wockhardt abruptly exited the market and the brand manufacturer had already increased WAC. Ex. 156; Ex. 157; Ex. 125. After a customer informed Par of Mylan's increase, Par independently analyzed its own pricing while facing supply limitations. Ex. 126. As Par explained to a customer, "Wockhardt[']s exit left only two vendors for Divalproex, Par and Mylan. Increased demand led to higher prices by Mylan two weeks ago[.] Par is keeping up with market conditions." Ex. 158. Zydus and Dr. Reddy's entered the market two months later at the prevailing market WAC, a practice consistent with competition. Ex. 28 ¶¶ 228-29. The putative "parallel" list prices were plainly based on the market conditions.

Indeed, Humana's theory completely ignores the significance of Wockhardt's exit less than a month before Mylan announced its increase. When confronted with the fact that Humana omitted any mention of the Wockhardt exit from the complaint, Humana's 30(b)(6) witness conceded that Humana's assertion that there were no supply issues for Divalproex was not "accurate" and that Humana knew of the issue when it occurred. Ex. 159, 359:6-359:24. She did not offer any reason why Humana had included a false allegation in its complaint.

ii. <u>No Plus Factors</u>

***No Motive to Conspire***. An antitrust defendant's "desire to make money . . . in [a specific] market 'is, in and of itself, perfectly rational and legal.'" *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 149 (3d Cir. 2003). Evidence of a motive to conspire "means the market is conducive to price fixing." *Valspar*, 873 F.3d at 193. The record shows that Mylan made the independent, profit-

maximizing decision to increase WAC after Wockhardt exited the market, leaving Mylan as the largest generic supplier in the market. The fact that Par decided to follow the increase or that Zydus and Dr. Reddy's entered the market listing the same WAC is consistent with profit-maximizing behavior and cannot sustain Humana's claim. *Ins. Brokerage*, 618 F.3d at 322.

***No Conduct Contrary to Self-Interest.*** "[E]vidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market." *Valspar*, 873 F.3d at 193 (citation omitted). Humana suggests, without evidence, that declining to defend a customer when challenged by a new entrant is an example of conduct contrary to self-interest. But declining to defend a customer when challenged by a new entrant is a normal, lawful, and rational business decision to prevent price erosion. Ex. 28 ¶¶ 281-300. Indeed, this was a standard business practice for Mylan. Ex. 28 ¶ 285. When Zydus and Dr. Reddy's entered the market, Mylan elected not to defend certain customers, such as Rite Aid and Walmart. Gilbert Rep. § VII. Consistent with its strategy, Mylan was able to prevent price erosion to some extent, retain its more profitable customers, and retain its position as the largest generic supplier in the market for Divalproex. However, consistent with competition, Mylan's more profitable customers, such as Walgreens and ABC, received bids, and Mylan lowered its contract price to retain them. Ex. 150; Ex. 152; Ex. 160, Ex. 153, Ex. 154.

***No Traditional-Conspiracy Evidence***. Humana and its experts cite alleged records of calls between Aigner (Mylan) and O'Connor (Par) and between Nesta (Mylan), Ronco (Zydus), and Austin (Dr. Reddy's). These records are insufficient to survive summary judgment. As an initial matter, as Defendants' expert, Jensen, explained, Humana cannot rely "on the mere fact of telephone connections from these types of records to conclude that conversations took place—much less draw[] conclusions about the content of and supposed participants in such conversations,

as Dr. Bradford does." Ex. 119 ¶ 58. This is the conclusion demanded by the law. "Mere communication between alleged co-conspirators, without more, is not sufficient to defeat the presumption of independent action." *Wellbutrin*, 868 F.3d at 153; *Baby Food*, 166 F.3d at 133 ("[E]vidence of social contacts and telephone calls among representatives of the defendants was insufficient to exclude the possibility that the defendants acted independently."). "[W]hen evidence shows communications which provided an opportunity for agreement, a plaintiff must still produce evidence permitting an inference that an agreement in fact existed. . . . The evidence must give rise to more than speculation." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1013 (3d Cir. 1994) (internal citations omitted).

Humana offers only speculation. There is no evidence of the content of these calls, but O'Connor, Ronco, and Austin all testified that there was no agreement with Mylan. Ex. 10, 332:7-336:8; 343:23-345:2; Ex. 11, 269:25-271:2; Ex. 12, 281:18-284:13. O'Connor and Austin each had social relationships with Aigner and Nesta. Ex. 10, 332:7-336:8; 343:23-345:2; Ex. 12, 281:18-284:13.

Likewise, Humana's contention that certain Mylan employees attended a trade event in June 2013 cannot support its claim. *Supra* § I.A.2. The record includes no evidence that Mylan's employees conspired at any trade event, and Mylan approved its Divalproex WAC increase before the cited event occurred. Ex. 125. And Par did not begin assessing whether to adjust its WAC for more than a week after learning about Mylan's increase from a customer. Ex. 126. Summary judgment should therefore be granted.

### G. There is no Evidence of Mylan's Involvement in a Doxycycline Conspiracy

It is undisputed that Doxycycline Hyclate, Doxy DR, and Doxy Mono have unique features, are distinct drugs that are sold in separate markets, and Humana treated them separately in its Complaint. Nevertheless, Humana now combines them to mask the lack of evidence of

conspiracy. Compl. ¶¶ 28, 99 (listing different defendants for different Doxycycline products).

### ***1. There is no Evidence of Mylan's Involvement in a Doxy Mono Conspiracy***

Humana identifies no direct evidence of an agreement, no evidence that Mylan raised prices during the relevant time, and no evidence that tends to exclude independent conduct.

#### i. Doxy Mono Factual Background

Humana accuses Heritage, Lannett, Mylan, and Par of conspiring regarding Doxy Mono Tablets, which are sold in 50mg, 75mg, 100mg, and 150mg strengths. Compl. ¶ 521. Humana alleges the conspiracy involved non-WAC "price hike implementations" between the spring of 2013 and fall of 2014. *Id.* ¶¶ 498-99; 518-19. Neither Humana nor its experts cite any evidence to support the claim that Mylan increased any price (WAC or non-WAC) for Doxy Mono to any customer during the allegedly relevant period.

Beginning in January 2013, demand for Doxy Mono skyrocketed due to persistent nation-wide shortages on several other tetracyclic-class antibiotics. Ex. 161; Ex. 162; Ex. 163; Ex. 164.[12] For at least the next year, Heritage, Lannett, Mylan, and Par experienced significant Doxy Mono supply disruptions because their API suppliers could not manufacture enough to meet demand. *E.g.*, Ex. 165; Ex. 166; Ex. 167. At that time, Mylan believed that the increased demand could justify an increased price. *Id*. Mylan continued to receive inquiries regarding availability throughout the summer of 2013. *E.g.*, Ex. 168 (ABC); Ex. 169 (Econdisc). Humana admits that Doxy Mono supply issues persisted through the end of 2013. Compl. ¶ 505, *e.g.*, Ex. 170.

Mylan participated in competition in the Doxy Mono market throughout the relevant time. For example, in January 2014, Mylan submitted a bid to Giant Eagle but lost to another manufacturer offering a lower price. Ex. 171. In March 2014, Mylan offered McKesson a $2

[12] Delaware Health Alert Network (June 14, 2013), https://dhss.delaware.gov/dph/php/alerts/dhan305/.

million promotional credit across several products, including Doxy Mono tablets. Ex. 172.

Humana primarily relies on an alleged April 2014 call between Heritage's O'Mara and Mylan's Aigner, followed by an O'Mara email stating: "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone." Ex. 173. Notably, the email does not discuss Doxy Mono and does not list any prices or customers. Moreover, there is no evidence that Heritage ultimately implemented the contemplated price adjustment.

ii. No Direct Evidence

Humana offers no direct evidence of any Doxy Mono conspiracy, much less one involving Mylan. To the contrary, the two individuals alleged to have communicated with Aigner regarding Doxy Mono explicitly denied those allegations. Ex. 20, 174:11-175:17; Ex. 10, 332:7-336:8, 343:23-346:2; *see also, supra* § I.A.1.

iii. No Circumstantial Evidence of a Doxy Mono Conspiracy

**a) No Parallel Conduct**

To demonstrate parallel conduct, Humana must show that Doxy Mono Defendants acted similarly. *Baby Food*, 166 F.3d at 132 (affirming summary judgment where "defendants' prices were neither uniform nor within any agreed upon price range of each other"). While Humana alleges that Doxy Mono Defendants implemented "price hike[s]" and "coordinate[d] pricing," it does not support that conclusive allegation with any facts. Compl. ¶ 518. Humana has not identified any evidence that Mylan, Heritage,[13] or Par increased prices (WAC or non-WAC) for Doxy Mono during the allegedly relevant period.[14] Indeed, Humana's own proof undermines this

[13] While Humana alleges in its Complaint that Heritage "increased its Doxy Mono prices with at least one customer" in March 2014, Compl. ¶ 512, Humana has not identified any evidence supporting that allegation.

