**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724**<br><br>**16-MD-2724** |
| **THIS DOCUMENT RELATES TO:**<br><br>***Humana Inc. v. Actavis Elizabeth LLC, et al.*** | **HON. CYNTHIA M. RUFE**<br><br>**18-CV-03299** |

# MEMORANDUM OPINION

**Rufe, J.** **August 4, 2026**

This matter is one case in a multidistrict litigation ("MDL") concerning price-fixing by numerous generic drug manufacturers. Plaintiffs range from individuals to pharmacies, health insurance plans and hospitals. This matter, involving Plaintiff Humana Inc. and several defendants,[1] is set to be the MDL's initial bellwether trial. This memorandum and its accompanying order concern solely Defendants' motions for summary judgment on Counts 91 and 106 of Plaintiff Humana's Second Amended Complaint. Count 91 alleges Defendants engaged in an unlawful conspiracy to drive up the prices of Theophylline in violation of Count I of the Sherman Act. Count 106 alleges Defendants participated in an overarching conspiracy with one

[1] Actavis Elizabeth LLC, Actavis Holdco U.S., Inc., Actavis Pharma, Inc., and Teva Pharmaceuticals USA, Inc., Breckenridge Pharmaceutical, Inc., Mylan, Heritage, Lannett, Mayne Pharma Inc., Impax Laboratories, LLC.

another to drive up the prices of several generic drugs.[2] Several Defendants jointly moved for summary judgment against these claims, alleging they were brought outside of the applicable of limitations.[3]

Sherman Act claims must be filed within four years of their accrual.[4] Humana's complaint was filed in the Eastern District of Pennsylvania on August 3, 2018. It filed an amended complaint on December 21, 2018, and then a second amended complaint ("SAC") on April 10, 2019[5] that is at issue here. The SAC asserts *inter alia*, that several generic drug manufacturers conspired to set prices and allocate markets for several generic drugs in violation of federal law and the laws of several states. The parties do not dispute that claims raised in the first and second amended complaints relate back to the first complaint's August 3, 2018, filing. Humana asserts that federal claims for acts committed prior to August 3, 2014, were tolled both because the 2016 filing of similar claims by several states against many of the defendants named by Humana in this matter suspended the running of federal and several states' statutes of limitations

---

[2] Although more than thirty or forty drugs were named in Humana's Second Amended Complaint ("SAC"), Humana has since informed Defendants and the Court that it will pursue claims only for Baclofen, Benazepril, Clobetasol, Clomipramine, Diogixin, Divalaproex, Doxycycline (delayed release), Fluocinonide, Levothyorxine, Lidocaine (excluding Lidocaine-Prilocaine formulations), Pravastatin, Propranolol, and Theophylline. It has also informed Defendants and the Court that it will not pursue Clayton Act claims for injunctive and declaratory relief.

[3] Defendants' Joint Motion for Partial Summary Judgment on Statute of Limitations and Laches Grounds. 18-cv-3299, Doc. No. 452. (Unless otherwise stated, all references to document numbers are to the docket of 18-cv-3299.)

[4] 15 U.S.C. §15b.

[5] Doc. No. 110.

for claims in this matter, and because during years prior to 2014 Defendants successfully concealed a conspiracy among them to control the distribution and pricing of generic drugs from Humana despite its efforts to discover the cause of price increases for generic drugs it purchased. Defendants argue no tolling applies and thus they are entitled to summary judgment on the claims.

## I. LEGAL STANDARD

Summary judgment is appropriate for a claim, or part of a claim, where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[7] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor."[9] However, not all facts must be viewed in favor of the nonmoving party, but only those inferences and assumptions that are reasonable.[10] Further, a court may not weigh the evidence or make credibility determinations.[11]

---

[6] Fed. R. Civ. P. 56(a).
[7] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[8] *Id.*
[9] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).
[10] *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).
[11] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[12] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[13] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[14] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[15]

## II. ACCRUAL OF CLAIMS

Federal antitrust lawsuits must be brought within four years after the cause of action accrued.[16] An antitrust cause of action "accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business."[17] This "injury-occurrence" rule, which all parties agree applies to federal antitrust actions,[18] holds that when a plaintiff feels the adverse impact, a cause of action

---

[12] *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This does "not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Rule 56 does not require the nonmoving party to depose her own witnesses." *Id.* at 324.

[13] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[14] *Walden v. Saint Gobain Corp.,* 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[15] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[16] 16 U.S.C. §15(b).

[17] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *W. Penn Allegheny Health Sys. v. UPMC*, 627 F. 3d 85, 105-106 (2010) (quoting *Zenith*).