[14] On June 11, 2013, Lannett announced a Doxy Mono price increase in response to API shortages and manufacturing issues. Ex. 175; Ex. 91, 509:18-510:11; Ex. 176. In the following months, Lannett lost significant market share. *E.g.*, Ex. 177.

theory. Bradford relies on an article confirming that Mylan and Heritage did not increase WAC or non-WAC Doxy Mono prices: "in the case of doxy mono, two of the four manufacturers allegedly involved in the doxy mono cartel [Heritage and Mylan] did not experience any price increase at all during the cartel period." Ex. 174, at 4. When asked whether he considered these findings during his deposition, Bradford testified that it was irrelevant to his assignment that neither Mylan nor Heritage raised any Doxy Mono prices. Ex. 55, 384:10-18. Bradford admitted that a jury would not be able to tell from his average pricing charts that neither Mylan nor Heritage raised their prices. Ex. 55, 368:9-22. Where three of the Defendants did not implement the alleged non-WAC price increases, Humana cannot plausibly argue that it meets its burden of showing that Doxy Mono Defendants acted in parallel.

**b) No Plus Factors**

***No Motive to Conspire***. In the face of undisputed evidence that neither Mylan, Par, nor Heritage implemented the purported price increases on Doxy Mono, Humana cannot show such a motive to conspire. Even if Humana could adduce evidence of a motive to conspire, such evidence would not defeat summary judgment because motive to conspire is equally consistent with interdependence as it is with conspiracy in an oligopolistic market. *Flat Glass*, 385 F.3d at 361.

***No Conduct Contrary to Self-Interest***. Humana is unable to proffer "evidence of behavior inconsistent with a competitive market." *Valspar*, 873 F.3d at 193 (citation omitted). The record shows the opposite: widespread supply constraints, continued bidding, and active competition.

***No Traditional-Conspiracy Evidence.*** Humana cannot show "proof that the [alleged conspirators] got together and exchanged assurances of common action or otherwise adopted a common plan." *Flat Glass*, 385 F.3d at 361. The "opportunity [for Defendants] to conspire, without more," cannot satisfy this plus factor. *Taylor v. Gural*, 2025 WL 638596, at *25 (E.D. Pa. Feb. 27, 2025) (quoting *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224,

1235 (3d Cir. 1993)).

Humana's purported evidence of communications involving Mylan consists of (1) certain internal Heritage emails from April 2014 (nearly a year after Mylan's fictitious "summer of 2013" price increase); (2) allegations of calls between Aigner and certain Heritage and Par employees; and (3) Mylan's purported attendance at various trade shows and industry events. None of this evidence is probative of a Doxy Mono conspiracy involving Mylan (or any other Defendant).

*First*, there is no evidence that Mylan reached an agreement with any Defendant on Doxy Mono during the alleged phone calls between Aigner (Mylan) and O'Connor (Par) or Aigner (Mylan) and O'Mara (Heritage). O'Mara testified that he does not recall which products he was referencing in the April 23, 2014 email Humana relies on. What O'Mara does recall is that Aigner did not commit to whatever the two discussed on their call, could not commit to anything because he had no authority, and never told O'Mara that Mylan would follow a price increase (which, for Doxy Mono, did not happen). Ex. 20, 169:21-171:23. Nor does O'Mara recall ever following up with Aigner or Aigner ever acting on the subject. *Id*. Critically, O'Mara denied ever reaching an agreement with anyone at Mylan regarding the price of a generic drug. Ex. 20, 174:5-21.

*Second*, there is no evidence that any of the competitor communications involving Mylan that Humana cites related to Doxy Mono. To tie Mylan and Par to the alleged Doxy Mono conspiracy, Humana cherry picks several calls between Aigner and O'Connor that occurred around the time of several of the alleged communications between Sather (Heritage) and Sullivan (Lannett). Again, there is no evidence suggesting that O'Connor and Aigner discussed Doxy Mono in any of their communications. This evidence fails because, as discussed above, neither Mylan nor Par took the alleged price increases on Doxy Mono. *Supra* § I.G.1.iii.a. Moreover, O'Connor denied discussing generic drug pricing with any competitor and explained that she and Aigner are

close personal friends who have known each other since the early 1990s. Ex. 10, 334:8-335-1. O'Connor also testified that she does not recall ever discussing Doxy Mono with Aigner. *Id.*, 332:7-333:6. Summary judgment should therefore be granted.

***2. There is no Evidence of Mylan's Involvement in a Doxy DR Conspiracy***

Humana cannot defeat summary judgment on its market allocation claims for Doxy DR. Mylan did not raise WAC, AWP, or any customer prices for Doxy DR. Instead, when Heritage entered on the 150mg strength, Mylan evaluated customer-specific bids through its ordinary pricing process. It vigorously competed to retain customers, lowering prices to defend its business at CVS, Walgreens, Rite Aid, and Walmart, among others. Humana offers no direct evidence of an agreement or parallel conduct. Indeed, Judge Oetken granted Mylan's motion for summary judgment in the Mylan Securities Litigation based on the same facts Humana cites here.

i. <u>Doxy DR Factual Background</u>

Doxy DR is the generic for the brand drug Doryx and is used to treat infections. Ex. 23 ¶ 21. It is manufactured in oral tablets with seven dosages including the 150mg dose at issue in this case. *Id.* ¶ 21. Mylan did not raise the WAC, AWP, or any of its prices on Doxy DR to any customers. *Id.* ¶ 173.

Humana names Mylan, Mayne, and Heritage as Defendants, but its allegations as to Mylan are limited to a claim that Heritage and Mylan conspired to allocate McKesson and CVS to Heritage when Heritage entered the market on the 150mg strength of Doxy DR. Compl. ¶¶ 437-41. Humana does not allege any conspiracy between Mylan and Mayne, cites no communications between them, and does not allege that Heritage served as a conduit.

Humana relies on a limited set of contacts between Mylan and Heritage employees in 2013. Those contacts occurred against the backdrop of business dealings between the companies, including Mylan's search for a divestiture buyer following its acquisition of injectable company

Agila Specialties Private Limited.[15] One of the interested potential buyers was Heritage (which had been acquired by Emcure in 2011). Ex. 178. During this time, Malik had four phone calls lasting a minute or longer with Emcure's founder, Satish Mehta, between July 15 and July 18. Ex. 179; Ex. 180; Ex. 181. Malik also had two phone calls with then-CEO of Heritage, Glazer, on May 8 and July 18, 2013. Ex. 182; Ex. 183. Malik was involved in high-level business matters and was not involved in day-to-day pricing decisions at Mylan, which were made through Mylan's Pricing and Executive Pricing Committees.

As the first ANDA filer, Mylan entered the Doxy DR market with 180 days of exclusivity vis a vis other generics.[16] Nevertheless, Mylan only captured 35.8% market share from the brand, far less than is expected or typical of the first generic market entry. Ex. 184. After its generic exclusivity ended, Mylan anticipated that other generics would enter the market, and it knew it would need to lose customers to keep the product profitable. Ex. 185 (budget assumption "Launching Day 1 with 2 other competitors in Q3 2013").

Heritage first challenged Mylan's Doxy DR business when it offered to supply McKesson's 150mg tablets. Ex. 186; Ex. 187. This competing offer triggered a ROFR. A pricing analyst evaluated the opportunity and recommended that Mylan not bid because this was the first business to be challenged by a new entrant, and the last four times McKesson had asked for a price reduction, Mylan declined and maintained the business. Ex. 188; Ex. 189; Ex. 190; Ex. 191; Ex. 192; Ex. 193; Ex. 194; Ex. 195. The Pricing Committee agreed, and because the business exceeded the escalation threshold, the Executive Pricing Committee was also consulted and agreed with the decision not to submit a competing bid. Ex. 196; Ex. 197; Ex. 198; Ex. 199. No Humana theory

---

[15] https://investor.mylan.com/news-releases/news-release-details/mylan-acquire-agila-create-leading-global-injectables-platform.

[16] https://investor.mylan.com/news-releases/news-release-details/mylan-launches-first-generic-version-doryxr-150-mg.

connects any members of either committee to Heritage.

Next, Heritage submitted three bids to CVS between July 8 and July 12, which CVS rejected without consulting Mylan. Ex. 200; Ex. 201; Ex. 202; Ex. 203. During this time, there are no records of any calls between Mylan employees and Heritage employees.

Over a month later, on August 15, CVS asked Mylan to submit a lower bid to retain the account. Ex. 204; Ex. 205. Mylan approved a $20 per package price decrease to CVS, which [redacted] and was over $200 lower than Mylan's initial price to Walmart [redacted]. Ex. 206; Ex. 207; Ex. 208; Ex. 209. CVS rejected the offer. Ex. 210; Ex. 211.

Thereafter, Mylan repeatedly lowered prices to retain other customers. After learning Heritage targeted Walgreens' 150mg business, Mylan submitted two bids (lowering prices), and Walgreens accepted the second. Ex. 212; Ex. 213. Mylan also defended Rite Aid by offering its requested price to defend the business. Ex. 214; Ex. 215; Ex. 216; Ex. 217. When Heritage bid for Walmart's business, Mylan reduced its price to retain the account. Ex. 218, Ex. 219.