[18] Doc. No. 476, p. 13; Doc. No. 579, p.18.

immediately accrues to him, and the statute of limitations begins to run.[19] The commission of a new act, though, does not permit a plaintiff to recover for injuries caused by prior overt acts outside of the limitations period.[20] All parties agree that Humana may sue for injuries it can prove it suffered as a result of purchases after August 3, 2014. The statute of limitations for antitrust violations may be tolled by operation of statute or equitable tolling. Defendants claim that Humana was on notice that it had antitrust claims against Defendants on August 15, 2013, when its employees began investigating why prices it paid for drugs were rising, and therefore, if it wanted to recover for injuries it incurred as a result of Defendants' concealment of their illegal acts, it should have filed suit by August 15, 2017.[21]

Whether Humana was on "inquiry notice" of its claims before August 15, 2014, turns on an examination of when Humana should have known of the basis for its Theophylline and overarching conspiracy claims. The Third Circuit's two-part analysis for answering this question examines whether and when Humana had sufficient information of Defendants' wrongdoing.[22] First, Defendants must show the existence of "storm warnings," that is, information available in specialized trade journals, industry reports and other information related to industry pricing, as well as in more general circulation news outlets, that would alert a responsible person to the

---

[19] *Zenith Radio*, 401 U.S. at 339.
[20] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1984).
[21] Doc. No 476,pp. 1, 27.
[22] *Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 506-08 (3d Cir. 2006).

probability (not possibility) that misleading statements or significant omissions were made. At this point, Humana is responsible for exercising diligence by demonstrating it heeded the storm warnings, but despite reasonable diligence, it could not find and avoid the storm.[23]

Humana seeks to prove that Defendants violated federal antitrust law as early as 2011.[24] Absent tolling allowed by statute or equitable tolling doctrines, Humana cannot sue under the Sherman Act for any claims prior to August 3, 2014, four years before the filing of its complaint. Humana claims that it is entitled to tolling by statute and two grounds of equitable tolling — "*American Pipe*" and fraudulent concealment. Defendants claim that Humana was on notice that it could file antitrust claims against Defendants on August 15, 2013, when its employees began investigating why prices it paid for drugs were rising.

As of the publication of this memorandum, the parties have informed the Court that the only federal claims Plaintiffs plan to prove at trial that Defendants now seek to dismiss are Sherman Act claims in Count 91 alleging a conspiracy to

[23] *Id.* at 507.

[24] For example, Humana alleges that from 2011, Defendant Taro conspired, and at least up to the time of the filing of the complaint continued to conspire with other manufacturers (Par and Perrigo) to increase the price of Nystatin cream. SAC, ¶¶ 592-602. Humana's expert, W. David Bradford, Ph.D., found that Defendants began communicating about increasing drug prices for Desonide, Lidocaine, and Nystatin as early as 2011. Doc. No. 476, Ex. 12, ¶40. The SAC alleges Defendants conspired to control and manipulate the market for generic drugs as early as 2006. Doc No. ¶264.

manipulate the prices of and market for Theophylline since 2014[25] and Count 106 alleging an overarching conspiracy to drive up all of the drugs that are still subject of this case because the statute of limitations for the claims expired. Humana has also informed the Court that it will dismiss its Clayton Act §16 declaratory relief and injunctive relief counts.[26]

## III. TIMELINESS OF PLAINTIFF'S CLAIMS

Humana asserts three theories for allowing it to pursue claims for Sherman Act violations alleged in Counts 91 and 106 that accrued prior to August 3, 2014, four years before it filed its complaint. First, claims raised in the lawsuits several states filed in this MDL beginning in 2016 are preserved as to Humana, they assert, by operation of 15 U.S.C. §16(i). Second, those raised in the class action lawsuits filed by End-Payer Plaintiffs ("EPPs") and Direct Payment Plaintiffs ("DPPs) preserved the overarching conspiracy and Theophylline conspiracy claims due to the tolling doctrine of *American Pipe v. Utah*[27] because Humana was a member of both classes. Third, Humana claims that Defendants, by misdirection and falsehood, concealed their conspiracy to jointly manipulate the market for generic drugs such that Humana, despite exercising reasonable diligence to discover the reasons for the price increases, could not do so before the EPPs and DPPs filed their first single conspiracy lawsuits in 2016. Despite

[25] The SAC claims price manipulation in Theophylline began as early as February 2014. Doc. No. 110, ¶¶ 669-670.
[26] Doc No. 579, p. 2 n.7.
[27] 414 U.S. 538 (1974).

diligent efforts to uncover the reasons behind those price increases, Humana states it did not have enough notice of an overarching conspiracy involving price increases of several generic drugs among their manufacturers and the Theophylline price and market manipulations prior to August 3, 2014 to focus on possible antitrust violations before the filing of other lawsuits in 2016. Humana seeks to have the jury determine whether, and what injuries it suffered before August 3, 2014, on account of the injuries claimed in Counts 91 and 106 that were fraudulently concealed and not discovered despite a reasonable inquiry.

## A. Government Proceeding Tolling under the Clayton Act

Humana posits that pursuant to 15 U.S.C. §16(i), several states' filings of complaints against several pharmaceutical companies on December 15, 2016, and October 31, 2017[28] alleging a broad-based scheme to fix prices and allocate markets for generic drugs tolled the statute of limitations for Humana's federal antitrust claims.[29] It is not necessary to describe those lawsuits in detail for the purposes of the government tolling doctrine because §16(i) does not apply to those lawsuits.[30]

---

[28] State of Connecticut, et al. v. Aurobindo, 3:16-cv-2056 (D. Conn.), filed on December 15, 2016, and amended on March 1, 2017, and In re: Generic Pharm. Pricing Antitrust Litig., 2:17-cv-3768 (E.D. Pa.), filed October 31, 2017 and amended on June 15, 2018. The first complaint was filed by twenty states, and the last amended complaint was on behalf of 49 states and territories. Not all the drugs at issue in this case are subject of the state complaints that pre-date Humana's.