When Heritage later launched the 75mg and 100mg strengths of Doxy DR in December 2013, it again targeted McKesson and Mylan lowered its price to defend. Ex. 220; Ex. 221; Ex. 222. The undisputed evidence shows Mylan competing for Doxy DR business.

ii. No Direct Evidence of a Doxy DR Conspiracy

Humana has no direct evidence of a Doxy DR conspiracy. Humana's only evidence—calls between Malik (Mylan) and Glazer (Heritage) and a related email are not direct evidence as they require an inference of agreement. As discussed below, they also are not a basis for a reasonable inference. *Infra* § I.G.2.3.b.; *see also*, *supra* § I.A.1.

iii. No Circumstantial Evidence of a Doxy DR Conspiracy

**a) No Parallel Conduct**

There is no evidence of parallel conduct. Humana has not alleged Mylan and Heritage fixed prices, and in fact Mylan did not raise prices for Doxy DR. Ex. 57, Table 2 p. 37 (noting a 4% price overcharge for Doxy DR, Doxycycline Hyclate, and Doxy Mono lumped together, but failing to disaggregate or explain why this finding was statistically significant). Mylan ceded McKesson and lost CVS within months of Heritage bidding for those two competitors, but that is not evidence of parallel conduct because it is simply how a bidding market works. In a bidding market, the customer determines who gets to bid on its product and when. For example, despite soliciting three bids from Heritage in July 2013, CVS waited until August 2013 to approach Mylan about the competing offer. Ex. 204. Once a customer decides which supplier will get its business, it generally notifies the losing supplier of their loss. Humana cannot use the natural progression of business in a bidding industry as evidence of parallel conduct.

**b) No Plus Factors**

***No Motive to Conspire***. When Heritage first entered the market, Mylan was the sole generic supplier, yet only captured 35.8% share, with the brand maintaining the rest. As a result of brand competition, Mylan was incentivized to compete more aggressively with new entrants, while also still competing with the brand. Ex. 184. On the one occasion that Mylan did not retain its business, it did so in accordance with its procedures**.**

***No Conduct Contrary to Self-Interest***. Mylan's decisions were economically rational and consistent with established practices. Its decision not to lower McKesson's price in 2013 was consistent with Mylan's repeated prior refusals—at least four of them—to reduce McKesson's price on Doxy DR in 2012 and early 2013, prior to any alleged communications between Malik and Glazer. Ex. 189; Ex. 190; Ex. 191; Ex. 192; Ex. 193; Ex. 194; Ex. 195. In all four of these

instances, Mylan kept McKesson's business despite declining to reduce its price. After the fifth refusal to reduce its Doxy DR price, in June 2013, McKesson moved its business.

Once Mylan lost McKesson, it competed aggressively to avoid losing more business, including by lowering prices for CVS, Walgreens, Rite Aid, Walmart, and other customers. Although Humana attempts to characterize the CVS price decrease as "nominal," CVS [redacted] before the decrease, Ex. 206, and an incumbent need not underbid a new entrant to retain the business. *E.g.*, Ex. 223, 117:1-5 [redacted]. In fact, Heritage's initial bid to CVS was higher than the price Mylan was already offering CVS before Mylan lowered its price even further to compete. *Compare* Ex. 201; Ex. 224 ($650 direct price) *with* Ex. 225 ($615.98 direct price).

***No Traditional-Conspiracy Evidence***. Humana's theory depends on two calls between Glazer (Heritage) and Malik (Mylan) in May and July 2013. Glazer testified that Malik was "non-committal" because he "didn't want to promise [] anything" regarding Mylan defending CVS or McKesson. Ex. 226, 381:10-16; 107:5-108:8. Glazer's statement is self-evident; there was no promise or commitment by Malik. Ex. 226, 108:11.

Given this lack of agreement, Humana must prove a "subsequent communication or action [that] represented Mylan's at least tacit assent to the agreement." Securities MSJ Opinion at 62. There is no such evidence. Humana does not point to any actions by Malik after the call with

Glazer. Instead, Humana relies on a July 18, 2013 internal Mylan e-mail (not written by Malik) stating that Heritage "will be reaching out to McKesson CVS and Rite Aid on the 150." Ex. 227. This email does not support a reasonable inference of any subsequent communication between Mylan and Heritage—indeed, Glazer (Heritage) did not know that Heritage was targeting Rite Aid, and so could not have been the source of that information for Mylan. Ex. 226, 327:15-17. Instead, the evidence shows that Mylan most likely received this information from a customer—Spina (CVS) spoke with someone at Heritage on July 12, 2013 and then with Duda (Mylan) on July 18, 2013, and the internal Mylan email was sent shortly thereafter. Ex. 182; Ex. 228; Ex. 227.

There is no evidence supporting an inference that Mylan and Heritage conspired on Doxy DR, and summary judgment should therefore be granted.

### H. There is no Evidence of Mylan's Involvement in a Levothyroxine Conspiracy

Humana cannot defeat summary judgment on its price fixing claims for Levothyroxine because: (1) no witnesses testified that there was a conspiracy involving Mylan; (2) brand price increases drove Mylan's pricing, which was not always followed by competitors; and (3) there is no evidence Mylan conveyed its pricing strategy to competitors.

#### *1. Levothyroxine Factual Background*

Levothyroxine is a synthetic thyroid hormone used to treat hypothyroidism that is available in several branded and generic versions. Ex. 23 ¶ 22. The market for Levothyroxine is unique because it has a narrow therapeutic index, thus small differences in formulation can impact efficacy, and not all branded and generic versions are substitutable. As a result, the branded products maintained significant market share. [17] Ex. 229. Mylan's product occupied a distinct position in this market as the only generic bioequivalent to all four branded products. Mylan

[17] https://go.drugbank.com/categories/DBCAT003972.



FILED WITH REDACTIONS – PUBLIC VERSION

therefore tracked branded competition closely, including pricing for branded Synthroid and the recall of branded Levoxyl. *E.g.*, Ex. 230; Ex. 231.

Humana alleges that beginning in January 2013,[18] Mylan, Lannett, and Sandoz increased Levothyroxine prices in unison, pointing to Mylan's price increases in January 2013, August/September 2013 and April/May 2014. Compl. ¶¶ 573, 575; Ex. 30 ¶ 335. Humana further alleges that, on January 3 and 4, 2013, Teva (which Humana does not allege was party to a Levothyroxine conspiracy) served as an intermediary between Mylan and Sandoz to coordinate the January 2013 increase.

The unrebutted evidence shows that Mylan identified Levothyroxine for a potential price increase in mid-2012. Ex. 232. By December 2012, in view of WAC and AWP increases for Synthroid (the branded product), Mylan internally approved a 20% WAC price increase to take effect in early January 2013. Ex. 233; Ex. 234; Ex. 235. On the morning of January 2, 2013, Mylan notified customers that the price increase would take effect on January 4, 2013. *E.g.*, Ex. 236 (Cigna).

Humana's allegation that Teva acted as a conduit for a Mylan-Sandoz conspiracy is implausible on its face and inconsistent with Humana's other allegations—*i.e.*, that Mylan and Sandoz directly conspired on three different drugs. Tellingly, Humana does not explain why Teva would be motivated to serve as such an intermediary or why Mylan and Sandoz required any intermediary. Further, by the time the "intermediary" communications occurred on January 3 and 4, customers had received Mylan's price increase notification and were sharing that information with competitor manufacturers, including Sandoz. Ex. 237 (January 4, 2013 Kellum (Sandoz) email stating he heard from a customer that "Mylan took a significant price increase on

[18] While the complaint alleges a levothyroxine conspiracy beginning in August 2013, Humana's experts allege that conspiracy began in January 2013.

Levothyroxine."); Ex. 238 (January 4, 2013 Prime Therapeutics (customer) email to Sullivan (Lannett) stating Mylan had taken a 10% price increase on Levothyroxine); *Id*. (January 4, 2013 Lannett email stating customer Premier already informed Lannett of a 20% Mylan price increase). *See Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1298 (N.D. Ga. 2002) ("contemporaneous documents" reflecting a defendant's "uncertainty about what trends would occur in pricing . . . belie[d] Plaintiffs' allegations of conspiracy."), *aff'd sub nom. Williamson Oil. Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003). Sandoz did not follow Mylan's January 2013 price increase, making the supposed scheme of Teva connecting Mylan and Sandoz implausible.

Competitors did not respond in parallel to Mylan's price increases. Sandoz was struggling with quality issues affecting supply and gaining bioequivalency status. Ex. 239; Ex. 240. Lannett's WAC was higher than Mylan's, so it actually lowered WAC (below Mylan's new WAC). Ex. 241; Ex. 242.

In March 2013, when Pfizer's branded Levoxyl was recalled, Mylan considered another price increase, noting (1) Levoxyl would not "be available until 2014," and (2) Lannett had "matched" Mylan's January 2013 price by lowering WAC (even though Lannett had actually adopted a slightly lower WAC). Ex. 243; Ex. 244; Ex. 231. Ultimately, Mylan did not increase price. Ex. 245. Then, in July 2013, AbbVie raised the price of its branded Synthroid. Ex. 246.