[29] Doc. No. 579, pp. 4-5.

[30] No party attached copies or portions thereof of the states' complaints and amended complaints to their pleadings. Though they and this matter have been part of the same MDL, it is unrealistic for the parties to expect the Court to hunt for them, especially

§16(i) of the Clayton Act provides in pertinent part:

> Whenever any civil or criminal proceeding is instituted by the *United States* to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year. . . .[31]

As Humana states, the Supreme Court held that §16(i)'s tolling provision must be given broad application.[32] Neither the Supreme Court nor any other court has held that §16(i) applied to any government's lawsuits or criminal prosecutions initiated by any party other than the United States. §16(i) does not toll any statute of limitations on account of the states' 2016 complaint in the District of Connecticut. As the federal government was not a party to that lawsuit, §16(i) does not toll either of the federal claims Defendants seek to dismiss.[33]

---

when both sides have already submitted hundreds of pages of documents, some barely legible, in support of their respective positions. The descriptions of the complaints are not a matter of great dispute— the parties' dispute lies in whether and how they affect Humana's ability to litigate injuries that accrued prior to August 3, 2014.

[31] 16 U.S.C. §16(i) (emphasis added).

[32] *Leh v. General Petroleum Corp.*, 382 U.S. 54, 59 (1965).

[33] This Court notes that the Department of Justice, in the Eastern District of Pennsylvania, indicted Jeffrey Glazer on December 12, 2016, and he was sentenced on April 2, 2024 (U.S. v. Jeffrey A. Glazer, 2:16-cr-0506, Doc. Nos. 1, 76). Similarly, the Department of Justice indicted Jason T. Malek in the Eastern District on February 13, 2016, and he was sentenced on March 28, 2026. (U.S. v. Jason T. Malek, Doc. Nos. 1 and 62. There are dozens of mentions of both men in Humana's exhibits accompanying its responses to the several motions for summary judgment. See Doc. Nos. 730, 731 and 732. No party to the motions adjudicated in the order accompanying this motion have discussed whether, and how, the Malek and Glazer

**B. American Pipe Tolling**

Humana claims its federal overarching conspiracy claim and claim regarding Theophylline are covered by the equitable tolling rule of *American Pipe v. Utah*, which holds "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class. . . ." [34] In that case, the Supreme Court found that the pendency of a motion for class certification in a timely-filed complaint tolled the statute of limitations for the putative members of the class so

---

prosecutions tolled the statutes of limitations for federal and state antitrust claims. However, Humana included Glazer's and Malek's guilty pleas designated in its omnibus exhibits filings as PX 137 and PX 138 respectively, as an exhibit in other summary judgment responses. In MDL Doc. No. 4486 (Humana's Omnibus Memorandum of Law in Opposition to Defendant's Individual Motions for Summary Judgement) p. 179, the indictments are cited to support Humana's claim that, "The relevant Defendants for the Doxy RR conspiracy are: Actavis, Endo, Par, Sun, Teva, and West-Ward. Heritage executives, Jeffrey Glazer and Jason Malek, entered criminal plea agreements for 'conspiracy to suppress and eliminate competition by allocating customers, rigging bids, and fixing and maintaining prices for doxycycline hyclate sold in the United States, from in or about April 2013 and continuing until at least December 2015.'". See also MDL Doc. No. 4475 (Plaintiff Humana Inc.'s Memorandum of Law in Opposition to Defendants' Joint Motion for Summary Judgment as to Humana's Overarching Conspiracy Claim, Causation, and Injunctive Relief Claims) at Appendix B, Rows 1 and 2.

If asked, this Court would have to rule that 15 U.S.C. §16(i) tolls the statute of limitations for Counts 91 and 106 from December 12, 2012, four years before Glazer's indictment. *See Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 314 (1965) (under Section 5(b) of the Clayton Act, now 15 U.S.C. §16(i) "a 'civil or criminal proceeding . . . instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws' suspends the running of the statute of limitations during the pendency thereof and for one year thereafter with respect to private actions arising under those laws and based on any matter complained of in the government suit"). That section "'applies to every private right of action based in whole or in part on "any matter" complained of in the government suit. *Id.* at 317.