On July 16, 2013, Lubke (Sandoz) incorrectly reported that Mylan had increased its price on Levothyroxine. Ex. 247 ("Levothyroxine (Lanette [sic] followed))." Neither Lannett nor Mylan, however, had changed their WAC since January.

On August 6, 2013, Mylan's Pricing Committee approved a WAC increase, which Mylan announced on August 8, 2013. Ex. 248; Ex. 249. Later that day, a customer emailed Lannett a list

of Mylan's price increases. Ex. 250. After hearing this news, Lannett began planning to match Mylan's WAC increase, Ex. 251, which it did on August 13, 2013. Ex. 252. On September 12, 2013, Sandoz's Pricing Committee approved an increase that matched Mylan's WAC. Ex. 253; Ex. 254.

On April 11, 2014, Mylan's Pricing Committee and Executive Pricing Committee approved a price increase. Ex. 255; Ex. 256; Ex. 257. Mylan notified customers on April 24, 2014, and Lannett matched Mylan's new WAC on April 28, 2014. Ex. 258; Ex. 259; Ex. 260. A month later, on May 23, 2014, Sandoz raised its WAC higher than Mylan's—neither Mylan nor Lannett followed. Ex. 261; Ex. 262. Humana alleges that this increase was somehow coordinated on an April 23, 2014 call between Nesta, who was a member of the Pricing Committee and Smith (Lannett). No reasonable inference of conspiracy can be drawn from the mere existence of that call given that (1) it occurred *after* Mylan internally approved an increase, and (2) Lannett did not raise WAC until *after* Mylan's increase was public information.

***2. No Direct Evidence as to Levothyroxine***

No testimony or documentary evidence supports Humana's alleged Levothyroxine conspiracy. Instead, testimony confirms that no agreement existed. *Supra* § I.A.1.

***3. No Circumstantial Evidence as to Levothyroxine***

i. <u>No Parallel Conduct</u>

Levothyroxine competitors did not price in parallel. On January 4, 2013, Mylan increased its WAC. Ten days later, Lannett *decreased* its WAC to match Mylan and raised some—but not all—of its contract prices. Sandoz did not alter its prices. Three competitors employed three different strategies. In March 2013, Mylan considered and voted on increasing WAC but decided against it. No competitor considered increasing its WAC at that time. Mylan's publicly announced August 8, 2013 WAC increase was followed a week later by Lannett and over a month later by



FILED WITH REDACTIONS – PUBLIC VERSION

Sandoz. In April 2014, Mylan increased its WAC, followed by Lannett. However, Sandoz did not match Mylan's increase and went higher. Mylan and Lannett did not follow.

ii. No Plus Factors

***No Motive to Conspire***. As the only generic interchangeable with all four branded products, Mylan had an independent motive to price against the brands, and internal materials show it tracked brand pricing closely. Ex. 233; Ex. 246.

***No Conduct Contrary to Self-Interest.*** Raising WAC in response to favorable market conditions, branded price increases, and/or supply disruptions is economically rational. This is especially true for a generic product with Mylan's unique bioequivalence position. Mylan's analysts, Pricing Committee, and Executive Pricing Committee all reviewed and approved the increases through standard internal processes.

***No Traditional-Conspiracy Evidence***. Humana cannot prove a "common plan." *Flat Glass*, 385 F.3d at 361. Humana has *no evidence* of the content of the one April 2014 phone call it relies on, and the record evidence show that the content of that call was social in nature. Ex. 91, 640:8-14, 665:15-19. Regardless, there is no information that could have been disclosed on that call other than a decision to increase Mylan's WAC price—which was publicly announced to customers the following day, and which is not prohibited by law. That is not an assurance of common action or a common plan.

For the January 2013 increase, Mylan finalized its decision by December 2012 and notified customers on January 2, 2013. Ex. 233; Ex. 234; Ex. 235. Humana has not identified any phone calls between the alleged conspirators that pre-date that notification.

Likewise, even taking what Lubke said as true, the Levothyroxine information Nesta supposedly gave her on July 16, 2013 was that Lannett had already followed Mylan's price increase, which was public information in January 2013. Ex. 2, 478:8-11.

After Mylan's Pricing Committee voted to approve its second price increase for Levothyroxine on August 6, 2013, Nesta called Lubke and Smith. However, neither of these calls likely connected, as Nesta's calls to Lubke that day lasted five seconds and one second respectively, and his call to Smith lasted 24 seconds. Ex. 263; Ex. 264. The next time Nesta had a call with either of them lasting a minute or longer was *after* Mylan notified customers of the increase. Smith additionally testified that he does not recall talking to Nesta around August 2013 to discuss Mylan's price increases. Ex. 91, 617:1-11.

By 2014, Nesta was no longer in contact with Lubke, and Humana alleges that Nesta communicated with Smith of Lannett. At this time, Nesta did not participate in the Pricing Committee decision on April 11. Ex. 255; Ex. 256. The decision was then escalated to the Executive Pricing Committee on April 22. The day after that decision, on April 23, Nesta called Smith. Smith messaged his colleagues that same day that "it will happen tomorrow," but even if he were referring to Mylan's Levothyroxine increase, Mylan's decision had already been made and all that was left was to publicly announce it. Ex. 265. On April 24, Mylan notified customers of the increase. Ex. 258; Ex. 259. Nesta at most gave Smith and only Smith 24-hour advance notice of a decision which Mylan had already fully committed to based on its independent business rationale.

This is not evidence of an agreement and summary judgment should therefore be granted.

**I. There is no Evidence of Mylan's Involvement in a Propranolol Conspiracy**

Humana has not and cannot advance direct or circumstantial evidence sufficient to support an inference of a Propranolol Tablets conspiracy or Mylan's participation therein. The record reflects Mylan's independent decision to increase WAC for a supply constrained and unprofitable product five months after its competitors. And witnesses from each Propranolol Tablets Defendant *deny* forming any agreement with Mylan.

### *1. Propranolol Tablets Factual Background*

Propranolol treats tremors, angina, and hypertension, and is sold in several dosage forms including IR Tablets and ER Capsules. Ex. 23 ¶ 23. The Mylan sales at issue here relate only to IR Tablets as Mylan did not sell the ER Capsules.[19] Humana does not differentiate between the dosage forms and alleges that Mylan conspired with other IR Tablet makers (Heritage, Qualitest (Par), Teva, and Actavis) and makers of ER Capsules (Actavis, Breckenridge, and Upsher-Smith) to increase prices of Propranolol, generally. Compl. ¶ 107; Ex. 23 ¶ 23.

There is no evidence of a Propranolol agreement; Humana's claims are based only on inferences from limited communications between Mylan, Teva, and Heritage and attendance at industry events. *First*, there is no evidence that Propranolol was discussed during limited December 2014-January 2015 communications between Nesta and Rekenthaler (Teva) who denied making any agreement with competitors and lacked authority to agree for Teva. Ex. 22, 616:12-618:12. *Second*, Humana cites March 12, 2015 calls between Aigner and O'Mara (Heritage), and text messages from O'Mara to his supervisor indicating he would discuss "Prop" with Aigner. Ex. 30 ¶ 392. But there is no evidence Aigner provided competitively sensitive information to O'Mara, who was also speaking with customers. Ex. 266, at -9194. Although O'Mara did not remember the specific phone call, Ex. 20, 144:22-145:10, he testified he never made, or had the authority to make, any agreement with Mylan, and did not believe Aigner had the authority to agree on behalf of Mylan. *Id.*, 174:11-175:17. *Third*, Humana asserts the increases "followed" Defendants' attendance at three industry events in February 2015 but advances no evidence that Propranolol was even discussed at the events. Compl. ¶ 656.

The record shows independent pricing decisions driven by market changes. Mylan's and

[19] Propranolol ER Capsules allegations against Mylan have been dismissed. Order, *César Castillo, Inc., v. Actavis Elizabeth, LLC*, No. 17-cv-00078-JSR (S.D.N.Y. Feb. 28, 2017).

Heritage's API supplier ceased shipping in July 2014 due to quality issues. Ex. 268. Those issues forced Heritage, which had roughly 30% share, to exit the market in December 2014, Ex. 269; Ex. 270, resulting in former Heritage customers approaching the remaining suppliers. *E.g.*, Ex. 271. Mylan, which had only about 3% share and was losing money on the product, could not secure an alternate API supplier and therefore declined to bid for additional business. Ex. 23 ¶ 217; Ex. 272; Ex. 273; Ex. 271. Demand further increased after Qualitest and NorthStar Rx, which together had around 15% share, exited in or around March 2015. Ex. 23 ¶ 213.

These changed market dynamics led to each Defendant independently deciding to increase WAC. On January 15, 2015, Actavis notified customers that its new WACs would be effective February 17, 2015. Ex. 274; Ex. 275; Ex. 276; Ex. 277. Teva followed on January 28. Ex. 278. Mylan learned about these increases through customers and public pricing sources. *Id.*; Ex. 279; Ex. 280. And in April 2015, before deciding to increase its own prices, Mylan took on McKesson's Propranolol Tablets business at prices below the new WACs, which further constrained its supply. Ex. 281.