[34] 414 U.S. 538, 554 (1974).

they could refile individual cases once the class was dismissed.[35] "Thus, the commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs." The Third Circuit, relying on *American Pipe,* has since held that neither class certification nor dismissal of the class claims need occur before class members, like the Plaintiffs herein, can file individual lawsuits and take advantage of *American Pipe*'s tolling provisions.[36] The *American Pipe* rule is grounded in the equitable power of the courts.[37]

Humana's response to Defendants' joint partial motion for summary judgment claims the overarching conspiracy and the Theophylline counts benefit from *American Pipe* tolling. In a single paragraph in the response, Humana states only that the majority of the drugs that are subject of the SAC were filed by DPPs by August 15, 2017, four years after the inquiry notice date of August 15, 2013, the Defendants argue is the date from which the Sherman Act statute of limitations runs.[38] It then lists eighteen drugs that the DPPs filed as single-drug class actions. While one of the Appendices to its response lists Theophylline and overarching claims as protected by

---

[35] *Id.* at 550-551.
[36] *Aly v. Valeant Pharms, Int'l Inc.*, 1 F.4th 168, 177 (3d Cir. 2021).
[37] *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,* 582 U.S. 497, 509 (2017)
[38] Doc. No. 579, p. 16. Defendants assert the Plaintiffs were on notice of their overarching conspiracy claim from August 15, 2013 because of an internal Humana email, discussing price rises, speculates about the possibility price rises were due to market allocations by Defendants. See Doc. No. 649, p.4. This notion is discussed below.

*American Pipe*, the continuing violation doctrine, and government proceeding tolling, it, too, does not explain why *American Pipe* applies, foregoing precise citation to the complaint(s) it claims contain class claims of an overarching conspiracy.[39] Humana's post-argument submission mentions *American Pipe* only to note that it rests on the aforementioned argument in its response. This Court's examination of the parties briefs and their appendices leads to the conclusion that the Theophylline claim is covered by *American Pipe* tolling as a result of DPPs and EPPs first raising those claims in a June 7, 2018 complaint, but that only affords Humana a few weeks prior to the SAC's filing, making the *American Pipe* deadline June 7, 2014.[40]

**C. Fraudulent Concealment**

Humana's SAC claims that Defendants engaged in an overarching conspiracy to fix prices and allocate markets for generic drugs as far back as 2006,[41] as well as a conspiracy in early 2014 to do the same for Theophylline.[42] It attributes its failure to file its lawsuit to Defendants' concealment of their conspiratorial actions, such as failing to maintain a document retention policy, instructing one another to communicate in writing and meeting in secret to conceal the conspiracies.[43] The SAC

[39] Doc. No. 579, pp. 36, 56.
[40] See Doc. No. 579, Appendix 10, p.2; Doc. No. 476, p.9, n.8. EPPs, who included Humana as an unnamed class member, filed the first class action concerning Theophylline and an overarching conspiracy on June 7, 2018.
[41] Doc. No. 110, ¶¶ 261-288.
[42] Doc. No. 110, ¶¶ 665-685.
[43] Doc. No. 110, ¶¶ 755-759

further alleges that Humana acted with due diligence to discover the source of the rising prices.[44] "The equitable doctrine of fraudulent concealment is read into every federal statute of limitation."[45] Humana therefore claims it is entitled to invoke the equitable tolling doctrine of fraudulent concealment to assert claims that arose prior to August 3, 2014.

When a defendant opposes the invocation of equitable tolling,

> A court must determine (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their . . . claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable diligence, and (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint.[46]

The Third Circuit requires that a plaintiff pleading fraudulent concealment "must fully plead the facts and circumstances surrounding his belated discovery and the delay which has occurred and must be shown to be consistent with requisite diligence."[47] Humana's response to the motion to dismiss discussed at length, and supplied ample evidence, proving for the purpose of a summary judgment motion what Humana did

[44] *Id.*, ¶759.
[45] *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946).
[46] *Forbes v. Eagleson*, 228 F.3d 471, 486-87 (3d Cir. 2000). *See also In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1178-79 (3d Cir. 1993).
[47] *In re Lower Lake Erie*, 998 F.2d at 1179, *quoting Dayco v. Goodyear Tire and Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).

to discover and learn about the prices it paid for generic drugs starting five years prior to Humana's filing of its complaint. Defendants, however, maintain their evidence shows Humana had enough notice of antitrust harm in 2013 that the statute of limitations began to run.

Defendants assert that prior to August 3, 2014, Humana had reason to suspect the existence of a conspiracy to raise generic pharmaceutical prices. Defendants cite events they say demonstrably placed Humana on notice they had antitrust claims against them:

- The New York Times, on August 9, 2012, reported on the doubling and tripling of prices of some dermatologic drugs. The article, however, also quotes an investment banker with a minority shareholding in one of the companies that increased its prices— Taro— saying, "It's much more time-consuming and expensive to get these drugs approved [by the Food and Drug Administration]." James Kedrowski, Taro's chief executive, told the newspaper the company did its best to offer fair prices to customers. But, he said, pricing structure for many of its products had gotten so low that other drug makers 'were dropping out because they couldn't make money at it." Nevertheless, Kedrowski claimed prices were dropping again as other manufacturers, seeing the price increases, were seizing opportunity and returning to the market. As proof, he said that while Taro had been the sole producer of Nystatin, four competitors had entered the market. Perrigo's chairman, Joseph C. Papa cited a "favorable pricing environment" that accounted for large increases in revenues from net sales. The article also described Sun Pharmaceuticals, a two-thirds owner of Taro, as pessimistic about the sustainability of the higher prices, as evidenced by Taro's desire to sell Sun for a price lower than minority investors thought fair.[48]

[48] Doc. No. 476, Ex 1.