Months later, on July 10, 2015, Mylan followed the WAC increases on an unprofitable product while still working through supply issues. Ex. 23 ¶¶ 214, 217; Ex. 282. Mylan P&C conducted a financial analysis, and the Pricing Committee approved the increases. Ex. 286; Ex. 284; Ex. 285; Ex. 286; Ex. 287. Mylan continued to compete on price after the increases. In late July 2015, Actavis bid on McKesson thinking Mylan could not supply it, then rescinded the offer after learning Mylan was still committed to supplying McKesson, but Mylan nevertheless lowered McKesson's contract prices. Ex. 288; Ex. 289. Although Mylan expected to receive more API supply in the summer, Ex. 290; Ex. 291, it ultimately did not obtain it until November 2015. Ex. 292; Ex. 293; Ex. 294; Ex. 295.

### *2. No Conspiracy on Either At-Issue Propranolol Form*

Propranolol IR Tablets and Propranolol ER Capsules are sold in distinct markets; there can be no conspiracy encompassing both dosage forms. *FTC v. AbbVie Inc.*, 976 F.3d 327, 373 (3d Cir. 2020) (product market limited to topical, not injectable, form TRTs where employees testified forms do not compete). To determine market definition, courts examine "industry or public recognition of the [] market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct prices, sensitivity to price changes, and specialized vendors." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). That two forms of a drug "contain the same medicines and treat the same condition does not automatically mean that they compete in the same market." *Id.* at 340-41 (finding plausible that prefilled syringe and vial forms of the same drug compete in different markets based on industry recognition and unique characteristics, uses, and production facilities).

The industry regards Propranolol IR Tablets and Propranolol ER Capsules as different products in separate markets, as an Actavis witness confirmed, Ex. 21, 135:6-10. The speed and method of dispensing the drug differs between the forms—IR Tablets dissolve quickly and can be crushed or broken for smaller dosages or easier swallowing, while ER Capsules release medication slowly over time and cannot be crushed or broken. IR Tablets received FDA approval in 1967, while ER Capsules were approved in 1983.[20] These forms are not direct substitutes and are prescribed for different purposes. *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063-64 (3d Cir. 1978) (unique features indicate separate markets).

Pricing and manufacturers of the forms differed, and pricing changes for one form did not

[20] https://www.drugs.com/pro/propranolol-tablets.html

trigger changes to the other. Tablets cost cents per pill, even after the increases, while Capsules cost dollars per pill. Compl., pp.155-56; *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 497 (2d Cir. 2004) (evidence of a substantial gap in pricing indicated separate brand and generic markets). Only Actavis is a Defendant for both forms. Mylan, Teva, Heritage, and Qualitest are not alleged to have manufactured Capsules during the relevant time; Breckenridge and Upsher-Smith are not alleged to have manufactured Tablets. The Capsules increases began in November 2013, and Tablets pricing did not increase until over a year later, starting in January 2015. Since Propranolol IR Tablets and ER Capsules are not economic substitutes, grouping them into one market is inappropriate, and there cannot be a conspiracy involving both forms.

#### ***3. No Direct Evidence of a Propranolol Tablets Conspiracy***

No testimony or document explicitly evidences Humana's alleged Propranolol conspiracy. Instead, employees from each Propranolol Tablets Defendant *denied* an agreement or knowledge of any agreement with competitors. *Supra* § I.A.1.

#### ***4. No Circumstantial Evidence of a Propranolol Tablets Conspiracy***

i. <u>No Parallel Conduct</u>

Propranolol Tablets pricing is explained by lawful interdependence. Mylan increased WAC five months after its competitors, following internal analysis and receiving Pricing Committee approval on a supply-constrained and unprofitable product. These decisions reflect Mylan's independent economic self-interest, not coordination. *Ins. Brokerage*, 618 F.3d at 326 ("a claim of conspiracy predicated on parallel conduct" is insufficient when "common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for [the] defendants' common behavior"). Competitors learned about the increases through customers and public pricing sources. There is no evidence of parallel customer pricing, which Humana's expert failed to investigate. Ex. 55, 30:13-21. Moreover, no

inference of conspiracy can be drawn on the magnitude of the increases, which are explained by independent decisions, supply issues, and the increased demand following market exits. *Petroleum Prods.*, 906 F.2d at 445 ("[w]ere we to permit [a theory that price hikes were "too high"], few pricing decisions would be immune from antitrust scrutiny").

ii. No Plus Factors

***No Motive to Conspire***. Mylan had an independent motive to raise WAC given supply constraints and increased demand. Mylan's profit-maximizing behavior does not support an inference of conspiracy. *Baby Food*, 166 F.3d at 135 ("[E]vidence of action that is against self-interest or motivated by profit must go beyond mere interdependence."); *Valspar*, 873 F.3d at 193 ("evidence of conscious parallelism cannot alone create a reasonable inference of a conspiracy").

***No Conduct Contrary to Self-Interest***. Mylan increased prices on an unprofitable product that experienced a sharp increase in demand after several competitors exited the market. Humana cannot meet the "substantial" burden of showing evidence that "tends to exclude the possibility that the defendants were acting independently." *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 791 (M.D. Pa. 2014) (citation modified). Shortly after increasing WAC, Mylan retained large customers such as McKesson by lowering pricing and continued competing for business, evinced by its changed market shares. Ex. 23, Fig. 7.

***No Traditional-Conspiracy Evidence***. Humana cannot establish that Mylan was part of a "common plan" relating to Propranolol. *Flat Glass*, 385 F.3d at 361. Humana relies on competitor communications, a single Heritage document referencing competitive intelligence, industry event attendance, and Fifth Amendment invocations. None supports an agreement.

*First*, a conspiracy cannot be inferred from the alleged communications. As discussed *supra*, witnesses from each Defendant denied any agreement, and there is no evidence Nesta or Aigner provided actionable information or made any agreement. These Mylan individuals—sales

employees *without* unilateral pricing authority—did not learn about Mylan's increases before July 2015 and were not involved in analyzing the product for an increase.

*Second*, Humana's reliance on a March 2015 document noting that the Heritage employee accused of communicating with Aigner "provided competitive intelligence that Mylan will be raising their price soon" is insufficient to support a conspiracy. Ex. 296. These notes were from 10 days after the alleged communication, and months before Mylan had begun discussing the increases that would become effective in July 2015. The document does not indicate the source of the information, and Humana's expert ignores that the employee could have learned this information from customers despite citing another document indicating Heritage learned about Mylan's ability to supply ***from a customer***. Ex. 297.

*Third*, as discussed *supra* § I.A.2, Humana claims the increases followed Defendants' attendance at industry events but advances no evidence that Propranolol was discussed or that either Mylan employee it suggests was involved in the alleged conspiracy was present. Compl., Ex. A.

*Fourth*, as discussed *supra* § I.A.3, no adverse inference can be drawn against Mylan based on the Fifth Amendment invocations by Nesta and Aigner because there is insufficient "independent evidence." *Local 560 Int'l Bhd. of Teamsters*, 780 F.2d at 292 n.32. There is no independent evidence that Nesta discussed the drug with the Teva employee, who denied forming any agreements with competitors. And there is no evidence Aigner provided competitively sensitive information regarding Propranolol to the Heritage employee, who testified relating to another drug that he sometimes told his supervisor that he reached out to Aigner to "placate" his supervisor. Ex. 20, 125:20-25, 168:4-15. That Heritage employee also conceded that Aigner had no pricing authority, *Id.*, 175:5-10, so the alleged calls were of no value. *Baby Food*, 166 F.3d at

125 ("Evidence of sporadic exchanges of shop talk among field sales representatives who lack pricing authority is insufficient to survive summary judgment.").

**J. There is no Evidence of Mylan's Involvement in a Verapamil Conspiracy**

Humana's Verapamil theory collapses once the two forms of the product are considered separately—and would fail regardless. Humana's allegations conflate Heritage (which only sold IR tablets) communications and price increases for ER capsules, a different product that Heritage never sold. Humana never explains, let alone identifies evidence supporting, that conflation. What the evidence does show is that Heritage did not raise the price on the product it did sell (IR tablets), and ER capsule pricing was driven by brand price increase and supply shortage—none of which supports inference of any conspiracy.

***1. Verapamil Factual Background***

Verapamil, a calcium channel blocker, is available in multiple strengths and forms—ranging from 40mg to 360mg, immediate release and extended-release tablets and capsules, regular and p.m. versions, and intravenous solutions. Humana does not specify which forms of Verapamil are at-issue in its Complaint and remained vague in discovery responses. Ex. 298, Response to Interrogatory 14. Based on the defendants named and the alleged evidence cited, Humana appears to be alleging a Verapamil conspiracy beginning in July 2014 that involves a combination of Verapamil IR tablet and Verapamil ER capsule products.[21] Compl. ¶¶ 110, 698-99, 711.