- On August 15, 2013, Greg Riehl, the CFO of Humana's mail-order pharmacy subsidiary, informed Mark McCullough, the CFO of Humana's Pharmacy Benefits Manager, of an unexpected drop in monthly profits. Mr. McCullough then conferred with Tony Braun, another Humana manager, who responded that this may be the result of collusion among generic drug manufacturers on some drugs.[49]
- At a deposition, Mark McCullough testified that as of 2013 he believed the increases in generic drug prices were due to collusion.[50]
- Pursuant to a request from Mr. Riehl seeking information about the price increases, Keith Dostal, Vice-President of Supply Chain Strategies, sent an email on August 15, 2013, opined that generic pharmaceutical manufacturers utilize "fair share methods to minimize competition, price erosion, and maintain profitability." The email however also notes, "Generic manufacturers are feeling significant revenue pressure in 201f3 due to (1) limited number of new generic product launches, (2) YOY customer competitive bid price erosion, and (3) API & manufacturing cost increases."[51]
- A September 3, 2013, slide presentation sent to Humana's officers identified "fair share" methods by generic pharmaceutical manufacturers as a possible source of price increases troubling Humana.[52]
- Tony Braun, on August 23, 2013, sent an email to other Humana executives suggesting that reporting the price rises to the Federal Trade Commission was an option.[53]
- Despite the filing of several lawsuits against Defendants in 2016 and 2018, it was not until EPPs and DPPs filed their first complaints alleging Defendants engaged in an overarching conspiracy.[54]

---

[49] Doc. No. 476, Ex. 2 at HUM-GEN-MDL-002799547.
[50] Doc. No 452, Ex. 3, pp. 230-33.
[51] Doc. No. 476, Ex. 5, p. HUM-GEN-MDL-002711473-74.
[52] Doc. No. 476, Ex. 6; Ex. 7 at second slide.
[53] Doc. No. 476, Ex. 8.
[54] Doc. No. 476, pp. 8-9.

In sum, Defendants claim that Humana was on notice on April 15, 2013, when some it employees used the phrase "fair share" to discuss pharmaceutical companies' pricing practices. Humana and other plaintiffs in this MDL have alleged that the Defendants engaged in an overarching conspiracy, stating Defendants "pursued a common goal — to achieve artificially-inflated generic drug prices through the allocation of markets and through price-fixing agreements and that they did so through a wide-ranging 'fair share' arrangement."[55] The Defendants suggest that knowledge of this term evidences a sophistication Humana's employees possessed that should have tipped them off on August 15, 2013, when the term was first used, that something was amiss, and alert them to other suspicious behavior by Defendants.[56]

To satisfy the first prong of the fraudulent concealment doctrine, requiring a showing that Defendants concealed their overarching conspiracy to control the allocation and prices in the generic drug market, as well as their conspiracy regarding Theophylline, Humana cites proof that Defendants plotted to frustrate inquiries that would allow Humana and others to get to the bottom of the price increases. Proof of the cover-up includes:

- In an October 25, 2019, interview with the United States Department of Justice, Kevin Green, a Zydus employee starting in November 2013, explained that one of his duties was to exchange price information with

---

[55] *In re Generic Pharms Pricing Antitrust Litig.*, 394 F.Supp. 3d 509, 515 (E.D.Pa. 2019).
[56] Doc. No. 476, pp. 7-8.

Zydus' competitors. His immediate supervisor, Kristy Ronco, a vice-president of sales, set the agenda and sales objectives. She in turn reported to Zydus' CEO, Joe Renner, and COO, Michael Keenley. Green told the DOJ that he and Ronco regularly shared price information with competitors. She told Green never to put information about price sharing in writing, and to never divulge his sources to Green and Keenly. (Green was under the impression Renner and Keenley knew what he was doing but did not want him to tell them.)[57]

- Kevin Green, starting in 2006, worked as Director of National Accounts for Teva Pharmaceutical Industries Ltd., reporting to the company's Vice-President of Sales, Dave Rekenthaler. Rekenthaler avoided naming companies when speaking with Green about communications with competitors, using the names of states in place of the companies' names.[58]
- Tony Polman, a sales employee for Perrigo, reported to John Wesolowski, Perrigo's Vice-President of Sales at the time, from approximately 2011 through 2016. During that time, even after Polman knew the Department of Justice had launched an investigation, Wesolowski tasked Polman with obtaining market information from competitors, but to never use email or text messages. Wesolowski repeated this instruction to Polman and five other employees involved with or connected to sales at weekly, Friday meetings over the course of five or six years. Polman said he did not need Wesolowski to tell him why he could not use email or text messaging: Polman knew such communications with competitors was illegal.[59]
- Nisha Patel, a sales employee with Teva, said that on its behalf she engaged in conversations regarding pricing, market share, and allocation of customers between manufacturers with representatives of competitors including, Sandoz, Lupin, Mylan, Zydus, Amneal and others. She told the DOJ, "Keeping the conversations quiet or confidential was implied

[57] PX 87 at 7-9. (PX refers to exhibits accompanying Humana's response.)
[58] PX 86 at 2, 6
[59] PX 90 at 5-6.

from the beginning. No one was sending this information by email; the text messages simply said call me when you can."[60]