Humana primarily relies on the same (1) alleged April 2014 call between Heritage's O'Mara and Mylan's Aigner, and (2) O'Mara email that Humana cites in support of a supposed Doxy Mono conspiracy. *Supra* § I.G.1.i. The email does not discuss Verapamil and does not list

[21] For example, Humana does not discuss the intravenous solution and does not list Verapamil ER tablet manufacturers Apotex, Glenmark, Sun, or Teva as defendants.

any prices or customers. Ex. 173. O'Mara testified that he did not recall discussing Verapamil during the call, never entered into any agreement with Mylan, and lacked authority to do so. He likewise testified that he did not believe Aigner had authority to agree on behalf of Mylan. Ex. 20, 161:6-19, 125:7-25, 168:4-23, 174:5-175:17.

Ahead of these alleged communications, Mylan's WACs for IR tablets was already higher than Heritage's. Ex. 299, Ex. 300, Ex. 301, Ex. 302. Humana does not identify any evidence of Mylan increasing its Verapamil IR tablet prices or ceding customers after the alleged communications.

As to ER capsules, Mylan could not have conspired with Heritage because Heritage never sold them. Also, the evidence supports independent explanations for ER-capsule price changes, including an increase in the brand price and supply backlogs leading to back orders, allocation decisions, and concern over failure-to-supply penalties. Ex. 303; Ex. 304, Ex. 305, Ex. 306. To manage these issues, Actavis increased ER-capsule WAC prices effective March 30, 2015. Ex. 307, Ex. 308, Ex. 309, Ex. 310. Despite regular requests from potential customers for ER capsules throughout 2015, *e.g.*, Ex. 311, Mylan did not follow Actavis' WAC increase for more than a year. Mylan finally considered increasing ER capsule WAC in February 2016. Ex. 312. After an internal analysis recognized the risk of supply insufficiency, Mylan increased its WACs for Verapamil ER capsules on April 27, 2016. *Id.*, Ex. 313.

### *2. No Conspiracy on Either At-Issue Verapamil Product*

Verapamil IR Tablets and Verapamil ER Capsules are distinct products that are sold in different markets and cannot be in a conspiracy containing both dosage forms. Market definition is based on "industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct prices, sensitivity to price changes, and specialized vendors." *Regeneron*, 96 F.4th at 339 (cleaned up). Just because

two forms of a drug "contain the same medicines and treat the same condition does not automatically mean that they compete in the same market." *Id.* at 340.

As demonstrated by internal Mylan documents, Mylan and its customers regarded Mylan's Verapamil products as distinct products with different pricing strategies. *E.g.*, Ex. 314; Ex. 315; Ex. 316. The speed and method of dispensing the drug differs between the forms—IR Tablets dissolve quickly, while ER Capsules release medication slowly over time and can be administered with applesauce. Ex. 317; Ex. 318. The two forms are the subject of different applications, approved on different dates, prescribed for different purposes, and are not therapeutic equivalents. Ex. 319; Ex. 320; Ex. 321; Ex. 322.[22]

Pricing and manufacturers of the forms differed, and pricing changes for one form did not trigger changes to the other. ER capsules tended to be priced at least five times more per pill than IR tablets. *E.g.*, Ex. 314; Ex. 315; *Geneva*, 386 F.3d at 497. Mylan and Actavis were the two primary generics in the Verapamil ER capsule market, whereas Heritage only joined Mylan and Actavis in the IR tablet market. Mylan increased prices on IR tablets in October 2012 without increasing prices on ER capsules and then increased prices on ER capsules in April 2016 without increasing prices on IR tablets. Grouping them into one market is inappropriate, and there cannot be a single conspiracy involving both forms.

### *3. No Direct Evidence*

Humana identifies no direct evidence of a Verapamil conspiracy. *Supra* § I.A.1. The only document that Humana relies on, a single email, does not evidence any conspiracy at least because it does not discuss Verapamil or any agreed-on prices and identifies no customer allocations. Ex. 173. Moreover, the supposed Heritage price increase never occurred.

---

[22] *Drugs@FDA: FDA-Approved Drugs - Verapamil Hydrochloride*, FDA.GOV, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=071881



FILED WITH REDACTIONS – PUBLIC VERSION

***4. No Circumstantial Evidence***

i. <u>No Parallel Conduct</u>

Humana's circumstantial case depends on mixing allegations regarding Heritage's IR tablets and price increases on ER-capsules or an undefined "average market." The two markets differ materially. The ER capsule market primarily involved Actavis and Mylan, while the IR-tablet market had three generic competitors. Ex. 323, at 391 and 393.

In 2014 and 2015, Actavis faced significant supply shortages on ER-capsules, which led to dropped customers, back orders, and failure to supply penalties. Ex. 305, Ex. 324, Ex. 307, Ex. 308, Ex. 325. Those shortages drove Actavis' March 2015 ER-capsule WAC increase, while IR-tablet WAC did not increase. Ex. 308; Ex. 309; Ex. 310. Mylan did not follow. Mylan only increased its Verapamil ER capsule WAC after it gained market share creating the possibility of its own supply risks, which was over a year after Actavis' WAC price increase. Ex. 312, Ex. 313.

ii. <u>No Plus Factors</u>

***No Motive to Conspire.*** Mylan had no reason to conspire with Heritage to increase IR tablet prices in 2014 as Mylan's WACs had already been higher than both Actavis' and Heritage's WACs since before 2012. As for increases in Verapamil ER capsule prices, Humana has not even tried to provide a motive for a conspiracy.

***No Conduct Contrary to Self-Interest.*** The record shows economically rational conduct. When Mylan increased IR-tablet WAC in 2012 and 2013,[23] it considered market factors such as brand pricing and limited generic competition. Ex. 299, Ex. 326. Neither Actavis nor Heritage implemented WAC increases for Verapamil IR tablets during the relevant time and as discussed, Actavis was considering how to protect itself from shortages in the market when it decided to

[23] Humana does not allege that these WAC increases are at issue.

increase its Verapamil ER capsule prices in February 2015. Ex. 308.

***No Traditional-Conspiracy Evidence***. There is no evidence of a "common plan." *Flat Glass*, 385 F.3d at 361. Humana cites phone logs, O'Mara's email, and Fifth Amendment invocations. None of this evidence is sufficient.

Phone records show only that competitors communicated, not that "those communications rise to the level of an agreement, tacit or otherwise." *Baby Food*, 166 F.3d at 126 (citation omitted). As discussed, the O'Mara phone call and email did not reference Verapamil and resulted in no price increase.

Nor do the Fifth Amendment invocations establish a conspiracy. As discussed *supra* § I.A.3, no adverse inference can substitute for evidence where none exists.

Humana's evidence cannot support a reasonable inference that Mylan participated in any Verapamil conspiracy and summary judgment should be granted.

## II. THERE IS NO EVIDENCE MYLAN PARTICIPATED IN AN OVERARCHING CONSPIRACY

As explained in the Defendants' Joint Motion as to Humana's Overarching Conspiracy Claim, Humana has failed to establish the existence of the overarching conspiracy alleged in its Complaint. We respectfully submit that the Court should not allow this claim to move forward against any of the defendants. Moreover, there is no evidence as to Mylan. Indeed, Humana does not allege any wrongdoing by Mylan on 13 of the Subject Drugs. First, there is no evidence that Mylan joined the alleged overarching conspiracy. Second, the DPAs and plea agreements on which Humana relies do not implicate Mylan. Third, to the extent the purported overarching conspiracy existed and included Pravastatin, evidence establishes that Mylan may have been overcharged just like Humana claims to have been—and Mylan cannot be both a victim and co-conspirator. Fourth, Humana cannot establish Mylan's participation in an "overarching" conspiracy under Third Circuit

law.

### A. There is No Evidence Mylan Joined the Alleged Overarching Conspiracy

Humana has failed to establish even basic facts in support of their claim, including how and when Mylan joined the alleged overarching conspiracy, who supposedly joined on its behalf, or even what Mylan purportedly agreed to do. With "nothing more than speculation as to the who, what, when, where, and how of the communications that allegedly facilitated the parallel price increases," Humana has "no evidence permit[ting] a reasonable inference of a price-fixing agreement." *Chocolate*, 999 F. Supp. 2d at 805.

Not a single witness provided evidence establishing Mylan's participation in the alleged overarching conspiracy. To the contrary, witnesses consistently denied Mylan's participation in *any* conspiracy, including the alleged overarching conspiracy. *E.g.*, Ex. 5, 177:8-13; Ex. 7, 299:23-302:2; Ex. 8, 313:22-317:2; Ex. 6, 154:15-155:5. Not even Humana's cooperating witnesses testified that Mylan participated in the alleged overarching conspiracy. *E.g.*, Ex. 226, 330:11-331:5. In fact, they affirmatively testified that Mylan ***did not*** conspire with other Defendants. For example, Lubke, Vezza, Krauthauser, and Bihari, each denied any "overarching" agreement, or any agreement involving Mylan. Ex. 2, 527:19-528:4, 476:1-477:22; Ex. 4, 703:22-704:10; Ex. 19, 451:6-452:22; Ex. 3, 1264:12-1265:21, 1609:23-1610:22. Ex.