- Della Lubke, a Sandoz employee, testified that at times she was instructed to tell customers that Sandoz had a supply issue with a requested drug that Sandoz could sell at a lower price than a competitor to avoid punishing the competitor for having a higher price.[61]

Humana also alleges that Defendants lied to several purchasers to justify price increases. It cites misrepresentations Defendants made about several drugs. These include the following:

- A customer, Amerisource Bergen on November 25, 2013, asked a Lannett employee what justification it would give customers for an increase in the price of Acetazolamide. The Lannett employee's response: "Hmmm…haven't concocted a story yet."[62] That employee then emailed the question to another Lannett employee that she was instructed to respond to Amerisource Bergen that the price increase was due to "increased production costs," the Lannett employee responded, "Oy."[63]
- In March 2014, Teva told customers it was increasing Baclofen prices due to "industry-wide changes."[64] One month later, in another email, Patel admitted that Teva had to "take the increase [for Baclofen] across the board, for optics."[65]
- On December 3, 2013, Econdisc, a customer for Lannett's Digoxin, asked why the price for that drug and others had increased, and Lannett replied the blame lay with increased costs due to new government regulations and material shortages.[66] Lannett gave a similar reply two

---

[60] PX 76, at 1-2,7.
[61] PX 5, at 108-110.
[62] PX 1609.
[63] PX 1610.
[64] PX 1621.
[65] PX 387.
[66] PX 1615.

months earlier to the same question posed by the Minnesota Multistate Contracting Alliance for Pharmacy.[67]

- In February, 2014, Heritage's Anne Sather informed co-worker Jason Malek that Cardinal Health asked Heritage to bid on Doxy DR. Malek told her that Heritage did not want to upset Mylan's pricing.[68]
- On May 31, 2013, West-Ward internal emails expressed concern about news stories reporting a shortage of Doxycycline Hyclate Regular Release (RR). While some employees on the chain thought West-Ward should explain the shortage, another ended the conversation by stating West-Ward should not risk public scrutiny by responding to the stories.[69]
- On May 16 and 17, internal Teva emails concerning a bid from Schnucks Markets indicated agreement not to respond to Schnucks' request for a bid on various doses of Pravastatin. Teva's Kevin Green's stated reason was, "There's a lot of market activity right now, and we need to stay put on our current market share."[70]
- On April 7, 2014, Rich Smith at Heritage affirmed that Heritage had the supply to meet a request for proposal from Meijer for Theophylline ER.[71] Nevertheless, on April 16, 2014, Heritage's Matt Edelson told Meijer supply issues prevented Heritage from bidding on the RFP.[72]
- A consultant to a U.S. Senate Special Committee on Pharmaceutical Pricing sent an email on April 24, 2014, to a Croatian distributor of Theophylline ER, about a 200% increase in the drug's price, who forwarded it to Rachel Yehezkel of Teva, asking her to respond to the consultant's inquiry. The email was forwarded to other Teva employees, one of whom said, "I don't have a great story."[73] Emails between Teva employees over the next two days showed how the Theophylline ER market was divvied up between Teva and other companies, and a

[67] PX 1613.
[68] PX 1611.
[69] PX 732.
[70] PX 1622.
[71] PX 975.
[72] PX 976.
[73] PX 986.

contrived excuse was to be given to the inquiry from the Senate Special Committee consultant.[74]

- In 2014, Jeffrey Malek of Heritage was instructed to tell a pharmaceutical distributor employer, Patrisha Cowley, false excuses— what Malek described as "a typical reason that Heritage used to explain price increases."[75] (The excuses are not described.) These were communicated by Sather to Crowley on June 26, 2014.[76]
- At an April 16, 2025, deposition, Jeffrey Glazer described conversations between Heritage and Mylan that ended in agreement for Mylan not to compete with Heritage for sales to CVS of Doxycycline Hyclate Delayed Release.[77]
- In late April 2014 Lannett increased its Ursodiol price 1500%, telling customers the price increase of an ingredient was to blame.[78] At the same time, internal emails showed Lannett had a five-month supply of inventory of the drug and the active ingredient in question.[79]

Next, to satisfy the third prong showing how aware they were, and how aware they should have been, of Defendants' conspiratorial activities, Humana cites examples of its diligent efforts to discover why prices were rising.

- As of August 13, 2013, Keith Dostal, a Humana pharmacist and a vice-president for supply chain strategies, did not know what "fair share " meant in the context of price increases for drugs.[80]
- In November, 2013, internal emails between Humana employees demonstrated investigation of the drug price increases. At that time, an industry publication attributed the increases to shortages of the drugs.[81]

[74] PX 1186.
[75] PX 110, pp. 1, 5;
[76] PX 983 at HER-AS-000067003, HER-AS-000067003.
[77] PX 28, pp. 42-48.
[78] PX 1612.
[79] PX 991; PX 992.
[80] PX 1754; PX 1734.
[81] PX 1733.