Humana's documentary evidence fares no better. There are no documents supporting Mylan's participation in an overarching conspiracy. Aside from materials showing a WAC increase occurred—a lawful occurrence—Humana cites a pittance of documents which relate only to one other company (Heritage) and to three drugs: Doxy DR, Doxy Mono, and Verapamil. Compl. ¶ 278; Ex. 1; Ex. 93, App'x L. These documents fail to show a conspiracy as to any subject drug, *supra* §§ I.G, I.J, much less establish Mylan's involvement in an overarching conspiracy. Humana is many drugs and Defendants short of proving its larger claim.

### B. The DPAs or Plea Agreements Do Not Make Humana's Case

Lacking any actual evidence of Mylan's participation in the alleged industry-wide conspiracy, Humana seeks to rely on factual admissions on certain individual drug conspiracies (none at issue for Mylan). Putting aside that none of the criminal actions involved any overarching conspiracy much less the overarching conspiracy alleged by Humana in the instant matter, none of the DPAs or plea agreements mention Mylan, and none connect Mylan to a conspiracy with all Defendants on any drugs. Ex. 18, 489:3-9 (Kellum did not enter into any agreement with Mylan); Ex. 6, 154:15-155:5 (Malik was "not aware of [an agreement to allocate customers] between Mylan or Heritage or any other company *for any product*.").[24]

### C. Mylan was a Victim On At Least One Product Humana Claims Was Part of the Overarching Conspiracy

For Humana's claim to succeed, it needs to show that Defendants benefited from the sub-conspiracies, including on products they did not sell or on which they are not accused of wrongdoing. Humana offers no evidence that Mylan received any such benefit from any alleged conspiracy. Indeed, the evidence demonstrates that the opposite is true for at least Pravastatin—a product for which Mylan was a downstream purchaser and not a seller during the relevant time. Ex. 23 ¶ 88. Conceding this, Humana dismissed Mylan from its complaint on Pravastatin. *Humana Inc. v. Actavis Elizabeth, LLC et al.*, No. 2:18-cv-3299-CMR, Dkt. 156 (E.D. Pa.). Mylan Institutional, which sources generic drugs to repackage them into "unit dose" sizes for the convenience of hospitals and patients, purchased Pravastatin from Teva during the relevant period. Ex. 23 ¶¶ 88, 99 fn. 264; Ex. 327, p. 4; Ex. 328. For this reason, DOJ listed Mylan Institutional (near Humana) as one of the potential "corporate victims" of a Pravastatin conspiracy. *United*

[24] The DOJ advised that it "no longer considers Mylan, and its former President, Rajiv Malik, a subject of its antitrust investigation in the generic drug industry." https://newsroom.viatris.com/2024-07-02-U-S-Department-of-Justice-Informs-ViatrisThat-It-No-Longer-Considers-Mylan-a-Subject-of-Generic-Drug-Industry-Antitrust-Investigation.

*States of America v. Teva Pharms. USA, Inc.*, No. 2:20-cr-00200-RBS, ECF No. 186 at 1, 4 (E.D. Pa. Sept. 11, 2020). One cannot be both a victim and co-conspirator in the same alleged conspiracy. *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 311 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita*, 475 U.S. at 588 (dismissing alleged co-conspirator that was a "target" of the conspiracy); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *6 (N.D. Cal. Aug. 3, 2011) (pleading "HP and Dell were *victims* of" a conspiracy was "flatly incompatible with a theory that HP and Dell were co-conspirators"). Thus, Mylan's status as a victim establishes that Mylan cannot be jointly and severally liable for any damages arising from the any overarching conspiracy or, at least, any alleged Pravastatin conspiracy.

### D. There is No Evidence of The Three *Kelly* Factors

In the Third Circuit, to determine whether a conspiracy is "overarching" courts consider (1) whether "the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators[;]" (2) the extent to which the participants overlap in the various dealings; and (3) whether there was a common goal among the conspirators. *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) (citations omitted); *United States v. Kemp*, 500 F.3d 257, 288-89 (3d Cir. 2007). Humana cannot establish any of these three factors.

*First*, Humana has no evidence of "continuous cooperation" or "interdependen[ce]" of the alleged sub-agreements involving Mylan; Humana cannot show the success of one alleged sub-conspiracy was dependent on another. *Kemp*, 500 F.3d at 287-89; *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *22 (D.N.J. Feb. 25, 2016). To show that alleged agreements involving Mylan were broader than a specific drug, Humana merely points to alleged conspiracies on two drugs (only one of which, Doxy DR, is a Subject Drug) involving Mylan and Heritage where Mylan purportedly agreed to "play fair" in one market in response to Heritage's actions in another market. Ex. 30 ¶ 426. But evidence makes clear that Mylan never reached an agreement on Doxy DR

(*supra* § I.G.2). In any event, the purported agreement relates to only one Subject Drug and is insufficient to establish interdependence involving any of the other alleged agreements on the 21 other Subject Drugs. Humana cannot adduce any evidence that Mylan derived a benefit from allegedly unlawful activity in markets in which it did not participate. Ex. 329, 111:21-112:3; Ex. 93 ¶¶ 173-74. Humana's experts conducted no analyses to demonstrate whether Mylan's purported participation in the alleged overarching conspiracy resulted in more favorable economic outcomes for Mylan in any markets, and without a showing of a benefit conferred to other co-conspirators beyond drug-specific agreements, Humana cannot establish interdependence. *Kemp*, 500 F.3d at 290-91.

Supposed "continuous" cooperation is also contradicted by the fact that Mylan was a potential victim of the alleged conspiracy for at least Pravastatin. This indicates Mylan derived no benefit from the alleged unlawful conduct in markets where it did not participate and indicates Mylan did not engage in continuous cooperation. Similarly, Mylan launched Theophylline ER and Ursodiol, two Subject Drugs, within two years of the start of each alleged collusion. Cremieux Rep. E-1. However, Humana does not allege that Mylan participated in the alleged conspiracies for either drug, again showing Mylan did not engage in continuous cooperation.

*Second*, Mylan had limited overlap with alleged co-conspirators, which is "on its own, insufficient to establish an overarching agreement." *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 531 (E.D. Pa. 2019); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *28-29 (E.D.N.Y. Jan. 4, 2011). Mylan had no overlap on any Subject Drug with 11 of the Defendant corporate families who allegedly joined the overarching conspiracy. Ex. 93, Fig. 10. For seven other Defendants, Mylan overlapped on only a single drug. Thus, Mylan had repeated competition with only five Defendants, further undermining

that each of the alleged Subject Drug agreements were interdependent. The lack of overlap between Mylan and most Defendants also limits any potential enforcement mechanism of the alleged overarching conspiracy through interactions with other Defendants in other Subject Drug markets. Where there is "no punishment, or even a mechanism to punish, the inference tends toward no agreement." *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018).

*Third*, nothing in the record establishes that Mylan shared the alleged common goal to achieve its "fair share" and refuse to compete for additional business. Compl. ¶ 268. Instead, Mylan engaged in robust competition for the each of the Subject Drugs. *Supra* §§ I.A-I.J. Evidence also confirms Mylan did not raise prices for all drugs or all customers. Mylan did not raise direct CVS's prices for at least several Subject Drugs, including Amitriptyline, three Benazepril strengths, Clomipramine, and Divalproex ER. Ex. 23 ¶¶ 101, 118, 159, 164. In some markets, such as the market for Doxy Mono, Mylan never increased WAC. Ex. 93 ¶¶ 127-28. This evidence confirms that Mylan shared no common goal.

**E. Humana Cannot Add New Claims Against Mylan Via Its Expert**

Humana's complaint does not allege that Mylan participated in any agreement involving Baclofen, Clobetasol, Econazole, Pravastatin, Theophylline, or Ursodiol. *See generally* Compl. Yet Humana's expert, Dr. W. David Bradford, identifies (without citing evidence) Mylan as a Defendant with respect to these drugs. Ex. 30, Table 33. Humana cannot, as a matter of law, use an expert report to amend its complaint and add claims against Mylan. *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 908–10 (9th Cir. 2011) (declining to consider allegations "listed for the first time in the expert report").To the extent Humana seeks damages based on Mylan's sales with respect to any of the above drugs, the Court should grant summary judgment on that commerce. *Carr v. Gillis Associated Indus., Inc.*, 227 F. App'x 172, 175–76 (3d Cir. 2007)

("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour.").

## III. HUMANA CANNOT ESTABLISH CAUSATION

Summary judgment is also warranted as to Humana's claims for which Humana cannot establish that Mylan's conduct caused Humana's alleged injury. Humana must, but cannot, prove that Defendant's alleged conduct was the proximate cause of Humana's harm with respect to each claim. *Chocolate I*, 801 F.3d at 395 (plaintiff must prove that "this conspiracy was the proximate cause of the plaintiff's injury") (citation omitted); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 439 (3d Cir. 2000) (but-for causation is insufficient in antitrust cases). For claims where no overcharge was incurred at the pharmacy level as a result of Defendants' alleged conduct, no overcharge was passed on to Humana, and Humana thus suffered no injury.

Transactions where Mylan did *not* increase price are included in Humana's damages analysis, and Humana has no methodology by which such claims could be removed. Ex. 330 ¶¶ 190-95. For example, CVS had no price increase during the alleged period of collusion on direct sales by Mylan of at least Amitriptyline Tablets, three Benazepril tablet strengths, Clomipramine, and Divalproex ER. Ex. 23 ¶¶ 101, 118, 159, 164. It avoided indirect price increases on others, including Levothyroxine. Ex. 330 ¶ 192. [redacted] Ex. 331.