The publication, *Drug Channels- Expert Insights on Pharmaceutical Economics and the Drug Distribution System*, wrote:

> *Retail generic drugs usually get cheaper over time. But our exclusive analysis (below) shows that about one-third of generic drugs have gotten more expensive in the past twelve months. Even more surprising, a small number have skyrocketed. Twelve drugs' costs have increased by more than 2,000%.*
>
> *Drug shortages appear to be the primary culprit. Contrary to what some people believe, exploding generic costs are the one thing that can't be blamed on Obamacare.*
>
> *Pharmaceutical wholesalers have been the big winners. Some pharmacies have also benefited, but many are being squeezed by third-party payer reimbursements. My big questions: will continued price increases slow the pharmacy industry's race-to-the-bottom generic price war or make preferred network participation less appealing to pharmacies? Keep an eye on this trend.*

- On July 17, 2014, Dan Brais, Humana's Channel Strategy Leader, responded to internal questions about the price increases by indicating his research showed that ingredient shortages and quality issues limited supplies of drugs, causing all vendors of the drugs to increase prices.[82]
- William Flemming, a former President of Humana's pharmacy operations, testified in October 2025 that he heard of many definitions for the term "fair share." He also testified that Humana unsuccessfully tried to negotiate lower prices in return for large pharmaceutical orders.[83]

Defendants' examples of Humana's not responding to what they claim were obvious signs of price manipulation instead demonstrate additional attempts by Humana to learn the cause of the price increases. Defendants omitted pertinent excerpts from exhibits they say demonstrate Humana's lack of diligence in tracing the reasons for

[82] PX 1731.

[83] PX 1753.

the price increases.[84] Those omissions further buttress Humana's claim it acted with diligence. As noted above, the 2012 New York Times article Defendants cite quotes drug manufacturer spokesmen citing sundry market and material supply issues for price increases.[85] The August 15, 2013, email[86] that mentions "fair share pricing," when placed in context, demonstrates Humana's Mr. Dostal, given the information he possessed, offered several other reasons prices may have risen, and suggested several courses of action. This excerpt from that email shows an effort to investigate why prices were rising and devise ways to deal with them:

> ***Overview (Generic Price Increases):***
>
> *• Generic pharmaceutical industry pricing is primarily based upon supply-demand mechanics. However, generic pharmaceutical manufacturers utilize "fair share" market share methods to minimize competition, price erosion and maintain profitability. Generic manufacturers contractually require the ability to raise pricing or remove products from contract.*
>
> *• Generic manufacturers are feeling significant revenue pressure in 2013 due to (1) limited number of new generic product launches, (2) YOY customer competitive bid price erosion and (3) API & manufacturing cost increases.*
>
> *• Therefore, generic manufacturers are attempting to push through price increases where there is limited competition, quality/ supply issues by other manufacturers or raw material price inflation.*
>
> *• Current industry generic manufacturer contracts do not contain any price protection language in their agreements other than typically required 60-90 day notification process before price can change; price lock or inflation agreements typically come at a higher unit cost[.]*
>
> ***Mitigation:***

---

[84] See *supra*. at pp. 14-15.
[85] Doc. No. 476, Ex. 1.
[86] Doc. No. 476, Ex. 5, p. HUM-GEN-MDL-002711473-74

> *• Issue competitive pricing requests to other generic manufacturer ANDA holders actively manufacturing & selling the products.*
>
> *• Benchmarking pricing against wholesaler distribution price points to understand extent of price increase reach within industry.*
>
> *• Manufacturer discussions ongoing with impacted products, bundled product opportunities and may look to other products within generic portfolio for additional price relief[.]*
>
> *• If unable to mitigate cost of goods impacts, request MAC pricing increase[.]*
>
> *• Challenge our Humana contract template to limit or protect Humana from generic price increases and validate what language is industry leading thru industry consultant review process[.]*[87]

Defendants' citation to the September 3, 2013, slide presentation also fails to note it mentions several possible reasons prices were rising, including eroding customer bidding competition, API (active pharmaceutical ingredient) and manufacturing price increases, and industry consolidation while smaller manufacturers exited product lines to focus on core products. The presentation lists no less than ten mitigation proposals.[88]

Defendants ask that this Court not consider investigative reports Humana cites from the United States Postal Inspection Service and the Federal Bureau of Investigation[89] to support Humana's claim that those witnesses will support claims of collusion between Defendants in price fixing and market allocation.[90] While the

---

[87] Doc. No. 476, Ex. 5, p. HUM-GEN-MDL-002711473

[88] Doc. No. 476, Ex. 7, slides 2 and 5.

[89] *See e.g.*, PX 76, PX 86, PX 87, and PX 90, *supra.*

[90] Doc. No. 649, pp. 10-11.

reports themselves are likely inadmissible at trial, in this Circuit, they can be considered at summary judgment. "The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial. The proponent need only "explain the admissible form that is anticipated."[91] This Court will therefore consider the investigative reports cited in this memorandum because they contain statements admissible, depending on how they are offered as direct evidence from the declarant or as an exception to the hearsay rule.