Because CVS paid no overcharge, it had no overcharge to pass on to Humana. *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 2483981, at *19-20 (E.D. Pa. Aug. 27, 2025). However, Humana's damages expert, Vogt, cannot remove such claims because the data he relied on does not identify pharmacies. Ex. 330 ¶ 195. Summary judgment is warranted as to these claims and any others where an upstream purchaser did not suffer any overcharge, and for which Humana has not proven pass-through.

## IV. HUMANA FAILS TO PLEAD OR MEET THE RULE OF REASON STANDARD

Humana has failed to establish any *per se* violation. The conduct Humana challenges as to Mylan is, at most, characterized by the exchange of certain information, which is evaluated under the rule of reason, rather than the *per se* standard. *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). At the summary judgment stage, if a plaintiff's allegations of a *per se* violation must instead be assessed under the rule of reason, and plaintiff has not plead rule of reason and its elements, dismissal is appropriate. *Ins. Brokerage*, 618 F.3d at 317 (citing *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006)).

Humana asserted only per se claims, Compl. ¶ 135, yet years of discovery confirm that Humana's claim resembles—at most—exchanges of certain information. *E.g.*, *supra* §§ I(A)(1), I(I)(4)(ii). As this Court held, such information exchanges do not violate the Sherman Act. *In re Generic Pharms. Pricing Antitrust Litig*., 2022 WL 1664456, at *3 (E.D. Pa. May 25, 2022) (Rufe, J.). Because Humana has "expressly disavowed reliance on the rule of reason," it is "prevented from pursuing a claim under a rule of reason theory following summary judgment on a *per se* claim." *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1051 (E.D. Pa. 2016).

## V. MYLAN CANNOT BE LIABLE FOR CONDUCT THAT OCCURRED BEFORE IT ALLEGEDLY JOINED ANY PURPORTED CONSPIRACY

Humana does not assert that Mylan engaged in wrongdoing on any Subject Drug before 2013.[25] Ex. 1, pp.14-21. Thus, Mylan cannot be liable for any conduct or alleged harm that Humana suffered before Mylan supposedly joined the alleged conspiracy. "[T]here is no causal nexus between injuries a plaintiff suffers at one point in time and an entity that joins a conspiracy long after, even when the conspiracy's objective is to keep doing whatever it was that previously injured the plaintiff." *Rabin v. NASDAQ OMX PHLX LLC*, 182 F. Supp. 3d 220, 230 (E.D. Pa.

[25] In interrogatory 2, Humana cites a 2012 Doxy agreement; this is inconsistent with contentions and expert reports.

2016), *aff'd*, 712 F. App'x 188 (3d Cir. 2017); *Levine v. United States*, 383 U.S. 265, 266 (1966) ("[T]he Solicitor General . . . concedes that an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy."); *United States v. Uvino*, 2025 WL 1932448, at *1 (2d Cir. Apr. 25, 2025) ("A defendant who joins a conspiracy is not automatically liable for all acts committed by co-conspirators before he joined."). Mylan cannot be liable for any allegedly unlawful act completed before 2013, including on at least several of the alleged sub-conspiracies, including Acetazolamide, Desonide, Lidocaine, and Nystatin, where the WAC increased before any allegedly unlawful conduct by Mylan.

## VI. HUMANA HAS NO TRIABLE CLAIMS AFTER 2015 AT THE LATEST

Summary judgment is warranted for any claim after—at the very least—2015. Humana alleges no unlawful conduct by Mylan after 2015 to support either an alleged conspiracy as to any of Mylan's drugs at issue or participation in an overarching conspiracy. Dismissal is warranted "where there are no specific facts establishing the existence of a conspiracy for the entire time period alleged." *Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*, 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015); *In re Domestic Drywall Antitrust Litig.*, 2016 WL 3453147, at *2-4 (E.D. Pa. June 22, 2016) (dismissing with prejudice claims for years for which there was no evidence of a conspiracy); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *12 (N.D. Cal. Jan. 21, 2014). Showing the "period of the [alleged] conspiracy" is vital to Humana's claims. *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 179 (3d Cir. 2010) (rejecting conspiracy claim where plaintiff failed to show the parties to the conspiracy, the period of the conspiracy, and the object of the conspiracy).

Despite baldly asserting that the "End date" of the "alleged collusion period" was December 31, 2018, Humana and its experts identify no allegedly unlawful act by Mylan occurring

after 2015. Indeed, Bradford and Vogt admit they have no basis—other than the arbitrary direction of Humana's counsel—for identifying December 31, 2018 as the end of the alleged conspiracies. Ex. 87 ¶ 93; Ex. 332 ¶ 93. This putative "End date" differs by years from the latest Mylan conduct cited by Humana and its experts for all of Mylan's drugs at issue:

- Amitriptyline: July 2014 (Ex. 1, p.15; Ex. 30 ¶ 186).
- Benazepril: August 2013 (Ex. 2, p.15; Ex. 30 ¶¶ 193-4).
- Clomipramine: July 2013 (Ex. 30 ¶ 224).
- Digoxin: November 2014 (Ex. 1, p.8; Ex. 30 ¶ 263).
- Divalproex: August 2013 (Ex. 1, p.8-9).[26]
- Doxy DR: "2014 summer months" (Ex. 30 ¶ 285).
- Doxy Monohydrate: April 2014 (Ex. 1, p.10; Ex. 30 ¶ 297).
- Levothyroxine: April 2014 (Ex. 1, p.11; Ex. 30 ¶ 338).
- Propranolol Tablets: July 2015 (Ex. 1, pp.20, 28; Ex. 30 ¶ 393).
- Verapamil: July 2014 (Ex. 1, p. 12).

Because it offers no evidence of later conduct, Humana cannot assert a claim, or recover damages for, any of these alleged conspiracies after at least the dates above. *Domestic Drywall*, 2016 WL 3453147, at *2-4. Similarly, Humana offers no evidence of "lingering price effects" continuing after the alleged conduct ceased. *Precision Assocs., Inc.*, 2015 WL 4987751, at *5. *First*, Mylan did not raise prices at all on certain products, including Doxy DR and Doxy Mono. *Second*, Humana's experts are either silent on the issue or offer only vague, unsupported speculation. Ex. 87 ¶¶ 84-85.

## VII. NO EVIDENCE REGARDING MYLAN N.V. OR MYLAN INC.

No evidence supports a liability finding as to Mylan N.V., Mylan Inc., or UDL Laboratories Inc.[27] Throughout the alleged conspiracy, Mylan Pharmaceuticals Inc.—not Mylan N.V. or Mylan Inc.—sold and distributed pharmaceuticals in the United States; UDL sold only to large institutional customers (*i.e.*, group purchasing organizations, hospitals, and long-term care

[26] Bradford asserts Mylan had "calls" in 2015 but never links those alleged calls to Divalproex. (Ex. 30 ¶ 275).
[27] UDL changed its name to Mylan Institutional.

facilities).[28] UDL operated separate from Mylan Pharmaceuticals with its own pricing committee. Ex. 333. Humana's agreements were all with Mylan Pharmaceuticals. *E.g.*, Exs. 334; 335; 336.

Humana cannot "imput[e] corporate liability to any affiliate company unlucky enough to be a bystander to its sister company's alleged misdeeds." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423 (4th Cir. 2015). Absent evidence specific to a corporation's parent or sister entities, a plaintiff cannot assert claims based merely on alleged actions by the subsidiary. *Fried v. JPMorgan Chase & Co.*, 850 F.3d 590, 595 n.2 (3d Cir. 2017) ("[P]arent companies are not, merely by dint of ownership, liable for the acts of their subsidiaries."); *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (same).

Humana offers no evidence of conduct by Mylan N.V., Mylan Inc., or UDL. Indeed, Mylan N.V. was not formed until 2014 and was not the indirect parent of Mylan Pharmaceuticals Inc. until 2015, after almost all the allegedly unlawful conduct occurred. Moreover, Mylan Pharmaceuticals, not Mylan N.V., Mylan Inc., or UDL, was responsible for entering the at-issue agreements with Humana and implementing the allegedly unlawful WAC increases. Ex. 337; Ex. 338; Ex. 335. Nothing in the record supports any claim against Mylan N.V., Mylan Inc., or UDL.

## CONCLUSION

For the foregoing reasons, Mylan respectfully requests summary judgment.

*<u>/s/ Jeffrey C. Bank</u>*
Jeffrey C. Bank
Seth C. Silber
WILSON SONSINI GOODRICH & ROSATI
1700 K Street, NW, 5th Floor
Washington, D.C. 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
jbank@wsgr.com
ssilber@wsgr.com

[28] https://www.sec.gov/Archives/edgar/data/69499/000006949913000009/myl10k_20121231xdoc.htm.

Chul Pak
Michael Sommer
WILSON SONSINI GOODRICH &
ROSATI
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
cpak@wsgr.com
msommer@wsgr.com

*Counsel for the Mylan Defendants*