Humana said that it did not learn of the "full existence and scope of the price fixing conspiracy" until the March 2, 2016, filing of the EPP class action complaint.[92] Indeed, Defendants point to no instance where they encouraged anyone to do anything but fully accept their excuses for the price increases. Defendants also do not quarrel with the authenticity or completeness of any particular Humana exhibit. It is common experience that prices for many products in a general category like generic pharmaceuticals can suddenly rise in unison. As this memorandum is published, many news stories report this is occurring in the market for all sophisticated computer memory chips and in grocery products. This does not and should not automatically

[91] *Fraternal Order of Police, Lodge 1 v. City of* Camden, 842 F.3d 231, 238 (3d Cir. 2016) (citations omitted) (overruling district court ruling that plaintiffs' accounts of statements made by police officers concerning retaliation could be considered at summary judgment). *See also, J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (in antitrust action, buyer's affidavit that recounted complaints about prices from salespersons could be considered at summary judgment because the statements were reducible to admissible evidence at trial).
[92] Doc No. 579, p. 20.

give rise to conspiracy theories that the vendors are engaged in anticompetitive activities. The filing of a class action or a government administrative complaint can be the event that first alerts a plaintiff that vendors' sensible explanations for price rises may be less than truthful and instead the result of illegality, triggering the need for any victims to contemplate litigation for acts that have been occurring for years. In *Isaak v. Trumbull S&L Co.*,[93] concerned plaintiffs waited until the conclusion of bankruptcy proceedings to sue an owner who looted campgrounds in which the plaintiffs had an interest. Aside from other signs they were being defrauded, the most obvious, the initiation of the bankruptcy proceedings five years later (and one year past the RICO statute of limitations) was, the court ruled, the notice to the plaintiffs to the need to file suit.[94] A similar, official record of a defendant's wrongdoing was the starting gun in *In re NAHC.*[95] In this securities fraud litigation, the Third Circuit ruled that plaintiffs, shareholders in a healthcare company, were put on inquiry notice not by regular statements they received from the defendants, but the defendants' filing of a government securities form (Form 8-K) that showed the defendants' prior representations as to the value of its business were likely false. *Plumbers Loc. Union No. 690 Health Plan v. Apotex Corp.*,[96] found that no later than the date a union health plan agreed to participate in a class action against other drug wholesalers regarding pricing

[93] 169 F.3d 390, 399 (6th Cir. 1999).
[94] *Id.*
[95] 306 F.3d 1314, 1326 (3d Cir. 2002).
[96] 2017 U.S. Dist. LEXIS 156444, *29, n.12 (E.D. Pa. 2017).

practices, it knew the defendants also engaged in similar pricing practices, and therefore it could not claim they exercised reasonable diligence prior to filing another suit years later when the statute of limitations. In all three cases, the plaintiffs saw signs that the defendants may have engaged in tortious behavior, but the alarm bell was the initiation of some official action— a lawsuit or an admission on a government filing—to trigger the statute of limitations clock.

A 2020 lawsuit filed by the states in this MDL in the District of Connecticut, four years after their first generic drugs lawsuit, is another example of how another party's lawsuit gives notice that a claim must be pursued. In that case, the Plaintiff states were found to have successfully alleged at summary judgment that they were victims of fraudulent concealment by some manufacturers of generic dermatological drugs for several years, allowing the states to make claims farther back than the statute of limitations, or in the case of the states' Clayton Act claims, the usual four-year period a laches determination would usually allow. Despite having already filed two lawsuits regarding generic drugs, the states demonstrated that, because of the defendants' concealment and misrepresentation of their activities, they[97] did not have inquiry notice of their claims concerning the dermatological drugs until investigative subpoenas yielded records of an overarching conspiracy. Misleading and false statements to customers, evidence of avoidance of committing incriminating

[97] *Connecticut v. Sandoz, Inc.*, 2025 U.S. LEXIS 214944 *67-*68 (D. Conn. 2025).

information to writing, and the use of code words all were part of the concealment, as they are in this case.[98] Denying summary judgment on statute of limitations grounds, that Court ruled that the issue of when the states were on notice of their claim was going to be placed before the jury.[99]

For the purpose of summary judgment, Humana has shown that it exercised due diligence in pursuing the suspicious increases of drugs it observed in 2013. After observing several price hikes, it developed strategies to confront the problem and followed trade publications reporting on it. Companies are not required to assume the worst of vendors who increase their prices, especially when vendors tell the public and their customers that their costs have risen or prices will fall soon. Humana has raised a genuine, substantive dispute of fact as to whether the Defendants schemed to conceal agreements between them to control the price and supply of generic drugs, and whether before August 3, 2014, that scheme prevented Humana from learning, as opposed to speculating, that the high prices it paid resulted from those conspiracies. The issue of when Humana was on notice it had Sherman Act claims concerning both Theophylline and the overarching conspiracy is for a jury to decide.[100]

---

[98] *Id.* at *67-*78.
[99] *Id.* at *81.
[100] *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999) (issue of whether Sherman Act claims were tolled due to fraudulent concealment should be placed before a jury. *Accord Knopick v. Connelly*, 639 F.3d 600, 611 (3d Cir 2011) (under Pennsylvania law, when plaintiff should have known that his lawyer's failure to call a witness at trial was malpractice was a jury question).

## IV. CONCLUSION

WHEREFORE, for all of the foregoing reasons, Defendants' motion for partial summary judgment as to Counts 91 and 106 of the Second Amended Complaint is DENIED.

**BY THE COURT:**

**/s/ Hon. Cynthia M. Rufe**

**CYNTHIA M. RUFE, J.**